UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

BRIAN ASHWORTH,

Plaintiff,

v.

5:26-CV-0370
(MAD/ML)

ONONDAGA COUNTY PROBATION;
PAUL HELFELD; and TODD GUERIN,

Defendants.

---

APPEARANCES:

OF COUNSEL:

BRIAN ASHWORTH
Plaintiff, *Pro Se*
8266 Kirkville Road
Kirkville, New York 13082

MIROSLAV LOVRIC, United States Magistrate Judge

**ORDER and REPORT-RECOMMENDATION**

Plaintiff Brian Ashworth ("Plaintiff") commenced this *pro se* action against Defendants Onondaga County Probation Department, Paul Helfeld, and Todd Guerin (collectively "Defendants") alleging violations of his civil rights. (Dkt. No. 1.) Plaintiff did not pay the filing fee and seeks leave to proceed *in forma pauperis* ("IFP"). (Dkt. No. 2.) For the reasons set forth below, I (1) grant Plaintiff's IFP application, and (2) recommend that the Complaint be accepted in part for filing and dismissed in part.

## I. BACKGROUND

Construed as liberally[1] as possible, the Complaint alleges violations of Plaintiff's civil rights by Defendants. (*See generally* Dkt. No. 1.)

More specifically, Plaintiff alleges that on January 28, 2025, he was sentenced to probation for a three-year term. (Dkt. No. 1 at 3.)

Plaintiff alleges that after he was sentenced to probation, he met with Defendant Helfeld—a supervisor with Defendant Onondaga County Probation—and Defendant Helfeld stated that he does not know how Plaintiff was sentenced to probation because Plaintiff is not probation material. (Dkt. No. 1 at 3.) Plaintiff alleges that Defendant Helfeld stated that he would not accept Plaintiff on probation and instead would contact Plaintiff's attorney and the court. (*Id*.) Plaintiff alleges that Defendant Helfeld stated that he remembered Plaintiff from Plaintiff's experience on probation 20 years before and Defendant Helfeld "remember[ed] how that went and [Plaintiff is] still doing the same thing." (*Id*.)

Plaintiff alleges that he was accused of violating probation on the following five bases:

1. Plaintiff left Onondaga County and entered Madison County to pick up a prescription. (Dkt. No. 1 at 3.) Plaintiff alleges that he tried to contact his probation officer but did not receive a response back. (*Id*.)

2. Plaintiff was ordered to enter a treatment facility and he voluntarily admitted himself to Commonwealth Place for two days. (Dkt. No. 1 at 3.) Plaintiff alleges that he left inpatient treatment and entered outpatient treatment on March 13, 2025, at Syracuse Recovery Services where he was given a sublocade injection. (*Id*.)

---

[1] The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

3. Plaintiff was ordered not to operate a motor vehicle without permission but his father needed the driveway cleared of snow after a snowstorm. (*Id.*) Plaintiff alleges that he moved a vehicle 30 feet on his property without entering a public roadway. (*Id.*)

4. Plaintiff was given a urine drug screen on February 10, 2025, but was unable to provide the minimum sample size. (Dkt. No. 1 at 3.) Plaintiff was tested again on March 4, 2025, but again was unable to provide a suitable sample. (*Id.*) Plaintiff alleges that he asked if he could provide a mouth swab but his request was denied.

5. Plaintiff "had a 20 day stay order and 10 days to have interlock installed" but asserts that this violation is "null and void." (Dkt. No. 1 at 3.)

Plaintiff alleges that he turned himself into the Town of Clay court on a warrant and provided proof that he was engaged in treatment. (Dkt. No. 1 at 3.) Plaintiff alleges that on March 18, 2025, he was released on his own recognizance, the warrant was removed, and he was ordered to continue engaging with treatment and report to probation. (Dkt. No. 1 at 3-4.) Plaintiff alleges that on March 25, 2025, he reported to probation and Defendants Guerin and Helfeld informed Plaintiff that there was a warrant for violation of probation. (*Id.* at 4.) Plaintiff alleges that he "pleaded with them to verify" the warrant because it was vacated and removed but he was booked and incarcerated on a vacated warrant. (*Id.*)

Plaintiff alleges that on March 25, 2025, Defendants Helfeld and Guerin reported to the District Attorney that Plaintiff made threats "to the dwi team" but Plaintiff "has foil requested [his] booking video in which it shows no threat was ever made." (Dkt. No. 1 at 4.)

The Complaint alleges that on March 26, 2026, at 3 p.m., the judge contacted the jail and told "them to release Plaintiff" and Plaintiff was directed to report to probation. (*Id.*) Plaintiff alleges that on April 1, 2025, he reported to probation and Defendant Guerin stated "you have

court tonight and good luck [I] got a feeling we won[']t be seeing each other again." (*Id.*) Plaintiff alleges that Defendants Guerin and Helfeld then lied to Assistant District Attorney Pelosi by telling him that Plaintiff threatened them with the goal of revoking Plaintiff's probation and remanding him to custody. (*Id.*)

Plaintiff alleges that as a result of the lie told by Defendants Guerin and Helfeld, his probation was violated and he was incarcerated for 6 months and 22 days. (Dkt. No. 1 at 4.) Plaintiff asserts that he pleaded guilty to the probation violation that accused him of leaving the county when he traveled to pick up a prescription in Madison County. (*Id.*) Plaintiff asserts that the 6 months and 22 days incarceration combined with the 28 hours that he was incarcerated between March 25, 2025, and March 26, 2025, resulted in 4,876 hours of incarceration. (*Id.*)

Based on these factual allegations, Plaintiff asserts claims pursuant to the Fourth, Fifth, and Fourteenth Amendments and 42 U.S.C. § 1983. (Dkt. No. 1 at 5.) As relief, Plaintiff seeks monetary damages. (*Id.* at 6.)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1).[2] After reviewing Plaintiff's IFP application

[2] The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

(Dkt. No. 2), the Court finds that Plaintiff meets this standard.[3] Therefore, Plaintiff's application to proceed IFP is granted.[4]

## III. LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

---

[3] Plaintiff is reminded that proceeding IFP is always a privilege, not an unqualified right. Misuse of the IFP process by a litigant, such as repetitive filing of frivolous lawsuits, may result in the denial of a request to proceed IFP.

[4] Plaintiff is reminded that, although his IFP application has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV. ANALYSIS

### A. Claims Against Defendant Onondaga County Probation

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal . . . department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850 at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, C.J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of

Social Services are not amenable to suit and no claims lie directly against the Department.")), *rep't and rec. adopted*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.). Hence, Defendant Onondaga County Probation is not proper party amenable to suit. As a result, I recommend that Plaintiff's claims against Defendant Onondaga County Probation be dismissed.

To the extent that the Complaint is liberally construed as asserting claims against Onondaga County, I recommend that it be dismissed.

"[T]o hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Adams v. City of Syracuse*, 21-CV-0650, 2025 WL 2772081, at *28 (N.D.N.Y. Sept. 29, 2025) (Nardacci, J.) (internal brackets omitted) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)). A plaintiff can establish the existence of an official policy or custom through "(1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees." *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and brackets omitted).

The Complaint here essentially complains of two discrete incidents on March 25, 2025, and April 1, 2025, during which Plaintiff was allegedly treated improperly by employees of Onondaga County. (*See generally* Dkt. No. 1.) Plaintiff fails to assert facts plausibly suggesting a policy or custom, which would support municipal liability based on these facts. *See Flagg v. NYS Division of Parole*, 19-CV-0886, 2019 WL 5002215, at *5 (N.D.N.Y. Aug. 15, 2019)

(Baxter, M.J.) (citing *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a Monell claim."), *report and recommendation adopted*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019) (McAvoy, J.); *Wright v. City of Syracuse*, 10-CV-0661, 2014 WL 1293527, at *15 (N.D.N.Y. Mar. 31, 2014) (Suddaby, J.) ("Isolated acts of municipal employees are typically not sufficient to establish municipal liability."). In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of Onondaga County.

As a result, I recommend that any claims against Defendant Onondaga County Probation—or Onondaga County—be dismissed for failure to state a claim upon which relief may be granted.

In addition, to the extent that the Complaint asserts claims against Defendants Helfeld and Guerin in their official capacities, I recommend that those claims be dismissed for failure to state a claim upon which relief may be granted. *See Malay v. City of Syracuse*, 638 F. Supp. 2d 303, 311 (N.D.N.Y. 2009) (McCurn, J.) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)) (holding that "claims against a government employee in his official capacity are treated as a claim against the municipality.").

### B. Claims Against Defendants Helfeld and Guerin in Their Individual Capacities

#### 1. Fourth Amendment Claims

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on state and municipal officers such as Defendants

Helfeld and Guerin. *See Tsinberg v. City of New York*, 20-CV-0749, 2021 WL 1146942, at *10 (S.D.N.Y. Mar. 25, 2021) (citing *City of Ontario v. Quon*, 560 U.S. 746, 750 (2010)).

**a. False Imprisonment**

A claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)); *see also*, *e.g.*, *Kirby v. Abraham*, 24-CV-0522, 2024 WL 4906112, at *4 (N.D.N.Y. Oct. 25, 2024) (Dancks, M.J.), *report and recommendation adopted*, 2024 WL 4905131 (N.D.N.Y. Nov. 27, 2024) (Sannes, C.J.). "Such claims are one and the same because '[f]alse arrest and false imprisonment overlap; the former is a species of the latter.'" *Kirby*, 2024 WL 4906112, at *4 (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)) (additional citation omitted). "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant*, 101 F.3d at 852). Accordingly, to state a claim for false arrest and imprisonment, "a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). "An arrest is privileged if it is based on probable cause." *Kirby*, 2024 WL 4906112, at *5 (citing *Jenkins*, 478 F.3d at 84).

A claim for false arrest fails so long as "probable cause existed for *some* offense," regardless of "whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Grytsyk v. Morales,*

527 F. Supp. 3d 639, 647 (S.D.N.Y. 2021) (citing *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006)). "[A] conviction of the plaintiff following the arrest is viewed as establishing the existence of probable cause." *Boykins v. Lopez*, 21-CV-2831, 2022 WL 2307684, at *7 (S.D.N.Y. June 27, 2022) (citing *Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986)).

With respect to Plaintiff's incarceration from April 1, 2025, until on or about October 23, 2025, Plaintiff "fails plausibly to allege," or otherwise permit an inference of, "the lack of probable cause necessary to maintain" a false imprisonment claim. *Corsini v. Brodsky*, 731 F. App'x 15, 18 (2d Cir. 2018) (summary order) (citing *Jaegly*, 439 F.3d at 152). The Complaint appears to allege that Plaintiff was incarcerated beginning on April 1, 2025, after pleading guilty to a probation violation before Judge Germano. (Dkt. No. 1 at 4.) Plaintiff's admission to a probation violation established the existence of probable cause for his incarceration even if he was not found guilty of each individual probation violation he was initially charged with. *See Jaegly*, 439 F.3d at 154. Probable cause thus defeats Plaintiff's claim for false imprisonment from April 1, 2025, to October 23, 2025.

With respect to Plaintiff's incarceration from March 25, 2025, until March 26, 2025, I recommend that a response be required to Plaintiff's false imprisonment claim. "When an officer learns from a computer database . . . that a person is the subject of an outstanding arrest warrant, probable cause exists to arrest that person." *United States v. Miller*, 265 F. App'x 5, 7 (2d Cir. 2008). "Even if the arrest warrant in question later turns out to be invalid, an officer may still have probable cause to arrest the target of the warrant provided 'the arresting officers did not know, and had no reason to know, that the warrant had been vacated' or was otherwise invalid." *Morrison v. City of New York*, 14-CV-4508, 2019 WL 175121 at *6 (E.D.N.Y. Jan. 10, 2019) (quoting *United States v. Santa*, 180 F.3d 20, 27 (2d Cir. 1999)). In short, "probable cause

can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

Here, Plaintiff alleges that he informed Defendants Helfeld and Guerin that the warrant had been vacated and requested that they verify the warrant with the court before taking him into custody. Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment false imprisonment claim against Defendants Helfeld and Guerin in their individual capacities related to Plaintiff's incarceration for "28 hours" beginning on March 25, 2025.

**b. Malicious Prosecution**

To the extent that the Complaint is construed as alleging a malicious prosecution claim, I recommend that it be dismissed for failure to state a claim upon which relief may be granted.

"The elements of a [Section] 1983 malicious prosecution claim require that the plaintiff prove that (1) the defendant initiated a prosecution against the plaintiff, (2) the defendant lacked probable cause to believe the proceeding could succeed, (3) the defendant acted with malice, (4) the prosecution was terminated in plaintiff's favor, and (5) there was a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Wagner v. Hyra*, 518 F. Supp. 3d 613, 633 (N.D.N.Y. 2021) (Hurd, J.) (quoting *Bernshtein v. City of New York*, 496 F. App'x 140, 142 (2d Cir. 2012) (summary order)); *see also Rohman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000).

To establish the element of malice, the plaintiff must show "that the defendant . . . commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 572 (2d Cir. 1996) (citation omitted); *accord Fulton v. Robinson*, 289 F.3d 188, 198 (2d Cir. 2002). Malice may be inferred when probable cause is "totally lacking." *Pacicca v. Stead*, 456 F. App'x 9, 13 (2d Cir. 2011).

Plaintiff alleges that he admitted to a violation of his probation. (Dkt. No. 1 at 4.) "In doing so, Plaintiff struck a fatal blow to his malicious prosecution claim." *Young v. Lugo*, 18-CV-4216, 2026 WL 1978864, at *11 (E.D.N.Y. Feb. 6, 2026) (citing *LaRocco v. Jackson*, 10-CV-1651, 2012 WL 947554, at *3 (E.D.N.Y. Mar. 19, 2022) (noting plaintiff's malicious prosecution claim failed not only because plaintiff failed to show a lack of probable cause for the commencement of proceedings against him, but also because the guilty plea entered by plaintiff "preclude[d] a finding of termination of the proceedings in [his] favor.")), *report and recommendation adopted in part and rejected in part on other grounds*, 2026 WL 1662274 (E.D.N.Y. June 9, 2026).

As a result, I recommend that Plaintiff's malicious prosecution claim be dismissed for failure to state a claim upon which relief may be granted.

**2. Fifth Amendment Claim**

Plaintiff asserts an unspecified claim pursuant to the Fifth Amendment. Based on the allegations contained in the Complaint, the undersigned liberally construes that claim as a due process clause claim pursuant to the Fifth Amendment.

The Fifth Amendment due process clause applies only to the federal government, and not to state or municipal governments. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002)

("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law."). Here, the Complaint does not allege that any federal official violated Plaintiff's Fifth Amendment due process rights. As a result, I recommend that Plaintiff's Fifth Amendment due process claim be dismissed with prejudice. *See, e.g., Robinson v. Wright,* 21-CV-1098, 2022 WL 2663369, at *3 (N.D.N.Y. Jul. 11, 2022) (Lovric, M.J.) (dismissing the plaintiff's Fifth Amendment claims because no allegations made against any federal official), *report and recommendation adopted by*, 2022 WL 4356214 (N.D.N.Y. Sept. 19, 2022) (McAvoy, J.).

**3. Fourteenth Amendment Claim**

The Fourteenth Amendment's guarantee that no state shall "deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, entitles a person to "'be informed as to what [a law] commands or forbids.'" *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)). The Fourteenth Amendment's Due Process Clause protects procedural and substantive rights. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government.").

Upon review, I recommend that Plaintiff's due process claim be dismissed. Broadly construed, Plaintiff's Section 1983 claims involve a seizure of his person when he was allegedly unlawfully incarcerated.

Plaintiff's due process claim is duplicative of his false imprisonment claim. Where a plaintiff asserts due process and false arrest claims stemming from the same set of facts, the Second Circuit has held that the two claims "merge," such that the plaintiff's due process claim

is subsumed by the "false arrest" claim. *See Fernandez-Bravo v. Town of Manchester*, 711 F. App'x 5, 8 (2d Cir. 2017); *Maliha v. Faluotico*, 286 F. App'x 742, 744 (2d Cir. 2008); *see also Lozado v. Weilminster*, 92 F. Supp. 3d 76, 102 (E.D.N.Y. 2015) (holding that a plaintiff's procedural due process claim merges with his false arrest claim, the constitutional source of which is the Fourth Amendment).

As a result, I recommend that Plaintiff's due process claim be dismissed as duplicative and therefore merged with his false arrest/false imprisonment claim.

## V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[5]

---

[5] *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can

Although this Court has serious doubts about whether Plaintiff can amend the Complaint to assert actionable claims, given Plaintiff's *pro se* status and that this is Plaintiff's first pleading, out of an abundance of caution, I recommend that Plaintiff be granted leave to amend his pleading against Onondaga County.

Notwithstanding, I recommend that Plaintiff's claims (1) against Defendant Onondaga County Probation Department, (2) asserting a Due Process claim pursuant to the Fifth and Fourteenth Amendments related to his alleged unlawful incarceration, and (3) asserting a malicious prosecution claim pursuant to the Fourth Amendment, be denied without leave to amend because a better pleading cannot cure the deficiencies identified herein.

If Plaintiff chooses to file an amended complaint, he should note that in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

---

rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

PLAINTIFF IS ADVISED THAT HE SHOULD NOT SEEK TO FILE A MOTION TO AMEND HIS COMPLAINT UNTIL UNITED STATES DISTRICT JUDGE D'AGOSTINO RULES ON THIS COURT'S RECOMMENDATIONS WITH RESPECT TO PLAINTIFF'S COMPLAINT. ANY AMENDED COMPLAINT OR MOTION TO AMEND BEFORE JUDGE D'AGOSTINO'S DECISION WITH RESPECT TO THIS COURT'S RECOMMENDATIONS WILL BE STRICKEN AS PREMATURE AND WILL NOT BE CONSIDERED BY THE COURT. As noted below, however, Plaintiff may file objections to this Court's recommendations.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2), is **GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be (1) **ACCEPTED FOR FILING** to the extent that it asserts a claim of false imprisonment related to his incarceration for 28 hours beginning on March 25, 2025, against Defendants Helfeld and Guerin in their individual capacities; and (2) **DISMISSED WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND** with respect to (a) claims against Defendant Onondaga County Probation,[6] and (b) a denial of due process claim and a malicious prosecution claim against Defendants Helfeld and Guerin in their individual capacities; and it is further

---

6 However, I recommend that Plaintiff be permitted to amend his pleading to include allegations against Onondaga County if he desires.

**ORDERED** that the Clerk of the Court shall file a copy of this order and report-recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[7]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: September 10, 2026
Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[7] The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[8] If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Blue-Striped Flag
Appeal Filed by Adams v. City of Syracuse, 2nd Cir., October 17, 2025

2025 WL 2772081
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert ADAMS, Jr., Plaintiff,
v.
CITY OF SYRACUSE et al., Defendants.

5:21-cv-00650 (AMN/MJK)
|
Signed September 29, 2025

**Attorneys and Law Firms**

A. CABRAL BONNER, ESQ., CHARLES A. BONNER, ESQ., LAW OFFICES OF BONNER & BONNER, 3060 Kerner Boulevard – Suite A, San Rafael, California 94901, Attorneys for Plaintiff.

JESSE P. RYDER, ESQ., RYDER LAW FIRM, 6739 Myers Road, East Syracuse, New York 13257, Attorneys for Plaintiff.

DANIELLE R. SMITH, ESQ., TODD M. LONG, ESQ., CITY OF SYRACUSE, CORPORATION COUNSEL, 233 East Washington Street, Room 300 City Hall, Syracuse, New York 13202, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci, United States District Judge:

## I. INTRODUCTION

***1** On June 3, 2021, Robert Adams, Jr. ("Plaintiff"), commenced this civil rights action against Police Officers Joseph Tolone, [1] Aaron Cecile, and Lashonda Russell (the "Responding Officers"); Detectives Ryan Brimmer and Jeffrey Beauchine (the "Detectives" and together with the Responding Officers, the "Individual Defendants"); the City of Syracuse ("Defendant City," and, together with the Individual Defendants, "Defendants"); Does 1-100 (the "Doe Defendants"); and others, alleging violations of federal and state law arising from his arrest and subsequent monthslong detention during a since-dismissed criminal prosecution. Dkt. No. 1 ("Complaint").

Presently before the Court [2] is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Dkt. No. 77 ("Motion"), Plaintiff's opposition, Dkt. No. 85, and Defendants' reply in further support, Dkt. No. 90. For the reasons set forth below, the Motion is granted in part and denied in part.

## II. BACKGROUND [3]

### A. The Parties

Plaintiff is a black man who has lived in Syracuse for most of his life. *See, e.g.,* Dkt. No. 77-44 at 16:5-17:4. In May 2019, he was 55 years old, approximately 5'7" in height and 160 pounds in weight, and lived in an apartment building located at 941 James Street. Dkt. No. 90-1 at ¶ 515; Dkt. No. 77-23. At that time, Plaintiff's medical diagnoses included, *inter alia*, alcoholism, depression, and schizophrenia. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454.

Defendant City is a large municipality in New York State with a police department that employs the Individual Defendants. As of May 2019, Officer Cecile had been a patrol officer for approximately two years, Dkt. No. 77-47 at 21:24-22:15; Officer Russell had been a patrol officer for approximately three years, Dkt. No. 77-46 at 9:17-25; Officer Tolone had been a patrol officer for approximately three years, Dkt. No. 77-48 at 9:24-10:2; Detective Brimmer had been a detective for less than three years, Dkt. No. 77-49 at 12:11-13:8; and Detective Beauchine had been a detective for approximately nine years, Dkt. No. 77-51 at 16:21-17:17.

### B. Relevant Events

#### 1. May 1, 2016

Shortly after 7:30 p.m. on May 1, 2019, police (apparently including Officer Russell) and emergency medical services found Plaintiff intoxicated and lying on the side of a road in Syracuse. Dkt. No. 77-42 at 2, 50-51; Dkt. No. 77-46 at 104:15-25. Plaintiff was covered in feces and urine and reported drinking six to seven "Na[tt]y Daddy beverages," a brand of malt liquor. Dkt. No. 77-42 at 2, 51; Dkt. No. 77-43 at 49:11-13. Plaintiff was transported to a local hospital emergency room for treatment, where his blood alcohol level ("BAC") was measured at 0.422 percent later that night. [4] Dkt. No. 77-55 at ¶ 311; Dkt. No. 77-42 at 25.

**2. May 6, 2016**

**a. 941 James Street**

***2** At around 3:00 p.m. on May 6, 2019, Plaintiff began drinking in and in front of his apartment building at 941 James Street. Dkt. No. 77-55 at ¶¶ 407, 410. By 4:00 or 5:00 p.m., he had consumed three or four 24-ounce cans of Natty Daddy. *Id.* at ¶ 411. Around that time, a younger man, Charles Jones, came over to socialize with Plaintiff. *Id.* The two had known each for several years and, while they were not actually related, Plaintiff referred to Mr. Jones as his nephew and Mr. Jones called Plaintiff uncle. Dkt. No. 77-43 at 71:8-15; Dkt. No. 77-44 at 59:1-7, 98:16-23. Plaintiff and Mr. Jones walked to a store to purchase four of five more 24-ounce cans of Natty Daddy that they could share. Dkt. No. 77-55 at ¶¶ 414, 416. Plaintiff paid for the alcohol because Mr. Jones had no money. *Id.* at ¶ 415. The two returned to 941 James Street, where a woman (Vanessa Goldych) and an unnamed man were outside the building. *Id.* at ¶¶ 417, 419, 421-22, 424. Plaintiff continued drinking Natty Daddy and joined Mr. Jones, Ms. Goldych, and the unnamed man in front of 941 James Street. *Id.* at ¶¶ 419-20. At some point, Mr. Jones and the unnamed man got into a verbal altercation, which then turned physical. *Id.* at ¶¶ 421, 424.

**i. 911 call**

Shortly before 7:30 p.m., a young woman (Arianna Jordan Bailey) was walking down James Street with her siblings. *Id.* at ¶¶ 1, 339. At that time, Ms. Bailey observed the physical altercation between Mr. Jones and the unnamed man. *Id.* at ¶ 340. Mr. Jones swung a stick at the unnamed man; that man grabbed the stick and proceeded to knock Mr. Jones to the ground. *Id.* The unnamed man then discarded the stick, smashed Mr. Jones' cell phone on the ground, and took off running down the sidewalk. Dkt. No. 85-10 at 4. Mr. Jones was not moving and did not get up, and Plaintiff went to check on him. *Id.* at 5. Plaintiff asked Ms. Bailey to call 911. *Id.* At approximately 7:25 p.m., Ms. Bailey did so. Dkt. No. 77-55 at ¶ 1.

The roughly three and a half minute recording of that 911 call reflects that Ms. Bailey informed the dispatcher that two people had been fighting; one was unconscious on the ground; and "a big type log looking thing" had been involved as a weapon. *Id.* at ¶¶ 2-4; *see also* Dkt. No. 77-5. When the dispatcher asked whether the assailant was still there, Ms. Bailey said "no" and explained that "he got up out of here." Dkt. No. 77-55 at ¶ 5.

When the dispatcher asked for a description of the assailant, Ms. Bailey said "he was African-American" and she had "just seen him running off." *Id.* at ¶¶ 6-7. Ms. Bailey then switched to providing a description of Mr. Jones, whom she described as approximately 25 years old and 5'7". *Id.* at ¶¶ 8-9. When the dispatcher clarified that he needed the description of the assailant, Ms. Bailey stated that he was "kind of bigger, he's gotta be like 6'3", like medium build[.]" *Id.* at ¶ 10.

When the dispatcher asked what the assailant was wearing, Ms. Bailey said "a green lookin' sweatsuit thing" and then explained that "officers [a]re right here on site and I'm just gonna tell them what happened." *Id.* at ¶¶ 10-11. Ms. Bailey can then be heard saying "he got in a fight with somebody, the other dude ran off but he got knocked out... he was, he was hit too in the whole altercation, you see that stick he was hit with that ... he was." *Id.* at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

**ii. Police response**

Officers Russell, Cecile, and Tolone were the officers who initially responded to 941 James Street between approximately 7:27 and 7:28 p.m. *Id.* at ¶¶ 14-15. The 911 call notes indicated "2 PEOPLE FIGHTING – ONE PERSON NOW UNC[ONSCIOUS] ON THE GROUND – COMPL[AINANT] SAW A VERY LG STICK." Dkt. No. 77-4 at 3; Dkt. No. 77-55 at ¶¶ 16-17. The 911 call notes also reported that the assailant was " 'a black male,' 25-35 years old, six feet 3 inches, last seen wearing a green sweat[suit]." Dkt. No. 90-1 at ¶ 18. Soon after 7:30 p.m., four other officers arrived at the scene. *See, e.g.,* Dkt. No. 77-4 at 1-2.

After arriving, each of the Responding Officers activated and de-activated their body worn cameras ("BWC") at different times. *See* Dkt. Nos. 77-15, 77-16, 77-17. Officer Russell's BWC footage initially shows her standing over Mr. Jones, next to Plaintiff (who is also on the ground) and Ms. Bailey, as Officer Cecile exits his police vehicle and walks over. Dkt. No. 77-16 at 0:00. Ms. Bailey, who was still on the phone with 911 at this time, is visible pointing down at Mr. Jones and saying "he got into a fight with somebody" and "the other dude run off." *Id.*; Dkt. No. 77-55 at ¶ 21. Plaintiff says words to the same effect. Dkt. No. 77-16 at 0:00.

***3** Officer Russell proceeded to ask Plaintiff, who had some blood on his lip, "what happened to you, why you bleeding?" Dkt. No. 77-55 at ¶ 29. Ms. Bailey explained "he was hit too" and "you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; Dkt. No. 77-16 at 0:05. Ms. Bailey subsequently slowly

walked down the sidewalk, as Officer Tolone walked past her to join Officers Russell and Cecile by Mr. Jones. Dkt. No. 77-16 at 0:15; Dkt. No. 77-55 at ¶ 32. Officer Tolone tended to Mr. Jones, who remained unconscious, with labored, gasping breaths and blood coming from the left side of his head. Dkt. No. 77-55 at ¶¶ 40-42.

Plaintiff remained near the Responding Officers during this time. *See generally* Dkt. Nos. 77-16, 77-17. In response to Officer Cecile's question about who had hit Mr. Jones, Plaintiff said "some motherfucker." Dkt. No. 77-16 at 1:10. In response to Officer Russell's question about what that person looked like, Plaintiff pointed down James Street and said it was a "black guy" whom he did not know. Dkt. No. 77-16 at 1:15. Following further questions, Plaintiff stated words to the effect of "y'all acting like we did something wrong." *Id.* at 1:58. Officer Russell responded "no, no, we just trying to get that information, so that way we can put out a point of information regarding the guy who did it." *Id.* at 2:03. Officer Russell again asked about Plaintiff's lip; Plaintiff responded that it was "a long story" and unrelated to Mr. Jones. *Id.* at 2:28. In response to Officer Russell's question, Plaintiff confirmed that he, Mr. Jones, and Ms. Goldych had been drinking with a fourth person. *Id.* at 2:54. Plaintiff also stated that the fourth person hit Mr. Jones, and that this person's name was "Pete." *Id.* Officer Russell then confirmed this version of events with Ms. Goldych. *Id.* at 3:00. In response to further questioning from Officer Russell, Plaintiff provided his name, address, and birthdate. *Id.* at 3:47, 4:10. Plaintiff again stated words to the effect "y'all acting like we done something," to which Officer Russell responded "no, we just need your info so that way you can help us, that's all." *Id.* Soon after, Officer Russell again asked "were you two fighting each other," to which Plaintiff responded "no." *Id.* at 5:45.

Approximately thirty seconds later, at 7:34 p.m., Officer Tolone directed Plaintiff to stand up and turn around, quickly patted him down, and informed Ms. Goldych "you're gonna get detained too dear." Dkt. No. 77-17 at 4:34. Officer Tolone then told Plaintiff "you're being detained right now" and placed Plaintiff in handcuffs. *Id.* at 4:53. Officer Tolone walked Plaintiff over to a police vehicle and said "stand right here; don't move," before unlocking the vehicle and directing Plaintiff into the backseat. *Id.* at 5:10.

The Responding Officers proceeded to put up police tape around the scene. *See, e.g.,* Dkt. No. 77-16 at 7:43. At approximately 7:38 p.m., Officer Russell remarked to Officers Tolone and Cecile that "we don't have anything to put out a point for, except for it was a black man." *Id.* at 9:54. Officer Tolone responded, "it's the guy we have in the car, I can almost guarantee it," Dkt. No. 77-17 at 8:27, and Officer Cecile agreed, saying "it's definitely him." [5] Dkt. No. 77-15 at 1:41.

At approximately 7:39 p.m., Officer Tolone asked various officers "have we started a canvas yet guys?" Dkt. No. 77-17 at 9:54. Officer Russell responded "yeah, we'll do that right now. I wish we would have got those people that were ..." and gestured down the sidewalk in the direction Ms. Bailey and her siblings had walked. Dkt. No. 77-16 at 11:27. At approximately 7:40 p.m., the Responding Officers spoke with two non-party officers who arrived after they did. *See, e.g.,* Dkt. No. 77-17 at 10:14. One of the non-party officers asked "what's up with the guy with the busted lip," to which Officer Tolone responded "yeah, I'm thinking that's gonna, like you said, that's gonna be our guy." *Id.*

***4** At approximately 7:41 p.m., Officer Cecile called the Criminal Investigations Division of the Syracuse Police Department ("CID"). Dkt. No. 77-15 at 4:55. Officer Cecile reported that "we've got possible suspects, I don't know, they're totally drunk, I don't know if someone wants to show up down here or not." *Id.* at 5:35. During the course of this call, Officer Cecile asked Officer Russell for the name of "the guy, the suspect ... the guy that we got detained right now," and then provided Plaintiff's name as "the possible suspect." *Id.* at 8:19.

At approximately 7:45 p.m., Officer Russell asked Officer Tolone, "did anyone contact those people back," Dkt. No. 77-16 at 17:21, presumably again in reference to Ms. Bailey and her siblings, to which Officer Tolone responded that he tried but they did not want to meet, Dkt. No. 77-17 at 15:51. Officers Tolone and Russell then canvased the area for additional eyewitnesses, without success. *See, e.g.,* Dkt. No. 77-55 at ¶ 76; Dkt. No. 77-17 at 18:30.

At approximately 7:47 p.m., seemingly while on hold with CID, Officer Cecile stated to other officers on the scene that "I'm just going to call back the [911] caller, because they obviously saw it, and see if they want to talk and give us the, uh, a statement of what happened, once I'm done with CID." Dkt. No. 77-15 at 10:57. After the call with CID resumed, Officer Cecile reiterated to the person with whom he was speaking that "he's totally, he's totally wasted, so how much that would do, I don't know" before saying words to the effect that he would "try and give the [911 caller] a call" and "see

if she witnessed who did it ... and maybe she'll give us a statement." *Id.* at 12:39.

At approximately 7:50 p.m., Officer Cecile again informed one of the other officers at the scene that he was going to contact the 911 caller "to see if they could give us a statement since they're all wasted, and then, you know, to [see] who hit him with it, because obviously they saw the whole thing." *Id.* at 14:16. Officer Cecile then spoke with Ms. Bailey and asked if she could provide "an ID of who the suspect is, because right now all we've got is three people that are intoxicated, nobody's owning up to hit, hitting this, uh, gentlemen with a stick." *Id.* at 14:50. Officer Cecile went on to ask "do you remember what the, uh, what the guy that hit him with a stick was wearing," before repeating "a green shirt." *Id.* at 16:01. Officer Cecile then clarified "the guy that got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?" *Id.* at 16:43. After the call ended, Officer Cecile shared with other officers on the scene that he had spoken with Ms. Bailey, and said that Mr. Bailey had said the assailant "was wearing a green shirt, he's got a green vest on," to which another officer responded "yeah, it's this guy," presumably in reference to Plaintiff. *Id.* at 17:20. Officer Cecile then tried to call Ms. Bailey again, and asked if she would come back to identify the person she had seen fighting with Mr. Jones. *Id.* at 18:30. Ms. Bailey did not agree to do so, in part because she had just "seen a fight, I don't want nobody looking for me or anything." *Id.* at 18:45.

While officers identified numerous video cameras that could contain footage of the incident, no such footage was retrieved. *See, e.g.,* Dkt. No. 77-16 at 24:15; Dkt. No. 77-55 at ¶¶ 86, 134, 316, 383-84.

Shortly before 8:00 p.m., Plaintiff was removed from the police vehicle to be photographed by a non-party officer. Dkt. No. 77-16 at 31:11; Dkt. No. 77-55 at ¶ 113. During this process, Officer Russell walked over and asked Plaintiff "you being good Robert" and "how'd that thing go the other day when you shit your pants?"[6] *Id.* at 31:22. Plaintiff appears to have mumbled that he "got drunk." *Id.* at 31:29. The non-party officer photographing Plaintiff directed him to ball his hands up behind his back. *Id.* at 31:38. After leaning down to examine Plaintiff's hands and knuckles—presumably for blood or injuries—this officer did not photograph them. *Id.*

***5** Plaintiff then exclaimed "I want to know what I did," to which Officer Russell responded "we're trying to figure that out too." *Id.* at 31:50. As the non-party officer placed Plaintiff back in the vehicle, Officer Russell asked Plaintiff "you nervous," to which he responded "yeah." *Id.* at 32:00.

**3. Criminal Investigations Division**

Officers Tolone and Cecile transported Plaintiff and Ms. Goldych from 941 James Street to CID. Dkt. No. 77-6 at 5. Officer Tolone placed Plaintiff in a holding room, where he remained detained for several hours. Dkt. No. 77-8 at 3.

At some point during the hours that Plaintiff was detained at CID, Detective Brimmer and a non-party detective appear to have traveled to 941 James Street to investigate the scene. *See* Dkt. Nos. 77-13, 77-19. Detective Brimmer's police report indicates that he also reviewed the 911 call notes at this time. Dkt. No. 77-19 at 2. The non-party detective assisting Detective Brimmer in canvassing the apartment building documented that one of the witnesses "stated that he did not know the men who drank in the parking lot, but stated that he observed three men and one woman drinking beer in the lot this afternoon." Dkt. No. 77-13 at 2. Once back at CID, Detective Brimmer tried to speak with Ms. Goldych, but determined that she "appeared extremely intoxicated" and "was unable to speak due to apparent intoxication."[7] Dkt. No. 77-19 at 2. Detective Brimmer's police report states that "[b]ased on the 911 caller[']s description of the incident" and Plaintiff's presence at the crime scene, "he was being considered a likely suspect." *Id.* at 3.

Once Detective Brimmer returned to CID, he and Detective Beauchine moved Plaintiff into a small interrogation room at approximately 10:30 p.m. Dkt. No. 77-55 at ¶ 141; Dkt. No. 77-21 at 0:00. Plaintiff remained in this room until he was placed back in handcuffs at approximately 1:00 a.m. *See generally* Dkt. No. 77-21. Shortly after 10:30 p.m., Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Plaintiff proceeded to speak with the Detectives. In response to Detective Brimmer's initial question about "[w]hat happened over there, man," Plaintiff stated "[w]ell, what happened -- my nephew got into it with some guy. You know, and - - you know, they was fighting and stuff, you know. And I'm drunk. You know what, hey, here I am. That's what happened." Dkt. No. 77-22 at 6:18-23.

***6** The parties dispute the extent of Plaintiff's intoxication during the approximately two and half hours that he remained in the interrogation room. Sometime after approximately 1:00 a.m. on May 7, 2019, when Plaintiff's booking process began, his BAC was measured at 0.15 percent, or nearly twice the

legal limit to operate a motor vehicle. Dkt. No. 77-24; *see also supra* n.4. According to one of Defendants' retained experts (Robert L. Weisman, D.O.), the physiological effects of such a BAC are that "[m]otor function, speech, and judgment are all severely affected at this height of blood alcohol. Staggering, and slurred speech, may be observed." [8] Dkt. No. 77-52 at 10.

Based on Dr. Weisman's review of numerous record materials and his examination of Plaintiff in June 2024, his expert psychiatric report contains several other findings that are relevant for purposes of summary judgment. *See generally id.* First, Dr. Weisman determined that—when sober—"Mr. Adams has deficits in his *Miranda* understanding, particularly regarding legally acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." *Id.* at 7, 9. Based on certain of Mr. Adams' test scores—again, when sober—Dr. Weisman also concluded that Plaintiff's "basic understanding of *Miranda*" ranked in the eighteenth percentile of pretrial defendants. *Id.* at 8-9. Defendants take the position in the Motion that "Dr. Weisman's opinions are unrebutted." Dkt. No. 77-56 at 20.

Beyond the extent of Plaintiff's intoxication, the parties also dispute the voluntariness and significance of various statements Plaintiff made during his interrogation by the Detectives. In sum, the Detectives refused to accept Plaintiff's version of events, and instead told Plaintiff that video evidence, forensic evidence, and numerous witnesses all established that he had fought Mr. Jones; Plaintiff just needed to provide the details. *See generally* Dkt. No. 77-22. For example:

Det. Beauchine: Okay. Hit the reset button. All right, okay.

Det. Brimmer: Why don't we start at the beginning and tell the truth?

Plaintiff: That's the truth.

Det. Brimmer: No.

Det. Beauchine: No, it's not. Listen, listen. It's not. We can do this over --

Plaintiff: Okay. Then you tell the truth, then. Okay?

Det. Beauchine: I don't need to tell the truth. You're the one that needs to --

Plaintiff: Well, well, I'm telling you what I -- I'm telling you what as far as I know.

Det. Brimmer: You were there. You were part of this.

Det. Beauchine: Yes.

Det. Brimmer: So you should --

Plaintiff: That's what I'm saying.

Det. Brimmer: -- you should know, then.

Plaintiff: Okay. That's what I'm saying. Okay, I'm trying to tell y'all what happened. You telling me I'm lying.

Det. Beauchine: Well, let me put it to you like this. Okay?

Plaintiff: Oh, man. That --

Det. Beauchine: We got several people saying that you, all right, got into an argument with this guy, and that you hit him with a stick. All right? Just hear me out. Hear me out. Okay? And that you hit him with a stick, and that you hit him so hard that he got knocked out and went to the ground.

Plaintiff: No.

Det. Beauchine: And so we're trying to verify whether or not you intentionally hit him --

***7** Plaintiff: No. No, no, no, no, no.

Det. Beauchine: -- because you're a predatory person who wants to go out there and hurt people and do bad things to people, or if this is just a family argument that went awry and --

Plaintiff: No.

Det. Beauchine: Okay.

Det. Brimmer: He ended up falling and hitting his head or something.

Det. Beauchine: Right. And that's exact --

Plaintiff: Oh, no.

Det. Beauchine: -- that's (indiscernible).

Plaintiff: No.

Det. Beauchine: Okay. That's what we're facing, so did -- was this something where you are a predator? You intentionally attack people with things --

Plaintiff: No.

Det. Beauchine: -- or whatever -- whatever you have available to you? Or is this just something that just --

Plaintiff: I don't hurt nobody.

Det. Beauchine: -- listen, listen. Or is this something where you, a couple guys are having a couple drinks and some shit is said, and it's a family matter and shit went south, and it was more of an accident than anything else, or are you intentionally going around doing stuff like this? This is --

Plaintiff: No.

Det. Beauchine: Okay. Which of the --

Plaintiff: No.

Det. Beauchine: -- which of the two is it?

Plaintiff: Nothing. Not one.

Det. Beauchine: No, no. Which -- no, no, no. I'm --

Plaintiff: I just happened to be there.

Det. Beauchine: You didn't just happen to be there. Okay?

Plaintiff: I didn't even hit the guy.

Det. Beauchine: Not with your hand.

Plaintiff: I hit nobody.

Det. Beauchine: You say not with your hands, because you're showing us your hands. We know that. All right? We know that.

Det. Brimmer: Listen, it was a mistake, and you didn't mean for him to get hurt like that, that's a big difference than if you go out there trying to hurt people.

Plaintiff: I ain't hit him.

Det. Brimmer: It's a huge difference.

Plaintiff: I didn't. Man, I swear to God I didn't. I didn't.

Det. Brimmer: It's a huge difference.

Plaintiff: I just happened to be there.

Det. Brimmer: No.

Plaintiff: I witnessed the thing.

Det. Brimmer: That story is not going to fly.

Det. Beauchine: Right. When people --

Det. Brimmer: It's not going to hold up.

Det. Beauchine: -- when people see the video and they talk to someone --

....

They're going to see you in a certain fashion. And that's without you saying anything, right? So if you give your side of the story, and give your thoughts, and what was going through your head at the time, listen, it puts people in your perspective and in your shoes. Now, it doesn't -- and here's what I would say. It --

Plaintiff: I didn't do nothing.

Det. Beauchine: Hold on, listen to me. It doesn't always make it right.

Plaintiff: I'm telling you. I didn't do this.

Det. Beauchine: People will understand if you put them in your shoes, and you can only do that by talking.

Plaintiff: I don't give a --

Det. Beauchine: By telling us.

Plaintiff: Well, I'm telling you.

Det. Beauchine: Yeah.

Plaintiff: I'm telling you how it happened. Okay? I didn't --

Det. Beauchine: Were you shooing him away with the stick, or did you mean to hurt him with the stick?

Plaintiff: No. No.

Det. Beauchine: What were you doing?

***8** Plaintiff: Wait a minute. You put -- you put words --

Det. Beauchine: No, no, no. I'm asking you. It's a question.

Det. Brimmer: We're trying to get to the --

Plaintiff: -- you're putting words in my mouth.

Det. Brimmer: -- we're trying to get to the bottom of this.

Plaintiff: I'm telling you. Charles was fighting this guy. Okay? Next thing I know --

Det. Beauchine: We're past that. We're past that. Alright? We're past that. We know.

Plaintiff: And --

Det. Beauchine: We're past that. All right? Listen, relax.

Det. Brimmer: Just help us understand.

Det. Beauchine: Help us understand what happened. All right? Between you and Charles.

Det. Brimmer: I mean, you got a wound on your face. That could be a defensive wound, you know. It could --

Plaintiff: No. I ran into a tree being drunk.

Det. Beauchine: Okay. So is it safe -- how often do you drink?

Plaintiff: Hmm? Every day.

Det. Beauchine: Okay. Could this be --

Plaintiff: All day. (laughs)

Det. Beauchine: -- could this -- listen, could this be a mistake between you and Charles --

Plaintiff: No.

Det. Beauchine: -- because you were intoxicated and --

Plaintiff: No, no, no no.

Det. Beauchine: -- he was intoxicated?

Plaintiff: No, no, no, no, no, no, no. No, no, no, no. Really, me and Charles ain't got no problem at all.

Det. Beauchine: Well, you did tonight.

Plaintiff: No. Hmm-mm.

Det. Beauchine: You did.

Plaintiff: No. No. No. Huh-uh.

Det. Beauchine: You might not want to think that you might have had a problem, but --

Plaintiff: No, man.

Det. Beauchine: -- you get -- you had a problem with him tonight.

Plaintiff: No.

Det. Beauchine: Or he had a problem with you, and you were defending yourself, tell us.

Plaintiff: No, no, no, no.

Det. Brimmer: Did he start talking about Vanessa and upset you?

Plaintiff: No.

Det. Brimmer: No?

Det. Beauchine: You had a problem with him tonight.

Plaintiff: Me and Vanessa had walked up. They happen to over sitting -- sitting down, drinking. And still we was drinking. Okay, next thing I know, they fighting. Really. Really, man. Period.

Det. Beauchine: Was this an accident or did you mean to hurt him?

Plaintiff: Man -- I didn't hurt him.

Det. Beauchine: You meant to hurt him?

Plaintiff: I never hurt him at all.

Det. Beauchine: It was an accident?

Plaintiff: Why do you -- why are you trying to put words in my mouth? Okay? Huh?

Det. Brimmer: We're not trying to. We just want to get to the bottom of this.

Plaintiff: Man, where -- well, where the bottom -- we're at the bottom of [sic]. I was telling you.

Det. Brimmer: We're just going in circles.

Plaintiff: I didn't do nothing. I was a witness. That don't -- this they got --

Det. Brimmer We're just going in circles here....

*Id.* at 51:2-59:19.

During the interrogation, Plaintiff's cellular phone rang. The Detectives instructed Plaintiff not to answer the phone, to turn it off, and to place it on the table. *Id.* at 27:6-20. At approximately 11:14 p.m., just prior to the first break taken during the interrogation, Detective Brimmer said that he was going to take Plaintiff's phone outside the room. *Id.* at 60:24-25; *see also* Dkt. No. 77-21b at 13:50. Plaintiff responded, "[m]an, give me my phone," to which Detective Brimmer replied "[n]o, it's going to sit out here." Dkt. No. 77-22 at 61:1-3. During this break, Plaintiff is visible talking to himself and unsuccessfully trying to open the interrogation room's door, which appears to have been deadbolted from the outside. Dkt. No. 77-21b at 14:00-17:00. Plaintiff subsequently informed the Detectives that he was not currently working because he had a "dual diagnosis" and that his psychiatrist, counselor, and primary care doctor were all at the same local healthcare provider. *Id.* at 102:16-103:16; *see also* United States v. Moran, 778 F.3d 942, 951 (11th Cir. 2015) ("[D]ual diagnosis patients are those suffering from both substance abuse *and* acute mental disorders.").

***9** Plaintiff contends that he denied assaulting Mr. Jones nearly 200 times before the Detectives coerced him into providing a false confession around midnight. Dkt. No. 85-2 at ¶¶ 570-71. During the subsequent break, Plaintiff can be heard saying "I'm going to jail for something I didn't do,"[9] Dkt. No. 77-21c at 8:49, and further talking to himself, *see, e.g., id.* at 9:10, 11:23.

Defendants contend that Plaintiff's eventual confession was not coerced and not false. Dkt. No. 77-56 at 9, 25. Presumably to support this position, Defendants requested that Dr. Weisman opine on Plaintiff's capacity during the May 2019 interrogation. Dkt. No. 77-52 at 11, 12. As relevant here, Defendants requested that Dr. Weisman determine whether Plaintiff had the "proper requisite intellectual capacity and base intelligence level" and the "proper requisite psychological state and mental health capacity" to have:

> ....
>
> (c) understood the significance and context of the questions being asked regarding the assault of Charles Jones; ...
>
> ....
>
> (f) understood [the] significance and context of his answers to those questions with respect to the assault of Charles Jones; ....
>
> (g) observed the events for which he was being questioned, illustrated the ability to recall those same observations, and provided answers based upon those observations and recollections (even if, under certain circumstances, Plaintiff was deceptive in his response); ....
>
> (h) [had] the ability (or exhibited the ability) to communicate his answers truthfully, effectively, clearly and coherently; ..... and
>
> (i) provided the answers of his own accord.

*Id.* at 11-12, 12-13. In response to every one of these items, Dr. Weisman concluded:

> Initially, yes, but towards the latter part of the ~1.5-hour interview, Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him.

*Id.* at 11-12, 12-13.

**4. Police Reports**

**a. Detective Brimmer**

According to the arrest report prepared by Detective Brimmer, he and Detective Beauchine arrested Plaintiff at 12:00 a.m. on May 7, 2019. Dkt. No. 77-23. The arrest report listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Appeared Normal." *Id.* The arrest report included criminal charges against Plaintiff. *Id.*

Detective Brimmer also prepared a police report regarding events on May 6 and 7, 2019, including his telephone conversation with Ms. Bailey. Dkt. No. 77-19. The parties dispute what was said during this conversation on May 7, 2019.

According to Detective Brimmer's report, Ms. Bailey corroborated certain key details of Plaintiff's confession during this conversation, including that the day before "she observed 2 unknown black males yelling at each other[;]"

"one male punched the other, and the one that got punched was hitting the other with a stick[;]" and "one of the subjects went down to the ground unresponsive and the other male was saying something about his nephew[.]" *Id.* at 3. Detective Brimmer also wrote that Ms. Bailey stated that "she called 911 but walked away prior to EMS and Police arrival." *Id.*

***10** According to a sworn affidavit provided by Ms. Bailey, she never said many of the statements Detective Brimmer attributed to her, including that she "never used the word 'punch' because I did not see either of the two individuals punching[;]" "never told Detective Brimmer that the man helping the victim was the who hit the victim. The person who hit the victim ran away. The victim was unresponsive and the older man told me the victim was his nephew. The older man asked me to call 911[;]" "never told Detective Brimmer that the older man was involved in this fight[;]" and "[t]he police arrived while I was on the phone with 911 and I spoke to a lady officer. I did not tell Detective Brimmer that I left before the police arrived." Dkt. No. 85-10 at ¶¶ 6-9. Ms. Bailey further stated that Detective Brimmer's report "contains false statements. I never told him that I witnessed anyone punching. I never told him that the older man who called the victim his nephew was involved in the fight. I never told him that I left before the police arrived." *Id.* at ¶ 10.

**b. Officer Cecile**

Officer Cecile's police report, dated May 6, 2019, listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Impaired Alcohol." Dkt. No. 77-6 at 2.

In the narrative portion of his report, Officer Cecile stated that "while in route, dispatch notes read that there was a fight in progress between two people with one person [ ] unconscious on the ground, the other person was wearing a green sweat suit and there is a very large stick involved." *Id.* at 5. With respect to Plaintiff's detention, Officer Cecile wrote "[b]ased on the notes from dispatch and lack of cooperation for Goldych and Adams, both were detained at this time." *Id.* As for his call with Ms. Bailey, Officer Cecile wrote:

> Bailey stated that she witnessed the fight between the victim and suspect ... Bailey stated that the suspect was an old black male wearing a green jump suit. Bailey stated that she saw the male in the jump suit dodge a punch from the victim and then swing the large stick at [t]he victim's head which connected and knocked him to the ground.

*Id.* As for Plaintiff's appearance, Officer Cecile described him as "an older black male in a grayish/teal puffy jacket and green pants[.]" *Id.*

**c. Officer Tolone**

Officer Tolone's police report, dated May 6, 2019, listed Plaintiff as 55 years old, provided no height or weight, and described his apparent condition as "Normal." Dkt. No. 77-8 at 4.

In the narrative portion of his report, Officer Tolone wrote that "[p]rior to our arrival dispatch advised us that our caller, Jordan Bailey who refused to speak with us regarding this incident, stated to the call taker that she saw two males fighting, one wearing a green jump suit, and then saw someone get struck with a stick and then saw the man on the ground." *Id.* at 2. With respect to Plaintiff's detention, Officer Tolone wrote that "Adams was detained at this time for suspicion that he was in deed [sic] the suspect in this incident however, when we initially arrived on scene Adams stated there was another male that started a fight with Jones." *Id.* As for Plaintiff's appearance, Officer Tolone wrote that "Adams, at the time contact was made, was wearing green pants and a grey / green vest." *Id.*

**d. Other Police Reports**

Officer Russell prepared a short report, also dated May 6, 2019, with a brief narrative that does not mention Ms. Bailey or Plaintiff, or Officer Russell's interactions with either of them. Dkt. No. 77-7 at 2.

Following Plaintiff's interrogation at CID, a non-party officer photographed Plaintiff in the interrogation room and collected his clothing early in the morning of May 7, 2019. Dkt. No. 77-10. This officer catalogued Plaintiff's clothing as consisting of a "Black winter coat[,]" "Grey pants with belt[,]" "Blue/green/white striped shirt[,]" "Blue Puma sneakers[,]" and a "Baseball Hat (Grey, green Bird Game logo)[.]" *Id.* at 3.

**5. Criminal Prosecution**

In the weeks after the events of May 6, 2019, Officer Cecile, Detective Brimmer, and Ms. Bailey testified before a grand jury in Onondaga County. Dkt. No. 77-25. The grand jury subsequently indicted Plaintiff[10] for (i) assault in the first degree in violation of N.Y. Penal Law § 120.10(1); (ii) assault in the second degree in violation of N.Y. Penal Law § 120.05(2); and (iii) criminal possession of a weapon in the third degree in violation of N.Y. Penal Law § 265.02(1). Dkt. No. 77-26 at 1. Plaintiff remained detained in jail pending trial. Dkt. No. 77-55 at ¶¶ 309, 382.

***11** Mr. Jones died in the hospital on August 18, 2019. Dkt. No. 85-15. A medical examiner ruled Mr. Jones' death a homicide as a result of complications from being struck in the head "with a large stick containing imbedded nails." *Id.* at 1, 2. After Mr. Jones' death, it appears that the criminal charges against Plaintiff could have been increased from assault to manslaughter.[11] Dkt. No. 77-55 at ¶¶ 372-74.

On August 19 and 20, 2019, ADA Michael Manfredi offered Plaintiff, through his court-appointed counsel, "a plea to Manslaughter in the first with a sentence of 12 years Determinate." Dkt. No. 77-28 at 2, 1. On October 8, 2019, ADA Manfredi reiterated to Plaintiff's court-appointed counsel that the "[o]ffer remains Man 1[st] with 12 years determinate." *Id.* at 1.

On January 9, 2020, Plaintiff's court-appointed counsel made a bail application on behalf on Plaintiff, in part on the basis that:

> We have had an opportunity to review much of the evidence against [Plaintiff] and the defense believes there is significant evidence that the People have the wrong man in jail. Despite what the People have presented as a "confession", the defense believes that the evidence will show that it is a psychologically coerced false confession. There is no indication there are any witnesses identifying him at the scene. In fact the opposite. The People's case is weak.

Dkt. No. 77-39 at ¶ 22.

Soon after, an investigator from the DA's Office contacted Ms. Bailey. Dkt. No. 77-34 at 1. On January 16, 2020, Ms. Bailey provided a voluntary affidavit that stated in relevant part:

> [Investigator Tim Galanaugh] asked if I would be willing to come down to his office and meet with Mr. Coolican, the prosecutor, and see if I would watch some video footage that they had. He also made me aware that the police had made an arrest of an individual the day of the [May 6, 2019] incident. I told him that I would be willing to come down and speak to them, and help in any way because I was unaware that the victim had died.
>
> Back in May, when everything had happened, I initially called 911 for a man that was trying to assist the victim. That man that I am speaking about was African American and told me that the victim was his nephew. I stayed on the scene with my siblings until the police officers arrived. I gave information to the 911 person telling them that the suspect that was responsible had run down James Street towards downtown. I told the dispatch person that the suspect was African American and over 6 foot tall and was wearing dark green. As the officers showed up they started talking to the older guy that was kneeling next to his nephew. They wanted him to step back from the victim. I told the female officer that he had nothing to do with it. There was a[ ]lot going on at the time and I didn't want to get more involved so I walked away with my siblings. At the time, I felt that I had cooperated enough by reporting it and I didn't want to involve myself or my siblings in what appeared to me at the time to be a fight between two guys that ended with one being knocked out with a stick. When the police officers contacted me 30 minutes or so later to see if I would come back to the scene to try to identify someone, I didn't want to get involved. I was scared that it would jeopardize my safety and my siblings['] safety so I told the police officers that I didn't want to do anymore than what I had done to help already.
>
> ***12** ....
>
> This is what I remember about the incident today: That I had been leaving Bryant and Stratton on James Street and observed two African American men that appeared to be about to fight. Me and my siblings w[ ]ere almost walking right through where this was occurring. The victim had a long branch in his hand and starts to run up on the suspect.

As the victim tries to swing on the suspect, the suspect grabs the stick and snatches the stick from the victim. The suspect then swings the stick at the victim with one hand towards his upper body. I couldn't tell where it connected or if he followed up with an elbow. All I seen is the victim stumble and drop to the ground. Suspect then tosses the stick. The suspect then goes to the pa[ ]nts pocket of the victim, takes a cell phone out and smashes it onto the pavement. Then the suspect takes off running down the sidewalk on James Street towards downtown.

I didn't see where the suspect had run to because I then focused my attention on the victim on the ground. That's the same time when I noticed the older man get off the stones by the Chestnut Apartments sign and walk over to his nephew to check on him. I remember telling him that he should help get him up off the ground. The victim wasn't moving and looked like he had been knocked out, but after a few moments of looking at him more closely I told the older man that he, the victim, didn't look so good. That[']s when the uncle asked me to call 911, so I did. I stayed with the uncle until the police arrived, but like I said, I walked off shortly after with my siblings because we didn't want to get more involved.

Today, at around 1045 AM, I met Mr. Coolican and Investigator Galanaugh at the D.A.'s Office. They had me watch some video footage from one of the officer's body cameras when they showed up at the scene. In the video I saw the victim on the ground and the African American man, who told me the victim was his nephew, kneeling next to him wearing a gray baseball hat. You can hear me talking in the video telling the female officer that the victim was hit with the stick.

I showed Mr. Coolican w[here] the victim's cell phone can be seen in the video laying on the pavement, smashed. I was told by Mr. Coolican and Investigator Galanaugh that the person that was arrested in this incident, was the man that told me that the victim was his nephew. The person that the police arrested was not the suspect that I saw fighting with the victim, and causing the victim to be hurt with the stick. I saw that suspect run from the scene after smashing the victim's phone on the ground.

*Id.* at 1-2; *see also* Dkt. No. 77-55 at ¶¶ 380-81.

Plaintiff was not released from jail until February 12, 2020, more than nine months after his arrest on May 6, 2019. Dkt. No. 77-55 at ¶ 382. The charges against Plaintiff were not dismissed until September 15, 2020. *Id.* at ¶ 404.

**a. Plaintiff's Capacity**

On February 13, 2020, the judge presiding over Plaintiff's criminal prosecution ordered Plaintiff's capacity evaluated pursuant to New York Criminal Procedure Law § 730. Dkt. No. 77-35 at 1 (stating that "the Court being of the opinion that the defendant may be an incapacitated person" an examination is ordered "to determine whether said defendant, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense").

***13** Two physicians subsequently examined Plaintiff and issued their reports on August 27, 2020. Dkt. No. 77-55 at ¶¶ 391-92, 395. As relevant here, the first physician concluded that "although suffering from Alcohol Use Disorder," Plaintiff "at the time of this evaluation, did not as a result of mental disease or defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 394. The second physician similarly concluded that Plaintiff "is not currently suffering from a mental illness which would cause him to lack the capacity to understand the proceedings against him or to assist his counsel in his own defense" and that Plaintiff, "at the time of this evaluation, did not as a result of mental disease o[r] defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 398.

**6. Additional Investigation by CID**

On January 29, 2020, prior to Plaintiff's release from jail, two non-party detectives returned to 941 James Street to obtain video footage of the incident that had occurred nearly nine months earlier. *Id.* at ¶ 383. Their investigation obtained no such footage, *id.* at ¶ 384, and determined that none of a dozen nearby businesses retained such footage for longer than three months, Dkt. No. 77-31 at 2. The two detectives also made efforts at this time to locate individuals previously mentioned by Plaintiff and Ms. Goldych, including "the 'Pete' mentioned in BWC [footage from the Responding Officers], but without success." Dkt. No. 77-55 at ¶¶ 385-86.

Forensic evidence recovered from items collected at 941 James Street—apparently including multiple drink containers as well as Mr. Jones' smashed phone—was linked to an individual whose first name is Pierre. Dkt. No. 85-1 at ¶ 56; Dkt. No. 85-4; Dkt. No. 85-14 at 9, 28; Dkt. No. 85-11 at 28. A

non-party detective testified during his deposition that "[w]e do have forensic evidence indicating that he may have been present at the time of the incident or in the hours preceding it." Dkt. No. 77-50 at 123:24-124:9.

A September 2020 internal memorandum from the Syracuse Police Department ("Memo") states that such evidence "strongly suggests, at a minimum, Pierre [ ] was onscene at some point that day [May 6, 2019], and drinking with the group" and notes that Pierre "is listed as much bigger than Adams ([ ] - 6'00", 220 lbs.), and closer resembles that of the suspect description initially provided to 911 by Jordan Bailey." Dkt. No. 85-11 at 28. When provided with the opportunity to speak with CID, Pierre apparently declined to do so. *Id.* Another internal document from the Syracuse Police Department indicates that while Pierre had been identified as "a person of interest," "there is no proof beyond a reasonable doubt suggesting [Pierre] is the primary suspect at this time." *Id.* at 7-8. The Memo notes that the investigation of Mr. Jones' death "will now be considered 'unsolved'." *Id.* at 30.

### C. Prior Proceedings

#### 1. Citizen Review Board

In April 2021, Plaintiff filed a complaint with Defendant City's Citizen Review Board in connection with his arrest and interrogation. Dkt. No. 85-11 at 14-21. The Syracuse Police Department's Internal Affairs Division assigned a sergeant to investigate Plaintiff's complaint and prepare a case report. *Id.* at 1-13 ("Report"). The sergeant's investigation included an interview with a deputy police chief. *Id.* at 8-9. The sergeant included the following information from that conversation in the Report:

> I addressed the complaints made by Mr. Adams of the false arrest as well as being interviewed while intoxicated. Deputy Chief [ ] was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state. Deputy Chief [ ] also informed me it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic state.... Therefore, the actions by [the D]etectives during that interview were lawful and proper.

***14** *Id.* at 9. The Report ultimately concluded that:

> Mr. Adams['] claim that he was arrested and charge[d] for a crime he did not commit is true. However, after reviewing this case and based on the evidence shown, there is no evidence to show wrong doing on behalf of any of the Syracuse Police Officers involved. The interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer. The basis for Mr. Adams being charged with this crime was due to his own admission and the lack of cooperation from the original eye witness. Therefore, this complaint is unsubstantiated.

*Id.* at 12.

In the course of reaching these conclusions, the sergeant also briefly spoke with the Detectives. *Id.* at 11-12. According to Detective Brimmer, "Mr. Adams did not appear excessively intoxicated during the interview" that began on May 6, 2019. *Id.* at 11. Detective Beauchine similarly "stated [that] he did not feel Mr. Adams was excessively intoxicated" during the interview. *Id.* at 12. Detective Brimmer also shared that "Mr. Adams would not have been under arrest without the confession." *Id.* at 11.

The sergeant, the sergeant's supervisor, a bureau chief, the first deputy chief, and the chief of police are all listed as March 2022 signatories to the Report. *Id.* at 13.

#### 2. New York Court of Claims

Plaintiff previously filed a notice of claim in the New York Court of Claims. Dkt. No. 63-1. Defendants examined Plaintiff on January 22, 2021. Dkt. No. 77-43.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**D. Procedural History**

Plaintiff commenced this action in June 2021. Dkt. No. 1. Defendants moved to dismiss the Complaint in July 2021. Dkt. No. 7. Plaintiff voluntarily dismissed his claims against one individual defendant and otherwise opposed the motion. Dkt. Nos. 9, 16.

In March 2022, United States Senior District Judge Lawrence E. Kahn partially granted and partially denied Defendants' motion to dismiss. Dkt. No. 19. Judge Kahn observed that "[i]f the facts alleged by Plaintiff are true, Plaintiff's detainment amounts to a substantial miscarriage of justice." *Id.* at 1. Judge Kahn dismissed Plaintiff's second, sixth, seventh, and ninth claims, as well as another individual defendant, and denied the balance of Defendants' motion. *Id.* at 1-18. Discovery proceeded, with the parties requesting and receiving numerous extensions. *See generally* Docket Sheet.

In January 2024, United States Magistrate Judge Mitchell J. Katz denied Plaintiff's motion to amend the Complaint to add two individual defendants, but granted Plaintiff's request to dismiss his claims against three other individual defendants. Dkt. No. 64.

The Motion was fully submitted in April 2025. Dkt. Nos. 77, 85, 90.

**E. Plaintiff's Claims**

Plaintiff's remaining claims,[12] *see* Dkt. No. 19, are as follows: pursuant to Section 1983, (i) false arrest against the Individual Defendants, Dkt. No. 1 at ¶¶ 41-47; (ii) malicious prosecution against Defendants, *id.* at ¶¶ 63-71; (iii) fabricated evidence against Defendants, *id.* at ¶¶ 72-80; (iv) a *Monell* claim against Defendant City, *id.* at ¶¶ 52-62; and, pursuant to New York law, (v) false arrest against Defendants, *id.* at ¶¶ 91-93; and (vi) negligent supervision, etc., against Defendants, *id.* at ¶¶ 97-100.

**III. STANDARD OF REVIEW**

***15** Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also* *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *accord* *Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *accord* *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia, Anderson*, 477 U.S. at 249-50, 106 S.Ct. 2505).

**IV. DISCUSSION**

The Court addresses the parties' specific arguments with respect to the remaining claims below. Given the disputed factual record as to many aspects of Plaintiff's claims, the Court finds it appropriate to reiterate the Second Circuit's guidance in another case involving Section 1983 claims for false arrest, malicious prosecution, fabricated evidence, and related *Monell* liability:

> We write because the district court improperly granted summary judgment to defendants. The record before us reveals evidence from

> which a jury could find that certain of the individual police officers prepared a false report and initiated a prosecution of plaintiff[ ] predicated on this manufactured evidence. We also write to emphasize a larger issue raised by this case. Plaintiff[ ] allege[s] that the defendant police officers lied and fabricated evidence. While we do not know whether the accusations can be sustained, we do know that such accusations must be carefully reviewed. Lying is wrong, and if the police lie while acting in their official capacity, they also violate the public trust. Courts must ensure that such serious accusations receive appropriate scrutiny lest our Court appears to endorse such official misconduct, which would weaken the public's respect for the administration of justice. In making these remarks, we emphasize that we have reached no conclusions about whether the plaintiff['s] accusations can be substantiated. It will be for a jury to determine at trial whether plaintiff[ ] ha[s] proved [his] very serious charges.

***16** *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 125 (2d Cir. 1997). While the Court addresses the parties' significant factual disputes in detail below, it similarly reaches no conclusions at this stage regarding whether Plaintiff will ultimately be able to prove his surviving claims.

**A. False Arrest under Section 1983 and New York law**

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures[,] is substantially the same as a claim for false arrest under New York law." *Alexander v. City of Syracuse*, 132 F.4th 129, 156 (2d Cir. 2025) (alteration in original) (quoting *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021)). And "[u]nder New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)). "Under both federal and New York state law, probable cause is a complete defense to a false arrest claim." *Carruthers v. Colton*, 153 F.4th 169, 179 (2d Cir. 2025) (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022)); *see also Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) ("[Plaintiff]'s unlawful arrest claim fails because his handcuffing was an 'investigatory detention' (otherwise known as a '*Terry* stop') that never ripened into an arrest and was supported by reasonable suspicion."). "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)).

As detailed earlier, after several minutes of questioning by numerous officers, Plaintiff was handcuffed and put into the back of a police vehicle in front of 941 James Street at approximately 7:34 p.m. on May 6, 2019. *See supra* Section II.B.2. Plaintiff was eventually transported to CID shortly after 8:00 p.m., where he remained detained until his custodial interrogation began at approximately 10:30 p.m. *See supra* Section II.B.3. Plaintiff was held in the interrogation room until approximately 1:00 a.m. on May 7, 2019, when he was placed back in handcuffs and his booking process began. *Id.* Plaintiff was then detained for more than nine months, until his eventual release on February 12, 2020. *See supra* Section II.B.5.

Plaintiff's opposition to the Motion does not challenge his detention and questioning by officers prior to being handcuffed at approximately 7:34 p.m.[13] *See, e.g.,* Dkt. No. 85 at 10; *see also* Dkt. No. 77-56 at 12-13. And Defendants only seek summary judgment on the portions of Plaintiff's false arrest claims that relate to his "pre-confession detainment" and "post-confession arrest," not his subsequent months-long detention. *Compare* Dkt. No. 77-56 at 12, *with* Dkt. No. 1 at ¶¶ 43, 92-93; *see also* Dkt. No. 7-2 at 13-14; Dkt. No. 19 at 9-10. The Court thus focuses its analysis on Plaintiff's detention at 941 James Street on May 6, 2019, his formal arrest at CID on May 7, 2019, and the five or so hours that he remained detained in between.

**1. Plaintiff's Detention at 941 James Street**

***17** Defendants first contend that Plaintiff's false arrest claims should fail because—although Plaintiff was handcuffed, placed in the back of a police vehicle, transported from his home to a police station approximately 30 minutes later, and detained for hours—he was not actually under arrest during this time. Instead, Defendants argue, the approximately five-hour seizure of Plaintiff prior to his formal arrest merely constituted an investigative stop and only required reasonable suspicion. Dkt. No. 77-56 at 13, 16 (stating that "only reasonable suspicion was required" to detain Plaintiff at 941 Adams Street and Defendants "had ample reasonable suspicion to detain Plaintiff"); *id.* at 17, 18 (stating that "Plaintiff's pre-confession detainment at CID was merely a continuation of his on-scene detainment" and "the detainment was supported by reasonable suspicion"); Dkt. No. 90 at 6 (stating that, as to Plaintiff's interrogation, "Defendants maintain that Plaintiff was being *detained* requiring only reasonable suspicion").

This is a particularly weak argument given applicable law and the facts of this case.[14] *See, e.g., United States v. Lefebvre*, 117 F.4th 471, 475 (2d Cir. 2024) ("There were several factors present during th[is] seizure that, in many situations, this Court would consider to be evidence that a seizure had indeed become a de facto arrest. [Plaintiff]'s 'freedom of movement was restrained' and 'handcuffs were used.' ... [T]he encounter lasted roughly 20 minutes.... [Plaintiff]'s transportation to a police station, instead of some of other reasonable third location, would in many situations clearly establish that the seizure had ripened into a de facto arrest.") (citations omitted) (collecting cases). The Court agrees with Plaintiff, Dkt. No. 85 at 8-9, that Defendants' maximalist position regarding their multi-hour detention of Plaintiff is unsupported by Fourth Amendment jurisprudence, *see, e.g., United States v. Candelario*, 486 F. App'x 907, 908 (2d Cir. 2012) ("It is well established that 'a police officer may *briefly detain* an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.' ") (emphasis added) (quoting *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008)). *See also Grice*, 873 F.3d at 167 ("In general, to determine whether a *Terry* stop is so intrusive as to become an arrest, we look to: [']the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.[']") (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)).

By approximately 7:34 p.m., Plaintiff had already been questioned for several minutes by multiple officers at the scene. *See supra* Section II.B.2.a.ii. Plaintiff had informed officers that he did not assault Mr. Jones (which Ms. Bailey had also said); that the person who assaulted Mr. Jones had run down James Street (which Ms. Bailey had said as well); that the assailant was a black man named "Pete" (which Ms. Goldych had also said); and that Plaintiff lived in one of the apartments at 941 James Street. *Id.* Defendants acknowledge that "the entire interaction was peaceful" prior to Plaintiff's handcuffing, Dkt. No. 77-56 at 15, and Officer Tolone testified that he did not feel his safety was at issue, Dkt. No. 90-1 at ¶ 510. Throughout this time, Plaintiff did not interfere with the investigation, continued answering questions from officers, and made no effort to leave the scene. *See supra* Section II.B.2.a.ii. Indeed, BWC footage shows Plaintiff sitting down and speaking with Officer Russell seconds before Officer Tolone directed him to stand up and turn around. Dkt. No. 77-17 at 4:34. Officer Tolone then handcuffed Plaintiff and informed Plaintiff that he was being detained. *Id.* Officer Tolone proceeded to place Plaintiff into the back of one of the multiple police vehicles parked in front of Plaintiff's home. *Id.* at 5:08.

***18** Given this factual record, a reasonable juror could conclude that Plaintiff was arrested at this time. *Grice*, 873 F.3d at 167. As the authority upon which Defendants rely, Dkt. No. 77-56 at 15, makes clear, "[h]andcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest," *Grice*, 873 F.3d at 167. *See also United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.") (collecting cases). Moreover, Defendants have failed to demonstrate the applicability of any of the "certain unusual circumstances" when "handcuffing a suspect to investigate a reasonable suspicion does not transform a *Terry* stop into an arrest." *Grice*, 873 F.3d at 168 (collecting cases); *see also* Dkt. No. 77-56 at 15-16. As just discussed, nothing in the record indicates concern about officer safety. The balance of Defendants' cursory arguments about why Plaintiff purportedly needed to be handcuffed and placed in the back of a police vehicle are unpersuasive. *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018) ("[T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

reasonably available to effect their legitimate investigative purposes.") (quoting *Newton*, 369 F.3d at 674).

**2. Probable Cause**

Defendants next argue that, regardless of when Plaintiff was arrested, they had probable cause to arrest him for assault [15] within moments of arriving at 941 James Street. Dkt. No. 77-56 at 12-18.

This argument is also unconvincing, again given applicable law and the facts of this case. "To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' " *Ashley*, 992 F.3d at 136 (quoting *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013)). The parties largely agree on the basic information known to the Responding Officers at the time Plaintiff was handcuffed: [16] the 911 call notes, Plaintiff's presence at the scene, and some blood on Plaintiff's lip. Dkt. No. 77-56 at 13-14; Dkt. No. 85 at 14-15. The parties dispute the factual contours of much of that information, however, as well as its legal significance.

Defendants' arguments regarding probable cause miss the forest for the trees. When evaluating probable cause, the Second Circuit has "consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' " *Washington v. Napolitano*, 29 F.4th 93, 107 (2d Cir. 2022) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). Defendants were repeatedly informed that the black man who assaulted Mr. Jones was no longer present at the scene. *See supra* Section II.B.2.a. Ms. Bailey told the 911 dispatcher that this third man had assaulted the victim and had run off, but that the victim and his uncle were still there. *Id.* The 911 call notes indicated that the suspect was "last seen wearing" a green sweatsuit. Dkt. No. 90-1 at ¶ 18. Ms. Bailey again told Officer Russell—as Officer Russell stood next to Plaintiff, possibly within earshot of Officer Cecile as he approached—that the assailant who hit Mr. Jones was someone other than Plaintiff and had run off. *See supra* Section II.B.2.a. Plaintiff separately told Responding Officers that the assailant had run off, that his name was Pete, and that he was a black man. *Id.* Ms. Goldych also indicated that the man's name was Pete. *Id.* Defendants simply ignore the existence of this third man, identified by multiple eyewitnesses at the scene (and subsequently confirmed by forensic evidence). *See* Dkt. No. 77-56 at 12-18; *see also* Dkt. No. 77-50 at 123:24-124:9; Dkt. No. 85-11 at 28.

***19** Instead, Defendants argue that Plaintiff "was the only individual on scene that matched Ms. Bailey's description." Dkt. No. 77-56 at 14. But a reasonable juror could readily conclude that Plaintiff did not match Ms. Bailey's description. As the parties agree, the 911 call notes described the assailant as 25 to 35 years old, 6'3" tall, with a "med[ium] build," and "black male." Dkt. No. 90-1 at ¶ 18; Dkt. No. 77-4 at 3. At the time, Plaintiff was 55 years old, 5'7" tall, and weighed approximately 160 pounds. *See, e.g.,* Dkt. No. 90-1 at ¶ 515. Defendants' own observations and descriptions of Plaintiff are consistent with these attributes. *See, e.g.,* Dkt. No. 77-6 at 2 (Officer Cecile's police report listing Plaintiff's age as 55, height as 5'7," and weight as 160); Dkt. No. 77-23 (Detective Brimmer's arrest report listing the same); Dkt. No. 77-8 at 4 (Officer Tolone's police report listing Plaintiff's age as 55); Dkt. No. 77-16 at 4:11 (Officer Russell's BWC footage showing her asking Plaintiff for his birthdate, prior to his arrest, and being told the date in 1964), 18:26 (Officer Russell's BWC footage showing her providing Plaintiff's birthdate to another officer); Dkt. No. 77-25 at 7:5-11 (Officer Cecile testifying that he thought Plaintiff was in his "[l]ate 50s or early 60s" "just going by looking at [him]").

The only portion of Plaintiff's physical attributes that "matched" Ms. Bailey's description of the suspect is that Plaintiff was also "a black male." Dkt. No. 90-1 at ¶ 18. A reasonable juror could conclude that this fails to provide reasonable suspicion to briefly detain Plaintiff, let alone probable cause to arrest him. *See, e.g., United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) ("As we have repeatedly said, 'race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.' ") (quoting *United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005)); *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018) ("As the Supreme Court has made abundantly clear, stopping and interrogating people based solely on race or ethnicity violates the Fourth Amendment.") (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-86, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)); *Dancy v. McGinley*, 843 F.3d 93, 109 (2d Cir. 2016) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure.") (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 334 (2d Cir. 2000)); *Jenkins*, 478 F.3d at 90 ("It has long been established, however, that when that description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist.") (collecting cases); *see also supra* n.13.

Defendants also claim that Plaintiff's clothing "matched" the description Ms. Bailey had provided, in that "his hat, shirt, and pants all appeared to be different shades of green." Dkt. No. 77-56 at 13-14. This characterization is unsupported by the BWC footage from the Responding Officers, which a reasonable juror could conclude shows Plaintiff wearing a grey hat, a white striped shirt, grey pants, and a puffy black patterned jacket, none matching. *See generally* Dkt. Nos. 77-15, 77-16, 77-17. Defendants' claim is also contradicted by the assessment from the non-party officer who cataloged Plaintiff's clothing as consisting of a "Baseball Hat (Grey, green Bird Game logo)[,]" "Blue/green/white striped shirt[,]" "Grey pants with belt[,]" and a "Black winter coat[.]" Dkt. No. 77-10 at 3. In any event, the varied articles of clothing Plaintiff wore on May 6, 2019 are not indisputably a "green sweatsuit," like Ms. Bailey had described. Dkt. No. 90-1 at ¶ 18. And Ms. Bailey never described the suspect wearing any hat at all, Dkt. No. 77-5, let alone a hat with prominent neon lettering, like the one Plaintiff had on his head when Officer Russell arrived, walked over to Plaintiff and Ms. Bailey, and began speaking with them, Dkt. No. 77-16 at 0:00. Given this factual record, Defendants have not established that Plaintiff's clothing "matched" the description of the suspect such that they are entitled to judgment as a matter of law.

***20** At best, Defendants' argument is that they had probable cause to arrest Plaintiff because some of his clothing may have had some green. The Court finds this argument unpersuasive given the Second Circuit's analysis in *Dancy v. McGinley*. In that Section 1983 case, police officers received a description of a robbery suspect as simply "[t]hin black male, brown jacket." 843 F.3d at 99. Minutes later, officers stopped, and ultimately arrested, two teenagers near the crime scene, one of whom was wearing a "camouflage-patterned coat, with green, light green, and brown patches." *Id.* at 100, 101. As relevant here, the panel reasoned that there was not even reasonable suspicion to stop this teenager, who "was indeed thin, black, and male. But, unlike the description, he was wearing a camouflage-patterned coat." *Id.* at 109. The Circuit went on to explain that "[w]hile such a discrepancy does not necessarily defeat a finding of reasonable suspicion ... the remaining description—thin, black, and male—is too vague in the circumstances here to justify a stop of anyone meeting it[.]" *Id.* (citations omitted) (collecting cases).

A reasonable juror could reach a similar conclusion here. Plaintiff's age, height, and build were nothing like the physical description Defendants received for the suspect. Further, Plaintiff's clothes, in color and type, did not constitute a "green sweatsuit," and thus did not provide Defendants reasonable suspicion to detain him, let alone probable cause to arrest him. *See Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) ("Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that the police arrested [plaintiff] based on little more than a witness's statement that he wore a similar shirt to that of one of [the victims'] attackers. Although a jury could also interpret the evidence differently, the record presents genuine issues of material fact that preclude the conclusion that there was probable cause as a matter of law and that, instead, require a trial on the merits."); *see also supra* n.13.

Defendants' argument regarding Plaintiff's presence at the scene fares no better. *See, e.g., United States v. Delossantos*, 536 F.3d 155, 160 n.4 (2d Cir. 2008) ("[A] person's presence at a crime scene or association with criminal suspects do not, without more, amount to probable cause to arrest."); *Dufort*, 874 F.3d at 350 ("Police do not have particularized probable cause to make an arrest simply because a suspect has suspicious acquaintances, or happens to be at the scene of a crime[.]") (citation omitted); *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) ("[A]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.") (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). Plaintiff was present in front of the apartment building where he lived and, as detailed earlier, Defendants were repeatedly informed that the assailant was another man who had already left the scene. *Mitchell v. City of New* York, 841 F.3d 72, 78 (2d Cir. 2016) ("[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.") (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1250 (1983)).

As to the blood on Plaintiff's lip, in response to Officer Russell's question, Ms. Bailey can be heard explaining that "he was hit too in the whole altercation, you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

In sum, the totality of the circumstances proffered by Defendants fails to establish an undisputed factual record on which to grant summary judgment. *Delossantos*, 536 F.3d at 161. A reasonable juror could find that Defendants lacked probable cause to arrest Plaintiff at approximately 7:34 p.m. on May 6, 2019.

**3. Subsequent Information**

Defendants go on to argue that, between handcuffing Plaintiff and formally arresting him approximately five hours later, they obtained additional information that provided them probable cause to arrest Plaintiff. Dkt. No. 77-56 at 15-21. Because a reasonable juror could conclude that Plaintiff had been arrested at approximately 7:34 p.m., however, this subsequent information is not relevant to analyzing probable cause. *See, e.g., Carruthers*, 153 F.4th at 179 ("To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' ") (quoting *Ashley*, 992 F.3d at 136); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("The inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.' ") (quoting *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)). Nonetheless, for the avoidance of doubt, a reasonable juror could conclude that none of the subsequent information identified by Defendants, in combination with the earlier information discussed above, provided probable cause to formally arrest Plaintiff at approximately 1:00 a.m. on May 7, 2019.

**a. Plaintiff's Continued Detention Prior to His Interrogation**

***21** Defendants first argue that the Responding Officers "performed many investigative tasks" after handcuffing Plaintiff at approximately 7:34 p.m., and that Detective Brimmer "performed several investigative tasks" prior to interrogating Plaintiff at approximately 10:30 p.m. Dkt. No. 77-56 at 15, 17.

With respect to the Responding Officers, however, the only additional information Defendants identify is Officer Cecile's subsequent call with Ms. Bailey. *Id.* at 15-16. During that call, Ms. Bailey appears to have again stated that the man who hit Mr. Jones was "wearing a green jump suit," Dkt. No. 77-55 at ¶ 100, and was "like 35 to 40" years old, Dkt. No. 77-15 at 16:43, not the "[l]ate 50s or early 60s" that Officer Cecile perceived Plaintiff to be, Dkt. No. 77-25 at 7:5-11. Such information is largely consistent with—and duplicative of—the information Responding Officers already had. *See supra* Section IV.A.2. Thus, a reasonable juror could conclude that Plaintiff still did not match the description that Ms. Bailey provided.

Defendants further contend that the Responding Officers undertook various investigative efforts at 941 James Street after handcuffing Plaintiff. Dkt. No. 77-56 at 15-16. But Defendants identify no relevant additional information from these efforts. *Id.* Instead, Defendants take the position that the Responding Officers had "ample" probable cause to arrest Plaintiff because "[a]t the conclusion of th[eir] investigation, nothing excluded Plaintiff as the assailant. In other words, no eye-witness exonerated Plaintiff ... and there was no available surveillance evidence." *Id.* at 16. Defendants cite no legal authority for the proposition that unless a person is "exonerated" by an eyewitness or video evidence at the scene of a crime, there is probable cause to arrest them. *Cf. Ricciuti*, 124 F.3d at 130 ("This argument—an ill-conceived attempt to erect a legal barricade to shield police officials from liability—is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society."). Defendants identify nothing from these investigative efforts that even suggested that Plaintiff had committed a crime. *Hawkins*, 37 F.4th at 858.

With respect to Detective Brimmer's investigation prior to Plaintiff's interrogation, Defendants similarly contend that Detective "Brimmer did not discover any evidence that suggested Plaintiff *was not* the assailant." Dkt. No. 77-56 at 17. More importantly, Defendants again fail to identify any additional information developed by Detective Brimmer that indicated Plaintiff *was* the assailant. *Id.* Moreover, a reasonable juror could conclude that the factual record belies Defendants' claim. The results of the canvas conducted by Detective Brimmer and his colleague further indicated that there had been three men drinking at the scene of the assault, not just Plaintiff and Mr. Jones, and thus further supported the possibility that Plaintiff was not the assailant. Dkt. No. 77-13 at 2; *see also* Dkt. No. 77-56 at 12.

**b. Plaintiff's Interrogation**

Defendants next argue that Plaintiff's statements during his interrogation by the Detectives provided probable cause for his arrest, and that "Plaintiff voluntarily waived his rights and was not coerced into a confession." Dkt. No. 77-56 at 18-21.[17]

***22** "Challenges to the voluntariness of a confession are based on two overlapping constitutional provisions: (1) due process protections under the Fifth (or Fourteenth)

Amendment, and (2) the Fifth Amendment privilege against self-incrimination." *United States v. Mendonca*, 88 F.4th 144, 163 (2d Cir. 2023) (citing *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)). "As a general matter, courts' descriptions of statements as 'compelled' (invoking the text of the Self-Incrimination Clause) and/or 'involuntary' (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously." *United States v. Allen*, 864 F.3d 63, 82 n.84 (2d Cir. 2017) (collecting cases). As a practical matter, courts "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citation omitted). "To be effective, a waiver of a defendant's *Miranda* rights must be both knowing and voluntary." *United States v. LaPorte*, 779 F. App'x 63, 65 (2d Cir. 2019) (citing *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011)). In the *Miranda* context, " 'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *Taylor*, 745 F.3d at 23 (quoting *Plugh*, 648 F.3d at 127). Even if a waiver is knowing and voluntary, courts "must nonetheless determine whether the [subsequent] inculpatory statements themselves were voluntary." *Id.* (citing *Dickerson*, 530 U.S. at 444, 120 S.Ct. 2326).

Defendants make various factual arguments as to why "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary." Dkt. No. 77-56 at 19-20. Given the present factual record, however, Defendants are not entitled to summary judgment on this issue.

As an initial matter, Defendants' own expert contradicts Defendants' position. *Id.* at 20. Dr. Weisman has repeatedly opined that, over the course of the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13.

Further, the parties agree that Plaintiff consumed in excess of one hundred ounces of malt liquor in the hours before his interrogation. Dkt. No. 77-55 at ¶¶ 410-11, 414, 420. Plaintiff stated "I'm drunk" shortly after the interrogation began, Dkt. No. 77-22 at 6:22, and repeatedly referenced his drunkenness thereafter, Dkt. No. 90-1 at ¶ 522. Nearly three hours after the interrogation began, Plaintiff's BAC, as measured by Defendants, was still almost twice the legal limit. Dkt. No. 77-24; *see also supra* n.4. Dr. Weisman opined that, even at this lower BAC, "[m]otor function, speech, and judgment are all severely affected" and that "[s]taggering, and slurred speech, may be observed." Dkt. No. 77-52 at 10. A reasonable juror could conclude that Plaintiff's body movements, speech, and demeanor during the videotaped interrogation demonstrate a significant level of intoxication, and also that they are consistent with Dr. Weisman's opinion. *See generally* Dkt. No. 77-21.

Defendants' suggestion that Plaintiff's mental health during the interrogation was not at issue because he did not share any hallucinations with the Detectives proves too much. Dkt. No. 77-56 at 20 ("[A]t no point during the interview did Plaintiff indicate that he was hearing voices.... Similarly, at no point during the interview did Plaintiff indicate that he could see things that the Defendant Detectives could not see."). Plaintiff's medical diagnoses at the time included schizophrenia, depression, and alcoholism. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454. During the interrogation, Plaintiff explained that he was not currently working because he had a dual diagnosis and that his primary care doctor, psychiatrist, and counselor were at the same local healthcare provider. Dkt. No. 77-22 at 102:16-103:16. As for Defendants' argument that Plaintiff was determined not to be incapacitated more than a year after the interrogation, that does little to establish the voluntariness of Plaintiff's waiver on May 6, 2019. Dkt. No. 77-55 at ¶¶ 390-98.

***23** Given this record, a reasonable juror could determine that Plaintiff's *Miranda* waiver was not voluntary.

Even if Defendants had established that Plaintiff's waiver was voluntary, they have not demonstrated that it was also knowing. *LaPorte*, 779 F. App'x at 65. Defendants do not appear to make any express arguments on this second requirement for waiver. *See, e.g.,* Dkt. No. 77-56 at 18 ("[A]s discussed below, Plaintiff voluntarily waived his rights and was not coerced into a confession."); *id.* at 25 ("[F]or the reasons stated above, Plaintiff voluntarily waived his *Miranda* rights and his confession was freely given."). In any event, Dr. Weisman's opinions also include his assessment that—when sober—Plaintiff's "basic understanding of *Miranda*" ranks in the eighteenth percentile of pretrial defendants and that Plaintiff "has deficits in his *Miranda* understanding, particularly regarding legally

acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." Dkt. No. 77-52 at 7, 8-9. Because "knowing" for purposes of *Miranda* means "made *with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it," a reasonable juror could find that Plaintiff's waiver was not knowing. *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382-83, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010)).

A reasonable juror could also find Plaintiff's subsequent confession, after extensive interrogation by the Detectives, involuntary for similar reasons. *See, e.g., Taylor*, 745 F.3d at 24 ("An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual.... It is clear, however, that when 'a person is unconscious or drugged or otherwise lacks capacity for conscious choice,' a confession cannot be voluntary.") (first citing *Colorado v. Connelly*, 479 U.S. 157, 164-65, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); then citing *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (*per curiam*); and then quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Again, Defendants' expert has repeatedly opined that, during the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13. The Court also notes that, prior to Plaintiff's confession, the Detectives removed Plaintiff's phone from his person and then from the room. Dkt. No. 77-22 at 27:6-20, 60:24-61:3. During the subsequent break, and prior to Plaintiff's confession, Plaintiff is visible in the video talking to himself and trying to open the locked door keeping him in the interrogation room. Dkt. No. 77-21b at 14:00-17:00; *cf. Poventud v. City of New York*, 750 F.3d 121, 145 & n.6 (2d Cir. 2014) (Lynch. J., concurring) ("[W]e know that false confessions have been obtained by pressures much less imposing than those to which [plaintiff] was subjected.") (collecting authorities).

***24** Because a reasonable juror could determine that Plaintiff's confession was involuntary, based in part on his intoxication, capacity, and the length and nature of his detention and interrogation, the Court finds Defendants' argument that the Detectives permissibly used "falsehoods" during the interrogation to be somewhat beside the point. Dkt. No. 90 at 7 (citing *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) ("The fact that the police misrepresented statements that [a witness] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.")); *see also United States v. Caraballo*, 282 F. App'x 910, 914 (2d Cir. 2008) ("We have held that '[w]hether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials.' ") (alteration in original) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

For all of these reasons, [18] the Motion is denied as to Plaintiff's federal and state claims for false arrest following his handcuffing at approximately 7:34 p.m. on May 6, 2019.

**B. Malicious Prosecution under Section 1983**

"To prevail on a malicious prosecution claim under New York law, a plaintiff must show '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding[,] and (4) actual malice.' " *Alexander*, 132 F.4th at 158 (alteration in original) (quoting *Kee*, 12 F.4th at 161-62). Section 1983 requires these same four elements, "but it also imposes an additional one: '(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.' " *Id.* (first quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); and then citing *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562, 144 S.Ct. 1745, 219 L.Ed.2d 262 (2024)).

Defendants challenge only the probable cause element of Plaintiff's Section 1983 claim for malicious prosecution. Defendants argue that this claim fails because (i) "the probable cause supporting Plaintiff's arrest was overwhelming;" (ii) "[t]hat probable cause only increased in the day following Plaintiff's arrest;" and (iii) the DA's Office sought and obtained Plaintiff's indictment. Dkt. No. 77-56 at 21-24.

Defendants' first argument is unpersuasive for the reasons detailed previously. *See supra* Section IV.A. Given the current record, a reasonable juror could find that Defendants did not have probable cause to either arrest or prosecute Plaintiff based on the events that transpired between approximately 7:30 p.m. on May 6, 2019, and 1:00 a.m. on May 7, 2019.

*See, e.g.*, *Walsh v. City of New York*, 742 F. App'x 557, 562 (2d Cir. 2018) (" 'Probable cause, in the context of a malicious prosecution, has ... been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.' ... Because a reasonable juror could believe that probable cause did not exist for [plaintiff]'s arrest, as noted above, we conclude that it follows that a reasonable juror could also believe that probable cause did not exist for [plaintiff]'s prosecution.") (first alteration in original) (citing *Stansbury*, 721 F.3d at 95). Summary judgment is thus not appropriate on this ground.

***25** Defendants' second argument relies on disputed facts that are also not appropriately resolved at summary judgment. Defendants contend that, later on May 7, 2019, Detective Brimmer received additional information from Ms. Bailey and Ms. Goldych. Dkt. No. 77-56 at 22-23. But, as detailed earlier, the parties dispute what Ms. Bailey actually said to Detective Brimmer. *See supra* Section II.B.4.a. Moreover, Ms. Bailey's sworn statement suggests that she provided significant exculpatory information to Detective Brimmer. *See, e.g.,* Dkt. No. 85-10 at ¶¶ 7-8, 10; *Napolitano*, 29 F.4th at 107 ("[W]e have also consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' ") (quoting *Panetta*, 460 F.3d at 395). Because there is a genuine dispute of material fact as to what information Ms. Bailey provided Detective Brimmer—including whether it was exculpatory—such information is not an appropriate basis on which to find the existence of probable cause as a matter of law. Nor is the information that Ms. Goldych apparently provided Detective Brimmer on May 7, 2019, during his third attempt to speak with her. Dkt. No. 77-19 at 2-3. Given Ms. Goldych's intoxication, memory, and the absence of a written statement from her, the information attributed to her does not establish probable cause entitling Defendants to judgment as a matter of law. *See supra* n.7.

Defendants' third argument rests on the presumption of probable cause created by a grand jury indictment. *See, e.g.,* *Werkheiser v. Cnty. of Broome*, 655 F. Supp. 3d 88, 103 (N.D.N.Y. 2023) ("[I]ndictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.") (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). The parties agree that such a presumption applies in this case, but dispute whether the factual record rebuts it. Dkt. No. 77-56 at 23; Dkt. No. 85 at 28-29.

A reasonable juror could conclude that the current factual record rebuts such a presumption. Not only was the prosecution against Plaintiff dismissed, senior prosecutors in the DA's Office have indicated that the basis for the prosecution was deeply flawed. Dkt. No. 85-7 at 1; Dkt. No. 85-11 at 9. A reasonable juror could find, for example, that Plaintiff's prosecution was initiated by (i) the arrest report charging Plaintiff that Detective Brimmer prepared; (ii) the allegedly false confession obtained by Detectives Brimmer and Beauchine, *see, e.g., Ekukpe v. Santiago*, 823 F. App'x 25, 32 (2d Cir. 2020) ("A jury 'may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors.' ") (quoting *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010)); *Dufort*, 874 F.3d at 353 ("The 'initiation' requirement is met when the plaintiff can establish that police officers forwarded statements to a prosecutor without sharing that the statements were suspect.") (citing *Manganiello*, 612 F.3d at 163); and/or (iii) the purportedly false statements in the police reports prepared by Detective Brimmer, Officer Cecile, Officer Tolone, and Officer Russell, [19] *see, e.g., Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior.") (collecting cases); *Werkheiser*, 655 F. Supp. 3d at 103 ("A defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.' ") (first quoting *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017); additional citations omitted).

Moreover, Plaintiff is correct that a "jury examining Detective Brimmer's police report alongside Ms. Bailey's statements could conclude that Det. Brimmer fabricated what [Ms.] Bailey told him to support, rather than contradict, Mr. Adams' false confession." Dkt. No. 85 at 27; *see also Manganiello*, 612 F.3d at 162 ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.") (quoting *Ricciuti*, 124 F.3d at 130); N.Y. Crim. Proc. Law § 60.50 ("A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed."); N.Y.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Crim. Proc. Law § 70.10(1) ("[E]vidence is not legally sufficient when corroboration required by law is absent.").

***26** The Court also agrees with Plaintiff that a reasonable juror could conclude that the police reports from the Responding Officers contained "false or misleading information that wrongfully inculpated Mr. Adams and failed to include key exculpatory information." Dkt. No. 85 at 28; *see also* *Manganiello*, 612 F.3d at 162 ("Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome.") (quoting *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003)); *Werkheiser*, 655 F. Supp. 3d at 104 ("Alternatively, the presumption 'can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.' ") (quoting *Hill v. Melvin*, No. 05-cv-6645, 2006 WL 1749520, at *13 (S.D.N.Y. June 27, 2006)).

For instance, Officer Cecile's report states that Ms. "Bailey stated that the suspect was an old black man." Dkt. No. 77-6 at 5. But this assertion is contrary to the actual description of the suspect contained in the 911 call notes, Dkt. No. 90-1 at ¶ 18 (indicating that Ms. Bailey stated the suspect was only 25 to 35 years old) and the similar description Ms. Bailey appears to have provided to Officer Cecile during their subsequent phone conversation, Dkt. No. 77-15 at 16:43 (Officer Cecile clarifying "the guy who got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?"). Officer Cecile also noted in his report that the suspect had been described as wearing "a green sweat suit," while Plaintiff was wearing "a grayish/teal puffy jacket and green pants[.]" Dkt. No. 77-6 at 5. As detailed earlier, while there is presently a factual dispute as to whether Plaintiff's pants were green, Defendants do not contend that Plaintiff's jacket was green. *See supra* Section IV.A.2 (Defendants arguing that Plaintiff's "hat, shirt and pants all appeared to be different shades of green") (quoting Dkt. No. 77-56 at 14); *see also* Dkt. No. 77-10 at 3 (report from non-party officer stating that Plaintiff had a "Black winter coat"). Similarly, Officer Tolone's report states that the suspect was wearing "a green jump suit," while Plaintiff "was wearing green pants and a grey / green vest." Dkt. No. 77-8 at 2. As also detailed earlier, Defendants do not contend that Plaintiff was wearing a vest at all. *See supra* Section IV.A.2; *see also* Dkt. No. 77-10 (report from non-party officer listing Plaintiff's items of clothing, none of which are a vest). Given all this, a reasonable juror could find that Officers Cecile and Tolone fabricated portions of their reports to align their descriptions of Plaintiff with that of the suspect.

Additionally, Officers Cecile and Russell omitted any mention of the exculpatory facts that Ms. Bailey,[20] Ms. Goldych, and Plaintiff all indicated that a third man had assaulted Mr. Jones and left the scene. Dkt. Nos. 77-6, 77-7; *see also* *Werkheiser*, 655 F. Supp. 3d at 103; *Napolitano*, 29 F.4th at 107. For his part, Officer Tolone's report states only that "when we initially arrived on scene Adams stated there was another male that started a fight with Jones." Dkt. No. 77-8 at 2.

***27** With respect to each Individual Defendant, then, a reasonable juror could find that the indictment "was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith,' " or "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures," *Werkheiser*, 655 F. Supp. 3d at 104 (first quoting *Savino*, 331 F.3d at 72; and then quoting *Hill*, 2006 WL 1749520, at *13). Given the current factual record, a reasonable juror could find that the presumption of probable cause is rebutted. *Hicks v. Marchman*, 719 F. App'x 61, 65 (2d Cir. 2018) ("[T]he presumption can be rebutted by showing 'that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith[.]' ") (second alteration in original) (quoting *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1250-51). Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for malicious prosecution against the Individual Defendants.[21]

### C. Fabricated Evidence under Section 1983

In order to prevail on "a Section 1983 fabrication of evidence claim, a plaintiff must demonstrate that '(1) [an] investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Ortiz v. Stambach*, 137 F.4th 48, 67 (2d Cir. 2025) (alterations in original) (quoting

Garnett v. Undercover Officer C0039, 838 F.3d 265, 279 (2d Cir. 2016)).

Defendants first argue that Plaintiff's fabricated evidence claim is limited to his allegedly false confession and should thus be dismissed against the Responding Officers, "who were not present for Plaintiff's interview and were not involved in his confession." Dkt. No. 77-56 at 25, Dkt. No. 90 at 8. The Court agrees with Plaintiff that this claim is not so limited, and that "there are disputed issues of fact from which a reasonable juror could find that" each of the Responding Officers "fabricated inculpatory evidence [or] suppressed exculpatory evidence to implicate [Plaintiff] wrongly." Dkt. No. 85 at 30; *see also supra* Section IV.B.

As to the confession, Defendants' renewed argument that Plaintiff voluntarily waived his *Miranda* rights and voluntarily confessed remains unpersuasive for the reasons previously set forth. Dkt. No. 77-56 at 25; *see also supra* Section IV.A.3.b.

Defendants' final argument that the Detectives did not know Plaintiff's confession was false is similarly insufficient to grant summary judgment on this claim. Dkt. No. 77-56 at 25-26. A reasonable juror could view the videotaped interrogation of Plaintiff and conclude that the Detectives knew Plaintiff's eventual confession was false because, for example, Plaintiff was visibly intoxicated; Plaintiff denied assaulting Mr. Jones nearly 200 times, Dkt. No. 85-2 at ¶ 570; Plaintiff "became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him," as Defendants' expert opined after viewing the videotaped interrogation, Dkt. No. 77-52 at 11-13; or, as Detective Brimmer noted in his police report, because Plaintiff "provided several different versions about what occurred," Dkt. No. 77-19 at 2, some of which were implausible, *see, e.g.,* Dkt. No. 77-22 at 86:22-87:22 (Plaintiff stating that he was able to hit Mr. Jones in the head three of four times with a stick before Mr. Jones fell down); *id.* at 100:8-21 (Plaintiff stating that Mr. Jones punched him twice over the course of the day, both times on the "same place" on his lip and Detective Brimmer responding "[y]eah, he knows where to get you, man. He's got aim on that thing, huh"). *See also* Ortiz, 137 F.4th at 62, 67-68 ("[T]he law does not require a plaintiff to prove that police officers fabricated evidence or engaged in bad faith through any particular type of evidence and, thus, a plaintiff may do so entirely through circumstantial evidence.... 'The jury, of course, was not required to believe [the defendant's] testimony denying knowledge. Issues relating to state of mind, such as knowledge and intent, may be influenced by assessments of credibility and often must be established by circumstantial evidence.' ") (last alteration in original) (quoting United States v. Ocampo-Guarin, 968 F.2d 1406, 1410 (1st Cir. 1992)). Moreover, if a jury were to believe Ms. Bailey that Detective Brimmer fabricated various statements he attributed to her in his police report, they could also conclude that he did so knowingly.

***28** Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for fabricated evidence against the Individual Defendants. [22]

**D. *Monell* Claim**

Section 1983 "does not impose vicarious liability on a municipality for the actions of its employees." Alexander, 132 F.4th at 160 (citing Friend v. Gasparino, 61 F.4th 77, 93 (2d Cir. 2023)). Instead, "[t]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Lucente v. Cnty. of Suffolk, 980 F.3d 284, 297 (2d Cir. 2020) (second alteration in original) (first quoting Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007); and then citing Monell v. Dep't. of Soc. Servs. of the City of New York, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). As to the first element, a plaintiff can establish the existence of an official policy or custom in four ways:

> (1) a formal policy endorsed by the municipality, ...; (2) actions directed by the government's "authorized decisionmakers" or "those who establish governmental policy," ...; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware, ...; or (4) a "constitutional violation[ ] resulting from [policymakers'] failure to train municipal employees[.]"

Deferio v. City of Syracuse, 770 F. App'x 587, 589-90 (2d Cir. 2019) (final alteration added) (first citing Turpin v. Mailet,

619 F.2d 196, 199 (2d Cir. 1980); then quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); then citing *Turpin*, 619 F.2d at 199; and then quoting *City of Canton v. Harris*, 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Defendants first argue that Plaintiff's *Monell* claim should be dismissed because there is no underlying constitutional violation. Dkt. No. 77-56 at 26. Given that Plaintiff's constitutional claims survive summary judgment, this argument is unavailing. *See supra* Section IV.A-C.

Defendants next argue that the purportedly similar arrests referenced in one paragraph of the Complaint do not establish a *Monell* claim. Dkt. No. 77-56 at 27-28. Those alleged instances appear to relate to excessive force and racial profiling claims against non-party officers in the Syracuse Police Department over a span of some years. Dkt. No. 1 at ¶ 61. In part because Plaintiff has not brought an excessive force claim, the Court agrees with Defendants that these alleged instances are insufficiently similar to the constitutional deprivations Plaintiff allegedly suffered. *See* *Campo v. City of New York*, No. 19-cv-04364, 2022 WL 970730, at *12 (E.D.N.Y. Mar. 31, 2022) ("A plaintiff may also plead the existence of *de facto* customs or policies 'by citing to complaints in other cases that contain similar allegations.' ") (quoting *Gaston v. Ruiz*, No. 17-cv-1252, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018)). As Defendants correctly point out in reply, Plaintiff also has not opposed the Motion on this narrow issue. Dkt. No. 90 at 8-9; *see also* *Jackson*, 766 F.3d at 195. Accordingly, any *Monell* claim based on these dissimilar cases or racial profiling is dismissed.

***29** For whatever reason, Defendants do not squarely address the core of Plaintiff's *Monell* claim. *Compare* Dkt. Nos. 77-56, 90, *with* Dkt. No. 1 at ¶¶ 52-60 (alleging, *inter alia*, that Defendant City "has a policy, custom, practice and pattern of conduct in place that enables its agents and employee[ ] police officers to act with deliberate indifference to the constitutional rights of individuals[,]" including "inadequate guidelines for conducting interrogations, obtaining false confessions and corroborating false confessions with eye witness accounts"). Plaintiff's opposition to the Motion argues that Defendant City was deliberately indifferent to his constitutional rights by failing "to supervise and/or train its officers to undertake constitutionally lawful detentions, interrogations, and practices to forego the fabrication of evidence." Dkt. No. 85 at 31-33 (citing Dkt. No. 1 ¶¶ 53, 54, 58).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion)). The Second Circuit has set forth the following requirements before a municipality's failure to train or supervise constitutes deliberate indifference:

> "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." ... "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." ... "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." ... "In addition, at the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.' "

*Jenkins*, 478 F.3d at 94 (first quoting *Walker v. City of New York*, 974 F.2d 293, 297, 298 (2d Cir. 1992); and then quoting *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006)).

Regardless of whether Plaintiff has satisfied the first three of these requirements, his assertions with respect to the Responding Officers' training lack the necessary factual detail and are too conclusory. Dkt. No. 85 at 31. He fails to identify any "specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury[,]" *Green*, 465 F.3d at 81. Accordingly, any *Monell* claim based on the training of the Responding Officers is dismissed. For similar reasons, any *Monell* claim based on training related to fabricated evidence generally is also dismissed.

Plaintiff's arguments as to the training the Detectives received warrant a different outcome however. Plaintiff contends that the Detectives received inadequate "training on how to avoid false confessions" and "improperly interrogated" Plaintiff, leading to his allegedly false confession. Dkt. No. 85 at 33. Unlike with the Responding Officers and fabricated evidence more generally, Plaintiff also sets forth various facts regarding the Detectives' interrogation training, facts which Defendants

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

largely do not deny. Dkt. No. 90-1 at ¶¶ 523-28, 531-33, 587-88.

Additionally, the Report that Plaintiff includes in his opposition to the Motion states that a deputy police chief at the Syracuse Police Department "was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state." Dkt. No. 85-11 at 9. The Report further states that "it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic state." *Id.* The Report indicates that neither Detective thought Plaintiff was "excessively intoxicated" during the interview on May 6, 2019. *Id.* at 11, 12. Seemingly because of such training, the Report determined that "[t]herefore, the actions by [the D]etectives during that interview were lawful and proper." *Id.* 9.

***30** The Report went on to conclude that Plaintiff's "claim that he was arrested and charge[d] for a crime he did not commit is true[,]" and that while Plaintiff was charged "due to his own admission[,]" "[t]he interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer." *Id.* at 12.[23] Following that conclusion are signatures for the chief of police, the first deputy chief, a bureau chief, a supervisor, and the investigating sergeant. *Id.* at 13. *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights."); *Donovan v. Norwich City Sch. Dist.*, No. 19-cv-1638, 2022 WL 623904, at *11 (N.D.N.Y. Mar. 3, 2022) ("An official's title, though not dispositive of his authority to make policy, is relevant for the interferences fairly to be drawn therefrom.") (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)).

Drawing all reasonable inferences in Plaintiff's favor for purposes of summary judgment, a reasonable juror could find the requirements for deliberate indifference satisfied with respect to the Detectives' training for interrogating intoxicated individuals. First, the apparent existence of this very training reflects "a moral certainty" that detectives will need to interview such individuals. *Jenkins*, 478 F.3d at 94 (citation omitted). Second, Detective Brimmer's own testimony suggests that interviewing intoxicated individuals presents a "difficult choice." *Id.* (citation omitted); Dkt. No. 77-49 at 25:16-24 (Detective Brimmer testifying with respect to intoxication and mental capacity during custodial interviews that "I can't think of any exact incident where that has occurred but I do understand how, you know, severe intoxication or, you know, severe mental health where someone's having a schizophrenic outbreak, or something to that effect, is certainly going to affect what they're telling us. *And it would be a judgment call and we likely would not interview that person if they're under extreme intoxication or having an emotional and/or mental health crisis*.") (emphasis added). Third, Defendants' own expert indicates that the "wrong choice" can result in a false confession, and thus a deprivation of constitutional rights. *Jenkins*, 478 F.3d at 94 (citation omitted); Dkt. No. 77-52 at 11-13; *see also* Dkt. No. 85-7 at 1 ("The district attorney said the case shows police and prosecutors need better training in identifying the dynamics of false confessions. 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [DA] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. [']"). Finally, the Report identifies a "specific deficiency in the city's training program," *Jenkins*, 478 F.3d at 94 (citation omitted), in that the only limitation on interrogating intoxicated individuals appears to be when they are "in a manic state,"[24] Dkt. No. 85-11 at 9.

***31** At bottom, Plaintiff contends that the Detectives' training caused them to violate his constitutional rights, by interrogating him while he was intoxicated and coercing him into providing a false confession. Plaintiff may well ultimately fail to prove such a claim. *See, e.g., Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) ("[D]eliberate indifference is a stringent standard of fault.") (alteration in original) (quoting *Connick*, 563 U.S. at 61, 131 S.Ct. 1350). But he has done enough to survive summary judgment—particularly in the absence of more specific argument from Defendants regarding deliberate indifference. According, the Motion is denied as to Plaintiff's *Monell* claim based on the Detectives' interrogation training.

### E. Negligent Supervision and Retention under New York law

In general, "[t]o state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show[, *inter alia*,] (1) that the tort-feasor and the defendant were in an employee-

employer relationship ...; [and] (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence[.]" *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (first citing *D'Amico v. Christie*, 71 N.Y.2d 76, 524 N.Y.S.2d 1, 518 N.E.2d 896, 901-02 (1987); and then quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 654 N.Y.S.2d 791, 793 (N.Y. App. Div. 1997)). Additionally, "[w]hen a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.' " *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 972 N.Y.S.2d 169, 995 N.E.2d 131, 134 (2013)). "Providing police protection has long been recognized as a quintessential governmental function" and when "a municipality undoubtedly acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." *Id.*, 972 N.Y.S.2d 169, 995 N.E.2d at 135 (citing *Valdez v. City of New York*, 18 N.Y.3d 69, 936 N.Y.S.2d 587, 592, 960 N.E.2d 356 (2011)).

Defendants argue, *inter alia*, that this negligence claim should be dismissed (i) against the Individual Defendants because they were all employees and cannot be held liable as an employer; and (ii) against Defendant City because its employees were acting in the scope of their employment as police officers. Dkt. No. 77-56 at 28-30. Plaintiff provides no persuasive response. Dkt. No. 85 at 33-34. The Court also notes that Plaintiff offers no evidence regarding any of the Individual Defendants' "propensity for the conduct which caused the injury," *Ehrens*, 385 F.3d at 235 (citation omitted), nor any evidence that Defendant City owed him "a special relationship beyond the duty that is owed to the public generally," *Velez*, 730 F.3d at 135. Accordingly, the Court grants the Motion as to Plaintiff's tenth claim.

**F. Qualified Immunity for the Individual Defendants**

Defendants argue that (i) the Individual Defendants are entitled to qualified immunity on Plaintiff's false arrest and malicious prosecution claims because of the collective knowledge doctrine and because of "plausible instructions from a superior officer;" (ii) the Individuals Defendants are entitled to qualified immunity on Plaintiff's pre-interrogation detention because the multi-hour detention was "objectively reasonable;" (iii) the Individual Defendants are entitled to qualified immunity because they had arguable probable cause to arrest Plaintiff; and (iv) the Detectives are entitled to qualified immunity with respect to Plaintiff's confession because "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary[.]" Dkt. No. 77-56 at 30-38. Defendants do not appear to contend that they are entitled to qualified immunity as to the balance of Plaintiff's fabricated evidence claim. *See id.*

***32** "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (*per curiam*) (citation modified). The application of qualified immunity requires the Court to undertake a two-pronged inquiry: whether "(1) ... the official violated a statutory or constitutional right, and (2) ... the right was 'clearly established' at the time of the challenged conduct." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (alterations in original) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)). Under the "clearly established" prong, the law does not require "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)); *see, e.g., Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."); *Ricciuti*, 124 F.3d at 128, ("The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right."); *Weaver v. Brenner*, 40 F.3d 527, 533-34 (2d Cir. 1994) ("It is clear that [in 1989] ... a criminal suspect could not lawfully be compelled to be a witness against himself.... It was also clearly established in 1989 that police could not lawfully coerce incriminating statements from an in-custody criminal suspect."); *Zahrey v. Coffey*, 221 F.3d 342, 345 (2d Cir. 2000) ("We hold that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity .... [and] that this right was clearly established in 1996[.]"); *Morse v. Fusto*, 804 F.3d 538, 541 (2d Cir. 2015) ("[T]he actions of the defendants upon which [plaintiff] bases his claims were the knowing creation of false or misleading evidence by a government officer acting in an investigative capacity. We have held that such activity by a government official qualifies as an unconstitutional deprivation of the victim's rights. This right was, moreover, clearly established at the time of

the defendants' conduct."); *Horn v. Adger*, Nos. 24-1034, 24-1038, 2025 WL 1618761, at *3 (2d Cir. June 9, 2025) (summary order) ("On appeal, the Detectives do not contest our clearly established caselaw holding that police officers are liable under § 1983 for 'creat[ing] false information likely to influence a jury's decision and forward[ing] that information to prosecutors.' ") (alterations in original) (citation omitted). "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (citation omitted).

At this stage, the Court need only address the "constitutional violation" prong. As detailed above, whether any Defendant violated Plaintiff's constitutional rights depends on numerous disputed issues of material fact. The parties dispute, for example, when Plaintiff's detention ripened into an arrest, *see supra* Section IV.A.1; whether the Individual Defendants had probable cause to arrest Plaintiff prior to his interrogation, *see supra* Section IV.A.2-3.a; the extent of Plaintiff's intoxication during the interrogation, as well as the voluntariness and veracity of his statements, *see supra* Section IV.A.3.b; and whether the Individual Defendants improperly initiated Plaintiff's prosecution, *see supra* Section IV.B. Such factual disputes preclude a finding of qualified immunity at this stage. *See, e.g., Dufort*, 874 F.3d at 343 ("We conclude that the district court's grant of summary judgment as to [plaintiff]'s false arrest and malicious prosecution claims was premature, because disputed questions of material fact remain regarding key aspects of the criminal investigation and subsequent prosecution. We further conclude that those same questions of material fact preclude a grant of qualified immunity at the summary judgment stage.").

The Court reaches the same conclusion with respect to Defendants' arguments regarding reliance on "plausible instructions" from a superior officer and arguable probable cause. As to the former, the limited record evidence cited by Defendants is insufficient to establish, as a matter of law, that such instructions were given. Dkt. No. 77-55 at 34-35. In any event, as the authority on which Defendants rely makes clear, *id.* at 35, even if such instructions were given, that does not end the inquiry. *See Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (*e.g.*[,] a warrant, probable cause, exigent circumstances).") (first quoting *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir. 2000); additional citations omitted). And the disputed factual record precludes reaching a determination with respect to this inquiry.

As to arguable probable cause, the current factual record also precludes summary judgment. *See, e.g., Napolitano*, 29 F.4th at 105 ("A police officer has arguable probable cause 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' ") (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)); *Jenkins*, 478 F.3d at 88 ("[U]nder both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable.... If, however, on the undisputed facts the officer would be unreasonable in concluding that probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims.") (first citing *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001); and then citing *Dillard v. City of Syracuse*, 51 A.D.2d 432, 381 N.Y.S.2d 913, 915 (N.Y. App. Div. 1976)).

***33** In sum, the disputed factual record precludes summary judgment based on qualified immunity. *See, e.g., Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) ("In the qualified immunity context, '[p]re-trial resolution of the defense [of qualified immunity] ... may be thwarted by a factual dispute.' ... 'Any disputed questions of material fact—such as the acts of the defendant and their effects on the plaintiff—are to be determined by the factfinder.' ") (final alteration added) (first quoting *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990); and then quoting *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022)). Given the current factual record, Defendants have not carried their burden to demonstrate that no rational juror could conclude that they violated Plaintiff's constitutional rights. *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) ("Thus, a decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.' ") (quoting *al-Kidd*, 563 U.S. at 735, 131 S.Ct. 2074).[25]

**G. John Does 1-100**

Defendants also argue that because Plaintiff has not amended his Complaint, the Doe Defendants should be dismissed without prejudice. Dkt. No. 77-56 at 30. Plaintiff responds with a single sentence "reassert[ing] his request to amend the complaint to include additional defendants" and no authority in support of such a request. Dkt. No. 85 at 34.

Almost two years ago, Magistrate Judge Katz considered and denied Plaintiff's request to amend the Complaint to include two additional defendants. Dkt. No. 64. Since that time, Plaintiff has not sought a review of that decision and has not undertaken any further efforts to amend the Complaint. Plaintiff now offers no authority and no new arguments in support of his cursory request. Plaintiff's renewed request is denied for the reasons set forth by Magistrate Judge Katz, Dkt. No. 64, and all claims against the Doe Defendants are dismissed, *see, e.g., Kaczmarek v. City of Schenectady*, No. 10-cv-1193, 2013 WL 5506276, at *2 (N.D.N.Y. Oct. 4, 2013) ("Because plaintiffs have failed to timely identify and serve the John Doe defendants, plaintiffs' claims against both John Doe defendants are dismissed.").

**V. CONCLUSION**

Accordingly, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, Dkt. No. 77, is **GRANTED in part and DENIED in part**, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2772081

## Footnotes

1 The Complaint incorrectly spells Officer Tolone's last name as "Toltone." Dkt. No. 77-55 at 1 n.1. Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the document's internal pagination.

2 This case was reassigned to the undersigned on January 19, 2023. Dkt. No. 34.

3 Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response. *See* N.D.N.Y. L.R. 56.1. The Court has also considered the parties' other submissions and attached exhibits. *See generally* Dkt. Nos. 77, 85-86, 90.

4 A person with a BAC of 0.08 percent is considered intoxicated *per se* under New York's Vehicle and Traffic Law ("VTL"). *See* N.Y. Veh. & Traf. Law § 1192(2); *see also Dalmasi v. City of Mount Vernon*, No. 13-cv-8672, 2014 WL 6645827, at *1 n.3 (S.D.N.Y. Nov. 24, 2014) (noting that a court may "take judicial notice of the VTL in deciding" summary judgment) (citations omitted).

5 During his deposition, Office Cecile characterized this statement as "police banter." Dkt. No. 77-47 at 74:13-17 ("Q. So, it's definitely him doesn't mean -- it doesn't mean that you were sure it was him? A. Right. That's police banter. I wasn't sure.").

6 Officer Russell testified during her deposition that she already knew Plaintiff from "[p]rior incidents," none involving violence. Dkt. No. 77-46 at 104:16-25.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

7 Seemingly in the early morning of May 7, 2019, Detective Brimmer again tried to speak with Ms. Goldych, who "still seemed too intoxicated" and "could speak a little but was talking about outlandish things not related to this incident." Dkt. No. 77-19 at 3. When Detective Brimmer spoke with Ms. Goldych a third time, at some point later on May 7, 2019, she "seemed much less intoxicated." *Id.* While in that state, Ms. Goldych apparently told Detective Brimmer, *inter alia*, that she was "drunk[ ] at the time of the incident and does not remember all of the details" and that "she was unaware that Jones had been injured." *Id.* Detective Brimmer did not take a written statement from Ms. Goldych. *Id.*; *see also* Dkt. No. 77-30 at 2 (non-party detective's report stating that when he subsequently spoke with Ms. Goldych "[i]t should be noted throughout our conversation V. Goldych referred to 'spiritual incidents' as well as being visited by 'higher powers' on several different occasions. She often had a difficult time organizing her thoughts and at times did not directly answer questions. Based upon her actions and statements her mental health status is unknown to me at this time.").

8 Dr. Weisman further opined that "[t]o help determine typical reductions in human BAC, clinical services often utilize a declination rate of 0.015% per hour." Dkt. No. 77-52 at 11. This suggests that Plaintiff had a higher BAC several hours prior, when Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Presumably, the corresponding physiological effects identified by Dr. Weisman would have been more severe at that time and during the interrogation.

9 The transcript Defendants provided inaccurately characterizes Plaintiff's statement as "[m]umbles incoherently." Dkt. No. 77-22 at 105:7.

10 Members of the Onondaga County District Attorney's Office ("DA's Office") have since identified deficiencies with the process that led to this result. Dkt. No. 85-7 at 1 (" 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [Onondaga County District Attorney ("DA") William] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. We have done that in my office.' .... 'I have discussed the case with the prosecutor initially assigned and pointed out mistakes that were made,' Fitzpatrick said. 'The prosecutor who presented it to the grand jury and missed several red flags is no longer with the office.' "); Dkt. No. 85-11 at 9 (Syracuse Police Department report stating that, according to Onondaga County Assistant District Attorney ("ADA") Joe Coolican, "when the grand jury proceeding occurred, there was no identification process done by the Assistant District Attorney overseeing the case. Therefore, the witness [Ms. Bailey] was unaware Mr. Adams was the one who was in custody and accused of these crimes.").

11 From the record before the Court, it is not clear whether these charges were ever increased. *Compare* Dkt. No. 77-33, *with* Dkt. No. 77-38.

12 The Complaint also contains various requests for relief. *See, e.g.,* Dkt. No. 1 at ¶¶ 105-114; Dkt. No. 77-56 at 9 n.2.

13 To the extent that the Complaint states a claim for false arrest prior to this time, any such claim is dismissed as abandoned, as is any claim for declaratory judgment. *See* *Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."); *see also* Dkt. No. 1 at ¶¶ 101-04; Dkt. No. 77-56 at 9 n.2.

14 It also contradicts a position that Defendants took in support of their prior dispositive motion, wherein they argued that Plaintiff's "alleged drunken confession – insofar as it could possibly be construed as 'false' – did not result in Plaintiff's loss of liberty as he had already been arrested and confined." Dkt. No. 7-2 at 16.

15 Defendants do not contend that they had probable cause to arrest Plaintiff for any other offense. Dkt. No. 77-56 at 14.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

16 The parties further agree that the "collective or imputed knowledge doctrine" applies. *See, e.g.*, Dkt. No. 77-56 at 12 ("[T]he relevant inquiry is whether the collective knowledge of the Syracuse Police Department ('SPD') constituted probable cause, not whether a specific arresting officer had probable cause."); Dkt. No. 85 at 14. Under that doctrine, an arrest "is permissible where the actual arresting ... officer lacks the specific information to form the basis for probable cause ... but sufficient information to justify the arrest ... was known by other law enforcement officials initiating ... the investigation" and "the other officers 'have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold.' " *Brown v. City of New York*, 798 F.3d 94, 99 (2d Cir. 2015) (alterations in original) (first quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); and then quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008)).

17 Defendants do not dispute that *Miranda* warnings were necessary. *See id.*; *Jackson v. Conway*, 763 F.3d 115, 136 (2d Cir. 2014) ("The *Miranda* safeguards apply only to 'custodial interrogations.' ").

18 Defendants' argument that no Individual Defendants was personally involved in all of the events resulting in Plaintiff's arrest and monthslong detention is unpersuasive. Dkt. No. 77-56 at 13, 21 n.6. As detailed above, Plaintiff has sufficiently established the personal involvement of every Individual Defendant in the events giving rise to his false arrest claims. *See, e.g., Legree v. City of Waterbury*, No. 22-cv-00659, 2024 WL 3964944, at *7 (D. Conn. Aug. 28, 2024) ("However, 'personal involvement' in an arrest is not limited to officers who were physically involved in taking someone into custody. Courts in this Circuit have upheld false arrest liability for non-arresting officers.") (collecting cases).

19 Each report was affirmed under penalty of perjury. *See, e.g.,* Dkt. No. 77-19 at 2-3; Dkt. No. 77-6 at 5; Dkt. No. 77-8 at 2; Dkt. No. 77-7 at 2.

20 Defendants contend that Officer Russell was "unaware of the fact" that Ms. Bailey was still on the scene when Officer Russell arrived. Dkt. No. 77-56 at 14. This assertion is contradicted by Officer Russell's BWC footage. *See* Dkt. No. 77-16 at 0:01 (Officer Russell responding to Ms. Bailey's statement that "he got into a fight with somebody, the other dude ran off, but he got knocked out" with "the other dude knocked out?"); *id.* at 11:27 (Officer Russell stating "I wish we would have got those people that were ..." and gesturing towards the sidewalk in the direction Ms. Bailey and her siblings had walked); *id.* at 17:21 (Officer Russell stating "did anyone contact those people back," presumably again in reference to Ms. Bailey and her siblings).

21 To the extent that the Complaint states a distinct claim for malicious prosecution against Defendant City individually, or pursuant to New York law, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 22 & n.7, 24, *with* Dkt. No. 85 at 23-30; *see also* *Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed further below. *See infra* Section IV.D.

22 To the extent that the Complaint states a distinct claim for fabricated evidence against Defendant City individually, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 26, *with* Dkt. No. 85 at 30; *see also* *Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed next. *See infra* Section IV.D.

23 This portion of the Report makes clear that Detective Brimmer was subsequently promoted to Detective Sergeant, a position in which he supervises other detectives. *See also* Dkt. No. 77-49 at 12:20-13:1.

24 It is unclear from the current record how this limitation operates in practice, given that alcohol is a depressant while "[m]ania is a condition in which you have a period of abnormally elevated, extreme changes in your mood or emotions, energy level or activity level. This highly energized level of physical and mental activity and behavior must be a change from your usual self and be noticeable by others." *Mania*, CLEVELAND CLINIC,

https://my.clevelandclinic.org/health/diseases/21603-mania (last visited September 29, 2025). Neither the Report nor the Motion identify the referenced caselaw. *See generally* Dkt. Nos. 77, 85-11, 90.

25 Because factual disputes preclude summary judgment on the first prong of the qualified immunity inquiry, the Court makes no determination as to the second prong, as noted earlier. *Id.* at 219-220; *see also* *Linton v. Zorn*, 135 F.4th 19, 32 (2d Cir. 2025) ("But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.") (quoting *Tolan*, 572 U.S. at 656, 134 S.Ct. 1861). For similar reasons, the Court also does not address the parties' competing expert reports. Dkt. Nos. 77-53, 77-54, 85-14.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2307684
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tyrone BOYKINS, Plaintiff,
v.
Officer Angel LOPEZ, et al., Defendants.

No. 21-CV-2831 (KMK)
|
Signed June 27, 2022

**Attorneys and Law Firms**

Tyrone Boykins, Goshen, NY, Pro Se Plaintiff.

Kimberly Hunt Lee, Esq., David L. Posner, Esq., McCabe & Mack LLP, Poughkeepsie, NY, Counsel for Defendant City of Newburgh.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

***1** Tyrone Boykins ("Boykins" or "Plaintiff"), proceeding pro se and currently incarcerated at Orange County Correctional Facility, brings this action, pursuant to 42 U.S.C. § 1983, against the City of Newburgh (the "City"), City of Newburgh Police Department, as well as three of its police officers, Angel Lopez ("Lopez"), Joseph Palermo ("Palermo"), and Paredes (together, "Individual Defendants"; and collectively, "Defendants") alleging that Defendants used excessive force against him, unlawfully arrested him, committed perjury, and denied him medical assistance. (*See generally* Compl. (Dkt. No. 1).) Before the Court is the City's Motion To Partially Dismiss the Complaint (the "Motion"). (*See* Not. of Mot. (Dkt. No. 17).) For the reasons outlined below, the Motion is granted.

## I. Background

### A. Factual Background

Unless otherwise stated, the following facts are drawn from Plaintiff's Complaint and are assumed true for the purpose of resolving the instant Motion. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam). [1]

Plaintiff alleges that, on August 17, 2020, at around 4 p.m., Plaintiff and two other individuals were "abruptly stopped by Officer Angel Lopez [and] Officer Parades." (Compl. 7). According to Plaintiff, the officers drew their firearms on them "without warning, explanation, or [p]robable [c]ause," leading Plaintiff to fear for his life, especially because he "was not committing any crime." (*Id.*) In response, Plaintiff alleges that he backed away, and did not run or resist. (*Id.*)

According to Plaintiff, Palermo then "aggressively tackled" Plaintiff and began to kneel on his ribs. (*Id.*) "Officer Angel Lopez aided the attack" and began "striking [Plaintiff's] head with a closed fist." (*Id.*) Plaintiff alleges that while he was being physically assaulted at gunpoint, he was screaming out that he was not fighting or resisting. (*Id.*)

Plaintiff alleges that, as a result of this interaction, he sustained several injuries including, "bruised ribs, bruised [and] knotted head lumps[, and] mental anguish as to the [p]ost traumatized stress of being completely violated by sworn officers." (*Id.* at 5.) Plaintiff further alleges that he was falsely accused of "resisting arrest," and that upon his arrest, he was denied medical attention. (*Id.* at 8.)

### B. Procedural History

Plaintiff filed his Complaint on April 1, 2021. (Dkt. No. 1.) On April 15, 2021, Plaintiff filed an application to proceed in forma pauperis, (Dkt. No. 4), which was granted on July 12, 2021, (Dkt. No. 5). On July 13, 2021, the Court issued an Order of Service, in which it dismissed Plaintiff's claims against the City of Newburgh Police Department. (Dkt. No. 7.) On August 16, 2021, the City filed a pre-motion letter outlining the grounds for their anticipated motion. (Dkt. No. 12.) The Court adopted a briefing schedule on August 26, 2021. (Dkt. No. 14.) The City filed their Motion and supporting documents on September 30, 2021. (Dkt. Nos. 17–21.) Because Plaintiff never submitted an Opposition, the Court deems the Motion to be fully briefed.

## II. Discussion

### A. Standard of Review

***2** The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, as discussed above, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics omitted)).

B. Analysis

City Defendants argue that (1) Plaintiff fails to state a claim for false arrest, (*see* Defs.' Mem. of Law in Supp. of Mot. To Dismiss Compl. ("Defs.' Mem") 3–4 (Dkt. No. 19)); (2) Plaintiff fails to state a claim for denial of medical care, (*see id.* at 4–5); (3) Plaintiff fails to state a claim for perjury, (*see id.* at 5–6); and (4) Plaintiff fails to state a claim against the City under *Monell*, (*see id.* at 6.) The Court will address these arguments as necessary to resolve the Motion.

1. Service

As an initial matter, although the City does not dispute that it was served, the City noted in its Memorandum in support of the Motion that it has received no information regarding service of the Summons and Complaint on the Individual Defendants. (*See* Defs.' Mem 1 n.1.)

The Summons, which was issued by the Clerk of Court as directed by the Court in its Order of Service, (*see* Dkt. No. 7), contains the names and business address of the Individual Defendants, (*see* Dkt. No. 8). Federal Rule of Civil Procedure 4 provides that "an individual ... may be served in a judicial district of the United States by following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made ...." Fed. R. Civ. P. 4(e)(1). Under New York law, personal service can be made

> ***3** by delivering the summons within the state to a person of suitable age and discretion at the actual place of

> business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business ....

N.Y. C.P.L.R. § 308. However, to date, the Court has not received confirmation that the Individual Defendants were properly served under Federal Rule of Civil Procedure 4 and New York law. Thus, at this juncture, until it receives that confirmation, the Court cannot consider the Individual Defendants to be served.

2. Materials Considered

Additionally, before considering the merits of the Motion, the Court determines the proper treatment of a number of exhibits attached to the Complaint and Defendants' Motion. Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).

"Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.*; *see also* *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety ..., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.' " (alteration omitted) (quoting *Saimels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993))). "Moreover, 'where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.' " *Alvarez v. County of Orange*, 95 F. Supp. 3d 385, 394 (S.D.N.Y. 2015) (alteration omitted) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

Plaintiff attached several documents to the Complaint, including (1) the text of two New York state law opinions; (2) a pre-booking injury form from the Orange County Sheriff's Office and associated photographs; and (3) a medical incident report from the Orange County Jail. (*See* Compl.) Because these documents were attached to the Complaint, the Court will consider them. *See* *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (noting that a plaintiff's "complaint is deemed to include any written instrument attached to it as an exhibit"); *Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 530 F. Supp. 3d 447, 451 (S.D.N.Y. 2021), *reconsideration denied*, No. 19-CV-6957, 2022 WL 889209 (S.D.N.Y. Mar. 25, 2022) (same).

Defendants attached the following exhibits to their Motion: (1) the Complaint, (*see* Aff. of David L. Posner, Esq. in Supp. of Mot. ("Posner Aff.") (Dkt. No. 18) Ex. A (Dkt. No. 18-1)); (2) the Superior Court Information (*see* Posner Aff. Ex. B ("Superior Court Information") (Dkt. No. 18-2)); (3) the transcript from Plaintiff's guilty plea hearing, (*see* Posner Aff. Ex. C ("Hearing Tr.") (Dkt. No. 18-3)); and (4) the arrest report associated with Plaintiff's arrest (*see* Posner Aff. Ex. D ("Arrest Report") (Dkt. No. 18-4)). It is axiomatic that the Court can consider the Complaint. This leaves the arrest report, the Superior Court Information, and the transcript from Plaintiff's guilty plea hearing. (*See* Posner Aff. ¶ 2.)

***4** "Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases); *see also* *Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to the complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))). The Court finds that none

of these documents has been incorporated by reference into the Complaint because none of the documents was referenced in the Complaint. (*See generally* Compl.) *See also* *Hutson v. Notorious B.I.G., LLC*, No. 14-CV-2307, 2015 WL 9450623, at *3 (S.D.N.Y. Dec. 22, 2015) (declining to consider documents on a motion to dismiss as incorporated by reference where "they are not referenced in the [complaint]").

However, "Courts may take judicial notice of public documents and matters of public record," *Casey v. Odwalla, Inc.*, 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018), including "document[s] filed in another court[,] not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings," *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (quotation marks omitted). Beginning with the arrest report, although some courts in this Circuit have observed "that a district court may rely on [arrest reports] in deciding a motion to dismiss under Rule 12(b)(6)," *Harris v. Howard*, No. 08-CV-4837, 2009 WL 3682537, at *2 (S.D.N.Y. Oct. 30, 2009) (quotation marks omitted), courts generally decline to judicially notice arrest reports to establish the truth of the assertions therein, *see* *Vasquez v. City of New* York, No. 99-CV-4606, 2000 WL 869492, at *1 n.1 (S.D.N.Y. June 29, 2000) (judicially noticing an arrest report "not for the truth of the facts set forth therein, but for the fact that the document[ ] existed"). "And some courts in this Circuit have declined to judicially notice arrest reports altogether." *Bey v. Antoine*, No. 19-CV-1877, 2021 WL 3725985, at *7 (E.D.N.Y. Aug. 23, 2021); *see also* *Weaver v. City of New York*, No. 13-CV-20, 2014 WL 950041, at *3 (E.D.N.Y. Mar. 11, 2014) ("This Court is not persuaded [ ] that Second Circuit precedent permits consideration of an arrest report on a 12(b)(6) motion."); *but see* *Awelewa v. New York City*, No. 11-CV-778, 2012 WL 601119, at *3 (S.D.N.Y. Feb. 23, 2012) (taking judicial notice of a public NYPD arrest report). "The Court agrees with the courts that have refused to rely on such materials at this stage," *Alvarez*, 95 F. Supp. 3d at 395, and therefore declines to consider the arrest report.

Next, with respect to the Superior Court Information, courts within the Second Circuit routinely take judicial notice of criminal complaints, indictments, and other charging instruments. *See* *Griffith v. Clarkstown Police Dep't*, No. 20-CV-06505, 2022 WL 1213452, at *2 n.3 (S.D.N.Y. Apr. 25, 2022) ("Judicial notice may be taken of public records, including ... criminal complaints, indictments, and criminal disposition data."); *see also* *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1389 (2d Cir. 1992) (noting with approval that the court had previously taken judicial notice of several indictments); *Garcia–Garcia v. City of New York*, No. 12-CV-1302, 2013 WL 3832730, at *1 n.1 (S.D.N.Y. July 22, 2013) (taking judicial notice of criminal complaints and indictments for the limited fact that plaintiff was arrested and charged with certain crimes).

***5** Finally, the Court will also take judicial notice of the hearing transcript from Plaintiff's guilty plea, as "courts routinely take judicial notice—at the motion to dismiss stage—of transcripts of related judicial proceedings, including criminal proceedings," and this Court will do the same here. *Coggins v. County of Nassau*, No. 07-CV-3624, 2008 WL 2522501, at *7 (E.D.N.Y. June 20, 2008) (collecting cases); *see also* *Johnson v. Pugh*, No. 11-CV-385, 2013 WL 3013661, at *2 (E.D.N.Y. June 18, 2013) ("Here, the [c]ourt finds it proper to take judicial notice of [the] plaintiff's guilty plea, ... as a matter of public record without converting [the] defendant's motion [to dismiss] into one for summary judgment.").

### 3. *Monell* Claims

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes*, 723 F.3d at 405–06. However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009).

The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also* *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat

superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also* *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity itself commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also* *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also* *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

***6** A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). Moreover, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See* *Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Roe*, 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury" (quoting *Brown*, 520 U.S. at 404)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

Here, Plaintiff makes no reference to any municipal policy or custom in the Complaint. (*See generally* Compl.) As the City argues, "[i]t seems only to be involved as a [D]efendant because it is the employer of the three individual police officers [P]laintiff has also named as [D]efendants." (Defs.' Mem. at 6.) This is plainly insufficient under *Monell*. "Absent an alleged policy or custom that caused constitutional harm, Plaintiff cannot maintain a *Monell* claim against the C[ity]." *Sagaria v. Orange Cnty. Jail*, No. 20-CV-2287, 2021 WL 4392422, at *8 n.11 (S.D.N.Y. Sept. 24, 2021); *see also* *Lara-Grimaldi v. Cty. of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *20 (S.D.N.Y. Mar. 29, 2018) (dismissing a *Monell* claim where the plaintiff failed "to cite or describe a policy officially promulgated by [the county] or a specific act taken by a final policymaker of [the county]" relevant to the plaintiff's claims) (collecting cases); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Jan. 3, 2011) (dismissing a claim against the county because the complaint "[did] not allege the

existence of an unconstitutional custom or policy"), *report and recommendation adopted sub nom. Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010); *Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 300 (S.D.N.Y. 2009) (dismissing a *Monell* claim where the "plaintiffs fail[ed] to allege any facts showing that there is a [c]ity policy—unspoken or otherwise—that violates the Federal Constitution").

***7** Furthermore, "Plaintiff's claim is based on a *single* incident of [the Individual Defendants' alleged] failure to follow protocol, which generally is insufficient to establish a *Monell* claim." *Murphy v. Spaulding*, No. 20-CV-9013, 2022 WL 294552, at *10 (S.D.N.Y. Feb. 1, 2022) (emphasis added); *see also Sagaria*, 2021 WL 4392422, at *8 n.11 ("Normally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality.") (alterations and quotation marks omitted); *Stewart v. Schiro*, No. 13-CV-3613, 2015 WL 1854198, at *16 (E.D.N.Y. Apr. 22, 2015) (dismissing *Monell* claim where the plaintiff alleged "that he was injured as a result of a single, isolated episode of misconduct by a fellow inmate"); *Fernandez v. N.Y.C. Dep't of Corr.*, No. 08-CV-4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010) ("[The] [p]laintiff appears to allege a single, isolated episode of misconduct by correction officers ... in failing to adequately provide for his safety and medical needs. Thus, [the] [p]laintiff's claim for municipal liability must be dismissed.").

4. False Arrest

"[A] § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Scalpi v. Town of East Fishkill*, No. 14-CV-2126, 2016 WL 858944, at *10 (S.D.N.Y. Feb. 29, 2016) (same). "A [§] 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (quotation marks omitted). "To prevail, a plaintiff must prove four elements: (1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not contest the confinement[,] and (4) the confinement was not otherwise privileged." *Crews v. County of Nassau*, 996 F. Supp. 2d 186, 203 (E.D.N.Y. 2014) (quotation marks omitted).

Probable cause is a complete defense to an action for false arrest, whether that action is brought under New York state law or under § 1983. *See Simpson*, 793 F.3d at 265. In general, probable cause exists where an arresting officer "has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (quotation marks omitted). Probable cause is measured based on "those facts available to the officer at the time of arrest and immediately before it," *id.* (quotation marks omitted), and the existence of probable cause must be determined based on the "totality of the circumstances," *see Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989). A court assessing probable cause must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quotation marks omitted); *see also Drayton v. Young*, No. 17-CV-5440, 2018 WL 5831324, at *4 (S.D.N.Y. Nov. 7, 2018) (same).

"[A] conviction for the offense which precipitated the arrest is definitive evidence of probable cause." *Jean-Laurent v. Cornelius*, No. 15-CV-2217, 2017 WL 933100, at *4 (S.D.N.Y. Mar. 8, 2017); *see also Phelan v. Sullivan*, 541 F. App'x 21, 23 (2d Cir. 2013) ("A false arrest claim is defeated by ... [P]laintiff's conviction for the offense for which he was arrested."); *Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986) ("[A] conviction of the plaintiff following the arrest is viewed as establishing the existence of probable cause."); *Clark v. City of New York*, No. 16-CV-7744, 2018 WL 4372671, at *4 (S.D.N.Y. Sept. 13, 2018) ("A conviction of the crime for which an individual is arrested bars recovery for false arrest or malicious prosecution."); *Hudson v. County of Dutchess*, No. 12-CV-5548, 2015 WL 7288657, at *11 (S.D.N.Y. Nov. 16, 2015) (collecting cases); *Hope v. City of New York*, No. 08-CV-5022, 2010 WL 331678, at *2 (E.D.N.Y. Jan. 22, 2010) ("A valid prosecution resulting in conviction is conclusive evidence that probable cause existed for an arrest.").

***8** "The same is true if the conviction is obtained through a guilty plea." *Croft v. Greenhope Servs. for Women, Inc.*, No. 13-CV-2996, 2013 WL 6642677, at *5 (S.D.N.Y. Dec. 17, 2013) (citing *Maietta v. Artuz*, 84 F.3d 100, 102 n.1 (2d Cir. 1996)); *see also Timmins v. Toto*, 91 F. App'x 165, 166 (2d Cir. 2004) ("[I]n this Circuit, a plaintiff cannot establish any such claim [of false arrest] if he pleads guilty to a lesser offense pursuant to a plea agreement."); *Bell v. Drakeford*, No. 18-CV-2225, 2020 WL 1819879, at *3 (S.D.N.Y. Apr. 10, 2020) ("Since a guilty plea is the equivalent of a conviction, a guilty plea will also bar a § 1983 false arrest claim." (citation omitted)); *Hope*, 2010 WL 331678, at *2 ("A valid prosecution resulting in conviction is conclusive evidence that probable cause existed for an arrest, even if the conviction is the result of a guilty plea to a lesser charge than that for which plaintiff was arrested.").

Here, Plaintiff alleges that he was subject to an illegal arrest. (Compl. 4.) However, the hearing transcript attached to Defendant's Motion reveals that Plaintiff pled guilty to a lesser charge. (*See* Hearing Tr. 6, 24, 36; *see also* Def.'s Mem. 3–4).[2] Accordingly, the Court finds that Plaintiff is barred from recovery on his false arrest claim, and that claim is therefore dismissed. *See Williams v. City of New York Police Dep't.*, No. 06-CV-6053, 2007 WL 2462669, at *1 (E.D.N.Y. Aug. 27, 2007) (finding that plaintiff's guilty plea "conclusively establishe[d] that there was probable cause for his arrest"); *Roundtree v. City of New York*, 778 F. Supp. 614, 619–20 (E.D.N.Y. 1991) (dismissing a false arrest claim where plaintiff was arrested for possession of cocaine and pled guilty to lesser offense of disorderly conduct).

5. Medical Care

In *Estelle v. Gamble*, 429 U.S. 97 (1976), "the Supreme Court held that 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment[,] ... whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (quoting *Estelle*, 429 U.S. at 104–05). "The Court subsequently extended the protections for convicted prisoners established in *Estelle* to pretrial detainees under the Due Process Clause of the Fourteenth Amendment, reasoning that 'the due process rights of a person [detained but not convicted] are at least as great as the Eighth Amendment protections available to a convicted prisoner.' " *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *see also Charles v. Orange Cty.*, 925 F.3d 73, 86–87 (2d Cir. 2019) (applying same two-part objective/subjective standard to detainee's claim for deliberate indifference to serious medical needs under the Eighth and Fourteenth Amendments); *Massey v. City of New York*, No. 20-CV-9719, 2022 WL 179828, at *1 (S.D.N.Y. Jan. 20, 2022) ("While the Eighth Amendment applies only to convicted inmates and not pretrial detainees such as [Plaintiff], the Due Process Clause of the Fourteenth Amendment provides equivalent protections to pretrial detainees.").

"To state a claim under the Fourteenth Amendment for deliberate indifference to medical needs, health[,] or safety, Plaintiff must plausibly allege that (1) 'the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process' (the 'objective prong') and (2) defendants 'acted with at least deliberate indifference to the challenged conditions' (the 'mens rea prong')." *Morris v. City of New York*, No. 20-CV-9314, 2021 WL 4461994, at *4 (S.D.N.Y. Sept. 29, 2021) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 29–30 (2d. Cir. 2017.)) To establish the objective prong, Plaintiff "must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Herbert v. Smith*, No. 20-CV-06348, 2021 WL 3292263, at *5 (S.D.N.Y. Aug. 2, 2021). Regarding the subjective prong, "[d]eliberate indifference requires, at a minimum, culpable recklessness, i.e., an act or a failure to act that evinces a conscious disregard of a substantial risk of serious harm." *Darby*, 14 F.4th at 128 (quotation marks and italics omitted).

***9** Here, Plaintiff alleges that he was "denied medical assistance" for his "[b]ruised ribs, bruised and knotted head lumps." (Compl. 4–5.) However, "[d]istrict courts in the Second Circuit have consistently held that bruises, lacerations, cuts, black eyes, and other superficial injuries are not sufficiently serious to support a deliberate indifference claim." *Brown v. Annucci*, No, 19-CV-09048, 2021 WL 860189, at *5 (S.D.N.Y. Mar. 8, 2021); *but see Ruggiero v. Way*, No. 19-CV-3631, 2020 WL 5126112, at *7 (S.D.N.Y. Aug. 31, 2020) (injury sufficiently serious where the plaintiff alleged facial laceration that needed to be glued shut and long-term effects resulting from a head injury). Plaintiff's alleged injuries are akin to those that have been found by courts in this district to be insufficiently serious to establish a deliberate indifference claim. *See, e.g.*, *Brown*, 2021 WL 860189, at *5 (finding that the plaintiff's injuries, i.e., a "busted eye that

was swollen for two weeks," "a laceration under his left eye, and [ ] bleeding out of his right nostril and upper lip" were insufficiently serious to state a deliberate indifference claim); *Adams v. Annucci*, No. 17-CV-03794, 2020 WL 1489787, at *12 (S.D.N.Y. Mar. 27, 2020) (dismissing claim for deliberate indifference to a serious medical need because plaintiff's "headaches, backaches, stomach pains, sleeplessness, stress, and anxiety" "fail[ed] to satisfy the objective requirement"); *cf. Casanova v. Maldonado*, No. 17-CV-01466, 2021 WL 3621686, at *7 (S.D.N.Y. Aug. 16, 2021) (granting summary judgment for the defendant on deliberate indifference claim because the plaintiff's injuries, namely "bumps on his head, back pain, a headache, and superficial scratches" were not of the type that "might have produced death, degeneration, or extreme pain"); *Vasquez v. Cnty. of Rockland*, No. 13-CV-5632, 2020 WL 883514, at *13 (S.D.N.Y. Feb. 24, 2020), *reconsideration denied*, 2020 WL 8079814 (S.D.N.Y. Oct. 15, 2020), *aff'd sub nom. Vasquez v. Rockland Cnty.*, No. 20-3684, 2021 WL 5286676 (2d Cir. Nov. 15, 2021) (granting summary judgment for defendants where plaintiff's "headache and vomiting, neck tenderness, and scratches on [the plaintiff's] chest" were insufficiently serious to establish deliberate indifference claim).

Even if Plaintiff could establish the objective element, however, he cannot establish the subjective element. The medical incident report attached to the Complaint shows that Plaintiff was seen by a nurse at the Orange County Jail for his injuries. (*See* Medical Incident Report.) Thus, the documents attached to the Complaint itself do not suggest that Defendants "denied him treatment," *Darby*, 14 F.4th at 129 (citing *Charles*, 925 F.3d at 87), but instead merely show that Plaintiff "disagrees with [Defendants'] assessment of the severity of his condition and recommendation for treatment." *Id.* "This constitutes, at most, a difference of opinion about the proper course of treatment; it does not demonstrate deliberate indifference to a substantial risk of harm to [Plaintiff's] health." *Id.*; *see also Kalamaras v. Mangano*, No. 16-CV-00459, 2016 WL 4132254, at *9 (E.D.N.Y. Aug. 2, 2016) ("Although Plaintiffs may disagree with the medical treatment provided, such disagreement does not give rise to a deliberate indifference claim."). "Even assuming that [Defendants'] proposed treatment was inadequate, mere medical malpractice is not tantamount to deliberate indifference absent a showing of conscious disregard of a substantial risk of serious harm." *Darby*, 14 F.4th at 129 (quotation marks omitted).

Thus, Plaintiff has not alleged that Defendants acted with deliberate indifference to his serious medical condition, and this claim is therefore dismissed.

6. Perjury

"[A] [§] 1983 plaintiff may sue for denial of the right to a fair trial based on a police officer's fabrication of information ... when the information fabricated is the officer's own account of his or her observations of alleged criminal activity, which he or she then conveys to a prosecutor." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 274 (2d Cir. 2016). To establish a fair trial claim based on fabrication of evidence, a plaintiff must show that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Ganek v. Leibowitz*, 874 F.3d 73, 90 (2d Cir. 2017). "To satisfy the third element, the fabricated evidence need not actually reach a jury." *Gutierrez v. New York*, No. 18-CV-3621, 2021 WL 681238, at *17 (E.D.N.Y. Feb. 22, 2021). The Second Circuit only requires "a showing ... that the [false] information would likely influence the jury if it arrived at a jury." *Cook v. City of New York*, 243 F. Supp. 3d 332, 351 (E.D.N.Y. 2017). Unlike a false arrest or malicious prosecution claim, " '[p]robable cause is not a defense' to a claim for a denial of the right to a fair trial" based on the fabrication of evidence. *Garnett*, 838 F.3d at 277 (alteration in original) (quoting *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012)).

***10** Defendants contend that there is a sixth element, established in *McDonough v. Smith*, 139 S. Ct. 2149 (2019), requiring termination of the prosecution in the plaintiff's favor. (*See* Defs.' Mem. 5.) However, the Second Circuit has found that "*McDonough*'s accrual rule does not import malicious prosecution's favorable-termination requirement onto [§] 1983 fair-trial claims." *Smalls v. Collins*, 10 F.4th 117, 139 (2d Cir. Aug. 20, 2021). The Second Circuit explained that, "[w]here the plaintiff asserts a [§] 1983 fair-trial claim based on fabricated evidence, all that is required is that the underlying criminal proceeding be terminated in such a manner that the lawsuit does not impugn an ongoing prosecution or outstanding conviction." *Id.* Furthermore, the Second Circuit stated that "[t]his requirement may be satisfied where a criminal conviction has been invalidated or a criminal prosecution has been terminated in the criminal defendant's favor because, in such circumstances, there is no risk that

a section 1983 plaintiff's claim will impugn an existing conviction or the basis for an ongoing prosecution." *Id.*

Here, to the Court's knowledge, Plaintiff's criminal conviction has not been invalidated—it was not, for example, overturned on appeal or otherwise dismissed. *See, e.g.*, *Kee v. City of New York*, 12 F.4th 150, 170 (2d Cir. 2021) (finding that the *McDonough* favorable termination element was met for fair trial claim where the underlying criminal proceeding was dismissed on speedy trial grounds); *Jones v. City of Syracuse*, No. 20-CV-340, 2021 WL 4243439, at *4, *7 (N.D.N.Y. Sept. 17, 2021) (finding that the *McDonough* favorable termination element was met for fair trial claim where the plaintiff's conviction was dismissed on appeal because it was based on evidence that should have been suppressed). Indeed, as Defendants point out, the prosecution was not terminated in Plaintiff's favor, having ended in a conviction after Plaintiff pled guilty. (*See* Defs.' Mem. 5; *see also generally* Hearing Tr.) Thus, although Defendants did not correctly articulate the *McDonough* element as applied by the Second Circuit to fair trial claims, Plaintiff still does not meet that element, and thus cannot state a fair trial claim. Plaintiff's fair trial claim is therefore dismissed.

III. Conclusion

For the reasons stated above, all of Plaintiff's claims against the City are dismissed, except for Plaintiff's excessive force claim, which the City did not move to dismiss. (*See* Defs.' Mem. 2.) That is, Plaintiff's false arrest, medical care, perjury, and *Monell*, claims are dismissed without prejudice. Because this is the first adjudication of Plaintiff's claims on the merits, the Complaint is dismissed without prejudice. Plaintiff may file an amended complaint within 30 days of the date of this Opinion & Order. The amended complaint should contain appropriate changes to remedy the deficiencies identified in this Opinion & Order. Plaintiff is advised that the amended complaint will replace, not supplement, the instant Complaint, and therefore must contain all of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2307684

## Footnotes

1 When citing the Complaint, the Court will refer to the page numbers generated by ECF in the top right-hand corner.

2 Based on the Hearing Transcript, it appears that Plaintiff was charged with Criminal Possession of a Weapon in the Second Degree, but he pled guilty to the lesser charge of Attempted Criminal Possession of a Weapon in the Second Degree. (Hearing Tr. 6, 8.)

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional Facility; Joseph Williams, Warden, Lincoln Work–Release Center; Francis J. Herman, Senior Parole Officer Interstate Bureau; T. Stanford, Senior Parole Officer; Deborah Stewart, Parole Officer; John Doe # 1, Parole Agent, Watertown Correctional Facility; John Doe # 2, Parole Agent, Lincoln Work Release Center; Susan Bishop, Director of Interstate Compact, South Carolina; Cecil Magee, Parole Officer, South Carolina; Frank Barton, Parole Officer, South Carolina; John McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol Albany, NY, for defendants Peters, Herman Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant Attorney General, Carl N. Lundberg, Chief Legal Counsel, South Carolina Department of Probation, Columbia, SC, for defendants Bishop, Magee, Barton, McMahan, and Stanford, Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

***1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Daniel Scanlon, Jr., duly filed on April 17, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil rights action on November 17, 1995. On February 12, 1996, Magistrate Judge Scanlon ordered Brown to submit an amended complaint alleging the specific acts committed by the individuals named as defendants which Brown claimed violated his constitutional rights. Brown filed an amended complaint on March 21, 1996. In his amended complaint, Brown alleged that defendants violated his rights under the Eighth and Fourteenth Amendments by failing to process properly his interstate compact paperwork, resulting in Brown being imprisoned pursuant to a parole hold when in fact he had never violated the conditions of his parole. For a more complete statement of Brown's claims, see his amended complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On August 19, 1996, defendants Bishop, Magee, Barton, and McMahan made a motion to dismiss the complaint against them or, in the alternative, for summary judgment. Dkt. No. 20. On October 17, 1996, defendants Herman, Stewart, and Stanford made a motion to dismiss for failure to state a claim. Dkt. No 34. On April 17, 1996, Magistrate Judge Scanlon recommended that all defendants' motions to dismiss be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the magistrate judge's report-recommendation, having been granted additional time in which to do so. Dkt. No. 52. In addition, Brown filed on June 9, 1997, a motion for leave to file a second amended complaint and a copy of his proposed amended complaint. Dkt. No. 53. I turn first to the last motion filed, Brown's motion for leave to amend his complaint a second time.

Brown seeks to file a second amended complaint "setting forth in detail the personal involvement of each defendant and how their acts of commission and omission served to deprive plaintiff of Constitutionally secured rights." Dkt. No. 53. The district court has discretion whether to grant leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

***2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

no clear error on the face of the record in order to accept the recommendation").

***3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

***4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

***5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

***6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

***7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1 I note, however, that the report-recommendation would survive even *de novo* review.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 5002215
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,
v.
NYS DIVISION OF PAROLE; Mark Saben, Parole Officer; Syracuse Police Dept.; Detective William Summers, ID#409; D.P. Proud, ID# 0140; Richard Curran, ID# 0066; William J. Fitzpatrick, Onondaga County, District Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886 (TJM/ATB)
|
Signed 08/15/2019

**Attorneys and Law Firms**

LAYTONIA FLAGG, Plaintiff pro se

**ORDER and REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

***1** The Clerk has sent me an amended [1] civil rights complaint filed by pro se plaintiff Laytonia Flagg. (Dkt. No. 3). Plaintiff Flagg has also filed an application to proceed in forma pauperis ("IFP"). (Dkt. No. 4).

## I. IFP Application

A review of plaintiff's IFP application shows that she declares she is unable to pay the filing fee. (Dkt. No. 4). The court finds that plaintiff meets the financial criteria for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

## II. Complaint

Plaintiff states that she is the mother of Mario Leslie, who at the time of the incidents described in the complaint, was on parole. (Amended Complaint ("AC") at 1). [2] On August 8, 2016, defendant New York State Parole Officer ("PO") Mark Saben went to Mr. Leslie's home at 514 Marcellus Street in Syracuse, New York, to conduct a "standard home visit." [3] (*Id.*) Mr. Leslie lived at the Marcellus Street address with his girlfriend, Tamacha Rodriguez. (*Id.*) Plaintiff claims that Ms. Rodriguez answered the door for PO Saben, and that Mr. Leslie was "summoned" from his bedroom to speak with defendant Saben. (*Id.*) After some discussion, PO Saben was walking toward the front door, when he spotted some glassine packets "known to contain heroin." (*Id.*) Upon discovering the glassine packets, defendant Saben informed Mr. Leslie that he was going to conduct a search of the entire residence according to the conditions of his parole release. (*Id.*)

***2** Plaintiff states that, as a result of the subsequent search, the officer discovered a safe, containing a loaded firearm and $31,925 in United States currency. Defendant Saben also discovered a key chain on which were a set

of keys that were identified as keys to plaintiff's residence. Plaintiff claims that "[a]t this point Sr. P.O. Rigby called the Syracuse Police Department."[4] (AC at 2). Plaintiff claims that defendant Rigby spoke to Sergeant A. Llukaci, a detective with the Syracuse Police Department, and Sergeant Llukaci told defendants Detectives William Summers and D.P. Proud to go to the Marcellus Street address. Plaintiff states that upon his arrival, defendant Proud stated that he spoke to Ms. Rodriguez, who told defendant Proud that Mr. Leslie kept his money at his mother's apartment "although there is no affidavit on file to attest to that assertion by the [sic] Det. Proud."

Defendant Summers obtained a warrant for the search of plaintiff's home at 112 Fordham Rd. in Syracuse, New York. (AC Ex. CM/ECF p.16-17). Plaintiff claims that she was not home when the "Syracuse Police" and defendant Saben arrived at her home to execute the search warrant.[5] (AC at 2). The officers entered with the key that was found at Mr. Leslie's Marcellus Street home.[6] (*Id.*) Plaintiff arrived shortly thereafter, but was denied entrance to her home while the search was being executed. (*Id.*) Plaintiff states that the officers searched plaintiff's apartment and recovered $40,000.00 in cash from a safe that was located in plaintiff's bedroom closet. Plaintiff alleges that the officers confiscated the money.

Plaintiff claims that the officers did not have probable cause to obtain the warrant to search her home because there was no proof that Ms. Rodriguez ever made the statement that Mr. Leslie kept his money at his mother's house, and thus, the warrant was obtained improperly. Plaintiff claims that her Fourth Amendment rights were violated as the result of the search of her apartment. Plaintiff then claims that after the seizure of her $40,000.00, she informed defendant Assistant District Attorney ("ADA") Sean Chase that the money did not belong to Mr. Leslie, and that the money was plaintiff's savings which she would be using to purchase a new home. (AC at 5). Plaintiff claims that ADA Chase told her that his "office would return the illegally seized money." (*Id.*)

Plaintiff states that, shortly after the incident, she also filed a "complaint" form to complain about the police "conduct in Plaintiff's home," and to request the "immediate return of the Plaintiff's money." (*Id.*) Plaintiff states that the District Attorney's Office responded to the "property release" request only after plaintiff obtained the intervention of "a 3[rd] party (Feldman, Kramer & Monaco, P.C.)" (*Id.*) Plaintiff claims that the property release form showed that the plaintiff's "legally possessed currency was improperly forfeited along with the monies ($31,925.00) seized at 514 Marcellus St." (AC at 6).

Plaintiff claims that ADA Chase told plaintiff on three separate occasions that her money was going to be returned, but that this was a "stalling tactic" by the District Attorney's Office. ADA Chase told plaintiff that he was waiting to hear from Mr. Leslie's attorney "in hopes of persuading [Mr. Leslie] to sign a forfeiture document that later became clear to the Plaintiff that the forfeiture included what was seized at both residences...." (AC at 6). The forfeiture document states that Mr. Leslie stipulated to the forfeiture of $67,269.00, and that he was not aware of any other person who claimed to be the owner of the property.[7] (AC at 6). Plaintiff alleges that the $40,000.00 was not Mr. Leslie's to forfeit. Plaintiff also alleges that the amount on the stipulation of forfeiture that Mr. Leslie signed does not account for the entire amount seized, even though plaintiff was not given any of her money back. Plaintiff claims that the actual amount seized, including her $40,000.00 was $71,925.00, and that there is $4,656.00 missing from the total. (*Id.*) Plaintiff also claims that the individuals who seized her money did not have the "warrant in hand" and never gave her a receipt for the money that they took. (AC at 7). Plaintiff states that the money taken from her home was not specifically mentioned in any of the paperwork that was subsequently provided to plaintiff as the result of her inquiries. (AC at 8).

***3** Plaintiff states that she spoke to then-Chief of the Syracuse Police, Frank Fowler, who told plaintiff that her concerns would be "thoroughly investigated," but then did not provide plaintiff a report of the investigation and told plaintiff to file a Freedom of Information request if she wished to see the report. (*Id.*) Plaintiff has attached correspondence that she received from former Chief Fowler, stating that the report had been forwarded to him and that plaintiff could "be assured that [Fowler would] take the proper administrative action in this case." (AC Ex. CM/ECF p.19).

Although the AC contains a "Second Cause of Action," plaintiff essentially repeats that her Fourth Amendment rights were violated by the defendants' actions in conjunction with the search of her home and the seizure of her money. (AC at 8-9). Plaintiff states that she has not been afforded any documentation that would establish probable cause to search her home. (AC at 9). Plaintiff states that there is no connection between her and Mr. Leslie's "illegal activities," and there was nothing "illegal" found in plaintiff's apartment. (*Id.*) In

applying a very liberal reading of the AC, [8] the court could interpret plaintiff's second cause of action as a Fourteenth Amendment Due Process claim, asserting that the defendants deprived her of her money without due process of law when they did not return the money after she made various inquiries and did not allow her to challenge the ownership of the money after her son signed the waiver and stipulation.

As stated above, the plaintiff has attached various documents as exhibits to the AC, including (1) the search warrant issued by City Court Judge Kate Rosenthal for plaintiff's apartment at 112 Fordham Rd. (AC Ex. CM/ECF pp.16-17); (2) Plaintiff's Civilian Complaint Report (AC Ex. CM/ECF p.18); a letter to plaintiff from former Chief Fowler (AC Ex. CM/ECF p.19); a letter to plaintiff from David L. Chaplin, II, Esq. on behalf of the Citizen Review Board dated December 2, 2016 (AC Ex. CM/ECF p. 20); a letter to plaintiff from Kimberly M. Osbeck, a paralegal for the Onondaga County District Attorney's Office, dated March 6, 2018 (AC Ex. CM/ECF p. 21); a letter to plaintiff from the Public Integrity Bureau of the New York State Attorney General's Office (AC Ex. CM/ECF p. 22); an "Application for Release of Property," signed by plaintiff on November 2, 2017, together with the unsigned refusal to release the property because the "money [was] forfeited during [a] criminal prosecution." (AC Ex. CM/ECF pp.23-24); the "Waiver and Stipulation," signed by Mr. Leslie on February 28, 2017, relinquishing any rights to the seized money (AC Ex. CM/ECF pp.25-26); "CNYLEADS Narrative Supplement[s]" numbers 1-3, including an "offense page" and a "property supplement," detailing all the property taken from the Marcellus St. address. (AC Ex. CM/ECF pp.27-32).

Plaintiff seeks the return of the $40,000.00 that she claims was taken from her in August of 2016, compensatory damages for the "Syracuse Police Department trashing Plaintiff's two bedrooms at 112 Fordham Rd.," damages for "five hours" worth of lost income [9] on the day of the search, unspecified lost income for the day that she had to appear in court, [10] and "punitive" damages for emotional pain and suffering, including the damages for the delay in purchasing her dream home. (*Id.*)

### III. Eleventh Amendment/New York State Division of Parole

#### A. Legal Standards

***4** The Eleventh Amendment provides that states have immunity against suits in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). An action against state officers in their official capacities, or an action against an agency of the state, is tantamount to an action against the state. *Yorktown Medical Laboratory v. Perales*, 948 F.2d 84, 87 (2d Cir. 1991) (official capacity actions); *Santiago v. New York State Dep't of Correctional Services*, 945 F.2d 25, 28 n.1 (2d Cir. 1991) (agencies of the state).

#### B. Application

In this case, in addition to the individual parole officers who were allegedly responsible for obtaining the warrant to search her apartment, plaintiff has named the "N.Y.S. Division of Parole." (AC at 1). The Eleventh Amendment prevents plaintiff from suing the N.Y.S. Division of Parole. Thus, to the extent that plaintiff seeks to sue the agency separately from the individual officers, the AC may be dismissed with prejudice, but as further discussed below, plaintiff may sue Mark Saben, one of the individuals who allegedly participated in obtaining the warrant for her home. [11]

### IV. Syracuse Police Department/Municipal Liability

#### A. Legal Standards

Under New York law, departments, like the Syracuse Police Department that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality, and may not sue or be sued. *Hayes v. County of Sullivan*, Nos. 07-CV-667; 09-CV-2071, 2012 WL 1129373, at *24 (S.D.N.Y. March 30, 2012) (citing inter alia *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)).

#### B. Application

To the extent that plaintiff is suing the Syracuse Police Department as an entity separate from the individual police officers who were allegedly involved in obtaining the warrant for her apartment, plaintiff may not do so. Unlike the State of New York itself, against which a suit for damages would be barred by the Eleventh Amendment, the City of Syracuse could be named instead of the Syracuse Police Department. However, the municipality itself may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an

individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979).

***5** As it is written, the AC makes no claims that would allow the plaintiff to name the City of Syracuse as a defendant in this action. Plaintiff essentially complains of a single incident, during which the officers did not act properly in obtaining a warrant for her home and did not act properly in executing the warrant in her case. There is no indication that plaintiff can assert a policy or custom which would support municipal liability based on these facts. While plaintiff may not sue the Syracuse Police Department in any event, and while the court will not sua sponte replace the Syracuse Police Department with the City of Syracuse, the court does not rule out that, upon proper pleading, plaintiff could amend her AC to assert such a claim against the City of Syracuse.

However, plaintiff is warned that any such facts must plausibly suggest her claim, and that simply making a conclusory allegation of a "policy or custom" is insufficient to assert municipal liability. *Sulaymu Bey v. City of New York*, No. 17-CV-3563. 2019 WL 1434597, at *10 (E.D.N.Y. Mar. 29, 2019); *Nielsen v. City of Rochester*, 58 F. Supp. 3d 268, 277 (W.D.N.Y. 2014) (conclusory allegations which merely recite the elements for stating a *Monell* claim are insufficient to state a claim for municipal liability) (citing inter alia *Genovese v. Town of Southhampton*, 92 F. Supp. 2d 8, 25 (E.D.N.Y. 2013)). A single incident, particularly if it involved individuals below the policy-making, level is insufficient to state a *Monell* claim. *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998). As discussed below, plaintiff may proceed against the individual officers who she claims violated her constitutional rights: Detective Summers, D.P. Proud; and Richard Curran.

## V. Prosecutorial Immunity/Personal Involvement

### A. Legal Standards

#### 1. Prosecutorial Immunity

Prosecutors enjoy absolute immunity from suit under section 1983 in matters associated with their prosecutorial functions, regardless of motivation. *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County of Suffolk*, 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the grand jury).

Absolute immunity is defeated only when the prosecutor is engaging in investigative functions. *Bernard v. County of Suffolk*, 356 F.3d at 502-503 (citation omitted). The initiation and pursuit of prosecution, regardless of any alleged illegality, is protected by absolute prosecutorial immunity. *Peay v. Ajello*, 470 F.3d 65, 67-68 (2d Cir. 2006). It has also been held that a prosecutor is entitled to absolute immunity for his or her decision not to prosecute, regardless of the motivation for that decision. *Scloss v. Bouse*, 876 F.2d 287, 292 (2d Cir. 1989).

#### 2. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* *See also* *Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

***6** Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See* *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*.

*Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also* *Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

**B. Application**

Plaintiff has named the Onondaga County District Attorney, William J. Fitzpatrick, together with one of his Assistant District Attorneys, Sean Chase. (AC ¶ 3(c)). Plaintiff claims that she spoke to ADA Chase "right after the seizure," she explained to him that the money did not belong to her son, the money was hers, and she "produced tax returns" for the last five consecutive years in an effort to show that she "legally possessed the money." (AC at 5). She claims that "[k]nowing this," ADA Chase told plaintiff that his office would return the illegally seized money. (*Id.*) Plaintiff claims that notwithstanding ADA Chase's statement, he did not return the money, and allegedly "stalled" plaintiff until her son signed the waiver of forfeiture document, which included the total amount of money that was seized from both residences. (AC at 6). The initiation of civil asset forfeiture proceedings is a prosecutorial function that has been afforded absolute immunity. *See* *Byrne v. City of New York*, 736 Fed. App'x 263, 266 (2d Cir. 2018) (Second Circuit precedent affords absolute immunity to government attorneys who initiate civil suits) (quoting *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992); *Mangiafico v. Blumenthal*, 471 F.3d 391, 395 (2d Cir. 2006)).

ADA Chase was allegedly handling the forfeiture proceeding, and even though he did not have to initiate court proceedings because Mr. Leslie signed the stipulation and waiver, the document stated that "I have concluded that the District Attorney would likely establish that the above-mentioned property is subject to forfeiture pursuant to Article 13-A [of the NY Civil Practice Law and Rules] and the District Attorney would likely prevail in such a forfeiture action." [12] (AC Ex. CM/ECF p.25). This document took the place of an in-court forfeiture proceeding, which would have been held pursuant to N.Y. Civ. Prac. L. & R. § 1311 (Forfeiture Actions). Thus, ADA Chase is entitled to absolute immunity with respect to his conduct relative to the forfeiture of the money seized, even if plaintiff claimed that some of the money belonged to her. [13] This is true whether ADA Chase's conduct was proper or improper, and whether or not he was mistaken in obtaining Mr. Leslie's waiver and stipulation of forfeiture. Thus, to the extent that plaintiff raises due process violations with respect to her interest in the funds, they must be dismissed as against ADA Chase.

***7** Plaintiff has not asserted any facts against defendant Fitzpatrick. [14] He does not appear to have been involved in any way in obtaining the search warrant for plaintiff's apartment, in executing the search warrant for plaintiff's apartment, or in the forfeiture proceedings with respect to the money seized. Thus, any claims against him individually would fail for lack of personal involvement. If he had been personally involved in the forfeiture, he, like ADA Chase, would be entitled to absolute prosecutorial immunity. [15] Thus, plaintiff's amended complaint may be dismissed with prejudice as against defendants ADA Chase and DA Fitzpatrick.

**VI. Search and Seizure**

**A. Legal Standards**

"It is well-settled that in cases raising claims under the Fourth Amendment of unauthorized execution of a search warrant '[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to disclose, to the issuing Magistrate.' " *Arroyo v. City of Buffalo*, No. 15-CV-753, 2018 WL 4376798, at *3 (W.D.N.Y. Sept. 13, 2018) (quoting *Velardi v. Walsh*, 40 F.3d 569, 575 n. 2 (2d Cir. 1994) (internal quotation marks omitted)). A warrant is not invalid for section 1983 purposes if it is " 'based on seemingly reliable information which is later found to be erroneous.' " *Id.* (quoting *Lewis v. City of Mt. Vernon, N.Y.*, 984 F. Supp. 748, 756 (S.D.N.Y. 1997)).

**B. Application**

Although the court has concerns about the merits of this action, at this stage of the proceedings, the court finds that any Fourth Amendment claims that plaintiff may have against defendants Saben, Summers, Proud, and Curran may survive initial review. [16] Plaintiff seems to claim that the warrant for her home was based on false information given the court, which plaintiff claims was the only basis for the warrant. While it may be that a close review of the documents provided with the amended complaint, together with any other evidence

or argument by defendants in a properly supported dispositive motion, may show otherwise, the court is not currently in a position to make factual or other determinations regarding the validity of the warrant or any other claims that plaintiff may have regarding the search of her home.

***8** The court also notes that because of the waiver and stipulation, signed by Mr. Leslie, there was no formal forfeiture proceeding in New York State Court as provided in N.Y. Civ. Prac. L. & R. § 1311. Thus, it is unclear how the plaintiff could have challenged the forfeiture.[17] The court also makes no findings regarding the validity of any defenses that the defendants may assert regarding the incident in question.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 4) is **GRANTED**, and it is

**RECOMMENDED**, that the amended complaint (Dkt. No. 3) be **DISMISSED IN ITS ENTIRETY** as against defendants **N.Y.S. DIVISION OF PAROLE; SYRACUSE POLICE DEPARTMENT; WILLIAM J. FITZPATRICK; AND SEAN CHASE**, and it is

**RECOMMENDED**, that to the extent that the AC may be read as naming **SGT. LLUKACI or PO RIGBY**, the AC may be dismissed **WITHOUT PREJUDICE** for failure to state a claim, and it is

**RECOMMENDED**, that if the District Court adopts this Recommendation, the case be returned to me for further proceedings, including an order serving the remaining defendants: **SABEN, SUMMERS, PROUD, and CURRAN**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5002215

## Footnotes

1 When plaintiff filed her original complaint, the case was administratively closed due to plaintiff's failure to comply with the filing fee requirement. (Dkt. No. 2). Prior to re-filing her motion to proceed IFP, (Dkt. No. 4), plaintiff also filed an amended complaint, which the court will review as the operative pleading. The case was re-opened on August 1, 2019. (Dkt. No. 6).

2 Plaintiff numbered the pages of the “Fact” section of the amended complaint at the bottom of the page. The court will cite to the page numbers contained on the actual document. Plaintiff has attached a series of documents as exhibits to the amended complaint which she did not number. The court will cite to the plaintiff's exhibits (“AC Ex.”) with the page number as assigned by the court's electronic filing system (“CM/ECF”).

3 Plaintiff was not present for any of the incidents that she describes in her complaint until she arrived at her house during the subsequent search of her property. Plaintiff appears to be taking her recitation of the background facts from the police reports and other documents that she has attached to her amended complaint. (AC Ex. CM/ECF pp. 16-32). The court is stating the facts as plaintiff has described them in the amended complaint.

4 This is the first time that another parole officer was mentioned in plaintiff's statement of facts. The court will assume that defendant Rigby was at the residence from the beginning, but it is not completely clear from the papers.

5 Plaintiff does not allege that PO Rigby participated in the search of her apartment.

6 Plaintiff states that the officers were in possession of the door key "prior to their actual possession of the warrant for 112 Fordham Rd." (AC at 2).

7 Plaintiff has attached a copy of Mr. Leslie's "Waiver and Stipulation." (AC Ex. CM/ECF p.25-26). Plaintiff claims that this document was obtained after she asked for the return of the money several times from the District Attorney's Office, the Citizen Review Board, and the Syracuse Police Department. (AC at 7). When she failed to get a "truthful" response, she contacted Feldman, Kramer & Monaco, P.C. (*Id.*) The document was sent to the attorneys' office after the firm wrote a letter of inquiry. (*Id.*)

8 Plaintiff is pro se, and the court must interpret plaintiff's complaint liberally. *Sealed Plaintiff v. Sealed Defendants*, 537 F.3d 185, 191 (2d Cir. 2008). The court considers all possible grounds for relief that plaintiff could be raising. *See* *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (pro se papers are interpreted liberally to raise the strongest arguments suggested therein).

9 Plaintiff states that she works from home, and could not work for the time that the officers were searching her apartment. (AC at 10).

10 Apparently, on the day that the officers searched plaintiff's apartment, they found a "weed roach" and gave plaintiff an appearance ticket, which was later dismissed after plaintiff appeared in court. (AC at 10). Plaintiff seeks lost income for the time that it took to appear in court. (*Id.*)

11 It is unclear whether plaintiff meant to name PO Rigby as a defendant herein. He is mentioned briefly in the body of the complaint and was apparently present during the Marcellus St. search, but is not listed in the caption of the complaint, and plaintiff submitted no proposed summons for PO Rigby. In addition, it does not appear from the facts as stated by plaintiff that PO Rigby was involved in obtaining the search warrant for plaintiff's apartment, nor is it even apparent that he was present during the search of plaintiff's apartment. Thus, plaintiff does not state any claims against PO Rigby, and to the extent that she meant to name him as a defendant, the AC should be dismissed as against him.

12 Article 13-a is entitled "Proceeds of a Crime -Forfeiture." N.Y. Civ. Prac. L. & R. Art. 13-a

13 Although not relevant to the court's decision because it is based on absolute immunity of the prosecutor, regardless of whether Mr. Leslie's assertions in the document were correct, the court notes that plaintiff's statement herein is contrary to her son's ***sworn*** assertion in the document. Plaintiff states that ADA Chase told plaintiff that they were waiting to hear from Mr. Leslie's attorney regarding whether he was going to sign the forfeiture document. (AC at 6). Plaintiff claims that her son signed the document "under duress." Plaintiff cannot assert any claims regarding her son, and in any event, her son was, by her own statement, represented by counsel during the matter.

14 Plaintiff requests only damages, including a return of the $40,000.00 as relief in this action. She does not seem to be asking for any form of injunctive relief. Even though plaintiff asks for a "return" of money, the Eleventh Amendment does not "recognize a distinction 'between monetary damages and money in which plaintiff has a property interest.' " *Local 851 of Internat'l Broth. of Teamsters v. Thyssen Haniel Logistics, Inc.*, 90 F. Supp. 2d 237, 249-50 (E.D.N.Y. 2000) (quoting *Yorktown Medical Lab., Inc. v. Perales*, 949 F.2d 84, 87-88 (2d Cir. 1991)). The District Attorney could have been the proper party in a declaratory judgment under

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

New York State law under N.Y. Civ. Prac. L & R. 1327 (Proceedings to Determine Adverse Claims), which plaintiff could have filed within six months of the stipulation, signed by Mr. Leslie.

15 To the extent that the complaint could be interpreted as suing either ADA Chase or DA Fitzpatrick in their "official capacities," the Eleventh Amendment would bar any such suit. *See Blessinger v. City of New York*, No. 17-CV-108, 2017 WL 3841873, at *1-2 (S.D.N.Y. Sept. 1, 2017) (prosecutors are entitled to Eleventh Amendment immunity when they are acting in their prosecutorial capacity because they are acting as state officials rather than city or county employees) (citing *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 157 (S.D.N.Y. 2007) and *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) (when prosecuting a criminal matter, a district attorney in New York State represents the State not the County)).

16 Although plaintiff has included a proposed summons for Sgt. Llukaci, this individual is not listed in the caption of the AC, nor is he included in the section of the form-AC which lists the individual Syracuse Police Officers. (AC ¶ 3(c)) for whom she has included identification numbers. In any event, plaintiff's only allegations against Sgt. Llukaci are that he sent defendants Proud and Summers to Mr. Leslie's Marcellus St. home after the parole officers found contraband therein. Plaintiff does not allege that he was personally involved in any of the conduct that she claims violated her constitutional rights. He was not at either residence and was not involved in obtaining the allegedly invalid warrant. Thus, to the extent that plaintiff is trying to sue Sgt. Llukaci, the AC may be dismissed as against this defendant.

17 The court does note that section 1311(7) provides that an innocent owner may challenge the forfeiture and regain the forfeited property if the owner never received notice of the forfeiture. In addition, section 1327 provides for an "interested person" to bring a proceeding to determine adverse claims, even after the forfeiture action was settled by stipulation. *See Tupi Cambios, S.A. v. Morganthau*, 48 A.D.2d 278 (1st Dep't 2008). In *Tupi Cambios*, the District Attorney was the proper "defendant" in New York State Court.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4963112
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,
v.
NYS DIVISION OF PAROLE; Mark Saben, Parole Officer; Syracuse Police Dept.; Detective William Summers, ID#409; D.P. Proud, ID# 0140; Richard Curran, ID# 0066; William J. Fitzpatrick, Onondaga County, District Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886
|
Signed 10/08/2019

**Attorneys and Law Firms**

Laytonia Flagg, Syracuse, NY, pro se.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

***1** This pro se action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In his Order and Report-Recommendation dated August 15, 2019 (Dkt. No. 7), Magistrate Judge Baxter grants Plaintiff's application to proceed in forma pauperis, and examines the sufficiency of the allegations set forth in the Amended Complaint ("AC") in light of 28 U.S.C. § 1915. He recommends that the AC (Dkt. No. 3) be dismissed in its entirety as against defendants N.Y.S. Division of Parole, Syracuse Police Department, William J. Fitzpatrick, and Sean Chase; that to the extent that the AC may be read as naming Sgt. Llukaci or PO Rigby, the AC be dismissed without prejudice for failure to state a claim; and that if the Court adopts these recommendations that the case be returned to him for further proceedings, including an order serving the remaining defendants Saben, Summers, Proud, and Curran. No objections to the Report-Recommendation have been filed, and the time to do so has expired.

**II. DISCUSSION**

After examining the record, this Court has determined that the Order and Report-Recommendation is not subject to attack for plain error or manifest injustice.

**III. CONCLUSION**

Accordingly, the Court **ACCEPTS and ADOPTS** the recommendations in the Order and Report-Recommendation (Dkt. No. 7) for the reasons stated therein. Therefore, it is hereby

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 3) is **DISMISSED IN ITS ENTIRETY** as against defendants N.Y.S. DIVISION OF PAROLE, SYRACUSE POLICE DEPARTMENT, WILLIAM J. FITZPATRICK, and SEAN CHASE, and it is further

**ORDERED** that to the extent the Amended Complaint may be read as naming SGT. LLUKACI or PO RIGBY, it is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim, and it is further

**ORDERED** that the case be returned to Magistrate Judge Baxter for further proceedings, including an order serving the remaining defendants: SABEN, SUMMERS, PROUD, and CURRAN.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4963112

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4906112
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David L. KIRBY, III, Plaintiff,
v.
Mamoun ABRAHAM, [1] Defendant.

5:24-cv-0522 (BKS/TWD)
|
Signed October 25, 2024

**Attorneys and Law Firms**

DAVID L. KIRBY, III, Plaintiff, pro se, 05002304, Onondaga County Justice Center, 555 South State Street, Syracuse, NY 13202.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## I. INTRODUCTION

***1** On April 15, 2024, *pro se* Plaintiff David L. Kirby, III, commenced this action by filing a complaint naming the Syracuse Police Department as the sole defendant. Dkt. No. 1. Plaintiff did not pay the Court's filing fee or file a motion to proceed *in forma pauperis* ("IFP"), and the Court administratively closed the case. Dkt. No. 2. Plaintiff subsequently submitted a complete application to proceed IFP, and the case was reopened. Dkt. Nos. 3, 4, 5. On June 14, 2024, the undersigned granted Plaintiff's EFP application and performed an initial review of the complaint. Dkt. No. 6. On June 24, 2024, Plaintiff filed an amended complaint. Dkt. No. 7. In light of Plaintiff's amended complaint, the Court terminated the pending Report-Recommendation, and referred the action back to the undersigned for an initial review of the amended complaint. [2] Dkt. No. 9.

## II. SUFFICIENCY OF THE AMENDED COMPLAINT

Because Plaintiff is proceeding IFP and is a prisoner suing one or more government employees, his amended complaint must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). [3]

### A. Relevant Legal Standard

The Court shall dismiss a complaint in a civil action if it is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii); 28 U.S.C. § 1915A(b).

A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (holding that "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless ... or (2) the claim is based on an indisputably meritless legal theory.").

***2** To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Id.* It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal punctuation and citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In reviewing a *pro se* complaint, the court has a duty to show liberality toward *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served

and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted).

Generally, before the Court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the Court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

### B. Summary of the Amended Complaint [4]

Plaintiff brings this action against Defendant John Doe, a Syracuse Police Officer. Dkt. No. 7. In the "Statement of Facts" section, Plaintiff states, in full:

> John Doe hit me with his police car while he was off-duty working as an security guard. The results of me getting hit by car my neck, arm on right side and upper body collarbone was hurting very bad. I had to walk to court holding my arm in my left hand after being deny an arm slang by Justice Center medical staff. Also after that I was placed in handcuffs. Also John Doe illegally searched me which is violating my rights 4 th Amendment he searched me after hitting me with car and placing me in handcuffs. Then I was sent to hospital. And that is false arrest and false imprisonment.

*Id.* at 4. Plaintiff lists his first claim as "excessive force" and his second claim as "unconstitutional conditions of confinement." *Id.* at 5. Plaintiff seeks monetary damages. *Id.*

On July 2, 2024, Plaintiff filed a letter stating, "Officer Mamoun Abraham was the officer that struck me with deadly force using his car off-duty knowing that he was not supposed to do that." Dkt. No. 10. On August 14, 2024, Plaintiff filed another letter, stating, in part, "Brandon Hanks used excessive force, violated my 4 th Amendment right by his unreasonable search which led to false arrest and false imprisonment because my rights were violated and no probable cause to arrest me." [5] Dkt. No. 11.

## III. ANALYSIS

***3** Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

To state a valid claim under Section 1983, a plaintiff must allege that the challenged conduct: (1) was attributable to a person acting under color of state law; and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997).

### A. Defendant John Doe

The Court has reviewed Dkt. No. 10, wherein Plaintiff has identified the Doe defendant by name. Therefore, the Court construes Dkt. No. 10 as a request to substitute the name of "Mamoun Abraham" for John Doe, which is granted. While piecemeal pleadings are generally not accepted by the Court, an exception will be made since the letter was filed while the amended complaint was still under initial review. The amended complaint will be deemed to name Mamoun Abraham in place of John Doe and the Court will conduct its initial review accordingly. [6]

### B. Color of State Law

By its terms, Section 1983 applies only where the defendant acts "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983; *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) ("[A] plaintiff must allege a violation of rights secured by the Constitution or laws of the United States, and that such violation was committed by a person acting under the color of state law."). A "defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49-50 (1988). By contrast, "acts of officers in the ambit of

their personal pursuits are plainly excluded." *United States v. Giordano*, 442 F.3d 30, 42-43 (2d Cir. 2006) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion)).

"[T]here is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994). A defendant acts under color of state law for the purposes of Section 1983 when he exercises a power "possessed by virtue of state law and made possible only because the wrongdoer is cloaked with the authority of state law." *Colombo v. O'Connell*, 310 F.3d 115, 117-18 (2d Cir. 2002) (citation omitted). The "focus" of the color of law inquiry is on "whether there was an abuse or misuse of a power conferred upon [the state employee] by state authority," and "look[s] to the nature of the officer's act, not simply his duty status." *Pitchell*, 13 F.3d at 548-49.

***4** Courts therefore "look at a variety of factors, including, *inter alia*, whether the officer: (1) was off-duty; (2) identified himself as an officer of the law; (3) was in uniform; (4) was authorized to make an arrest at the time; (5) was carrying handcuffs; (6) was carrying any weapons; (7) flashed a police badge; and (8) placed the plaintiff under arrest or otherwise detained her." *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 372 (S.D.N.Y. 2007). An individual engaging in conduct as a private actor can still be liable under Section 1983, but only if he "is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). "Conclusory allegations that [the] private individual conspired or took concerted action with state actors will not suffice" to establish this element. *Lienau v. Garcia*, No. 12-CV-6572, 2013 WL 6697834, at *5 (S.D.N.Y. Dec. 19, 2013) (citation and internal punctuation omitted).

Mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g.*, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court assumes for purposes of initial review that defendant Abraham was acting under color of state law.

### C. Excessive Force

As noted above, Plaintiff lists excessive force as his first claim. Dkt. No. 7 at 5. " '[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard.' " *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 148-49 (2d Cir. 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis and internal quotation marks omitted)). Examining the reasonableness of the force used "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). An officer may not constitutionally employ "a degree of force beyond that which is warranted by the objective circumstances of an arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019). Additionally, "[w]hile handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force." *Lynch ex rel. Lynch v. City of Mt. Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008).

It is well-established "that the use of entirely gratuitous force is unreasonable and therefore excessive." *Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010). But " '[n]ot every push or shove' amounts to a Fourth Amendment violation. Indeed, a '*de minimis* use of force will rarely suffice to state a Constitutional claim.' " *Acosta v. City of New York*, No. 11 Civ. 856, 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012) (citing *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 2005)).

Here, Plaintiff's explanation of the alleged incident with defendant Abraham is conclusory and vague. He has not listed a date on which he was "struck" by the police vehicle and has not described *any* facts surrounding the alleged incident. Thus, Plaintiff has not provided "a short and plain statement of the claim showing that he is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Accordingly, the Court recommends dismissal of the excessive force claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

### D. False Arrest and False Imprisonment

Liberally construed, Plaintiff alleges he was subjected to "false arrest and false imprisonment." Dkt. No. 7 at 4. A claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause ...." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)). Such claims are one and the same because "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *see*

*also* *Jenkins v. City of New York*, 478 F.3d 76, 88 n. 10 (2d Cir. 2007) ("False arrest is simply false imprisonment accomplished by means of an unlawful arrest.") (citation omitted).

***5** "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins*, 478 F.3d at 84 (citing *Weyant*, 101 F.3d at 852). Accordingly, to state a claim for false arrest and imprisonment, "a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)) (internal punctuation omitted). An arrest is privileged if it is based on probable cause. *Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest.") (internal punctuation and citations omitted). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852.

Here, Plaintiff alleges in wholly conclusory fashion he was subject to a false arrest and false imprisonment. He alleges no facts related to his arrest suggesting there was no probable cause for his arrest. Further, to the extent that Plaintiff may be claiming that the alleged unlawful search led to his arrest and, thus, the arrest was unlawful, said claim does not set forth a cognizable false arrest claim because the "fruit of poisonous tree" doctrine applied in criminal cases to exclude evidence derived from an unlawful act—e.g., an unlawful search or seizure—does not apply to § 1983 actions. *See* *Tinsdale v. Hartley*, 442 F. Supp. 3d 569, 573 (W.D.N.Y. 2020) (citing, *inter alia,* *DiMascio v. City of Albany*, 205 F.3d 1322 (Table), No. 99-7653, 2000 WL 232053, at *1 (2d Cir. 2000) ("We have held ... that the fruit of the poisonous tree doctrine is inapplicable to civil § 1983 actions." (internal punctuation omitted))).

Therefore, the Court recommends dismissal of Plaintiff's false arrest or false imprisonment claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

**E. Illegal Search**

Plaintiff also alleges he was searched "illegally" by defendant Abraham. Dkt. No. 7 at 4. The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable ... subject to only a few specifically established and well-delineated exceptions.' " *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). A search incident to an arrest, however, "constitutes an exception to the warrant requirement" imposed by the Fourth Amendment. *Riley v. California*, 573 U.S. 373, 382 (2014). Nevertheless, there are limitations upon the scope of an appropriate search incident to an arrest. *See* *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). Indeed, whether a search incident to an arrest was lawful turns upon whether such search was reasonable. *Id.* The permissibility of a search "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989).

Here, the Court finds Plaintiff's allegations regarding the alleged illegal search are entirely conclusory and insufficient to plead a plausible cause of action. Plaintiff merely alleges that defendant Abraham "searched me which is violating my rights," Dkt. No. 7 at 4, "but fails to support this assertion with any supporting factual allegations." *Lautman v. Vill. of Saugerties, N.Y.*, No. 1:13-CV-00264 (MAD), 2014 WL 1653189, at *6 (N.D.N.Y. Apr. 23, 2014) (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994)); *see also* *Cannon v. Wood*, No. 9:10-cv-1332 (GTS/RFT), 2011 WL 7071100, *7 (N.D.N.Y. Aug. 12, 2011) (dismissing the plaintiff's illegal search claim where the plaintiff merely "states in a conclusory fashion that he was subjected to an illegal search" and the complaint was "devoid of any factual allegations to support this claim").

***6** Accordingly, the Court recommends dismissal of Plaintiff's illegal search claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

**F. Conditions of Confinement**

Plaintiff lists "unconstitutional conditions of confinement" as his second claim. Dkt. No. 7 at 5. Even when liberally construed, it is entirely unclear to the Court what "conditions"

Plaintiff claims are "unconstitutional" or who was personally involved in the constitutional violation or when and where the alleged deprivation occurred. Accordingly, the Court recommends dismissal of Plaintiff's condition of confinement claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

**G. Rule 10**

Plaintiff refers to the "Justice Center medical staff" in the body of the amended complaint. *See* Dkt. No. 7 at 4. Rule 10(a) of the Federal Rules of Civil Procedure provides that, "the title of the complaint must name all the parties." Fed. R. Civ. P. 10(a). A party not named in the caption of the complaint is not a party to the action. *Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (holding that the failure to name the individual defendants against whom the plaintiff intends to assert claims makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims").

Accordingly, the Court does not construe any claims in the amended complaint to be asserted against the Justice Center medical staff. *See Whitley v. Krinser*, No. 06-CV-0575, 2007 WL 2375814, at *1 (W.D.N.Y. Aug. 15, 2007) ("If people are not also named in the caption of the [ ] complaint, they will not be defendants in the case.").

Even if the amended complaint was liberally construed to assert a Fourteenth Amendment medical indifference claim against the Justice Center medical staff, the claim would fail for two reasons. First, "[p]leadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim." *Ying Li v. City of New York*, No. 15-CV-1599, 2017 WL 1208422, at *6 (E.D.N.Y. Mar. 31, 2017); *see also Wright v. Orleans Cnty.*, No. 14-CV-0622, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a Section 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2) which requires a short and plain statement of the claim showing that the pleader is entitled to relief (citation and internal punctuation omitted)); *Holmes v. Allstate Corp.*, No. 11-CV-1543, 2012 WL 627238, at *7 (S.D.N.Y. Jan. 27, 2012) ("Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it."); *see, e.g.*, *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 493-94 (S.D.N.Y. 2014) (dismissing without prejudice excessive force claim asserted against "members of the 'Special Search Team' and 'ESU Officers' " and noting that, "[t]o the extent that [plaintiff] does not know the names of the members of the Special Search Team or ESU Officers involved, he may name 'John Doe' defendants and include as much identifying information as he has knowledge of, for the purpose of filing an amended complaint" should he choose to do so).

***7** Second, to state a Fourteenth Amendment medical indifference claim, a detainee "must meet two requirements: (1) that Plaintiff[ ] had a serious medical need ..., and (2) that the Defendants acted with deliberate indifference to such needs." *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019) (citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); and *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). A detainee's medical need is "sufficiently serious" where it "contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). To satisfy the deliberate indifference requirement, a pretrial detainee "can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Id.* at 87 (emphasis in original).

Here, even if Plaintiff had alleged a defendant's personal involvement, Plaintiff's sparse allegations do not satisfy either prong of a plausible deliberate indifference to medical needs claim. Plaintiff's conclusory allegation that "I had to walk to court holding my arm in my left hand after being deny an arm slang by Justice Center medical staff is insufficient given that the Second Circuit has made clear that "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. "Nor does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (*citing Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

Thus, dismissal without prejudice would also be warranted for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

**IV. CONCLUSION**

For these reasons, the Court recommends Plaintiff's amended complaint be dismissed in its entirely for failure to state a

claim upon which relief may be granted. In recognition of his *pro se* status, the Court also recommends Plaintiff be granted leave to file a second amended complaint to cure the deficiencies identified above. [7] *See Ruffolo*, 987 F.2d at 131.

**WHEREFORE**, it is hereby

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by Plaintiff as his current location, with a copy of Plaintiff's inmate authorization (Dkt. No. 4), and notify the official that this action has been filed and that Plaintiff is required to pay the Northern District of New York the statutory filing fee of $350.00 in installments, over time, pursuant to 28 U.S.C. § 1915; [8] and it is further

***8 ORDERED** that the Clerk provide a copy of Plaintiff's inmate authorization (Dkt. No. 4) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the Clerk update the docket to substitute Mamoun Abraham for John Doe; and it is further

**RECOMMENDED** that Plaintiff's amended complaint (Dkt. No. 7) be **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A) for failure to state a claim upon which relief may be granted; and it is further

**RECOMMENDED** that Plaintiff be granted leave to file a second amended complaint that cures the deficiencies identified in this Report-Recommendation; and it is further

**ORDERED** that the Clerk provide Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff has fourteen (14) days within which to file written objections to the foregoing report. [9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4906112

## Footnotes

1 For reasons discussed below, the Clerk is directed to update the docket to substitute "Mamoun Abraham" for Defendant John Doe.

2 The Court will also consider the two letters, Dkt. Nos. 10 and 11, filed by Plaintiff. See Dkt. No. 12.

3 *See* 28 U.S.C. § 1915A(c) ("As used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."). Prisoners are not exempt from paying the full filing fee even when they have been granted permission to proceed IFP. *See* 28 U.S.C. § 1915(b)(1); *see also Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010) ("Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts.") *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

4 Plaintiff utilized the Court's form complaint for civil rights actions under 42 U.S.C. § 1983. Citations to Plaintiff's amended complaint will be to the pagination generated by CM/ECF, the Court's electronic filing system.

Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

5 At the top of the letter, Plaintiff lists three civil action numbers: 5:21-cv-886, 5:24-cv-124, and 5:24-cv-522. Dkt. No. 11. Thus, the letter was filed in all three of Plaintiff's cases. The Clerk's Office and the Court should not be tasked with determining which case Plaintiff's filing should be filed in. In this District, if a litigant has more than one action pending, any paper filed in a case must contain and relate to one civil action number unless the civil actions have been consolidated by the Court. Any motion or other papers purporting to relate to more than one action will not be accepted for filing and may be stricken by the Court. N.D.N.Y. L.R. 10.1(c)(1). On August 15, 2024, Plaintiff was advised by Text Order in *Kirby v. Hanks*, 5:24-cv-0124 (MAD/ML), proper case identification is required for all filings, which should include a case number, case name, and what relief Plaintiff is seeking.

6 The Court reaches a different result, however, with respect to Dkt. No. 11. Because Plaintiff's letter includes three civil action numbers, the submission does not include a caption and, based upon the allegations in the letter, it is not clear which action Plaintiff intended this letter to supplement, the Court does not construe Dkt. No. 11 as a request to amend the amended complaint. Moving forward, Plaintiff is advised he may not attempt to amend his pleadings in a piecemeal manner. *See* L.R. 15.1.

7 If the District Court adopts this Report-Recommendation, the second amended complaint must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure. Any second amended complaint should contain *all* factual allegations relevant to Plaintiff's claims, including, when possible, the dates, times, and places of the alleged underlying acts, as well as each individual who committed each alleged wrongful act, and the paragraphs should be correctly numbered. Any second amended complaint should allege facts demonstrating the personal involvement of any named defendant. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Any second amended complaint will replace the existing amended complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Jeanty v. Sciortino*, No. 6:22-CV-319 (BKS/TWD), 2023 WL 2931863, *14 (N.D.N.Y. Apr. 13, 2023).

8 Plaintiff will also be required to pay fees he may incur in this action, including copying and/or witness fees.

9 If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4905131
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David L. KIRBY, III, Plaintiff,
v.
Mamoun ABRAHAM, Defendant.

5:24-cv-522 (BKS/TWD)
|
Signed November 27, 2024

**Attorneys and Law Firms**

Plaintiff pro se: David L. Kirby, III, 05002304, Onondaga County Justice Center, 555 South State Street, Syracuse, NY 13202.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

***1** Plaintiff David L. Kirby, III brought this action under 42 U.S.C. § 1983 against the Syracuse Police Department and sought leave to proceed *in forma pauperis* ("IFP"). (Dkt. Nos. 1, 3). This matter was referred to United States Magistrate Judge Therese Wiley Dancks who, on June 14, 2024, granted Plaintiff's application to proceed IFP and issued a Report-Recommendation, recommending that Plaintiff's complaint be dismissed with prejudice and without leave to amend as to the Syracuse Police Department, pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A), but with leave to file an amended complaint. (Dkt. No. 6). Plaintiff did not file objections to the Report-Recommendation, but instead filed an amended complaint. (Dkt. No. 7). On June 26, 2024, this Court issued a text order terminating the recommendations in the Report-Recommendation as moot and recommitting the matter to Magistrate Judge Dancks for an initial review of the amended complaint. (Dkt. No. 9). On October 25, 2024, Magistrate Judge Dancks issued a Report-Recommendation recommending that Plaintiff's amended complaint be dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A) for failure to state a claim upon which relief may be granted, and that Plaintiff be granted leave to file a second amended complaint. (Dkt. No. 15). Magistrate Judge Dancks informed Plaintiff that he had fourteen days within which to file written objections to the Report under 28 U.S.C. § 636(b)(1), and that the failure to object to the Report within fourteen days would preclude appellate review. (*Id.* at 16). No objections to the Report-Recommendation have been filed.

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See* *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Court adopts the Report-Recommendation in its entirety.

For these reasons, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 15) is **ADOPTED**; and it is further

**ORDERED** that the amended complaint (Dkt. No. 7) is **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**; and it is further

**ORDERED** that any second amended complaint must be filed **within thirty (30) days** of the date of this Order. Any second amended complaint must be a complete pleading which will replace the current complaint in total and must comply with the directions in the Report-Recommendation (Dkt. No. 15, at 14–15, n. 7); and it is further

**ORDERED** that if Plaintiff files a timely second amended complaint, it shall be referred to Magistrate Judge Dancks for review; and it is further

**ORDERED** that if Plaintiff fails to file a timely second amended complaint, the Clerk shall close this case without further order; and it is further

**ORDERED** that the Clerk serve a copy of this Order on Plaintiff in accordance with the Local Rules.

***2 IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4905131

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 947554
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Dominick LAROCCO, Plaintiff,
v.
John JACKSON and James McGeown, Defendants.

No. 10–CV–01651 (NGG)(LB).
|
March 19, 2012.

**AMENDED MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, District Judge.

***1** Plaintiff Dominick LaRocco, pro se, brings this action against Defendants John Jackson and James McGeown under 42 U.S.C. § 1983. LaRocco alleges that he was the victim of a false arrest and imprisonment, a malicious prosecution, and a conspiracy to commit the former two acts. Defendant Jackson now moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion to dismiss is granted. The court also dismisses LaRocco's claim against Defendant McGeown for failure to serve pursuant to Federal Rule of Civil Procedure 4(m).

## I. BACKGROUND

LaRocco alleges that on or about November 10, 2008, he delivered a dozen roses and a gift to Kristin McGeown at the supermarket where she was working. (Compl. (Docket Entry # 2) at 9.) Later that night, Kristin McGeown filed a police report in which she claimed that LaRocco had made numerous unwelcomed visits to her place of work, sent her letters and gifts, and forcibly grabbed and kissed her. (*Id.* at 10.) Defendant John Jackson was the officer who took down the report. (*Id.* at 12.) LaRocco alleges that Defendant James McGeown, Kristin McGeown's father and an NYPD lieutenant, told Jackson, "I want this to stop." (*Id.* at 13.) The next day, November 11, 2008, Jackson arrested LaRocco on three charges: (1) aggravated harassment in the second degree; (2) stalking in the fourth degree; and (3) harassment in the second degree. (*See* Arrest Report (Docket Entry # 62–5) at 1–2.) LaRocco posted bail the following day but was arrested again for a parole violation on November 13, 2008. (Compl. at 13, 15.)

On April 7, 2010, LaRocco filed his instant Complaint pursuant to 42 U.S.C. § 1983, naming the City of New York, Kristin McGeown, John Jackson, and James McGeown as Defendants. [1] He alleges that Defendants subjected him to a false arrest and imprisonment, a malicious prosecution, and a conspiracy to commit the former two acts. (Compl. at 8.) LaRocco seeks monetary damages and a "lifetime order of protection against" the Defendants. (Compl. at 5.)

On July 9, 2010, the court dismissed the claims against Kristin McGeown on the grounds that she was not a state actor, and dismissed the claims against the City of New York on the grounds that LaRocco had not shown that a municipal policy or custom had caused a deprivation of his constitutional rights. (*See* Order of July 9, 2010 (Docket Entry # 7).) Thus, only John Jackson and James McGeown remained as Defendants.

The criminal case that resulted from the alleged false arrest and malicious prosecution had not been resolved at the time LaRocco filed his Complaint. As a result, the present case was stayed pending a final resolution of the criminal matter. (*See* Order of Apr. 20, 2011 (Docket Entry # 52).) On April 21, 2011, the criminal matter was resolved when LaRocco entered a plea of guilty to the charge of aggravated harassment in the second degree. (*See* Criminal Appearance History (Docket Entry # 62–6) at 1. [2]) John Jackson then moved to dismiss LaRocco's Complaint. (*See* Mot. to Dismiss (Docket Entry # 61).)

## II. STANDARD OF REVIEW

***2** In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court evaluates the sufficiency of the complaint under the "two-pronged approach" established by the Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). The court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Havden v. Paterson,* 594 F.3d 150, 161 (2d Cir.2010) (quoting *Iqbal,* 129 S.Ct. at 1950). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss. *Iqbal,* 129 S.Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to an entitlement for relief." *Id.* at 1950. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks omitted). Plausibility "is not akin to a probability requirement," but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

"[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers ." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted). "[T]he submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed–Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006) (internal quotation marks omitted). Nevertheless, even a pro se complaint will be dismissed if it does not contain "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570).

**III. DISCUSSION**

**A. Failure to Serve Defendant James McGeown**

Magistrate Judge Bloom ordered LaRocco to serve Defendant James McGeown by June 16, 2011. (*See* Order of Feb. 25, 2011 (Docket Entry # 48).) Because LaRocco has failed to do so, the court dismisses the claim against James McGeown pursuant to Federal Rule of Civil Procedure 4(m).[3] John Jackson is the only remaining Defendant.

**B. False Arrest**

LaRocco claims that his arrest by Jackson was illegal because it was based on false information and was made as a favor to James McGeown. However, LaRocco's guilty plea on a charge on which he was arrested precludes a determination that the arrest was unlawful.

A § 1983 false arrest claim must allege a deprivation of the plaintiffs Fourth Amendment right to remain free from unreasonable seizures, including the right to remain free from arrest absent probable cause. *Torraco v. Port Auth. of N.Y. & N.J.,* 615 F.3d 129, 139 (2d Cir.2010). "The existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006). "In the Second Circuit, an uncontroverted conviction for the crime of arrest is conclusive evidence that the arresting officer had probable cause to make the arrest." *Barmapov v. Barry,* No. 09–CV–03390 (RRM)(RML), 2011 WL 32371, at *4 (E.D.N.Y. Jan. 5, 2011) (citing *Cameron v. Fogarty,* 806 F.2d 380, 387–89 (2d Cir.1986)).

***3** Although LaRocco pled guilty to only one of the three charges on which he was arrested—all of which are linked to LaRocco's November 10, 2008, interaction with Kristin McGeown—that plea establishes probable cause for the arrest and thus bars LaRocco's claim for false arrest. *See id.* at *4 n. 5 ("[T]he Second Circuit ... does not require Plaintiff to have been convicted of exactly the same charge for which he was arrested. Th[e] court need only consider whether as a total transaction the activity forming the basis for the arrest is the same as the activity to which plaintiff pleaded guilty." (internal quotation marks, alterations, and citations omitted)); *Johnson v. New York City,* No. 01–CV–1860 (SJF)(VVP), 2004 WL 502929, at *4 (E.D.N.Y. Jan. 12, 2004); *Allison v. Farrell,* No. 97–CV–2247 (DAB), 2002 WL 88380, at *4 (S.D.N.Y. Jan.22, 2002). Because LaRocco has failed to show a lack of probable cause for his arrest, his claim for false arrest and imprisonment must be dismissed.

**C. Malicious Prosecution**

LaRocco's Complaint also alleges a claim for malicious prosecution against Jackson. This claim must be dismissed for similar reasons to his false arrest claim.

> In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law. To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff, (2) termination of the proceeding in plaintiff's favor, (3) lack of probable cause for commencing the proceeding, and (4) actual malice as a motivation for defendant's actions.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*Manganiello v. New York City,* 612 F.3d 149, 160–61 (2d Cir.2010) (internal quotation marks omitted).

As with LaRocco's false arrest claim, his claim for malicious prosecution fails because LaRocco cannot show a lack of probable cause for commencing the criminal proceedings against him. *See id* . Additionally, LaRocco's unchallenged guilty plea precludes a finding of "termination of the proceedings in [his] favor." *Id.; see also Okoi v. El Al Israel Airlines,* 378 Fed. Appx. 9, 11 (2d Cir.2010) (plaintiff's malicious prosecution claim failed because he pled guilty, even though the charges were later dismissed under a "conditional discharge" agreement). Because two essential elements of LaRocco's claim for malicious prosecution are absent, his claim is dismissed.

**D. Conspiracy**

Finally, LaRocco claims that Jackson conspired with James McGeown to falsely arrest and maliciously prosecute him. Because LaRocco's § 1983 claims for false arrest and malicious prosecution are dismissed, his claim for conspiracy to commit those violations must be dismissed as well. *See Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Pugh v. New York City,* No. 01–CV–0129 (ILG), 2002 WL 398804, at *2 n. 4 (E.D.N.Y. Jan.15, 2002).

**E. Leave to Amend**

***4** A court must give a pro se plaintiff leave to amend his complaint if the complaint "gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000). LaRocco's Complaint provides no such indication; thus, the court does not grant LaRocco leave to amend his Complaint. However, the court notes that if LaRocco successfully appeals his criminal conviction for aggravated harassment in the second degree, he might be able to cure his currently deficient Complaint. If that occurs, LaRocco is free to file a motion to reopen his case pursuant to Federal Rule of Civil Procedure 60(b).

**IV. CONCLUSION**

LaRocco's § 1983 claims against Defendant Jackson for false arrest and imprisonment, malicious prosecution, and conspiracy are DISMISSED with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). LaRocco's claims against Defendant McGeown are DISMISSED without prejudice pursuant to Federal Rule of Civil Procedure 4(m).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 947554

## Footnotes

1 At the time LaRocco filed his Complaint, he was incarcerated at Rikers Island.

2 In the context of a motion to dismiss, the court may consider facts alleged in the complaint, documents attached to the complaint or incorporated by reference, and matters of which courts may take judicial notice. *See Leonard F. v. Israel Discount Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999). Judicial notice may be taken of public records. *See Barmapov v. Barry,* No. 09–CV–03390 (RRM)(RML), 2011 WL 32371, at *2 n. 3 (E.D.N.Y. Jan. 5, 2011) (taking judicial notice of plaintiff's guilty plea in a false arrest and malicious prosecution case).

3 LaRocco acknowledges that he did not serve James McGeown. (*See* Pl. Opp. (Docket Entry # 59) at 25.)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4010106
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Windsor MORRISON, Plaintiff,
v.
The CITY OF NEW YORK, Peter Morales, and Edmund Morris, Defendants.

14-CV-4508 (MKB)
|
Signed 08/13/2019

**Attorneys and Law Firms**

Matthew S. Flamm, Brooklyn, NY, Richard Gross, Rubert & Gross, New York, NY, for Plaintiff.

Daniel Michael Braun, Mark David Zuckerman, NYC Law Department, New York, NY, for Defendants.

## ORDER

MARGO K. BRODIE, United States District Judge:

***1** On February 25, 2019, Plaintiff Windsor Morrison filed a motion for reconsideration of the Court's January 10, 2019 Memorandum and Order granting in part and denying in part Defendants' motion for summary judgment (the "January 2019 Decision"). (Pl. Mot. for Recons. ("Pl. Mot."), Docket Entry No. 95; Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 96); *see also* *Morrison v. City of New York*, No. 14-CV-04508, 2019 WL 175121 (E.D.N.Y. Jan. 10, 2019). Plaintiff challenges the Court's dismissal of his false arrest and imprisonment claims under both New York state law and federal law. (*See generally* Pl. Mem.) As further discussed below, because Plaintiff has not shown that the Court overlooked controlling law or data, the Court denies the motion.

## I. Discussion

### a. Standard of review

The standard for granting a motion for reconsideration is strict and "[r]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Cedar Petrochem., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 628 F. App'x 793, 796 (2d Cir. 2015) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)); *see also* *Oparah v. N.Y.C. Dep't of Educ.*, 670 F. App'x 25, 26 (2d Cir. 2016) ("The standard for granting a motion to reconsider 'is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked.' " (quoting *Shrader*, 70 F.3d at 257)); *see also* Local Civ. R. 6.3 (providing that the moving party must "set[ ] forth concisely the matters or controlling decisions which counsel believes the Court has overlooked").

It is thus well-settled that a motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.' " *Salveson v. JP Morgan Chase & Co.*, 663 F. App'x 71, 75–76 (2d Cir. 2016) (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)). A motion for reconsideration is "neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have previously been made." *Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 248 (E.D.N.Y. 2016) (quoting *Simon v. Smith & Nephew, Inc.*, 18 F. Supp. 3d 423, 425 (S.D.N.Y. 2014)), *aff'd*, 663 F. App'x 71 (2d Cir. 2016). In order to prevail on a motion for reconsideration, "the moving party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion." *Lichtenberg v. Besicorp Grp. Inc.*, 28 F. App'x 73, 75 (2d Cir. 2002) (citations and internal quotation marks omitted).

### b. Plaintiff has not stated a valid basis for reconsideration of his claim for false arrest and imprisonment under either state or federal law

#### i. State law false arrest and imprisonment claim

***2** Plaintiff argues that "the Court overlooked the significant differences between New York and federal law" in dismissing his state law claim for false arrest and imprisonment because "[u]nder New York law, an arrest based on a warrant determined to be invalid, vacated or nonexistent is without probable cause and unlawful under New York State law." (Pl. Mem. 1, 3 (citing *People v. Jennings*, 54 N.Y.2d 581 (1981)).)

In support, Plaintiff cites *Jiminez v. City of New York*, Index No. 1199/2014 (N.Y. Sup. Ct. May 16, 2016), for the proposition that "New York courts have unequivocally held that illegally obtained evidence may not be used to establish probable cause for purposes of false arrest actions." (*Id.* at 4.)

Defendants argue that the Court should deny Plaintiff's motion because his "fruit of the poisonous tree" argument was "not raised at all, and certainly not fairly, in his opposition to [D]efendants' motion for summary judgment." (Defs. Opp'n to Pl. Mot. ("Defs. Opp'n") 2, Docket Entry No. 97.) In addition, Defendants argue that Plaintiff has not pointed to any "controlling authority" which the Court overlooked in dismissing Plaintiff's state law claim for false arrest and imprisonment, (*id.* at 2–3), and that, in any event, the "fruit of the poisonous tree" doctrine is inapplicable to Plaintiff's arrest based on an indication in the New York City Police Department ("NYPD") database that there was an outstanding warrant for Plaintiff's arrest, (*id.* at 4–5).

The Court denies Plaintiff's motion for reconsideration as to his claim for false arrest and imprisonment under state law because Plaintiff has not "point[ed] to controlling decisions or data that the [C]ourt overlooked." *Cedar Petrochem., Inc.*, 628 F. App'x at 796 (quoting *Shrader*, 70 F.3d at 257). Plaintiff relies on *Jimenez*, a 2016 unreported New York Supreme Court case, to argue that the Court overlooked "differences between State and federal law," *i.e.*, that under state law, "illegally obtained evidence may not be used to establish probable cause for purposes of false arrest actions." (Pl. Mem. 4.) However, neither *Jimenez* nor the other cases cited by Plaintiff are controlling on this point. *See People v. Oliver*, No. 2518/05, 2006 WL 1594439 (N.Y. Sup. Ct. June 9, 2006) (applying the fruit of the poisonous tree doctrine to a *criminal* case), *rev'd on other grounds*, 835 N.Y.S.2d 308 (App. Div. 2007); *Tompson v. City of New York*, 23 N.Y.S.3d 839 (N.Y. Sup. Ct. 2015) (distinguishing between state law claims and section 1983 claims); *Murray v. City of New York*, 63 N.Y.S.3d 340 (App. Div. 2017) (finding an issue of fact as to whether the arresting officers had probable cause and thus reversing grant of summary judgment to defendants). In addition, while the court in *Jimenez* did state that "New York courts have unequivocally held that illegally obtained evidence may not be used to establish probable cause for purposes of false arrest" in a civil action, *Jiminez*, Index No. 1199/2014, that decision is inconsistent with *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 85 (2001), a controlling decision where the New York Court of Appeals held that the existence of probable cause defeated the plaintiff's false arrest claim in his civil case even though the evidence establishing probable cause was suppressed in the plaintiff's criminal case. *Id.* at 81–82, 85. Accordingly, because Plaintiff fails to identify any controlling decisions or data that the Court overlooked, the Court denies his motion for reconsideration as to his state law claim for false arrest and imprisonment. *See Cedar Petrochem., Inc.*, 628 F. App'x at 796 (explaining that a court may grant a motion for reconsideration where the party seeking reconsideration points to "controlling decisions or data that the court overlooked" (quoting *Shrader*, 70 F.3d at 257)).

**ii. Federal law false arrest and imprisonment claim**

***3** Plaintiff argues that the Court "overlooked and did not address or analyze the evidence that the ADW system was, by the City's own directives [in the New York City Patrol Guide], not reliable," and therefore his arrest based on the indication in the ADW system was without probable cause. (Pl. Mem. 5.)

Defendants argue that the evidence suggesting the unreliability of the ADW system was fully and fairly presented to the Court on summary judgment, and Plaintiff therefore improperly "repeat[s] old arguments previously rejected" in support of his motion to reconsider. (Defs. Mem. 6.) In addition, Defendants argue that the cited provision in the New York City Patrol Guide (the "Patrol Guide") does not lead to the conclusion that Defendants "knew or had reason to know that the warrant was invalid," or that the ADW system is unreliable, and Plaintiff's arrest was therefore made with probable cause based on the indication of an outstanding warrant. (*Id.* at 7.)

The Court denies Plaintiff's motion for reconsideration of his federal false arrest and imprisonment claim because he has not "point[ed] to controlling decisions or data that the [C]ourt overlooked." *Cedar Petrochem., Inc.*, 628 F. App'x at 796 (quoting *Shrader*, 70 F.3d at 257). In the January 2019 Decision, the Court addressed Plaintiff's argument that the officers who arrested him "deviated from proper police procedures" by failing to take "reasonable and required steps to confirm the unreliable information contained in the ADW system." *Morrison*, 2019 WL 175121, at *5–7. The Court explained that even if an officer makes an arrest based on an invalid warrant, the officer may still have had probable cause for the arrest if he or she "did not know, and had no reason to know, that the warrant had been vacated" or was otherwise invalid. *Id.* at *6 (quoting *United States v.*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*Santa*, 180 F.3d 20, 27 (2d Cir. 1999)). Because there was "no evidence in the record that either [arresting officer] knew or had reason to know that the warrant was invalid," the Court concluded that the officers had probable cause to arrest Plaintiff. *Id.* In addition, Plaintiff's argument that "the ADW system was, by the City's own directives [in the Patrol Guide], not reliable," is misplaced because even if the arresting officers had failed to follow the Patrol Guide, such failure would not amount to a constitutional violation because the Patrol Guide does "not establish constitutional standards." *See* *Daniels v. City of New York*, No. 16-CV-190, 2018 WL 4119191, at *7 (E.D.N.Y. Aug. 29, 2018) (citation omitted); *see also* *Cerbelli v. City of New York*, No. 99-CV-6846, 2008 WL 4449634, at *37 (E.D.N.Y. Sept. 8, 2008) ("[L]ocal agency-established policies, such as the Patrol Guide, do not establish constitutional standards."). Accordingly, because Plaintiff does not present any controlling decisions or data that the Court overlooked and instead "repeat[s] old arguments previously rejected" by the Court, *Salveson*, 166 F. Supp. 3d at 248, the Court denies Plaintiff's motion for reconsideration of his federal law claim for false arrest and imprisonment. *See* *Stoner v. Young Concert Artists, Inc.*, No. 11-CV-7279, 2013 WL 2425137, at *1 (S.D.N.Y. May 20, 2013) ("A motion for reconsideration is an extraordinary remedy, and this Court will not reconsider issues already examined simply because [a party] is dissatisfied with the outcome of his case. To do otherwise would be a waste of judicial resources." (alteration in original)).

## II. Conclusion

***4** For the foregoing reasons, the Court denies Plaintiff's motion for reconsideration.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2019 WL 4010106

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2663369
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher E. ROBINSON, Plaintiff,
v.
Michael WRIGHT, New York State Parole Officer; Matthew Mullen, New York State Parole Officer; and Tonia Zimmerman, New York State Parole Officer, Defendants.

5:21-CV-1098 (TJM/ML)
|
Signed July 11, 2022

**Attorneys and Law Firms**

CHRISTOPHER E. ROBINSON, Plaintiff, Pro Se, Cayuga Correctional Facility, Post Office Box 1186, Moravia, New York 13118.

**ORDER and REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

***1** The Clerk has sent this *pro se* amended complaint filed by Christopher E. Robinson ("Plaintiff") to the Court for review. (Dkt. No. 11.) For the reasons discussed below, I recommend that Plaintiff's Amended Complaint (Dkt. No. 11) be accepted in part for filing and dismissed in part without leave to amend.

## I. BACKGROUND

Construed as liberally [1] as possible, Plaintiff's Amended Complaint alleges that defendants Michael Wright, Matthew Mullen, and Tonia Zimmerman (collectively "Defendants"), who are all New York State parole officers, violated his civil rights by submitting perjured testimony against him. (*See generally* Dkt. No. 11 [Am. Compl.].) More specifically, Plaintiff alleges that on April 29, 2021, during a parole revocation hearing: (1) Defendant Wright testified that (a) Plaintiff was not allowed to possess a smartphone throughout his parole, and (b) his reasoning for requesting a search of Plaintiff's residence was because of law enforcement contact related to a domestic violence incident involving Plaintiff; (2) Defendant Mullen testified that he personally searched Plaintiff's bedroom and found a smartphone under a mattress; and (3) Defendant Zimmerman (a) omitted, while under oath, where she found alleged contraband while searching Plaintiff's residence, and (b) omitted, while under oath, Officer Delaney when listing the individuals present while searching Plaintiff's residence. (*Id.*)

Plaintiff alleges that based on Defendants' perjured statements, the parole violations against him were sustained and he has been reincarcerated. (*Id.*) Based on these factual allegations, Plaintiff asserts the following five causes of action: (1) a claim that Plaintiff's right to a fair trial was violated by Defendants pursuant to the Due Process Clause in the Fourteenth Amendment and 42 U.S.C. § 1983; (2) a claim that Plaintiff's right to a fair trial was violated by Defendants pursuant to the Fifth Amendment and 42 U.S.C. § 1983; (3) a claim that Defendant Wright violated Plaintiff's rights in making an arbitrary and capricious decision pursuant to the Fourteenth and Fifth Amendments; (4) a claim of malicious prosecution against Defendants pursuant to the Fifth, Eighth, and Fourteenth Amendments; and (5) a claim of false imprisonment against Defendants pursuant to the Fifth, Eighth, and Fourteenth Amendment. (*Id.*) As relief, Plaintiff seeks $3,000,000.00 in damages against Defendants. (*Id.*)

## II. LEGAL STANDARD GOVERNING INITIAL REVIEW OF A COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

***2** In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"[E]xtreme caution should be exercised in ordering sua sponte dismissal of a ... complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

**III. ANALYSIS**

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Amended Complaint with this principle in mind, I recommend that his claims be accepted in part for filing and dismissed in part without leave to amend.

**A. Section 1983 Claims Against Defendants in Official Capacities**

To the extent that Plaintiff's claims are asserted against Defendants in their official capacities, I recommend that they be dismissed for failure to state a claim upon which relief may be granted. Plaintiff seeks only monetary damages, and Defendants—in their official capacities—are immune from suit pursuant to the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("The Court has held that, absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court. This bar remains in effect when State officials are sued for damages in their official capacity." (internal citations omitted)); *Quern v. Jordan*, 440 U.S. 332, 341 (1979) ("[W]e simply are unwilling to believe, on the basis of such slender 'evidence,' that Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States."); *Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir. 1986) ("Using its authority under section 5 of the fourteenth amendment, Congress may abrogate the eleventh amendment in the absence of a waiver by the states, but the civil rights statute 42 U.S.C. § 1983 does not override the eleventh amendment." (internal citations omitted)).

***3** Plaintiff alleges that Defendants are New York State Parole Officers. (Dkt. No. 11 at 2-3.) "Because the New York State [Division of Parole ("DOP")] is an arm of the state, [and] Plaintiff [asserts] claims against.... DOP employees[,] ... the Eleventh Amendment bars any claims for damages against ... [D]efendants in their official capacities." *Kirkland v. New York State Div. of Parole*, 20-CV-8606, 2021 WL 706709, at *3 (S.D.N.Y. Feb. 18, 2021) (citing *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009)).

As a result, I recommend that Plaintiff's claims against Defendants in their official capacities be dismissed because they are immune from suit.

**B. Section 1983 Claims Against Defendants in Individual Capacities**

To the extent that Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 against Defendants in their individual capacities, I recommend that his claims pursuant to the Fifth and Eighth Amendments and alleging malicious prosecution and false arrest be dismissed but that Defendants be directed to respond to his claim pursuant to the Fourteenth Amendment.

**1. Fifth Amendment**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

The Fifth Amendment Due Process Clause applies only to the federal government, and not to state or municipal governments. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law."); *Poe v. Ullman*, 367 U.S. 497, 540 (1961) (explaining that prohibitions "against the deprivation of life, liberty or property without due process of law" set forth in Fourteenth Amendment are applicable to state government and same prohibitions in Fifth Amendment are applicable to "the Federal Government"); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466-67 (S.D.N.Y. 2009) (holding that any due process claim "against the City is properly brought under the Fourteenth Amendment, not the Fifth Amendment"); *Mitchell v. Home*, 377 F. Supp. 2d 361, 372-73 (S.D.N.Y. 2005) ("The Fifth Amendment's Due Process Clause protects citizens against only federal government actors, not State officials. Any due process rights plaintiff enjoys as against state government officials ... arise solely from the Fourteenth Amendment due process clause." (internal citations omitted)).

Plaintiff has not alleged that any federal official violated his Fifth Amendment due process rights. Instead, all of his allegations are against state officials. Thus, Plaintiff's due process claims may only be brought under the Fourteenth Amendment, not the Fifth Amendment. *See Dusenbery*, 534 U.S. at 167 (explaining that Fifth Amendment does not apply to State officials); *Ambrose*, 623 F. Supp. 2d at 466-67 (stating that Fifth Amendment does not apply to city officials).

As a result, I recommend that Plaintiff's Fifth Amendment claim against Defendants is dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

**2. Eighth Amendment**

The Eighth Amendment "protects prisoners from cruel and unusual punishment by prison officials," *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015), whereas the Fifth and Fourteenth Amendments "prohibit the government from depriving any person of life, liberty, or property, without due process of law." *Smalls v. Collins*, 10 F.4th 117, 133 (2d Cir. 2021) (internal quotation marks, citations and alterations omitted). Generally, *pro se* plaintiffs bring Eighth Amendment claims to challenge "excessive force," "denial of adequate medical care," "unconstitutional conditions of confinement unrelated to medical care," and the "failure to protect." *Randle v. Alexander*, 960 F. Supp. 2d 457, 470 (S.D.N.Y. 2013). Though Plaintiff cites the Eighth Amendment, he does not raise issues that are customarily resolved by Eighth Amendment claims; instead, he appears to challenge the lack of "due process of law." (Dkt. No. 11.) Accordingly, Plaintiff's Eighth Amendment claims "relating to [parole revocation] proceedings ... are more properly analyzed as due process violations." *Barclay v. New York*, 477 F. Supp. 2d 546, 555 (N.D.N.Y. 2007) (Hurd, J.).

**3. Malicious Prosecution/False Imprisonment**

***4** A plaintiff alleging malicious prosecution and false arrest must demonstrate termination of the proceedings in his favor. *See Henry v. City of New York*, 17-CV-3450, 2021 WL 1648029, at *4 (S.D.N.Y. Apr. 27, 2021) (citing *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 391 (S.D.N.Y. 2016)) (dismissing the plaintiff's malicious prosecution claim because he did not "secure a favorable termination of the criminal action."); *Aragon v. New York*, 14-CV-9797, 2017 WL 2703562, at *5 (S.D.N.Y. June 22, 2017) (quoting *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)) ("Thus, to recover damages for a false imprisonment claim under Section 1983, a prisoner must demonstrate that his conviction 'has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.' ").

Here, Plaintiff alleges that his "parole violations were sustained and [he has] been reincarcerated." (Dkt. No. 11 at 4.) Thus, Plaintiff has not obtained a favorable termination of the underlying proceeding to state a malicious prosecution or false imprisonment claim.

As a result, I recommend that Plaintiff's claims alleging malicious prosecution and false arrest be dismissed for failure to state a claim upon which relief may be granted.

**4. Fourteenth Amendment**

A final parole revocation proceeding is an administrative proceeding held solely to enable parole authorities to determine whether the parolee violated the terms of parole.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*People ex rel. Maiello v. New York State Bd. of Parole,* 65 N.Y.2d 145, 147 (N.Y. 1985). Although a parolee facing revocation of release is not entitled to the "full panoply of rights" due to a defendant in a criminal prosecution, the Supreme Court has held that the revocation of parole implicates a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *Morrisey v. Brewer,* 408 U.S. 471, 482 (1972). Upholding the *Morrisey* decision, a year later the Supreme Court further defined the process required during a preliminary parole revocation hearing. *Gagnon v. Scarpelli,* 411 U.S. 778, 786 (1973). "At the ... hearing, a probationer or parolee is entitled to notice of the alleged violations of probation or parole, an opportunity to appear and to present evidence in his own behalf, a conditional right to confront adverse witnesses, an independent decisionmaker, and a written report of the hearing." *Gagnon,* 411 U.S. at 786 (citing *Morrisey,* 408 U.S. at 487). Furthermore, at the final hearing, individuals are given a more detailed hearing with the minimum requirements including:

> (a) written notice of the claimed violations of (probation or) parole; (b) disclosure to the (probationer or) parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking (probation or) parole.

*Id.* (citing *Morrisey,* 408 U.S. at 489).

Here, Plaintiff alleges that his constitutional rights were violated during his parole revocation hearing based on false statements made by Defendants. Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff,* 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourteenth Amendment claims against Defendants in their individual capacities.

## IV. OPPORTUNITY TO AMEND

***5** Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[2]

In this instance, I conclude that any further amendments to Plaintiff's Amended Complaint would be futile. As a result, I recommend that Plaintiff's Amended Complaint be dismissed without leave to amend to the extent that it alleges claims pursuant to 42 U.S.C. § 1983 against Defendants in their (1) official capacities, and (2) individual capacities alleging violations of the Fifth and Eighth Amendments, for malicious prosecution, and for false imprisonment. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 168 (2d Cir. 2003) (quoting *Dluhos v. Floating & Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998)) (finding that the "District Court did not abuse its discretion in denying [the plaintiff] leave to amend the complaint because there was a 'repeated failure to cure deficiencies by amendments previously allowed.' "); *Salinger v. Projectavision, Inc.,* 972 F. Supp. 222, 236 (S.D.N.Y. 1997) ("Three bites at the apple is enough.").

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 11) be **ACCEPTED FOR FILING** with respect to Plaintiff's Fourteenth Amendment due process claim against Defendants in their individual capacities; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's claims (1) against Defendants in their official capacities, and (2) against Defendants in their individual capacities pursuant to the Fifth Amendment, Eighth Amendment, for malicious prosecution, and for false imprisonment, for failure to state a claim upon which relief may be granted and because it seeks monetary relief against Defendants who are immune from such relief pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [3]

***6 NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [4] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2663369

## Footnotes

1 The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2 *See also* *Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

3 The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

4 If you are proceeding *pro se* and served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4356214
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher E. ROBINSON, Plaintiff,
v.
Michael WRIGHT, New York State Parole Officer, Matthew Mullen, New York State Parole Officer, and Tonia Zimmerman, New York State Parole Officer, Defendants.

5:21-CV-1098 (TJM/ML)
|
Signed September 19, 2022

**Attorneys and Law Firms**

Christopher E. Robinson, Moravia, NY, Pro Se.

**DECISION & ORDER**

Thomas J. McAvoy, Senior United States District Judge

***1** The Court referred this *pro se* Complaint to Magistrate Judge Miroslav Lovric for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff alleges that Defendants, New York State Parole Officers, violated his rights when they brought parole violations against him. On May 12, 2022, the Court accepted and adopted a Report-Recommendation from Judge Lovric that recommended that the Court dismiss Plaintiff's Complaint with leave to replead. See dkt. # 12. The Court also accepted for filing an Amended Complaint that Plaintiff filed in response to Judge Lovric's Report-Recommendation. Id. The Court referred that Amended Complaint to Judge Lovric for an initial review. Id.

Judge Lovric's Report-Recommendation, dkt. # 13, issued July 11, 2022, recommends that the Court permit Plaintiff's Fourteenth Amendment due process claim against the Defendants in their individual capacities to go forward. Judge Lovric concluded that Plaintiff could conceivably make out a claim that the Defendants had violated his due process rights by testifying falsely at his parole revocation hearing. As far as the other claims Plaintiff raised, Judge Lovric concluded that better pleading would not cure their deficiencies and recommended that those claims be dismissed without opportunity to replead.

Plaintiff did not object to the Report-Recommendation. The time for such objections has passed. After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice and the Court will accept and adopt the Report-Recommendation for the reasons stated therein.

Plaintiff wrote to inform the Court that he had no objections to the Report-Recommendation. See dkt. # 16. Instead, he asked permission for leave to file a summary judgment motion because he could "show, beyond a reasonable doubt, that his claim is meritorious." Id. The Court will deny this motion. It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). As this law makes clear, a motion for summary judgment argues that no evidence exists to support a particular claim. Defendants have not yet answered the Complaint, and no evidence has yet been collected. A motion for summary judgment would not be appropriate at this time. The Court will deny the motion. A schedule for discovery and motion deadlines will be set after Defendants have answered or otherwise responded to the Amended Complaint.

Accordingly,

The Report-Recommendation of Magistrate Judge Lovric, dkt. # 13, is hereby **ACCEPTED** and **ADOPTED**. Plaintiff's Amended Complaint is hereby accepted for filing with respect to Plaintiff's due process claim against the Defendants in their individual capacities. Plaintiff's Amended Complaint is hereby DISMISSED WITHOUT LEAVE TO REPLEAD with respect to:

***2** 1. Plaintiff's claims against Defendants in their official capacities;

2. Plaintiff's claims against Defendants in their individual capacities pursuant to the Fifth Amendment, Eighth Amendment, and any claims for malicious prosecution and false imprisonment.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4356214

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1146942
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Leon G. TSINBERG, Plaintiff,
v.
CITY OF NEW YORK, Defendant.

20 Civ. 749 (PAE)
|
Signed 03/25/2021

**Attorneys and Law Firms**

Leon G. Tsinberg, Bronx, NY, Pro Se.

Pamela Ann Koplik, Mark W. Muschenheim, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendant.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

***1** Plaintiff Leon G. Tsinberg, a "non-admitted attorney" proceeding *pro se*, sues the City of New York (the "City") under 42 U.S.C. § 1983, alleging constitutional violations arising from the ticketing and towing of his 2009 Nissan Altima (the "Vehicle").

In 2018, while Tsinberg was temporarily living out of state, the Vehicle accumulated several parking tickets, mostly for displaying an expired registration. After Tsinberg failed to respond to those tickets, the City entered default judgments on them. Tsinberg later moved to reopen those judgments, but did not succeed. Then, in January 2019, the City immobilized and towed the Vehicle, which remains in storage accruing storage fees. Tsinberg alleges that these events violated, *inter alia*, his due process rights under the Fourteenth Amendment, his right to be free from excessive fines under the Eighth Amendment, his right to be free from unreasonable seizures under the Fourth Amendment, and his right against double jeopardy under the Fifth Amendment. The City has moved to dismiss all Tsinberg's claims.

Before the Court is the report and recommendation of the Honorable Sarah L. Cave, United States Magistrate Judge, recommending that the City's motion to dismiss be granted. *See* Dkt. 46 ("Report"). For the following reasons, the Court adopts that recommendation in full.

## I. Background

### A. Factual Background [1]

The Court adopts the Report's comprehensive account of the facts and procedural history, to which no party objects. The following summary captures the limited facts necessary for an assessment of the issues presented.

In New York City, the Parking Violations Bureau ("PVB") [2] issues and adjudicates summonses for violations of parking and traffic laws. *See* N.Y. Veh. & Traf. Law ("VTL") § 237(1)–(2), (9); N.Y.C. Admin. Code § 19-201 *et seq.* A person accused of a parking violation is first given a summons, *i.e.*, a parking ticket, containing information about the charged offense and how to contest or pay it. *See* VTL § 238(1); N.Y.C. Admin. Code § 19-204(a). State and City law require that, if the operator of the vehicle is not present at the time of service, notice of the violation must be affixed to the vehicle "in a conspicuous place." VTL § 238(2); N.Y.C. Admin. Code § 19-204(b). In that case, such notice "shall have the same force and effect and shall be subject to the same penalties for disregard thereof as" personal service on the violator. VTL § 238(2); N.Y.C. Admin. Code § 19-204(b).

***2** Once a parking summons issues, the recipient may plead guilty and pay the fine, or plead not guilty and receive a hearing date before an administrative law judge ("ALJ"). N.Y.C. Admin. Code §§ 19-202, 19-204, 19-206. A person may so plead by mail, by phone, in person at one of the Department of Finance's "Business Centers," or online, either through the City's website or a "Pay or Dispute" application. *See Schaer v. City of New York*, No. 09 Civ. 7441 (CM), 2011 WL 1239836, at *7 (S.D.N.Y. Mar. 25, 2011); Report at 3–4. If a party fails to plead or appear, the City may obtain a default judgment sustaining the charge in the summons, fixing the fine, and assessing fees and penalties. *See* N.Y.C. Rules & Regs. tit. 19 §§ 39-05, 39-07, 39-10(d). Once a default judgment is entered, a party may reopen it "only upon written application showing excusable neglect and a substantial defense to the charge." *Id.* § 39-10(i). After a party is found guilty of a parking violation, she may appeal to the PVB Appeals Board. *See* VTL § 242; N.Y.C. Rules & Regs. tit. 19 § 39-12(a), (b)(2). Finally, a party may challenge an adverse decision by the Appeals Board in New York State Supreme Court, by petitioning under Article 78 of the N.Y.

C.P.L.R. ("CPLR"). *See* VTL § 243; N.Y.C. Admin. Code § 19-209.

If the owner of a vehicle owes more than $350 in judgments, the City may tow and impound her vehicle to satisfy those outstanding judgments. *See* N.Y.C. Admin. Code § 19-212; N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9). In that case, the owner may be held liable for towing and storage fees associated with the impoundment. *See* CPLR § 8013(c);[3] N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9)(iii)–(vii) (authorizing, among other things, $185 removal fee and $20-per-day storage fee).

Tsinberg spent most of 2018 temporarily living and working in Pennsylvania, where he ran a business out of the Philadelphia International Airport. FAC ¶ 1. During that time, he left the Vehicle parked in the Riverdale neighborhood of the Bronx, where it amassed 11 tickets, five of which are relevant here. *Id.* ¶¶ 1–2; Dkt. 22-3; Dkt. 26 ("Koplik Decl."), Ex. A.[4] The first of those five tickets was for displaying an expired inspection sticker; the other four were for displaying an expired registration sticker. *See* Dkt. 22-3; Koplik Decl., Exs. D–H. Each was issued on a different day between April and October 2018. After Tsinberg failed to respond to them, the City entered a default judgment on each about three months after issuance. *See* Koplik Decl., Exs. D–H; Report at 6–7. Each ticket was originally $65, or $325 total, but, after penalties associated with Tsinberg's failure to plead to or contest the tickets accrued, the total amount owed on the five tickets rose to over $600. FAC ¶ 34; Report at 6–7.

In January 2019, Tsinberg discovered the tickets and the default judgments against him. FAC ¶ 3. He then sought to vacate three of the default judgments by filing disputes through the City's "Pay or Dispute" application and submitting an image of his current, unexpired registration. *See* FAC ¶ 11; Koplik Decl., Exs. D–F. Each application was denied by an ALJ because his application did not show a legally sufficient reason for his failure to respond to the summons, and his proof of current registration did not refute that his car had displayed an expired registration when each summons was issued. *See* Koplik Decl., Exs. D–F.

On January 29, 2019, the City placed an immobilizing "boot" on the Vehicle. FAC ¶ 14. The City affixed a notice to the Vehicle, which provided a telephone number and five physical addresses at which Tsinberg could pay the outstanding judgments. Dkt. 22-4 ("Booting Notice"). The City also affixed an execution to the Vehicle, which stated that the state of New York, or one of its subdivisions, was the judgment creditor, "and/or the debt enforced is for child support, spousal support, maintenance or alimony." FAC ¶ 7; Dkt. 22-2 ("Execution"). The same day, Tsinberg filed an order to show cause ("OTSC") in New York State Supreme Court, seeking to commence an Article 78 proceeding and to obtain a temporary restraining order ("TRO") to prevent the towing of his Vehicle. FAC ¶¶ 5, 8; Dkt. 22-9. He tried to serve the City with the OTSC at two the addresses provided on the Booting Notice, but neither office would accept service. FAC ¶ 10.

***3** On January 30, 2019, the City towed the Vehicle. *Id.* ¶ 12. On February 15, 2019, the City placed an "indefinite sales hold" on the Vehicle—meaning that the Vehicle would not be auctioned to satisfy Tsinberg's unpaid judgments—given the pending Article 78 petition. *See id.* ¶¶ 22, 36; Koplik Decl., Ex. R. The Vehicle remains in City storage and has accrued thousands of dollars in storage fees. Reply at 7 n.5 (as of July 28, 2020, total outstanding judgments were $10,397.72). On June 25, 2019, the New York State Supreme Court dismissed Tsinberg's Article 78 petition because he had failed to serve or file any complaint or petition in the matter and to exhaust administrative appeals. Koplik Decl., Ex. Q.

### B. Procedural History

On January 28, 2020, Tsinberg filed a Complaint. Dkt. 2. On May 7, 2020, the City moved to dismiss. Dkts. 15–17. On June 18, 2020, Tsinberg filed the FAC. On August 3, 2020, the City moved to dismiss the FAC, Dkt. 25, and filed a memorandum of law in support, City Mem., and the declaration of Pamela A. Koplik, Esq., *see* Koplik Decl. On August 4, 2020, the Court referred that motion to Judge Cave for a report and recommendation. Dkt. 29. On August 18, 2020, Tsinberg opposed the City's motion. Dkt. 31 ("Pl. Opp'n"). On September 8, 2020, the City replied. *See* Reply.

While the motion to dismiss was pending, Tsinberg sought "preliminary discovery" from the City; the City moved to stay discovery pending a ruling on its motion to dismiss. *See* Dkt. 43 at 1. On November 19, 2020, Judge Cave granted the City's motion to stay, with an exception for the exchange of five narrow categories of information, largely relating to the circumstances surrounding the seizure and storage of the Vehicle. *Id.* at 2–3.

On January 22, 2021, Judge Cave issued the Report, which recommends the dismissal of the FAC with prejudice and without leave to amend. *See* Report at 1, 35. On February

15, 2021, Tsinberg filed objections to the Report. Dkt. 51 ("Objections"). On March 15, 2021, the City responded. Dkt. 54 ("Response").

## II. Legal Standard

### A. Report and Recommendation

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When specific objections are made, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (citing *Wilds v UPS*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)); *see also Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006).

To the extent that the objecting party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report and recommendation strictly for clear error. *See Dickerson v. Conway*, No. 08 Civ. 8024 (PAE), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *Kozlowski v. Hulihan*, Nos. 09 Civ. 7583, 10 Civ. 0812 (RJH), 2012 WL 383667, at *3 (S.D.N.Y. Feb. 7, 2012).

### B. Motion to Dismiss Pursuant to Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

***4** Where, as here, the plaintiff is *pro se*, his complaint must be construed "liberally, reading it with special solicitude and interpreting it to raise the strongest claims that it suggests." *J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013) (quoting *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). This mandate "applies with particular force when a plaintiff's civil rights are at issue." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 348 (S.D.N.Y. 2009). Consistent with that approach, factual allegations made in a *pro se* plaintiff's opposition papers, or the attachments thereto, may be considered "as supplementing the Complaint, at least to the extent they are consistent with the allegations in the Complaint." *George*, 2012 WL 2512964, at *6 n.7.

However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Maisonet*, 640 F. Supp. 2d at 348 (citation omitted). Thus, even a *pro se* plaintiff "must state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). The Court need not accept allegations that are "contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005).

## III. Discussion

The Report recommends dismissal of Tsinberg's entire case for failure to state a claim. In many respects, Tsinberg's objections do not engage with any specific aspects of the thoughtful and well-reasoned Report, but reprise, through 35 "claims" spanning nearly 50 pages, general assertions about the sufficiency of the FAC's allegations and principles of constitutional law. Thus, as to much of the Report, review for clear error would be appropriate. *See Dickerson*, 2013 WL 3199094, at *1. Nevertheless, for the avoidance of doubt, in the interest of thoroughness, and given Tsinberg's *pro se* status, the Court will review the entire Report *de novo*.

The Court addresses Tsinberg's claims in the following order: (1) Fourteenth Amendment Due Process Clause claims; (2) Fifth Amendment Double Jeopardy Clause claim; (3) Eighth Amendment Excessive Fines Clause claim; (4) Fourth Amendment claim; (5) municipal liability claim; (6) Fair Debt Collection Practices Act claim; and (6) state-law claims. Finally, the Court addresses Tsinberg's request for leave to amend the FAC.

**A. Due Process Clause**

**1. Procedural Due Process**

Tsinberg claims that the City's ticketing and towing of his car violated his rights to procedural due process because he received insufficient notice of the tickets, because the dispute mechanism provided by the "Pay or Dispute" application was inadequate, and because his Article 78 proceeding failed to provide adequate post-deprivation remedies. *See* FAC ¶¶ 48–61; Pl. Opp'n ¶¶ 1–11, 18–20.

The Court agrees with the Report that Tsinberg has failed to allege a violation of his rights to procedural due process. Before depriving a person of a liberty or property interest, the state, consistent with due process of law, must use procedures that balance the interests involved in the deprivation. "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). The interests to be balanced are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

***5** "Courts in this Circuit have found that, as a general matter, the PVB/Article 78 review process for challenging parking summonses meets the requirements of procedural due process." *Nestle Waters N. Am., Inc. v. City of New York*, No. 15 Civ. 5189 (ALC), 2016 WL 3080722, at *8 (S.D.N.Y. May 25, 2016) (collecting cases), *aff'd*, 689 F. App'x 87 (2d Cir. 2017) (summary order); *see Schaer*, 2011 WL 1239836, at *9 ("The City's administrative parking violations system has been held to be constitutional.") (collecting cases); *Rackley v. City of New York*, 186 F. Supp. 2d 466, 480 (S.D.N.Y. 2002) (The City "provide[s] parking violators ... with more than sufficient process to satisfy the Constitution."). To plausibly allege a procedural due process violation, therefore, Tsinberg must allege some departure from that constitutionally "more than sufficient" process.

Tsinberg has failed to do so. First, he alleges that the City's service of parking summonses by affixing them to his car and mailing them to him was insufficient. That is because he alleges that he failed to receive *actual* notice of the tickets and, because he lived in Philadelphia at the time, the City should have either called or emailed him to give him such notice before the judgments against him were entered. *See* FAC ¶¶ 48–49; Objections at 17, 20–21. But the method of service the City employed here is prescribed by the statutes above, and courts have repeatedly held it to be constitutional. *See* VTL § 238(2); *e.g.*, *Nestle Waters*, 2016 WL 3080722, at *8. Nor was the City obliged to anticipate that Tsinberg might have been out of state for several months, and to depart from its statutorily prescribed method of service to accommodate that absence. Further, as the Report notes, Tsinberg did receive actual notice of the default judgments against him, as evidenced by his challenges thereto, and had both the chance to contest them before the City towed and impounded his Vehicle several weeks later, and to pay them while his Vehicle continued to accumulate storage costs. *See* Report at 19.

Second, Tsinberg alleges that the procedures through which he tried to vacate the default judgments against him were deficient because the "Pay or Dispute" application is flawed in unspecified ways. *See* FAC ¶¶ 48–51; Pl. Opp'n ¶ 10. To the extent that Tsinberg alleges that the City obtained judgments against him through "adjudication via app," that is wrong. As the Report notes, the default judgments were entered in the usual course, and Tsinberg merely tried to vacate them through the "Pay or Dispute" application. *See* Report at 18–19. As to the latter process, Tsinberg was never required to use that method of contesting the judgments—he remained free at all times to file his disputes by mail or in person. *See* City Reply at 3 n.1. His decision to do so, absent any allegation that other such options were unavailable, cannot support a plausible claim for any deprivation of procedural due process.

Third, Tsinberg alleges that, while Article 78 proceedings may, in some cases, provide adequate post-deprivation protections against arbitrary government action, here that was not so because the New York Supreme Court's dismissal of his Article 78 proceeding for failure to serve, failure to file a petition, and failure to exhaust administrative remedies was "merely on a Temporary Restraining Order," and not a "valid, final judgment on the merits." FAC ¶ 55. He also argues that, because the Booting Notice did not provide him with the proper address for service of an Article 78 petition on the City, he was denied procedural due process.

Pl. Opp'n ¶¶ 7–9; Objections at 6–7, 9–11, 15–17. As to the first point, Tsinberg's decision to seek a TRO rather than commence an Article 78 proceeding, as well as his failure to serve or file any attending petition or exhaust administrative remedies, resulted from his own decisions, not any procedural impediments erected by the City. *See* Koplik Decl., Ex. Q. Those decisions do not affect the availability of Article 78 proceedings as a sound, post-deprivation guard against erroneous deprivations. "The fact that [a plaintiff] failed properly to pursue the state court action, and that it is now too late to do so, does not affect [the] due process analysis. Where a state law remedy gives a party a meaningful opportunity to challenge the state's action, he is not deprived of due process simply because he failed to avail himself of the opportunity." *Nestle Waters*, 2016 WL 3080722, at *10 (quoting *Rivera-Powell v. N.Y.C. Bd. of Elections*, 740 F.3d 458, 467 n.9 (2d Cir. 2006)); *see Schaer*, 2011 WL 1239836, at *9 ("[T]he Second Circuit has 'held on numerous occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy[.]' " (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 985 F.2d 90, 93 (2d Cir. 1996))). [5] As to the second, Tsinberg does not provide any authority for the notion that the City deprived him of due process by failing to provide, on the Booting Notice, the proper address for service of a TRO, rather than the proper address at which to pay his tickets.

***6** The Court thus agrees with the Report that the FAC fails to plausibly allege any procedural due process violation. [6]

### 2. Substantive Due Process

Although the FAC did not do so expressly, the Report also construed it to assert a substantive due process claim, but found such claim to be deficient. The Court agrees with that assessment. To violate Tsinberg's substantive due process rights, the City's actions "must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.' " *Schaer*, 2011 WL 1239836, at *6 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)). "Only conduct that 'shocks the conscience' qualif[ies] as even potentially violative of plaintiffs' substantive due process rights." *Id.* (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)). Upon *de novo* review, the Court agrees with, and adopts in full, the Report's conclusion that the City's ticketing and towing of Tsinberg's car—all under established and oft-approved state and local law—does not approach this threshold. *See* Report at 23–24. [7] Tsinberg's claim for violation of his substantive due process rights is also dismissed.

### B. Double Jeopardy

Tsinberg next claims that the issuance of several tickets for the same alleged failure to display an unexpired registration sticker subjected him to double jeopardy, in violation of the Fifth Amendment. *See* FAC ¶ 45. The Report recommends dismissing this claim because the Double Jeopardy Clause applies only to criminal proceedings, and Tsinberg has failed to adequately allege that the parking sanctions imposed on him were "so punitive in form and effect as to render them criminal despite [the legislature's] intent to the contrary." Report at 25–26 (quoting *Doe v. Pataki*, 120 F.3d 1263, 1274 (2d Cir. 1997)).

***7** Again, the Court agrees with that assessment. The Double Jeopardy Clause protects an individual's right not to be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V, cl. 2. The Supreme Court has held that the "Clause protects only against the imposition of multiple *criminal* punishments for the same offense," and does not apply to civil penalties. *Hudson v. United States*, 522 U.S. 93, 99 (1997). To decide whether a sanction is criminal or criminal, courts apply a two-part test. First, courts consider whether the legislative intent behind the law was punitive: If the intent was " 'not to punish, but to accomplish some other legitimate governmental purpose,' then it has been considered 'nonpenal.' " *Doe*, 120 F.3d at 1273. Second, even where a law was not *designed* to be punitive, courts then must determine whether it is "so punitive either in purpose or effect" that the sanction at issue is "transform[ed] into a criminal penalty." *United States v. Ward*, 448 U.S. 242, 248–49 (1980). The Supreme Court "has not spelled out the precise nature of the second-stage inquiry," *Doe*, 120 F.3d at 1275, but has identified several non-exclusive and non-dispositive factors that may guide it, *see Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963) (identifying, *inter alia*, whether the sanction imposes an affirmative disability or restraint, has historically been considered punishment, and depends on a finding of scienter). At this second stage of the inquiry, the burden is on the party challenging a law to "show by 'the clearest proof' that the sanctions imposed 'are *so punitive in form and effect* as to render them criminal despite [the legislature's] intent to the contrary.' " *Doe*, 120 F.3d at 1274 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)).

Here, Tsinberg addresses only the second inquiry, arguing that the collective amount of fines and fees, including storage fees, imposed on him provide "the clearest proof" that the parking sanctions at issue are in fact criminal. *See* Objections at 32–35. The Court disagrees. As the Report cogently explains, the City's parking procedures, including seeking recoupment of storage costs occasioned by the impoundment of delinquent vehicles, serve legitimate, important non-punitive interests. *See* Report at 24, 26 (collecting cases). And Tsinberg does not explain how the accumulation of fines and storage costs, resulting from his own failure to pay the original penalties, can convert otherwise civil sanctions into criminal ones. Indeed, as the Report notes, such a result would be surprising given the substantial New York state authority holding that parking and traffic sanctions are civil, not criminal. *See Dubin v. County of Nassau*, 277 F. Supp. 3d 366, 400 (E.D.N.Y. 2017) (noting that "such a claim would not be plausible given the weight of New York legal authority holding that penalties for traffic infractions are civil and not criminal" and collecting cases). The imposition of parking tickets, and resulting penalties for non-payment, thus is not a criminal punishment to which the Double Jeopardy Clause applies. The Court adopts the Report's recommendation and dismisses Tsinberg's double jeopardy claim.

**C. Excessive Fines**

Next, Tsinberg alleges that the magnitude of the civil penalties that have accrued on the parking tickets at issue are impermissible under the Eighth Amendment's prohibition on excessive fines. In support, he argues that, while the $65 fines originally imposed may not be excessive, the accumulation of "fines on fines," including tow, boot, and storage fees, is unconstitutional, and tantamount to "criminal usury." *See* FAC ¶¶ 32–44, 69; Pl. Opp'n ¶¶ 21–27; Objections at 36–40. The Report recommends dismissal of this claim because, even if the Excessive Fines Clause applies here, the fines are not disproportionately excessive. *See* Report at 26–30. The Court agrees with the Report's assessment.

The Second Circuit has established a "two-step inquiry for determining whether a financial penalty is excessive under the Eighth Amendment." *United States v. Viloski*, 814 F.3d 104, 108 (2d Cir. 2016). First, a court must "determine whether the Excessive Fines Clause applies at all," *i.e.*, whether the forfeiture at issue "may be characterized, at least in part, as 'punitive.' " *Id.* at 109. Second, a court must "determine whether the challenged forfeiture is unconstitutionally excessive." *Id.* A fine is constitutionally excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Id.* (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).

***8** Here, the parties and the Report focus only on the second question, assuming that the Excessive Fines Clause applies in the first instance. The Court therefore assumes without deciding that the Clause applies to the routine application of the City's parking and traffic laws in cases like Tsinberg's. [8] As to the second factor, the Second Circuit has set forth a four-factor test governing the inquiry:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

*Viloski*, 814 F.3d at 109 (quoting *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015)). Courts may also consider, along with those four factors, "whether the forfeiture would deprive the defendant of his livelihood." *Id.* at 111. In undertaking this analysis, the Supreme Court has admonished that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336; *see id.* (courts "should grant substantial deference" to the legislature (citation omitted)).

The Court agrees that Tsinberg has failed to plausibly allege that the fines at issue are "grossly disproportional" to Tsinberg's offenses. Tsinberg does not argue that the $65 parking fines were excessive. *See, e.g.*, FAC ¶ 36; Pl. Opp'n ¶ 11. [9] Instead, he contends that the fines he accrued for failing to address the five $65 tickets, and the resulting fees associated with booting, towing, and storing his Vehicle collectively became disproportionate. *See, e.g.*, Objections at 38–40. Whereas Tsinberg was ticketed $65 per original ticket, or $325 total, those penalties increased to about $640, or another $63 per ticket, after he failed to respond to or pay those tickets. *See* FAC ¶ 34; Koplik Decl., Exs. D–H; Dkt. 22-3. As to the first factor, Tsinberg's offense is the accumulation and failure to resolve several duly issued parking tickets, for which, as several ALJs held, he did not

provide any legitimate excuse. *See* Koplik Decl., Exs. D–F. Beyond the five tickets directly at issue here—which Tsinberg still has not paid—he also accrued at least six others in a similar period, for a variety of offenses. *See* Dkt. 22-3. Thus, while negligent or reckless parking violations themselves may not entail a great degree of moral culpability, *see* *George*, 779 F.3d at 123, Tsinberg's sustained refusal to lawfully address them, well after he undisputedly received notice of them, weighs in the City's favor. As a result, Tsinberg is squarely a member of the "class of persons for whom" such enhanced penalties were principally designed. *Viloski*, 814 F.3d at 109. Without the prospect of escalating fines, violators like Tsinberg would have little reason ever to pay their tickets to the City. The third factor, as to whether the maximum fine was imposed, does not fit well into the parking-ticket context, where there appears to be little discretion over the degree of any given penalty. *Cf.* *Viloski*, 814 F.3d at 109 (discussing imposition of sentence and fine within the context of the criminal Sentencing Guidelines and statutory maximum penalties). Thus, the Court gives it little weight in the analysis. Last, although when Tsinberg's experience is viewed in isolation, his non-payment of five $65 tickets may not have meaningfully harmed the City of New York, the City must process an "overwhelming volume of alleged parking violations." *C.A.U.T.I.O.N., Ltd. v. City of New York*, 898 F. Supp. 1065, 1067 (S.D.N.Y. 1995). Without the ability to enforce timely compliance by scofflaws who might otherwise be disinclined to pay up, it would likely suffer substantial financial harms. The City also has a separate, if less tangible, interest in promoting compliance with its laws, which is undermined even by small-scale disregard like that here.

***9** Considering the above factors, Tsinberg has not plausibly alleged anything close to a gross disproportion between his offense and the penalties, totaling $315, for his failure to address his many parking tickets. That conclusion accords with the assessment of various other courts to have considered the issue. *See, e.g.*, *Shibeshi v. City of New York*, No. 11 Civ. 4449 (LAP), 2011 WL 13176091, at *2 (S.D.N.Y. Sept. 21, 2011) ("[Plaintiff's] fines totaling $515.16 for four tickets, plus additional fees, are not disproportional."), *aff'd*, 475 F. App'x 807 (2d Cir. 2012) (summary order); *Wemhoff v. City of Baltimore*, 591 F. Supp. 2d 804, 808–09 (D. Md. 2008); *Popescu v. City of San Diego*, No. 06 Civ. 1577 (LAB), 2008 WL 220281, at *4 (S.D. Cal. Jan. 25, 2008) (penalty's increase from $47 to $104 upon nonpayment not excessive). [10]

The same is true of Tsinberg's claim that the City's booting, towing, and impounding of his car, and that the resulting accrual of fees, were excessive. Courts have approved the towing and auctioning of vehicles to satisfy municipal judgments, as state law specifically authorizes. *See, e.g.*, *Berger v. Phila. Parking Auth.*, 413 F. Supp. 3d 412, 420 (E.D. Pa. 2019) (denying Eighth Amendment Excessive Fines claim under *Timbs* for towing and impoundment of vehicle for failure to pay parking tickets); *see also* *Rackley*, 186 F. Supp. 2d at 469–85 (same under Fourth Amendment and Due Process Clause). Although the value of the car was, at the time of its towing, substantially greater than the amount Tsinberg owed, he remained free at all times to recover the Vehicle by paying the City what he owes it. And even if the City auctions his car to satisfy the judgments at issue, Tsinberg would then have a right to receive any sale proceeds above the outstanding judgments and fees at the time of sale. *See* CPLR § 5234(a). Finally, as to the booting, towing, and storage fees associated with the Vehicle—including the mandatory $20 daily storage fee that has been amassing since January 2019 as a result of Tsinberg's refusal to pay his debts to the City, *see* N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9)(vii)—Tsinberg fails to explain, except in conclusory terms, why those essentially compensatory fees are unconstitutional. *See, e.g.*, *Potter v. City of Lacey*, No. 20 Civ. 05925 (RJB), 2021 WL 915138, at *1 (W.D. Wash. Mar. 10, 2021) (impoundment fees not excessive because "they can reflect the costs associated with towing and storage"); *see* Objections at 38–40. Accordingly, the Court adopts in full the Report's recommendation that Tsinberg's Eighth Amendment claim, too, be dismissed for failure to state a claim.

### D. Fourth Amendment

Tsinberg also asserts a Fourth Amendment claim related to the towing of the Vehicle, arguing that such towing constituted an unreasonable seizure. *See* FAC ¶¶ 62–67. Specifically, he claims that the City booted and towed his Vehicle "through an automated system ... without an independent review of the underlying facts and circumstances ... by a judge." *Id.* ¶ 65. He also asserts that the inclusion of language regarding child support, spousal support, or alimony on the Execution makes the seizure even more unreasonable. *See id.*; Execution. The Report recommends dismissal of this claim, which the Court adopts.

***10** The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on states

and, relevant here, municipalities such as New York City. *See City of Ontario v. Quon*, 560 U.S. 746, 750 (2010). It "applies in the civil context as well" as the criminal. *See, e.g.*, *Soldal v. Cook County*, 506 U.S. 56, 57 (1992) (collecting cases).

A seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (quoting *United States v. Jacobson*, 466 U.S. 109, 113 (1984)). The reasonableness of a seizure is the "ultimate standard under the Fourth Amendment." *Soldal*, 506 U.S. at 61 (citation omitted). The permissibility of any governmental seizure is thus "judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979).

Tsinberg has failed to plausibly allege that any seizure of his Vehicle was unreasonable. It is undisputed that the City seized Tsinberg's Vehicle based on valid judgments entered against him pursuant to state and local law, and that the seizure was authorized by statute given those outstanding judgments. *See* N.Y.C. Admin. Code § 19-212 (allowing towing of vehicle for which outstanding judgments exceed $350); *see also* VTL § 237(5) (empowering PVB to "enter judgments and enforce them, without court proceedings, in the same manner as the enforcement of money judgments in civil actions in any court of competent jurisdiction or any other place provided for the entry of civil judgment within the state of New York"); FAC ¶ 34 (alleging that $640.59 in fines "caused NYC Admin. Code § 19-212 to trigger this seizure of the property"). Courts have held that the towing and impoundment of vehicles in similar circumstances is reasonable under the Fourth Amendment. *See, e.g.*, *Shibeshi*, 2011 WL 13176091, at *2 ("The City's warrantless seizure of a person's vehicle from a public street due to that person's failure to pay parking ticket fines has been held not to violate the Fourth Amendment in that it is a reasonable seizure, does not implicate core privacy concerns requiring a warrant and, of itself, demonstrates probable cause."); *Yu Juan Sheng v. City of New York*, No. 05 Civ. 1118 (RRM) (VVP), 2009 WL 6871132, at *8 (E.D.N.Y. June 26, 2009) (approving towing and impoundment resulting from default judgments on parking tickets), *report and recommendation adopted*, 2010 WL 3744428 (E.D.N.Y. Sept. 20, 2010); *Rackley*, 186 F. Supp. 2d at 478–79 (same even where City officials erroneously calculated amounts owed to City on multiple dates). Tsinberg does not offer any countervailing authority, or explain why the underlying tickets arising from the same expired registration makes the ultimate seizure, which undisputedly complied with N.Y.C. Admin. Code § 19-212, unreasonable. *See* FAC ¶ 65. [11] The Court therefore also adopts the Report's recommendation on this point and dismisses Tsinberg's Fourth Amendment claim.

**E. *Monell* Liability**

***11** Having dismissed each of Tsinberg's § 1983 claims, the Court holds, with the Report, that dismissal of Tsinberg's claim for municipal liability against the City is required as well. A plaintiff cannot establish municipal liability under § 1983 based on a theory of *respondeat superior.* Instead, to hold a municipality liable for its employees' unconstitutional actions, a plaintiff must establish a municipal policy or custom that directly caused the plaintiff to be subjected to a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). Because *Monell* liability merely extends liability for an underlying constitutional violation to a municipality, without a predicate violation, the Court need not address whether the municipality itself can be liable for such violation. *See, e.g.*, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *see also Salem v. City of New York*, 811 F. App'x 678, 683 (2d Cir. 2020) (summary order) (dismissal of *Monell* claim appropriate where plaintiff had "not plausibly pled any underlying constitutional violation that survives a motion to dismiss"). Here, with the Court's having held that Tsinberg failed to state a claim for any underlying constitutional violation under § 1983, there is no basis to extend any such liability to the City based on an alleged custom, policy, or widespread usage of the City. Tsinberg's *Monell* claim is therefore dismissed.

**F. Fair Debt Collection Practices Act**

Tsinberg next asserts that the City's actions violated the Fair Debt Collection Practice Act ("FDCPA"), 15 U.S.C. § 1962 *et seq.* He alleges that the Execution's reference to child support or alimony, as a potential ground for seizure of the Vehicle, was false and harassing under that statute. *See* FAC ¶¶ 62–63; Pl. Opp'n ¶¶ 28–29; Objections at 40. As the Report

correctly concluded, that claim fails for at least two reasons. First, the FDCPA does not apply to actions taken by municipal employees, and Tsinberg alleges only that the City of New York, through its employees, affixed the Execution notice to his Vehicle. *See* 15 U.S.C. § 1962a(6)(C) (excluding from definition of "debt collector" any "officer or employee of ... any state"), (8) (defining "state" to include "any political subdivision" thereof). Second, the FDCPA "does not extend to creditors seeking to collect on debts owed to themselves." *Muniz v. Bank of Am., N.A.*, No. 11 Civ. 8296 (PAE), 2012 WL 2878120, at *3 (S.D.N.Y. July 13, 2012) (collecting cases). Here, the City's Execution was issued and posted in connection with its attempts to collect debts Tsinberg owed to the City, not to any other person. The Court thus adopts the Report in full in dismissing Tsinberg's claim for a violation of the FDCPA.

### G. State-Law Claims

Finally, Tsinberg brings claims under state law for conversion, trespass to chattels, and defamation. FAC ¶¶ 68–71. The Report recommends that the Court decline to exercise supplemental jurisdiction over these claims given the Court's dismissal of Tsinberg's federal causes of action. The Court agrees. "District courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine —judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citation omitted); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). Having dismissed all federal claims over which the Court had original jurisdiction before meaningful discovery has taken place, and far before trial, the Court dismisses Tsinberg's state-law claims, too, without prejudice to his pursuit of those claims in state court.

### H. Leave to Replead

***12** Last, the Report recommends that Tsinberg not be granted leave to file another amended complaint, and that his claims instead be dismissed with prejudice given the substantive deficiencies in his allegations and his earlier opportunity to amend his complaint after the City moved to dismiss it. Report at 34–35. Tsinberg, in his Objections (but not in his opposition), sought leave to file another amended complaint, after further discovery, to remedy any deficiencies in the FAC. *See* Objections at 48. He does not, however, identify any specific facts that, if pled, could salvage any of his claims. *See id.*

*Pro se* complaints should generally be given leave to amend when there is "any indication that a valid claim might be stated." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (citation omitted); *see Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013). But a district court has discretion to deny leave if a revised claim still "could not withstand a motion to dismiss." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). If the problems with a *pro se* plaintiff's claim are "substantive," rather than the result of an "inadequately or inartfully pleaded" complaint, an opportunity to replead would be "futile" and "should be denied." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Thus, "[i]n the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g.*, *Cuoco*, 222 F.3d at 112 (courts should generally grant a *pro se* plaintiff "leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated"); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim.").

The Court agrees with the recommendation in the Report and will dismiss Tsinberg's claims without leave to amend, and with prejudice. Tsinberg already had one opportunity to amend his complaint, and did so after reviewing the City's arguments, in its first motion to dismiss, explaining why his pleading failed to state a claim. *See, e.g.*, *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 506 (2d Cir. 2014) (upholding dismissal of amended complaint with prejudice where, "following Defendant's first motion to dismiss for failure to state a claim," plaintiff had already amended its

complaint once and failed to "resolve its pleading deficiencies in its First Amended Complaint"); *Green v. Niles*, No. 11 Civ. 1349 (PAE), 2012 WL 987473, at *7 (S.D.N.Y. Mar. 23, 2012). Further, the Court agrees with the Report's assessment that the FAC's substantive deficiencies are such that a third attempt to state a viable claim would be futile. *See, e.g.*, *Binn v. Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N. Y July 13, 2020) (collecting cases denying plaintiffs a "third bite at the apple"), *aff'd*, 2020 WL 4547167 (2d Cir. Aug. 6, 2020).

**CONCLUSION**

For the foregoing reasons, the Court adopts the Report in full, grants the City's motion to dismiss, and dismisses Tsinberg's claims without leave to amend. Tsinberg's federal claims are dismissed with prejudice, but his state-law claims are dismissed without prejudice to his ability to pursue them in state court.

***13** The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1146942

## Footnotes

1 The Court mainly draws its account of the facts from the Amended Complaint and the documents attached to and discussed in it. Dkt. 22 ("FAC"); *see DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). Given Tsinberg's *pro se* status, the Court also considers the allegations raised in Tsinberg's opposition to the motion to dismiss to the extent consistent with those in the FAC. *See, e.g.*, *George v. Pathways to Hous., Inc.*, No. 10 Civ. 9505 (ER), 2012 WL 2512964, at *6 n.7 (S.D.N.Y. June 29, 2012). To resolve the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2 What was once called the PVB is now called the "Adjudications Division." *See* Dkt. 27 ("City Mem.") at 2. The Court, however, follows the parties and the Report in generally referring to the agency using its old name, the PVB.

3 In its opening brief, the City misidentified the statute authorizing the imposition of towing and storage fees as VTL § 1224. *See* Dkt. 33 ("Reply") at 7 n.5. It clarified in its reply brief that VTL § 1224 only applies to abandoned vehicles, and that CPLR § 8013(c) is the authorizing statute for the imposition of removal and storage fees in this case. *Id.*

4 Only the first five were subject to final judgments in January 2019, when Tsinberg's car was towed, although several would later become so, leading to $750 more in outstanding judgments. *See* Dkt. 22-3; Report at 7–8.

5 The Report construed Tsinberg's allegations about the adequacy of the Article 78 proceedings as a challenge to the result of that action, and so assessed this issue under the *Rooker-Feldman* doctrine. *See* Report at 19–20. But in the Court's view, Tsinberg's challenge to the procedural adequacy of the Article 78 proceeding, liberally construed, does not necessarily require review of the merits of that action. *See Hoblock v. Albany Cnty. Bd. Of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (*Rooker-Feldman* bars federal court review of merits of state-court judgments). Thus, while the Court agrees with the Report's ultimate conclusion, it departs from the

Report insofar as it based its recommendation on the application of *Rooker-Feldman.* To the extent Tsinberg does seek review of the merits of the state-court decision at issue, the Court fully agrees with the thoughtful assessment of this issue in the Report.

6 In his Objections, Tsinberg argues, for the first time, that *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) requires a different result. But parties may not raise new legal arguments for the first time in their objections to a report and recommendation. *See, e.g.*, *Gonzalez v. Garvin*, No. 99 Civ. 11062 (SAS), 2002 WL 655164, at *2 (S.D.N.Y. Apr. 22, 2002) (dismissing objection "because it offers a new legal argument that was not presented in his original petition, nor in the accompanying Memorandum of Law"); *see also* *Abu-Nassar v. Elders Futures, Inc.*, No. 88 Civ. 7906 (PKL), 1994 WL 445638, at *4 n.2 (S.D.N.Y. Aug. 17, 1994) (rejecting arguments advanced for first time in objections to report because permitting such claims would "undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments"). The Court thus rejects this objection. In any event, as the City notes, *Krimstock* appears inapposite. *See* Response at 3 & n.1.

7 In his Objections, Tsinberg expands on his claim of a substantive due process violation, suggesting that the state has no legitimate interest in enforcing registration requirements and that he was singled out for disfavored treatment when the City placed his car on an "indefinite sales hold" as a result of his Article 78 petition, leading to significant storage fees. Objections at 17–19, 25–32. Again, these new theories are not cognizable in the Court's review of a report and recommendation. *See, e.g.*, *Gonzalez*, 2002 WL 655164, at *2. Even if they were, they do not come close to showing a substantive due process violation. In fact, it appears that it was Tsinberg, not the City, who requested that the Vehicle be placed on a sales hold, which request led to the accumulating storage fees. FAC ¶ 54; *see also* Koplik Decl., Ex. R (sales hold listing "requester" as "Leon G. Tsinberg").

8 *See* *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 198–99 (S.D.N.Y. 2019) ("fees and penalties" that "are multiples" of an unpaid tolls were plausibly alleged to be partially punitive); *Dubin*, 277 F. Supp. 3d at 400–02 (Excessive Fines Clause applied to "Drivers' Responsibility Fee" that imposed a mandatory $45 payment on ticketed motorists who received a final disposition other than "not guilty," and recognizing that "administrative and other civil penalties satisfy the [first factor], even if they bear no direct relationship to a criminal prosecution"); *see also* *Pimental v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020) (Excessive Fines Clause applies to "municipal fines," and specifically parking tickets and late penalties, under *Timbs v. Indiana*, 139 S. Ct. 682 (2019), which held that the Clause applies to the states). *But see* *id.* at 925–29 (Bennett, J., concurring) (disagreeing that Eighth Amendment Excessive Fines Clause "should routinely apply to parking meter violations," noting that the "potential for federal court litigation is endless" and risks "trivializ[ing] the Eighth Amendment, the Fourteenth Amendment, and the Civil Rights Acts"). Given the Supreme Court's recent holding that the Fourteenth Amendment incorporates the Excessive Fines Clause against state and municipal governments, *see* *Timbs*, 139 S. Ct. 682, courts in the coming years may be called on more often to assess its applicability to cases like this one, and the extent to which these protections police the bounds of municipal fines, fees, and other penalties. Without fuller presentation by the parties, the Court here has no occasion to opine on this threshold question.

9 Tsinberg, for the first time in his Objections, argues that the $65 exceeds a statutory cap of $50 for parking violations set by N.Y. Admin. Code § 19-203(b). *See* Objections at 37. As the City notes, the $65 amount results from a mandatory state surcharge required by VTL § 1809-a, which provides that "[t]he provisions of any other general or special law notwithstanding," any city with more than 100,000 persons, must levy "a mandatory surcharge in addition to any other sentence, fine or penalty otherwise permitted or required, in the amount of fifteen dollars." Response at 7. That provision states that such $15 surcharge "shall not be deemed a monetary penalty for the purposes of ... section 19-203 of the administrative code of the city of New York"—the provision that Tsinberg relies on for this point.

10 Although Tsinberg relies heavily on the Supreme Court's holding in *Timbs* in arguing to the contrary, that case merely held that the Excessive Fines Clause applies to the states. *See* 139 S. Ct. at 691 ("[R]egardless of whether application of the Excessive Fines Clause to civil *in rem* forfeitures is itself fundamental or deeply rooted, our conclusion that the Clause is incorporated remains unchanged"). It did not purport to alter the above analysis.

11 Tsinberg is also vague as to how the reference to child support or alimony on the Execution plays into the Fourth Amendment analysis. To the extent he argues that the language on the Execution falsely accuses him of owing child support or alimony, that characterization is wrong. A photograph of the Execution is attached to the FAC. It identifies outstanding child support or alimony as *among* the authorized bases for such an execution, but it does not state that each was the bases for executing on Tsinberg's car. It states: "The judgment creditor is the state of New York, or any of its agencies or municipal corporations *and/or* the debt enforced is for child support, spousal support, maintenance or alimony." Execution (emphasis added). The execution's recitation thus is consistent with the FAC's allegation that Tsinberg does not owe child support, alimony, or spousal support. FAC ¶ 7; *see* Report at 29 (noting that Execution merely recites legally available bases). Even construing the FAC liberally, it is not plausibly alleged that Tsinberg's vehicle was towed based on a misperception that he owed child support, spousal support, or alimony, as opposed to the substantial debts that Tsinberg admits he actually owed to the City for parking infractions.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 6685476
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kylie Ann TURCZYN, Deceased, by and through Barbara McGREGOR, as Administratrix of the Estate of Kylie Ann Turczyn, Plaintiff,
v.
CITY OF UTICA et al., Defendants.

No. 6:13–cv–1357 (GLS/ATB).
|
Signed Nov. 26, 2014.

**Attorneys and Law Firms**

Office of Frank Policelli, Frank Policelli, Esq., of Counsel, Utica, NY, for the Plaintiff.

City of Utica—Corporation Counsel, Mark C. Curley, Esq., Merima Smajic, Esq., Zachary C. Oren, Esq., of Counsel, Utica, NY, for the Defendants.

***MEMORANDUM–DECISION AND ORDER***

GARY L. SHARPE, Chief Judge.

## I. *Introduction*

***1** Plaintiff Kylie Ann Turczyn, deceased, by and through Barbara McGregor, as administratrix of the estate of Kylie Ann Turczyn, commenced this action against defendants City of Utica, City of Utica Police Dept., and Elizabeth Shanley alleging substantive due process claims pursuant to 42 U.S.C. § 1983 and separate state law causes of action. (Am.Compl., Dkt. No. 12.) Pending is defendants' motion to dismiss for failure to state a claim. (Dkt. No. 19.) For the reasons that follow, the motion is granted in part and denied in part.

## II. *Background*

### A. *Facts* [1]

Shanley, an Oneida County domestic violence investigator, was at all relevant times assigned by the Police Department to accomplish the goals of reducing "occurrence[s] of domestic violence by increasing reporting and by identifying and tracking repeat victims and/or offenders," and "increas[ing] victims' access to supportive services by encouraging [them] to report their abuse, thereby increasing arrest rates for domestic offenders." (Am.Compl.¶ 10.) On June 22, 2012, Thomas Anderson, Turczyn's former boyfriend and the father of her daughter, broke into Turczyn's home armed with a 9 mm rifle. (*Id.* ¶ 11) Anderson repeatedly shot Turczyn, taking her life in view of their four-year-old daughter, G.T. (*Id.*) Anderson then dispatched himself. (*Id.*)

In the twelve months preceding this horrific event, Turczyn made between five and ten complaints to Utica police officers, "including informing them of a specific threat by Anderson to kill her." (*Id.* ¶ 12.) Turczyn specifically told Shanley "that Anderson was armed and had threatened to kill her." (*Id.* ¶ 12(d).) Despite their knowledge of domestic violence between Turczyn and Anderson, neither Shanley, New York State Police, nor Utica Police took any steps to arrest Anderson, investigate Turczyn's complaints, or follow-up with Anderson "as is the policy and protocol of the domestic violence unit." (*Id.* ¶ 14.)

On June 18, 2012, Shanley told Turczyn to seek an order of protection, which she attempted to do, but was told by an unknown person at the Oneida County Family Court to return the following day because the court was " 'too busy.' " (*Id.* ¶¶ 15–16.) The following day, Turczyn left a voice message for Shanley, explaining that she was unable to obtain an order of protection and that Anderson had a gun and planned to kill her that week. (*Id.* ¶¶ 16–18.) Despite her knowledge, "Shanley took no action." (*Id.* ¶ 17.) Shanley also mistakenly believed that Turczyn's issues with Anderson were outside of the purview of Utica Police and should, instead, be dealt with by New York State Police; however, "she did not inform any other police agency or take any action herself." (*Id.* ¶¶ 18, 19, 20.)

### B. *Procedural History*

Turczyn commenced this action by filing a complaint on October 31, 2013. (Dkt. No. 1.) Defendants thereafter moved to dismiss, (Dkt. No. 10.) In response, Turczyn filed an amended complaint as of right, which is now the operative pleading. (*See generally* Am. Compl.) In her amended complaint, Turczyn alleges the following causes of action: (1) a denial of substantive due process rights under the Fifth and Fourteenth Amendments due to deliberate indifference; (2) a *Monell* [2] claim against the City; (3) negligence; (4)

a "derivative action" on behalf of G.T.; and (5) negligent infliction of emotional distress. (*Id.* ¶¶ 37–74.) Defendants now move to dismiss the amended pleading pursuant to Rules 8(a)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 19.)

### III. *Standard of Review*

***2** The standard of review under Fed.R.Civ.P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP,* 701 F.Supp.2d 215, 218 (N.D.N.Y.2010).

### IV. *Discussion*

**A. *Preliminary Matters***

At the outset, it is noted that some of Turczyn's claims are deemed abandoned by her failure to oppose their dismissal. *See Barmore v. Aidala,* 419 F.Supp.2d 193, 201–02 (N.D.N.Y.2005) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." (internal citations omitted)); *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 723 (S.D.N.Y.2005) ("[B]ecause [the] plaintiff did not address [the] defendant's motion to dismiss with regard to [a particular] claim, it [wa]s deemed abandoned and ... dismissed."). In particular, Turczyn squarely opposed dismissal of her substantive due process claim as against Shanley, (Dkt. No. 20 at 8–12), and scarcely, but sufficiently to save the claim from dismissal for abandonment, offered reasons why her substantive due process claim as against the City should survive defendants' motion, (*id.* at 5–7). Aside from the substantive due process claim, Turczyn failed to offer any opposition to defendants' motion, which also sought dismissal of her pendant causes of action. (Dkt. No. 19, Attach. 6 at 31–40 & n. 15.) Accordingly, Turczyn's pendant state law claims, (Am.Compl.¶¶ 59–74), are dismissed.

Additionally, it is clear that the Police Department must be dismissed as urged by defendants, (Dkt. No. 19, Attach. 6 at 2 n. 2), because "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Varela v. City of Troy,* No. 1:10–cv–1390, 2014 WL 2176148, at *6 (N.D.N.Y. May 22, 2014) (internal quotation marks omitted). As such, all claims as against the Police Department are dismissed.

The court also notes that both parties have submitted certain evidence that is outside of the pleadings (Dkt. No. 19, Attachs. 3, 4; Dkt. No. 20, Attachs. 1, 2.) Beginning with defendants, they submitted a January 2, 2013 stipulation of discontinuance, which, on its face, purports to memorialize McGregor's agreement to withdraw the notice of claim filed on behalf of Turczyn and to discontinue with prejudice, (Dkt. No. 19, Attach.3), and a December 28, 2012 letter, which appears to memorialize a conversation regarding the discontinuation of legal action and execution of a stipulation, (Dkt. No. 19, Attach.4). Relying on a single out-of-Circuit decision, *see Raines v. Haverford Coll.,* 849 F.Supp. 1009, 1010 (E.D.Pa.1994), which does not appear directly to support their position nor does it give this court confidence that the kinds of documents at issue here were contemplated by that decision, defendants assert that the documents may be considered on their motion to dismiss as "part of the record of this case." (Dkt. No. 19, Attach. 6 at 25 n. 11.) Turczyn argues that defendants' reliance on the stipulation is inappropriate at this juncture, yet she offers the affidavit of McGregor, submitted to dispute the validity of the stipulation, (Dkt. No. 20, Attach.1), without any explanation as to why the court should or may consider it. (Dkt. No. 20 at 12–13.)

***3** The court has excluded from its consideration of this motion to dismiss the exhibits offered by defendants as well as the McGregor affidavit. *See* Fed.R.Civ.P. 12(d). The existence of some document or documents that may extinguish a plaintiff's claims, such as a release or stipulation of discontinuance, is an affirmative defense, *see Beede v. Stiefel Labs., Inc.,* No. 1:13–cv–120, 2014 WL 896725, at *3 (N.D.N.Y. Mar.6, 2014), and " '[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) ... if the defense appears on the face of the complaint,' " *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 145 (2d Cir.2010) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)).

Here, the stipulation defense is not apparent from the face of the amended complaint. Moreover, the court refuses to consider the documents in question as part of the record of this case, a proposition for which no in-Circuit authority has been offered nor has any been discovered by this court. As such, the documents offered by defendants, (Dkt. No. 19, Attachs.3, 4), are not properly before the court, and their argument that Turczyn's claims must be dismissed because of

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

those documents is rejected. McGregor's affidavit, (Dkt. No. 20, Attach.1), which was also improvidently submitted for consideration, is likewise excluded. The court now turns to the merits of defendants' arguments regarding the substantive due process and *Monell* claims.

**B. *Rule 8***

First, defendants argue that Turczyn's § 1983 due process claim is subject to dismissal under the Rule 8 plausibility analysis—specifically because of Turczyn's failure to allege facts supportive of a sufficient nexus between Shanley's omissions and Turczyn's death. (Dkt. No. 19, Attach. 6 at 23–24.) The court disagrees. The amended complaint plausibly alleges a causal connection between the conduct of defendants—their alleged conscience-shocking failure to protect Turczyn, (Am.Compl.¶ 49)—and her injuries, *i.e.,* the allegations plausibly suggest that defendants' acts were a substantial factor in bringing about Turczyn's injuries. *See Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998) ("[I]n all § 1983 cases[ ] the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). Accordingly, this argument is rejected.

**C. *Rule 12(b)(6)***

Defendants argue that Turczyn has failed to state a substantive due process claim as against Shanley or the City. (Dkt. No. 19, Attach. 6 at 220, 26–31.) Defendants contend that Turczyn alleges only passive conduct on the part of Shanley that does not give rise to a substantive due process violation. (*Id.* at 10–12.) More generally, defendants assert that Turczyn has failed to plead facts to show "implicit prior assurances through repeated sustained inaction," and that, even if she did, the state action alleged does not rise to the level of conscience-shocking behavior. (*Id.* at 15–20.) Alternatively, defendants argue that Shanley is entitled to qualified immunity. (*Id.* at 20–23.) With respect to the City, defendants contend that Turczyn has failed to allege facts that support a claim of municipal liability. (*Id.* at 26–31.) For reasons explained below, defendants' motion is denied with respect to Turczyn's substantive due process claim against Shanley, but granted with respect to her *Monell* claim against the City.

***4** Only one relevant exception to the general rule that no substantive due process claim lies for a state's failure to protect an individual from private violence, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), potentially applies in this case. That exception imposes liability for failure to protect where state actors in some way affirmatively assist "in creating or increasing the danger to the victim." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 428 (2d Cir.2009) (internal quotation marks and citation omitted); *see Pena v. DePrisco,* 432 F.3d 98, 110 (2d Cir.2005). "[R]epeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin,* 577 F.3d at 428 (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 99 (2d Cir.1993)). Moreover, when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct" "even though none of the defendants [is] alleged to have communicated the approval explicitly." *Id.* at 428–29 (quoting *Pena,* 432 F.3d at 111)). In a nutshell, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Id.* at 429.

A successful substantive due process claim also requires that the plaintiff show "that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* at 431 (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). A hierarchy of intent provides guidance on the likelihood that a particular harm rises to the necessary level. Intentionally inflicted harms are most likely to meet the standard, while reckless and negligent inflictions of harm are each less likely, in graduated downward steps, to show conscience-shocking state action. *Id.* As for recklessly inflicted injuries, " '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another.' " *Id.* (quoting *Lewis,* 523 U.S. at 850). Accordingly, the inquiry is highly fact specific.

Unlike *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), or *Neal v. Lee County,* Civil Action No. 1:08CV262, 2010 WL 582437 (N.D.Miss. Feb.12, 2010)—cases in which police had limited interaction with either the victim or killer prior to the victim's demise, and upon which defendants rely for dismissal of the claim against Shanley, (Dkt. No. 19, Attach. 6 at 3–5, 7–8)—the allegations here go substantially farther. Turczyn alleges several occasions [3] when Shanley knew of

Anderson's threatening acts and did nothing, which arguably communicated to him prior assurances that there would be no penalty to pay for his conduct. (Am.Compl.¶¶ 12–13.) "This is so even though none of the defendants are alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. *Okin* has specifically recognized the liability that may arise under these circumstances. *See* 577 F.3d at 428–29 (explaining that liability under § 1983 attaches when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others" (quoting *Pena,* 432 F.3d at 111)).

***5** The amended complaint also pleads facts that demonstrate, at this juncture, egregious behavior that shocks the contemporary conscience. As in *Okin,* the allegations here tend to show that Shanley, who was tasked with accomplishing certain goals related to curbing domestic violence, was deliberately indifferent as to whether or not Anderson would make good on his multiple threats against Turczyn's life over a twelve-month-period. (Am.Compl.¶ ¶ 10, 12.) These allegations sufficiently support that Shanley's affirmative conduct was the product of deliberate indifference that shocks the conscience, and would provide a reasonable jury with a valid basis to so find. *See Conradt v. NBC Universal, Inc.,* 536 F.Supp.2d 380, 394–95 (S.D.N.Y.2008).

Finally, Shanley is not entitled to qualified immunity at this juncture. Her argument on this issue is two-fold. First, Shanley asserts that no constitutional violation occurred, and, second, she claims that, even if a constitutional violation occurred, the right was not clearly established. (Dkt. No. 19, Attach. 6 at 20–23.) The first prong of the argument is easily swept aside by reference to the preceding paragraphs that explain that the amended complaint alleges a cognizable substantive due process violation. As for whether or not the right was clearly established, which is a prerequisite to qualified immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), this question has been resolved by the Second Circuit. On the issue, the court has explained that it is "clearly established," under the state-created danger theory, "that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim, and as that is the substantive due process violation alleged here, qualified immunity does not apply." *Okin,* 577 F.3d at 434. Accordingly, Shanley is not entitled to qualified immunity at this time.

As for the City, defendants assert that Turczyn has failed to plead a *Monell* claim because the amended complaint merely alleges legal conclusions. (Dkt. No. 19, Attach. 6 at 26–31.) With respect to Turczyn's allegation that the City failed to properly train or supervise its employees, defendants contend that the amended complaint is too conclusory, but that, even if adequately pleaded, Turczyn's municipal liability claim must nonetheless fail because she has not alleged deliberate indifference. (*Id.* at 29–31.)

It is well settled that "the inadequacy of police training may serve as the basis for § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Oh. v. Harris,* 489 U.S. 378, 380, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The deliberate indifference standard is "stringent" and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* ––– U.S. ––––, ––––, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (internal quotation marks and citation omitted). A showing of deliberate indifference requires that: (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 390 n. 10).

***6** Here, because Turczyn has failed to adequately plead that the City's failure to train and supervise amounted to deliberate indifference, she has failed to state a claim of municipal liability. The amended complaint uses the label "deliberate indifference" in reference to Turczyn's municipal liability claim and generically references the City's failure to properly train and supervise, but it fails to allege facts that support either conclusory notion. (Am.Compl.¶¶ 45, 52.) Turczyn's pleading failure mandates dismissal of her *Monell* claim against the City. *See Gauthier v. Kirkpatrick,* Civil Action No. 2:13–cv–187, 2013 WL 6407716, at *10 (D.Vt. Dec.9, 2013) (dismissing failure to train *Monell* claim because the plaintiff failed to plead facts that supported the deliberate difference elements); *Santos v. New York City,* 847 F.Supp.2d 573, 577 (S.D.N.Y.2012); *see also Worrell v. City of N.Y.,* No. 12–CV–6151, 2014 WL 1224257, at *13 (E.D.N.Y. Mar. 24, 2014).

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to all claims alleged as against the City of Utica Police Dept. and the Clerk is directed to terminate the City of Utica Police Dept. from this action; and

**GRANTED** with respect to Turczyn's *Monell* claim against the City (Am.Compl.¶ ¶ 51–58), which is hereby **DISMISSED WITHOUT PREJUDICE,** and the Clerk is directed to terminate the City of Utica from this action; and

**GRANTED** with respect to all of Turczyn's pendant state law claims, (Am.Compl.¶ ¶ 59–74), which are hereby **DISMISSED;** and **DENIED** in all other respects; and it is further

**ORDERED** that the sole remaining defendant, Shanley, shall file an appropriate responsive pleading within the time allotted by the rules; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Andrew T. Baxter in order to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6685476

## Footnotes

1 The facts are presented in the light most favorable to plaintiff.

2 *See Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

3 In fact, Turczyn claims that she lodged five to ten complaints—of which Shanley was aware—with the Utica Police within the twelve months preceding the murder. (Am.Compl.¶¶ 12, 13.) So many occurrences may amount to "repeated [and] sustained inaction ... in the face of potential acts of violence." *Okin,* 577 F.3d at 428.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 981850
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE DEPARTMENT, et al., Defendants.

Civil Action No. 5:18-CV-1471 (GTS/DEP)
|
Signed 01/07/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: Jeramie White, Pro se, 18-B-0311, Cayuga Correctional Facility, P.O. Box 1186, Moravia, NY 13118.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

***1** This is a civil rights action brought by *pro se* plaintiff Jeramie White, a New York State prison inmate, pursuant to 42 U.S.C. § 1983, against the Syracuse Police Department ("SPD") and five of its officers. In his complaint, plaintiff alleges that defendants violated his constitutional rights during the course of his arrest on February 13, 2017. Plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP") have been referred to me for review. Based upon my consideration of those materials, I will (1) grant plaintiff's amended IFP application, (2) recommend dismissal of his claim against the SPD with leave to replead, and (3) recommend that his complaint otherwise be accepted for filing.

I. BACKGROUND

Plaintiff commenced this action on or about December 20, 2018. Dkt. No. 1. According to plaintiff, he and two friends were on their way to play indoor basketball when their vehicle was pulled over for a traffic infraction. *Id.* at 4; Dkt. No. 1-1 at 4. Plaintiff alleges that after the stop, defendant William Kittle forcibly removed White from the vehicle and that Kittle, in addition to defendants Abraham Mamoun and Shawn Hauck, proceeded to use excessive force against him during the course of his arrest. Dkt. No. 1 at 4-5, 6-7; *see also* Dkt. No. 1-1 at 4, 8. Plaintiff further alleges that defendants Altimonda and Fiorini were present and had an obligation to intervene and prevent the unlawful use of force, but failed to do so. *Id.* at 5, 7.

Plaintiff was ultimately arrested and charged with resisting arrest, in violation of N.Y. Penal Law § 205.30, and second-degree obstruction of governmental administration, in violation of N.Y. Penal Law § 195.05. Dkt. No. 1-1 at 4. As relief, plaintiff seeks compensatory and punitive damages in the amount of $1,000,000. Dkt. No. 1 at 8.

A. Plaintiff's Amended IFP Application [1]

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP if it determines that he is unable to pay the required filing fee. 28 U.S.C. § 1915(a)(1).[2] Because I conclude that plaintiff meets the requirements for IFP status, his amended application for leave to proceed without prepayment of fees is granted.[3]

B. Sufficiency of Plaintiff's Complaint

1. Governing Legal Standard

***2** Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in his complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Similarly, 28 U.S.C. § 1915A(b) directs a court to review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also* *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("We have found both sections [1915 and 1915A] applicable to prisoner proceedings *in forma pauperis*.").


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g.*, *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also* *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d. 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

2. Analysis of Plaintiff's Claims

***3** Although a municipality is subject to suit pursuant to section 1983, *see* *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located. *See* *Krug v. Cnty. of Rensselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing *Orraca v. City of N.Y.*, 879 F. Supp. 148 (S.D.N.Y. 1995) ); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *see also* *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department."). Although I would ordinarily recommend that, for the sake of judicial efficiency, the court substitute the City of Syracuse in place of the SPD, plaintiff's complaint contains no factual allegations that would support a *Monell* claim against the City of Syracuse. Accordingly, I recommend dismissal of plaintiff's claims asserted against the SPD.

With respect to his remaining claims, although plaintiff makes passing reference to his rights arising under the Eighth and Fourth Amendments, *see* Dkt. No. 1 at 6, it is clear from the factual allegations that he is asserting claims for excessive force and the failure to intervene arising under the Fourth Amendment. *See generally* Dkt. No. 1; *see also* *Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) ("Arrestees may invoke the Fourth Amendment's prohibition against 'unreasonable' seizures."). In light of the court's obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint should be accepted for filing and the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

individual officer defendants should be required to respond in accordance with the local rules of practice for this court and the Federal Rules of Civil Procedure. [4]

C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, while I recommend dismissal of plaintiff's claim against the SPD, plaintiff could potentially amend his complaint to assert a cognizable cause of action against a defendant, such as the City of Syracuse, which is amenable to suit. Accordingly, I recommend that plaintiff be granted leave to amend his complaint. If plaintiff chooses to file an amended complaint, he must clearly and concisely set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted) ).

II. SUMMARY, ORDER, AND RECOMMENDATION

***4** Having reviewed plaintiff's amended application for leave to proceed in this action IFP, I conclude that he has met the applicable requirements for leave to proceed without prepayment of fees, and will therefore grant his application. Turning to the merits of his complaint, to the extent that it names five police officers and alleges a violation of 42 U.S.C. § 1983, I conclude that those claims are not subject to dismissal at this procedural juncture. I recommend a finding, however, that plaintiff's claim against the SPD is legally deficient and subject to dismissal, but that plaintiff should be afforded an opportunity to amend with respect to that claim. Accordingly, it is hereby

ORDERED that plaintiff's amended application for leave to proceed in this action without prepayment of fees (Dkt. No. 6) is GRANTED; and it is further

ORDERED that plaintiff's original application for leave to proceed in this action without prepayment of fees (Dkt. No. 2) is DENIED as moot; and it is further

RECOMMENDED that plaintiff's complaint (Dkt. No. 1) be accepted for filing with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini; and it is further

RECOMMENDED that plaintiff's remaining cause of action against the Syracuse Police Department be otherwise DISMISSED with leave to replead within thirty days of the issuance of an order adopting this recommendation; and it is further

RECOMMENDED that, in the event plaintiff does not choose to file an amended complaint and the above recommendations are adopted, the case should move forward with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [5] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 981850

## Footnotes

1 Plaintiff filed both an original and amended motion to proceed in this action IFP. Dkt. Nos. 2, 6. While the two motions contain slightly different information concerning plaintiff's financial status, only the amended motion contains the required certification from an official at the correctional facility in which plaintiff is confined. *Compare* Dkt. No. 3 *with* Dkt. No. 7. Accordingly, plaintiff's original IFP application is denied as incomplete.

2 The total cost for filing a civil action in this court is $400.00, consisting of the civil filing fee of $350.00, *see* 28 U.S.C. § 1914(a), and an administrative fee of $50.00. Although an inmate granted IFP status is not required to pay the $50.00 administrative fee, he is required to pay, over time, the full amount of the $350.00 filing fee regardless of the outcome of the action. *See* 28 U.S.C. § 1915(b)(3).

3 Plaintiff is reminded that, although his IFP application has been granted, he will still be required to pay fees that he incurs in this action, including copying and/or witness fees.

4 The court expresses no opinion concerning whether plaintiff's claims can survive a properly filed motion to dismiss or motion for summary judgment, or whether he may prevail at trial.

5 If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 974824
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE DEPARTMENT; Abraham Mamoun, Syracuse Police Dept.; William Kittle, Syracuse Police Dept.; Shawn Hauck, Syracuse Police Dept.; Altimonda, Syracuse Police Dept.; and Fiorini, Syracuse Police Dept., Defendants.

5:18-CV-1471 (GTS/DEP)
|
Signed 02/28/2019

**Attorneys and Law Firms**

JERAMIE WHITE, 18-B-0311, Plaintiff, Pro Se, Cayuga Correctional Facility, P.O. Box 1186, Moravia, New York 13118.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

***1** Currently before the Court, in this *pro se* civil rights action filed by Jeramie White ("Plaintiff") against the Syracuse Police Department and five of its employees ("Defendants"), is United States Magistrate Judge David E. Peebles' Report-Recommendation recommending that (1) Plaintiff's Complaint be accepted for filing by the Court with respect to Plaintiff's Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and (2) Plaintiff's remaining cause of action against the Syracuse Police Department be dismissed with leave to replead within thirty days of the issuance of an Order adopting the Report-Recommendation. (Dkt. No. 9.) Plaintiff did not submit an objection to the Report-Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) [1]

Based upon a review of this matter, the Court can find no clear error in the Report-Recommendation: [2] Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein; Plaintiff's Complaint is accepted for filing with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini; and Plaintiff's remaining cause of action against the Syracuse Police Department is dismissed with leave to replead within thirty days of the issuance of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-Recommendation (Dkt. No. 9) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint is accepted for filing with respect to Plaintiff's Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini; and it is further

***2 ORDERED** that Plaintiff's remaining cause of action against the Syracuse Police Department is **DISMISSED with leave to replead within THIRTY (30) DAYS** of the issuance of this Decision and Order.

**ORDERED** that, in the event Plaintiff files an Amended Complaint within the above-referenced thirty-day period, it shall be referred to Magistrate Judge Peebles for review; and it is further

**ORDERED** that, in the event Plaintiff does not file an Amended Complaint within the above-referenced thirty-day period, this action shall move forward with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and the Clerk of the Court is directed to issue summonses and USM-285 forms at that time for service by the U.S. Marshal Service.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 974824

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

## Footnotes

1 The Court notes that, on January 11, 2019, Plaintiff filed a letter from the City of Syracuse Citizen Review Board dated December 31, 2018, outlining its findings with respect to this matter. (Dkt. No. 10.) In its letter, the Citizen Review Board upheld Plaintiff's claim for excessive force against "Det. One," recommended a written reprimand against that individual, and absolved "Det. Two," "Sgt. One," and "Lt. One" from wrongdoing regarding the use of excessive force. (*Id.*) The Court does not liberally construe this letter as any sort of Objection to the Report-Recommendation.

2 When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Declined to Extend by Jordan v. County of Chemung, W.D.N.Y., September 5, 2017

2014 WL 1293527
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Guynell WRIGHT, Plaintiff,
v.
CITY OF SYRACUSE; Jeffrey T. Wright; Andrew Nolan; Donald Thompson; Robert Calkin; John Doe(s); Jane Doe(s); John M. O'Connor, III; and Thomas Simone, Defendants.

No. 5:10–CV–0661 (GTS/TWD).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Bosman Law Firm, L.L.C., A.J. Bosman, Esq., Daniel W. Flynn, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Robert P. Stamey, James P. McGinty, Esq., Aimee M. Paquette, Esq., of Counsel, Syracuse, NY, for City of Syracuse Counsel for Defendants.

Hancock Estabrook LLP, John G. Powers, Esq., of Counsel, Syracuse, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

***1** Currently before the Court, in this employment discrimination action filed by Guynell Wright ("Plaintiff") against the City of Syracuse, six of its employees and an unstated number of John and Jane Does ("Defendants") is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 95.) For the reasons set forth below, the motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, in his Third Amended Complaint, Plaintiff, an African–American man who was formerly employed by the City of Syracuse ("the City") as a laborer for the Department of Public Works ("the Department"), alleges that, throughout his employment with the City, he was treated differently than similarly situated white employees in the form of promotions, work assignments and discipline; he was retaliated against for his complaints of racial discrimination; and he was subject to continuous hostile work environment conditions. (Dkt. No. 45.)

Based on the factual allegations of Plaintiff's Third Amended Complaint, he asserts the following twenty-one claims: (1) a claim against all Defendants alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); (2) a claim against all Defendants alleging race discrimination in violation of the New York Human Rights Law, N.Y. Exec. Law § 296 ("NYHRL"); (3) a claim against all Defendants alleging hostile work environment in violation of Title VII; (4) a claim against all Defendants alleging hostile work environment in violation of NYHRL; (5) a claim against all Defendants alleging retaliation in violation of Title VII; (6) a claim against ll Defendants alleging retaliation in violation of NYHRL; (7) a claim against all Defendants alleging race discrimination in violation of Plaintiff's right to equal protection under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 ("Section 1983"); (8) a claim against all Defendants alleging hostile work environment in violation of Plaintiff's right to equal protection under the Fourteenth Amendment pursuant to Section 1983; (9) a claim against all Defendants alleging retaliation in violation of Plaintiff's right to freedom of speech under the First Amendment pursuant to Section 1983; (10) a claim against the City alleging municipal liability on Plaintiff's Section 1983 claims against the individually named Defendants; (11) a claim alleging breach of contract against all Defendants; (12) a claim against all Defendants alleging race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"); (13) a claim against all Defendants alleging hostile work environment in violation of Section 1981; (14) a claim against all Defendants alleging retaliation in violation of Section 1981; (15) a claim against all Defendants alleging the deprivation of Plaintiff's property interest in his continued employment in violation of his right to due process under the Fourteenth Amendment pursuant to Section 1983; (16) a claim against all Defendants alleging the deprivation of Plaintiff's property and liberty interest in his good name and reputation in violation of his right to due process under the Fourteenth Amendment

pursuant to Section 1983; (17) a claim against all Defendants alleging the deprivations of Plaintiff's rights under Article I of the New York State Constitution; (18) a claim against all Defendants alleging retaliation in violation of Title VII based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; (19) a claim against all Defendants alleging retaliation in violation of Section 296 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; (20) a claim against all Defendants alleging retaliation in violation of Plaintiff's right to freedom of speech under the First Amendment pursuant to Section 1983 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; and (21) a claim against all Defendants alleging retaliation in violation of Section 1981 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits. (*Id.*)

**B. Undisputed Material Facts**

***2** The following material facts [1] are gleaned from Defendants' Local Rule 7.1 Statement of Undisputed Material Facts, and Plaintiff's response thereto. (*See* Dkt. No. 100–7 [Defs.' Rule 7.1 Statement]; Dkt. No. 105 [Pl.'s Rule 7.1 Response Statement].) Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3). It further provides that, to the extent that the nonmoving party fails to do so, the facts asserted in the movant's Statement of Material Facts will be deemed admitted, as long as they are supported by the record. *Id.*

Plaintiff was employed as a "Laborer I" in the Department's Street Cleaning Bureau from at least June of 2006 until his termination in February of 2010. [2] Laborer I is a civil service classified job title that includes a written job description and written qualifications. The Laborer I position is covered within the American Federation of State, County and Municipal Employees ("AFSCME") Local 400 ("Local 400") bargaining unit, of which Plaintiff was a member.

The collective bargaining agreement ("CBA") for the relevant period between the City and Local 400 provides that the City shall furnish each employee member of Local 400 with a copy of the existing Work Rules and that any amendments or additions to the Work Rules shall be discussed with Local 400 and published to its members prior to becoming effective and that thereafter, any complaint shall be resolved through the grievance procedure. (*See* Dkt. No. 96–2, at 64 [Ex. B to Decl. of Donald Thompson, June 13, 2013].) Section 8.1.4 of the CBA also provides that, "[i]n the event that an employee receives a written reprimand and one (1) year elapses without any other disciplinary action being imposed on the employee, such reprimand shall be removed from the employee's personal file.

The Work Rules provide, in relevant part, at follows:

> VII. Employee Discipline
>
> The City shall not exercise its right to discharge or otherwise discipline an employee without just cause. Whenever reasonable, the City shall subscribe to the principles of progressive discipline. Set forth below are the guidelines used by the City in enforcing progressive discipline and determining the appropriate disciplinary penalty in any particular circumstance. These guidelines may be deviated from when, in the City's opinion, circumstances warrant.

| MINOR OFFENSES | | |
|---|---|---|
| FIRST, SECOND, THIRD | - | Write up |
| FORTH | - | Write up and one day suspension |
| FIFTH | - | Write up and three day suspension |
| SIXTH | - | Write up and five day suspension |
| SEVENTH | - | Write up and ten day suspension |
| EIGHTH | - | Write up and termination |

| | | |
|---|---|---|
| MAJOR OFFENSES | | |
| FIRST | - | Write up and suspension or termination |
| SECOND | - | Write up and suspension or termination |
| THIRD | - | Write up and termination |

***3** Notwithstanding the provisions of Article 8.1.4 of the parties ['] collective bargaining agreement, the discipline imposed for those violations considered to be 'minor' shall be determined by reviewing the number of such violations for which an employee has been disciplined in the twelve (12) months preceding the current violation;

However, upon committing a fourth (4th) 'minor' violation within the above stated twelve (12) month[ ] period, then that minor violation and each succeeding 'minor' violation shall be based on discipline[ ] received within the preceding eighteen (18) month period. The discipline imposed for each succeeding violation shall be in accordance with progressive discipline as outlined in the above guidelines;

In all cases of 'major' violations which are subject to suspension and/or termination, the preceding eighteen (18) months disciplinary record (including 'minor' violations) shall be considered in determining the discipline to be imposed in accordance with those outlined in the above guidelines.

(Dkt. No. 107–1, at 9–10 [Ex. 1 to Flynn Aff. ].) The Work Rules expressly provide that "[i]nsubordination is a major ... violation." (*Id.,* at 7.) To be sure, the Work Rules provide that "[t]heft of any City property or services is prohibited[,]" the level of violation attached to such conduct is not specified. (*Id.*) However, Section 9.2.1 of the CBA refers to fighting, theft, substance abuse and insubordination as "serious violations." (*See* Dkt. No. 96–2, at 53.)

From July 2006 until he was terminated, Plaintiff was subject to a series of disciplinary actions by the City. First, in July 2006, Plaintiff was given a one-day suspension for insubordination. In February 2007, Plaintiff was given a 20–day suspension for fighting with another employee. [3] In July 2007, Plaintiff was given a 20–day suspension for theft of City property. In January 2009, Plaintiff was terminated for insubordination, but then was brought back to work through a "last chance" agreement between the City and Local 400. [4] Finally, on February 24, 2010, Plaintiff was terminated for theft of City Property. Plaintiff does not dispute the fact of these disciplinary actions, but disputes the bases for the actions and/or argues that the City applies their policies inconsistently, discretionarily and disparately.

Defendant, John M. O'Connor, III ("O'Connor") made the decision to terminate Plaintiff. O'Connor was appointed Commissioner of the Department in January 2010 and had no involvement in Plaintiff's discipline or any employment actions regarding Plaintiff prior to his termination in February 2010. Defendant, Jeffrey Wright ("Wright") was the Commissioner of the Department through December 2009 and had no involvement in the decision to terminate Plaintiff in February 2010. Defendant, Thomas Simone, III ("Simone") has been the First Deputy Commissioner of the Department since January 2010. He was not a decision maker regarding the determination to terminate Plaintiff in February 2010.

***4** Defendant, Donald Thompson ("Thompson") was the Director of Personnel during the relevant period. Thompson asserts by Declaration that he agreed that it was appropriate to terminate Plaintiff under the circumstances and concurred with O'Connor's decision in that regard. (*See* Dkt. No. 96 at ¶¶ 34–35 [Decl. of Donald Thompson, June 13, 2013].) At his deposition, O'Connor testified regarding his communication with Thompson prior to terminating Plaintiff, as follows: "I had [a] conversation with Don Thompson, who told me the level of progression [Plaintiff] was at and [sic] was instructed and encouraged that I should investigate, and most likely there would be termination here." (Dkt. No. 112, at 56 [Dep. of John M. O'Connor, III, at 152: 4–8, Jan. 4, 2013].) According to Plaintiff, O'Connor told him that Don (meaning Thompson) "said to fire you." (Dkt. No. 106 at 7–8 [Aff. of Guynell Wright at ¶ 41].)

During the relevant time period, Defendant, Robert Culkin ("Culkin") was the Acting Assistant Superintendent of the Department's Street Cleaning Bureau and Defendant, Andrew Nolan ("Nolan") was Acting Superintendent. Both Culkin and Nolan assert that they did not initiate the discipline leading up to Plaintiff's termination, did not participate in the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

pretermination hearing and played no role in the decision to terminate Plaintiff, nor were they consulted by O'Connor for their input regarding Plaintiff's discipline. (*See* Dkt. No. 98 at 8 [Decl. of Andrew Nolan at ¶ 49, June 13, 2013]; Dkt. No. 100 at 5 [Decl. of Robert Culkin at ¶ 32, June 13, 2013].) Plaintiff counters that he "personally observed [ ] O'Conn[o]r go to [ ] Nolan and [ ] C[u]lkin for advice on how to perform his duties as Commissioner." (Dkt. No. 106 at 8 [Wright Aff. ¶ 42].)

Prior to his termination in February 2010, Plaintiff was provided a copy of the notice of the disciplinary charges against him as well as the possibility that termination would be considered as a result. Plaintiff was afforded a disciplinary hearing at which he was given the chance to respond to the disciplinary charges against him and was permitted to have union representation present to advocate on his behalf. Simone was present at Plaintiff's disciplinary hearing. Although Simone has the authority to advise regarding discipline, his role at Plaintiff's hearing was as an observer and gatherer of information.

Also, Plaintiff exercised his procedural right to grieve his termination. That procedure ran its course according to the grievance procedure set forth in the CBA and terminated prior to the final step, when Local 400 voted not to take the grievance to arbitration.

Plaintiff ultimately filed complaints with the New York State Division of Human Rights ("DHR") on March 26, 2010 and April 28, 2010 challenging his February 2010 termination. [5] (*See* Dkt. No. 96–33 [Ex. GG to Thompson Decl.].) In those complaints, Plaintiff alleges that he was suspended and terminated based on his race and that he was retaliated against for his prior DHR complaints. Plaintiff alleges that white employees are treated differently than black employees in terms of employee discipline. (*See id.*) On June 3, 2010 and June 10, 2010, respectively, the DHR dismissed those complaints for administrative convenience. (*See* Dkt. No. 9'–13 [Ex. L to Decl. of Aimee Paquette, June 14, 2013]; Dkt. No. 96–34 [Ex. HH to Thompson Decl.].)

***5** After Plaintiff was terminated, he filed a claim for unemployment benefits with the Department of Labor ("DOL"). When the DOL inquired about the circumstances of Plaintiff's termination, the City responded that he had been terminated for cause. Plaintiff availed himself of the administrative appeal process to challenge the DOL's determination, which was ultimately overturned. Plaintiff received full payment of back benefits owed.

### C. Parties' Briefing on Defendants' Motion

#### 1. Defendants' Memorandum of Law

Generally, in their memorandum of law, the Defendants assert twelve arguments with regard to Plaintiff's claims against them. (Dkt. No. 100–8 [Defs.' Mem. of Law].)

First, argue the Defendants, Plaintiff's employment discrimination claims based on his termination may be dismissed for the following three reasons: (1) the discriminatory determination claim against Simone, Wright, Culkin, Thompson and Nolan should be dismissed because each was either not the decision maker or was not otherwise actionably involved in the decision to terminate Plaintiff; (2) the discriminatory determination claim against O'Connor and the City should be dismissed because (a) Plaintiff cannot make out a prima facie case that his termination was discriminatory, (b) Defendants have come forward with legitimate, nondiscriminatory reasons for Plaintiff's termination, and (c) Plaintiff has no evidence that Defendants' stated reasons for his termination are a pretext for discrimination; and (3) absent individual liability for discriminatory termination, no liability will lie against the City pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018 (1978). (*Id.* at 14–25.)

Second, argue the Defendants, Plaintiffs 18th, 19th, 20th and 21st causes of action alleging discrimination against the City for opposing his application for unemployment benefits may be dismissed for the following three reasons: (1) there is caselaw supporting the legal conclusion that an employer's opposition of a former employee's application for unemployment benefits is not adverse employment action; (2) where an employer opposes a former employee's unemployment application, but the employee is ultimately awarded those benefits, no adverse employment action occurs in any event; and (3) Plaintiff cannot prove discriminatory animus in the opposition of his unemployment application because he failed to seek any discovery or deposition from the City employee responsible for responding to DOL inquiries. (*Id.* at 26–27.)

Third, argue the Defendants, Plaintiff's hostile work environment claims may be dismissed as a matter of law for the following five reasons: (1) Plaintiff's Title VII and NYHRL claims of hostile work environment must be

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

dismissed for failure to exhaust his administrative remedies before the DHR; (2) Plaintiff's NYHRL claim must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) all of Plaintiff's hostile work environment claims must be dismissed because Plaintiff has failed to identify evidence that his workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of his employment; (4) Plaintiff's hostile work environment claims against Simone, O'Connor, Wright and Thompson must be dismissed because there is a lack of evidence of their personal involvement or discriminatory purpose; and (5) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 27–36.)

***6** Fourth, argue the Defendants, there is no claim for discriminatory overtime in this action for the following six reasons: (1) the Third Amended Complaint does not include a claim for discriminatory overtime; (2) any claim for discriminatory overtime under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (3) any discriminatory overtime claim under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (4) Plaintiff cannot identify any evidence that he was denied overtime due to discrimination; (5) Plaintiff cannot identify any evidence that he was denied overtime because of his race or protected activity; and (6) any claim of discriminatory overtime against Simone, O'Connor, Wright and Thompson must be dismissed because none of them was a decision maker or involved in setting Plaintiff's alleged discriminatory overtime assignments. (*Id.* at 36–43.)

Fifth, argue the Defendants, Plaintiff's discrimination and retaliation claims based on less desirable work assignments must be dismissed for the following five reasons: (1) Plaintiff's claimed discriminatory work assignments fail or do not constitute adverse employment action; (2) any claim of discriminatory work assignments against Simone, O'Connor, Wright and Thompson must be dismissed because none of them was a decision maker or involved in setting Plaintiff's alleged discriminatory work assignments; (3) any claim for discriminatory work assignments under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (4) any discriminatory claim for discriminatory work assignments under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; and (5) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 43–48.)

Sixth, argue the Defendants, Plaintiff's discriminatory and retaliatory discipline claims must be dismissed for the following six reasons: (1) Plaintiff's claim for discriminatory and retaliatory discipline under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (2) Plaintiff's claim for discriminatory and retaliatory discipline under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) some or all of Plaintiff's claims for discriminatory and retaliatory discipline are barred by the relevant statute of limitations; (4) Plaintiff cannot established that the challenged disciplinary actions were premised on discriminatory or retaliatory animus; (5) discriminatory discipline claim against Simone, O'Connor, Nolan, Culkin and Thompson must be dismissed because none of them was a decision maker or involved in the discipline of Plaintiff; and (6) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 48–57.)

***7** Seventh, argue the Defendants, Plaintiff's claims of discriminatory and retaliatory denial of promotion may be dismissed for the following six reasons: (1) Plaintiff's claims for discriminatory denial of promotion under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (2) Plaintiff's claim for discriminatory denial of promotion under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) Plaintiff's claims for discriminatory denial of promotion under Title VII, NYHRL and Section 1983 must be dismissed because they are timebarred; (4) Plaintiff cannot establish that the claimed promotions for which he was passed over were filled based on discriminatory or retaliatory intent; (5) Plaintiff's claims for discriminatory denial of promotion against Simone, Nolan, Culkin, Thompson and O'Connor should be dismissed because none of them was a decision maker or involved in the alleged failure to promote Plaintiff to crew leader; and (6) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 57–67.)

Eighth, argue the Defendants, Plaintiff's breach of contract claim must be dismissed because Plaintiff has failed to file a claim against Local 400, which is a prerequisite to a breach

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of contract claim based on a union's breach of its duty of fair representation. (*Id.* at 67–68.)

Ninth, argue the Defendants, Plaintiff's 15th and 16th causes of action, brought under Section 1983 for violation of his Fourteenth Amendment right to Due Process may be dismissed because (1) municipal employees hold no due process rights to promotions, overtime, discipline or work assignments; and (2) a municipal employee's liberty interest in keeping his employment is adequately served where there is a process available to challenge the employer's deprivation, such as a grievance procedure. (*Id.* at 68–70.)

Tenth, argue the Defendants, Plaintiff's 17th cause of action for violations of the New York State Constitution must be dismissed because no private right of action exists under the New York State Constitution where a claim based on the same allegations is asserted under Section 1983. (*Id.* at 70–71.)

Eleventh, argue the Defendants, Plaintiff's claim for punitive damages must be dismissed because no such claim may be maintained against the City as a matter of law and because Plaintiff has failed to identify any evidence to establish that the individual Defendants acted with evil motive or intent. (*Id.* at 71.)

Twelfth, argue the Defendants, Plaintiff's claims against John and Jane Doe defendants must be dismissed because Plaintiff failed to identify them through amendment of his pleading prior to the close of discovery. (*Id.*)

**2. Plaintiff's Opposition Memorandum of Law**

Generally, in his opposition memorandum of law, Plaintiff asserts eleven arguments: (1) because Plaintiff asserts claims under the NYHZL and the New York State Constitution, this Court should apply New York procedural law when deciding the pending motion for summary judgment; (2) Defendants' motion should be denied because there are triable issues of fact to support Plaintiff's claims that he was unlawfully discriminated against; (3) Defendants' arguments of failure to exhaust should be rejected because they rely only on the formal charges to the DHR rather than Plaintiff's intake form and handwritten submissions; (4) Plaintiff's hostile work environment claims should not be dismissed because there is more than sufficient evidence for a reasonable jury to conclude that Plaintiff's work environment was filled with discriminatory intimidation, ridicule and insult that the terms and conditions of his employment were altered for the worse; (5) the City Charter's Notice of Claim provision does not apply to Plaintiff's NYHRL claims; (6) Plaintiff's claims relating to his unemployment benefits should not be dismissed because the City's opposition of Plaintiff's unemployment applications should be deemed adverse employment action under *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006); (7) Plaintiff has viable due process claims because the CBA here only allows Local 400 to seek a post-termination hearing through arbitration; (8) Plaintiff's breach of contract claim should not be dismissed because it is a matter of fact for the jury to decide whether Local 400 breached its duty of fair representation; (9) Plaintiff's claims under the New York State Constitution should not be dismissed because the availability of a federal constitutional or statutory claim does not render a claim under the New York State Constitution subordinate; (10) Plaintiff's entitlement to punitive damages is not suitable for resolution at the summary judgment stage; and (11) Defendants lack standing to seek dismissal of the John and Jane Doe defendants. (*See* Dkt. No. 104 [Pl.'s Opp'n Memo. of Law].)

**3. Defendants' Reply Memorandum of Law**

***8** Generally, in their reply memorandum of law, the Defendants assert eleven arguments: (1) Plaintiff mischaracterizes his summary judgment burden; (2) Plaintiff fails to meet his burden with respect to his wrongful termination claim; (3) Plaintiff fails to oppose, and therefore concedes, Defendants' argument that no claim exists based on discriminatory overtime; (4) Plaintiff fails to meet his burden on his discriminatory promotion claim; (5) Plaintiff fails to meet his burden on his excessive discipline claim; (6) Plaintiff fails to meet his burden on his hostile work environment claim; (7) Plaintiff effectively concedes he has no discriminatory assignments claim; (8) post-employment contestation of unemployment benefits is not actionable; (9) Plaintiff is barred from asserting a contract claim against the City; (10) Plaintiff does not have a viable due process claim; and (11) Plaintiff has failed to establish sufficient evidence to support a *Monell* claim against the City. (Dkt. No. 124 [Defs.' Reply Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Motion for Summary Judgment

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

dispute as to a material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598 (1970)). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must identify evidence in the record that creates a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348 (1986)).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248 (citation omitted).

As for the genuineness requirement, a dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Id.* As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted; emphasis added). [6] Similarly, inadmissible hearsay is insufficient to create a genuine issue of fact, "absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir.1985) (citations omitted). [7]

**B. Legal Standard Governing Unopposed Motions**

***9** In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at * 1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y.Aug.7, 2009) (Suddaby, J.) (collecting cases).

**C. Plaintiff's Claims**

**1. Title VII**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of," inter alia, "such individual's race, color, religion, sex, or national origin." 42 U .S.C. § 2000e–2(a)(1). Liability under Title VII is limited to employers, not individuals. *See Reynolds v. Barrett,* 685 F.3d 193, 202 (2d Cir.2012).

Filing a charge with the EEOC is a jurisdictional prerequisite to a private civil action under Title VII. *See Morgan v. NYS Attorney Gen.'s Office,* No. 11–CV–9389, 2013 WL 491525, at *6 (S.D.N.Y. Feb. 8, 2013) (citing *Chin v. Port Auth. of New York & New Jersey,* 685 F.3d 135, 146 (2d Cir.2012) (citing 42 U.S.C. §§ 2000e–5(e) (1), (f)(1))). Claims not raised before the EEOC may still be brought in federal court as long as they are "reasonably related" to the claims that were filed with the agency. *See id.* (quoting *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993), superseded by statute on other grounds as recognized in *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684 (2d Cir.1998)). A claim is "reasonably related" where the conduct complained of "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts,* 990 F.2d at 1402. When determining whether a claim is reasonably related to the claims filed with the EEOC, courts should focus "on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving," and "whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Williams v. New York City Housing Auth.,* 458 F.3d 67, 70 (2d Cir.2006) (internal alteration and citation omitted). "[I]t is the substance of the charge and not its label that controls." *Mathirampuzha v. Potter,* 548 F.3d 70, 76–77 (2d Cir.2008) (quoting *Deravin v. Kerik,* 335 F.3d 195, 200–01 (2d Cir.2003)). "The central question is whether the complaint filed with the [EEO] gave th[e] agency adequate notice to investigate discrimination on both bases." *Mathirampuzha,* 548 F.3d at 76–77 (citing *Williams,* 458 F.3d at70).

**a. Hostile Work Environment**

***10** In enacting Title VII, Congress intended to protect against "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. New York Div. of Parole,* 678 F.3d 166, 174–175 (2d Cir.2012) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367 (1993)).

In order to establish a claim for a hostile work environment under Title VII, the underlying harassment alleged "must be sufficiently severe or pervasive," both subjectively and objectively, "to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Redd,* 678 F.3d at 175 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U .S. 57, 67, 106 S.Ct. 2399 (1986); *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). Further, the plaintiff must establish that the hostile or abusive treatment was because of his membership in a class of persons protected by Title VII. *See Redd,* 678 F.3d at 175.

A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Redd,* 678 F.3d at 175 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). Whether an environment is subjectively hostile or abusive may be determined by the effect on the plaintiff's psychological well-being, although no single factor is required. *See id.*

In order to establish his claim for hostile work environment, a plaintiff need not show that his "working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered h[is] working conditions." *Redd,* 678 F.3d at 175 (quoting *Pucino v. Verizon Commc'ns, Inc.,* 618 F.3d 112, 119 (2d Cir.2010)). Typically, isolated incidents will not suffice to establish a hostile work environment, "although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd,* 678 F.3d at 175–176 (citing, inter alia, *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir.2004) ("[A] single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." (internal quotation marks omitted)). "For racist comments, slurs, and jokes to constitute a hostile work environment, there [generally] must be more than a few isolated incidents of racial enmity." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quotation marks omitted).

It is important to keep in mind, however, that "while the central statutory purpose of Title VII was eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd,* 678 F.3d at 176 (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251 (1976); *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405 (2006). Title VII is "meant to protect individuals from abuse and trauma that is severe[, but is] not intended to promote or enforce civility, gentility or even decency." *Taylor v. New York City Dept. of Educ .,* No. 11–CV–3582, 2012 WL 3150388, at *8 (E.D.N.Y. Aug. 2, 2012) (quoting *Curtis v. DiMaio,* 46 F.Supp.2d 206, 213–14 (E.D.N.Y.1999)). Thus, "the 'mere utterance of an epithet which engenders offensive feelings' is insufficient to sustain a hostile work environment claim." *Tolbert v. Smith,* 09–CV–6579, 2014 WL 906158, at *19 (W.D.N.Y. Mar. 7, 2014) (quoting *Hannon v. Wilson Greatbatch, Ltd.,* No. 00–CV–0203, 2002 WL 1012971, *7 (W.D.N.Y. Apr. 24, 2002). *See also Brown v. Coach Stores, Inc.,* 163 F.3d 706 (2d Cir.1998) (occasional offensive racial comments are not sufficiently severe or pervasive to establish a hostile work environment).

***11** In addition to showing that he was subjected to a hostile work environment, a plaintiff must also establish that the conduct which created the hostile environment may be imputed to his employer. *See Shiner v. State Univ. of New York,* No. 11–CV–1024, 2012 WL 5398658, at *4 (W.D.N.Y. Nov. 2, 2012) (citing *Leopold v. Baccarat, Inc.,* 239 F.3d 243, 245 (2d. Cir.2001)).

The actions of a plaintiff's coworkers will be imputed to the employer if the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Wiercinski v. Mangia 57, Inc.,* No. 09–CV–4413, 2012 WL 2319142, at * 10 (E.D.N.Y. June 19, 2012) (quoting *Murray v. N.Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)).

However, the actions of a plaintiff's supervisor are "automatically imputed to the employer unless the employer is able to successfully raise an affirmative defense that examines the reasonableness of the conduct of both the employer and the employee." *Shiner,* 2012 WL 5398658, at *4. This defense requires the employer to show that it "exercised reasonable care to prevent and correct any

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275 (1998); *Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257 (1998).

Where an employer "maintains a policy against [ ] harassment and provides a process through which employees can complain about violations of that policy," it will have met the first prong of its affirmative defense. *Joyner v. City of New York,* No. 11–CV–4958, 2012 WL 4833368, at *3 (S.D.N.Y. Oct. 11, 2012). Further, where a plaintiff fails to take advantage of that system until more than a year after the alleged harassment began, and where the offensive conduct ceased once plaintiff reported it, an employer will establish the second prong of its defense. *See Joyner,* 2012 WL 4833368, at *3 (citing *Leopold,* 239 F.3d at 246).

**b. Race Discrimination and Disparate Treatment**

At the summary judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973), and its progeny. *See Mathirampuzha,* 548 F.3d at 78 citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742 (1993); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089 (1981)). At the first stage of the *McDonnell Douglas* analysis, the plaintiff bears the burden to show that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 30 (2d Cir.2013) (quoting *Reynolds v. Barrett,* 685 F.3d 193, 202 (2d Cir.2012) (internal quotation marks and alteration omitted)). "A showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir.2003).

***12** In order to establish a prima facie case of discrimination based on failure to promote under Title VII, a plaintiff ordinarily must demonstrate that: "(1) [he] is a member of a protected class; (2)[he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Yu v. New York City Housing Development Corp.,* 494 F. App'x 122, 124–125 C.A.2 (2d Cir.2012) (quoting *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir.2010) (quotation marks omitted).

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate non-discriminatory reason for the employment action at issue. *See Bir,* 2013 WL 362973, at*1 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097 (2000)). If the employer makes this showing, the burden then shifts back to the plaintiff to show that the employer's proffered explanation is a pretext for discrimination. *Id.* (citing *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 492 (2d Cir.2010)).

" 'A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' A change that is 'materially adverse' could consist of, inter alia, 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.' " *Morgan,* 2013 WL 491525, at *5 (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)).

**c. Retaliation**

To make out a prima facie case of retaliation under Title VII, a plaintiff must show [the following]: (1) participation in a protected activity known to Defendants; (2) an adverse employment action; and (3) a causal connection between the two." *Schanfield v. Sojitz Corp. of Am.,* 663 F.Supp.2d 305, 341 (S.D.N.Y.2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.,* 899 F.2d

203, 209 (2d Cir.1990). A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 416 (S.D.N.Y.2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *id.* (quoting *Sumner,* 899 F.2d at 209). The reasonableness of a plaintiff's belief is to be assessed in light of the totality of the circumstances. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996).

***13** Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006). "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Similarly, being laid off constitutes adverse employment action. *See Galabya,* 202 F.3d at 640; *Walker v. City of New York,* 98–CV–2695, 2002 WL 31051534, at *4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997[was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered.").

A plaintiff may establish a causal connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield,* 663 F.Supp.2d at 343 (citing *Knight v. City of New York,* 303 F.Supp.2d 485, 496 (S.D.N.Y.2004)).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably.' " *Id.* (quoting *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 542 (E.D.N.Y.2003)).

In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

Claims of retaliation under Title VII are governed by the burden-shifting analysis announced in *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. *See Guzman v. News Corp.,* No. 09–CV–9323, 2013 WL 5807058, at * 19 (S.D.N.Y. Oct. 28, 2013) (citing *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010); *Lennert–Gonzalez v. Delta Airlines, Inc.,* No. 11–CV–1459, 2013 WL 754710, at *9 (S.D.N.Y. Feb. 28, 2013)). *See also Puglisi v. Town of Hempstead,* 545 F. App'x 23, ———, 2013 WL 5663223 (2d Cir. Oct. 18, 2013) (discussing Title VII retaliation claim in context of *McDonnell–Douglas* burden-shifting framework).

"Under *McDonnell Douglas,* once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory business rationale to justify its adverse employment action." *Schanfield,* 663 F.Supp.2d at 343.

> ***14** If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, 'but for' the protected activity, she would not have been terminated. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534 (2013). The Supreme Court recently clarified that 'a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' as distinct from 'a motivating factor,' which had previously been the standard in the Second Circuit. *Id.* at 2534; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006).

*Guzman,* 2013 WL 5807058, at * 19. *See also Puglisi,* 2013 WL 5663223; *Leacock v. Nassau Health Care Corp.,* No. 08–CV–2401, 2013 WL 4899723, at *11 (E.D.N.Y. Sept. 11, 2013); *Wesley–Dickson v. Warwick Valley Cent. Sch. Dist.,* ––– F.Supp.2d. ———, ———, 2013 WL 5338516, at *18 (S.D.N.Y.2013).

**2. NYHRL**

"Because New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII," those claims may be analyzed in tandem. *Leopold v. Baccarat, Inc.* 174 F.3d 261, 264, n. 1 (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304, n. 4 (2d Cir.1995), abrogated on other grounds by *Burlington Indus.,* 524 U.S. 742, 118 S.Ct. 2257). *See also Salmon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 226, n. 2 (2d Cir.2008). Accordingly, a

court's ruling regarding a plaintiff's Title VII claims applies with equal force to those claims under the NYHRL. *See Leopold,* 174 F.3d at 264, n. 1.

Under the NYHRL, however, a plaintiff may allege claims against an individual defendant as an aider or abettor of NYHRL violations. In order for a plaintiff to recover against an aider or abettor of NYHRL violations, she must establish "(1) that [ ]he engaged in conduct protected by the NYHRL; (2) there is a causal connection between the protected conduct and the alleged [violations] of the NYHRL; and (3) that [the defendant] 'actually participated' in the discrimination." *Beattie v. Guilderland Cent. Sch. Dist.,* 124 F.Supp.2d 802, 805 (N.D.N.Y.2000) (citations omitted). *See also* N.Y. Exec. Law § 296.1(a) (McKinney 2012). Further, a plaintiff must show that the defendant "aided or abetted a primary violation of the NYHRL committed by another employee or the business itself." *Jordan v. Cayuga Cnty.,* No. 01–CV1037, 2004 WL 437459, at *4 (N.D.N.Y. Feb. 9, 2004) (quoting *Bennett v. Progressive Corp.,* 225 F.Supp.2d 190, 213 (N.D.N.Y.2002) (internal quotation and emphasis omitted)). *See DeJohn v. Wal–Mart Stores East, LP,* No. 09–CV–1315, 2012 WL 3679204, at * 16 (N.D.N.Y. Aug. 17, 2012). However, an individual cannot be held liable for aiding and abetting their own violations of the NYHRL. *See Reid v.. Ingerman Smith LLP,* 876 F.Supp.2d 176, 186 (E.D.N.Y.2012). Finally, an employee is not individually subject to suit as an aider or abettor under the NYHRL "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Miotto v. Yonkers Public Schools,* 534 F.Supp.2d 422, 427 (S.D.N.Y.2008) (quoting *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984)). *See also Tomka,* 66 F.3d at 1317.

### 3. 42 U.S.C. § 1983

***15** In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must show "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689 (1979)).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Kregler v. City of New York,* 821 F.Supp.2d 651, 655–656 (S.D.N.Y.2011) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation marks omitted)). A plaintiff may allege the personal involvement of a defendant who occupies a supervisory position by alleging that the defendant: "(1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibited 'gross negligence' or 'deliberate indifference' to the constitutional rights of [the plaintiff] by having actual or constructive notice of the unconstitutional practices and failing to act." *Kregler,* 821 F.Supp.2d at 655–56 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501).

A municipality may only be liable on a § 1983 claim "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018 (1978)). In the absence of such a custom or policy, a municipality may not be held liable on a § 1983 claim for the actions of its employees under a theory of vicarious liability. *See Jones,* 691 F.3d at 80 (citing *Monell,* 436 U.S. at 691, 98 S.Ct.2018). Thus, isolated acts of municipal employees are typically not sufficient to establish municipal liability. However, acts done "pursuant to municipal policy, or [that] were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware" would justify liability of the municipality. *Jones,* 691 F.3d at 81. Further, "a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Id.*

#### a. First Amendment Retaliation

***16** "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Dillon v. Suffolk Cnty. Dep't of Health Servs.,* 917 F.Supp.2d 196, 205 (E.D.N.Y.2013) (quoting *Garcetti v. Caballus,* 547 U.S. 410, 417, 126 S.Ct. 1951 (2006)). In order to establish a claim for First Amendment retaliation, a public employee must show that (1) he engaged in "constitutionally protected speech" because


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

he spoke as a citizen on a matter of public concern; (2) he suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor in the decision. *Dillon,* 2013 WL 208950, at *6 (quoting *Johnson v.. Ganim,* 342 F.3d 105, 112 (2d Cir.2003)). The threshold inquiry is whether the employee spoke as a citizen on a matter of public concern. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti,* 547 U.S. at 418. "The Supreme Court has defined 'a matter of public concern' as one that 'relat[es] to any matter of political, social, or other concern to the community.' " *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684 (1983)).

In the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights [.]" *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir.2006). Such actions can include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," or may include "lesser actions" such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik,* 464 F.3d at 226 (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999)).

**b. Equal Protection**

A plaintiff may establish a claim for the violation of her right to equal protection under the Fourteenth Amendment based on race discrimination, since the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). "Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006) (quoting *Feingold,* 366 F.3d at159 & n. 20). Thus, claims for hostile work environment and disparate treatment may be brought under § 1983 as equal protection claims. *See Demoret,* 451 F.3d at 149. However, a claim of retaliation for complaining of race discrimination is not properly brought under the Equal Protection Clause. *See Bernheim v. Litt,* 79 F.3d 318, 323 (2d Cir.1996).

**c. Due Process**

***17** The Due Process Clause of the Fourteenth Amendment essentially provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Thus, in order to prevail on a due process cause of action, a plaintiff must establish the deprivation of some tangible property or liberty interest. *See Patterson v. City of Utica,* 370 F.3d 322, 329–30 (2d Cir.2004) ("stigma plus" claim requires a showing of the loss of one's reputation coupled with a more tangible liberty or property interest); *DeMuria v. Hawkes,* 328 F.3d 704, 705 (2d Cir.2003) (substantive due process claim requires plaintiff to identify the deprivation of a protected liberty or property interest, in addition to the requisite consciousshocking behavior on the part of the government); *McMenemy v. City of Rochester,* 241 F.3d 279, 285–286 (2d Cir.2001) (to establish a procedural due process claim, plaintiff must show that he possessed a protected liberty or property interest, of which he was deprived without due process).

When an individual claims to have a property interest related to employment, courts may look to the relevant contract of employment-either explicit or implicit-or its functional equivalent to determine whether the individual has such a property interest. *See Board of Regents v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701 (1972); *Ciambriello v. County of Nassau,* 292 F.3d 307, 314 (2d Cir.2002).

Where a government employee has a constitutionally protected property interest in his employment, "some kind of hearing [is required] prior to [termination]." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487 (1985) (internal quotation marks and citation omitted).

> However, in general, something less than a full evidentiary hearing is sufficient prior to adverse action. Before being terminated, the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. As long as a full post-termination hearing

> is provided for, the pre-termination hearing may be minimal.

*Arteta v. Cnty. of Orange,* 141 F. App'x. 3, 7 (2d Cir.2005) (citing *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. 1487; *Locurto v. Safir,* 264 F.3d 154, 173–74 (2d Cir.2001)) (quotations omitted).

It is a well-established legal principle in the Second Circuit "that there is no [procedural] due process violation where ... pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." *Adams v. Suozzi,* 517 F.3d 124, 128 (2d Cir.2008) (citing cases). *See also Coollick v. Hughes,* 699 F.3d 211, 217 (2d Cir.2012).

A government employee may have a cause of action for violation of his right to substantive due process where a government defamation occurs in the course of dismissal from employment resulting in a deprivation of a liberty interest, commonly referred to as a stigma plus claim. *See Lawson v. Rochester City Sch. Dist.,* 446 F. App'x. 327, 329 (2d Cir.2011) (citing *Patterson,* 370 F.3d at 330). In order to prevail on such a claim, a plaintiff must prove (1) the utterance of a statement injurious to his reputation that is capable of being proved false and that plaintiff claims is false; and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement. *See Monserrate v. N.Y. State Senate,* 599 F.3d 148, 158 (2d Cir.2010). "An employee's liberty interest is not ordinarily implicated by statements in connection with his termination of employment if there has been no public disclosure of the reasons for the discharge." *Walsh v. Suffolk Cnty. Police Dep't,* 341 F. App'x 674, 675 (2d Cir.2009) (citing *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 (1976) ("Since the ... communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired."). Moreover, a plaintiff cannot prevail on a substantive due process claim unless he shows that the defendants infringed a liberty interest in an arbitrary or irrational manner and in such a way as to "shock the conscience." *Smith v. Half Hollow Hills Cent. School Dist.,* 298 F.3d 168, 173 (2d Cir.2002). *See also Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 503 (2d Cir.2001).

#### 4. 42 U.S.C. § 1981

***18** Employment discrimination claims brought under Section 1981, like those brought under Section 1983, are subject to the same substantive standards as claims brought pursuant to Title VII and NYHRL. *See Jackson v. City of New York,* No. 11–CV–3028, 2014 WL 1010785, at *4 (E.D.N.Y. Mar. 17, 2014). Procedurally, employment discrimination claims brought pursuant to Sections 1981 and 1983 are also analyzed under the *McDonnell Douglas* framework. *See id.* [8] Finally, Section 1981 claims against a municipality, like Section 1983 claims, are subject to analysis under *Monell. See Lang. v. New York City Health & Hosps. Corp.,* No. 12–CV–5523, 2013 WL 4774751, at * 5 (S.D.N.Y. Sept. 5, 2013).

#### 5. New York State Constitution

Where claims are brought pursuant to the New York State Constitution that mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims. *See Canzoneri v. Incorporated Vill. of Rockville Ctr.,* 2013 WL 6330671, at *11 (E.D.N.Y. Dec. 5, 2013) (citing *Krug v. Cnty. of Rennselaer,* 559 F.Supp.2d 223, 247–48 (N.D.N.Y.2008)). *See also Clayton v. City of Poughkeepsie,* 2007 WL 2154196, at *7 (S.D.N.Y. June 21, 2007) (quoting *De Vito v. Barrant,* No. 03–CV–1927, 2005 WL 2033722, at *6–7 (E.D.N.Y. Aug. 23, 2005)); *Flores v. City of Mount Vernon,* 41 F.Supp.2d 439, 446–47 (S.D.N.Y.1999).

## II. ANALYSIS

### A. Whether A Discriminatory Overtime Claim Exists in This Action

After carefully considering the matter, the Court answers this question in the negative, for the reasons stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 36–43 [Defs.' Mem. of Law].) To those reasons, the Court adds the following points.

Plaintiff fails to plead a claim for discriminatory overtime in his Third Amended Complaint. Moreover, Plaintiff has failed to oppose Defendants' motion for summary judgment in this regard. As indicated above in Point II.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. At the very least, Defendants have met

the lightened burden that was created by Plaintiff's failure to respond.

In any event, the Court would reach the same conclusion even if it were to subject the Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. The only evidence of Plaintiff being denied overtime occurred in January 2006, before the period that is relevant to the claims in this action. Moreover, the evidence reflects that Plaintiff grieved the issue, which was resolved in his favor. Accordingly, there is no evidence that Plaintiff endured a materially adverse change in the terms and conditions of his employment as it relates to overtime. Therefore, Defendants' motion for summary judgment on any claim of discriminatory or retaliatory denial of overtime is granted.

**B. Whether Plaintiff's Claims Under Article I of the New York State Constitution Must Be Dismissed**

***19** After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 70–71 [Defs.' Mem. of Law].) To those reasons, the Court adds the following points.

First, Plaintiff's purported claim under the New York State Constitution is that Defendants deprived him of his rights under Article I, essentially claiming a violation of the entire Bill of Rights. Accordingly, Plaintiffs' New York Constitutional claim is overly broad and therefore, should be dismissed for failure to state a claim. In an abundance of caution, the Court interprets Plaintiff's Third Amended Complaint to allege claims under Article I, Sections 6 (due process), 8 (freedom of speech), and 11 (equal protection).

Second, and in any event, as indicated above in Point II.C.5. of this Decision and Order, where Plaintiff's state constitutional claims mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims. Accordingly, for this reason alone, Defendants' motion for summary judgment on Plaintiff's 17th cause of action under the New York State Constitution is granted.

**C. Whether Plaintiff's Claims Against John Doe(s) and Jane Doe(s) Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reason stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 71 [Defs.' Mem. of Law].) To that reason, the Court adds the following point.

In opposition to Defendants' legally supported motion for summary judgment seeking dismissal of the John and Jane Doe defendants Plaintiff makes the bald and completely unsupported assertion that Defendants "have no standing" in that regard. (Dkt. No. 104 at 22 [Pl.'s Mem. of Law].) Plaintiff does not dispute that discovery in this action, which lasted in excess of two years, is complete, nor does he argue that further discovery would reveal the identity of these unnamed defendants. Accordingly, the completion of discovery and Plaintiff's failure to identify the John and Jane Doe defendants mandates their dismissal. *See Epps v. City of Schenectady,* No. 10–CV–1101, 2013 WL 717915, at *5 (N.D.N.Y. Feb. 27, 2013). Therefore, Defendants' motion for summary judgment is granted in this regard.

**D. Whether Plaintiff's Breach of Contract Claim Against Defendants Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reason stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 67–68 [Defs.' Mem. of Law].) To that reason, the Court adds the following point.

In opposition to Defendants' motion in this regard, Plaintiff cites inapposite caselaw and fails to address the point made by Defendants, which is that in order to pursue a breach of contract claim against the City under the undisputed facts of this case, Plaintiff must have also pursued a claim against Local 400 for breach of the duty of fair representation. *See Lore v. City of Syracuse,* 670 F.3d 127, 151 (2d Cir.2012). Plaintiff fails to identify any such claim against Local 400, nor has he alleged such a claim against Local 400 in this action. Accordingly, the caselaw Plaintiff cites, for the proposition that whether a union has breached its duty of fair representation is a fact question for a jury to decide, is irrelevant to the pending issue before the Court. (*See* Dkt. No. 104 at 20 [Pl.'s Mem. of Law citing *Smith v. Hussmann Refrigerator Co.,* 619 F.2d 1229, 1244–45 (8th Cir.1980) ].) Finally, it is worth noting that Plaintiff's misunderstanding of the law in this regard is dubious considering the supporting legal authority cited by Defendants, *Lore v. City of Syracuse,* is a case out of the Second Circuit Court of Appeals, a party to which was represented by Plaintiff's counsel in this action.

***20** Therefore, Defendants' motion for summary judgment regarding Plaintiff's breach of contract claim is granted.

**E. Whether Plaintiff's Claims Alleging Discrimination and Retaliation Due to the City's Contestation of His Application for Unemployment Benefits Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 26–27 [Defs.' Mem. of Law]; Dkt. No. 124 at 14–15 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following point.

Plaintiff opposes Defendants' motion in this regard, arguing that the City's contestation of his application for unemployment benefits was an adverse action. However, Plaintiff concedes that his retaliation claims in this regard are asserted solely against the City, despite the allegations in the Third Amended Complaint.

Plaintiff acknowledges that courts disagree whether an employer's decision to contest unemployment benefits constitutes an adverse action, but cites only one case in support of his argument that opposing unemployment benefits is adverse action, ostensibly suggesting that this Court should decide the issue here accordingly. *See Brown v. JP Morgan Chase Bank,* No. 12–CV–544, 2013 U.S. Dist. LEXIS 95946, at *21–22 (E.D.N.Y. Apr. 10, 2013). [9]

Nonetheless, this Court finds instructive and persuasive the caselaw holding that an employer's opposition of a terminated employee's application for unemployment benefits is not adverse action for purposes of a retaliation claim. *See Burnett v. Trinity Inst. Homer Perkins Ctr., Inc.,* No. 10–CV–681, 2011 WL 281023, at *3 (N.D.N.Y. Jan. 25, 2011) (citing *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997); *U.S. v. N.Y. City Transit Auth.,* 97 F.3d 672, 677 (2d Cir.1996)). *See also Belardo v. Con–Way Transp. Servs., Inc.,* No. 02–CV5406, 2005 WL 885016, at *8 (E.D.N.Y. Mar. 28, 2005) ("[A]n employer's actions in objecting to the provision of unemployment benefits to a former employee is not an adverse employment action cognizable under the employment discrimination laws."); *Jenkins v. St. Luke's–Roosevelt Hosp. Ctr.,* No. 09–CV–12, 2009 WL 3682458, at *9 (S.D.N.Y. Oct. 29, 2009) (granting motion to dismiss retaliation claim regarding employer's cessation of unemployment benefits); *Barriera v. Bankers Trust,* No. 98–CV–3641, 2003 WL 22387099, at *7 (S.D.N.Y. Oct. 20, 2003) (finding no adverse employment action where employer opposed plaintiff's unemployment benefits claim, failed to award severance pay, and informed the EEOC that the plaintiff resigned); *Roman v. Cornell Univ.,* 53 F.Supp.2d 223, 245 (N.D.N.Y.1999) (holding that employer's opposition to plaintiff's unemployment benefits application does not constitute an adverse employment action).

Therefore, Defendants' motion for summary judgment regarding Plaintiff's retaliation claims as it relates to the City's contestation of his unemployment benefits is granted.

**F. Whether Plaintiff's Hostile Work Environment Claims Must Be Dismissed**

***21** After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 31–34 [Defs.' Mem. of Law]; Dkt. No. 124 at 12–14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Defendants point to Plaintiff's deposition testimony to demonstrate the lack of evidence supporting Plaintiff's hostile work environment claim. Specifically, Plaintiff testified that he felt his employment environment was hostile because nobody on his crew liked him nor would they communicate with him, despite the fact that they never made any racial comments to him. (*See* Dkt. No. 108 at 264–264 [Dep. of Guynell Wright, Jan. 18, 2013].) Plaintiff further testified that he felt like he was walking on egg shells at work because he feared being disciplined for things that other people were not disciplined for, and that despite being a victim when a white employee lifted his leg up behind Plaintiff's head and when another employee patted his butt, Plaintiff was still disciplined. [10] (*Id.,* at 267–268.) Defendants argue that these instances do not rise to the level of severity or pervasiveness to establish hostile work environment and that Plaintiff has not established that the alleged hostile or abusive treatment was because of his race.

Plaintiff, in opposition, fails to identify any evidence in the record to create a question of fact on the issues of severity or pervasiveness or the issue of whether the alleged hostile treatment was because of his race. Instead, Plaintiff argues, in conclusory fashion, that "there is more than sufficient evidence for a reasonable jury to conclude that Plaintiff's work environment was filled with discriminatory intimidation,

ridicule and insult that the terms and conditions of his employment were altered for the worse." (Dkt. No. 104 at 12 [Pl.'s Mem. of Law].) Accordingly, Plaintiff has not met his burden to identify any fact question for a jury to decide regarding his hostile work environment claim and summary judgment may be granted on this basis alone. However, in an abundance of caution, the Court has reviewed the record to identify any other evidence that could possibly support Plaintiff's hostile work environment claim.

In his affirmation, Plaintiff states that when Nolan was crew leader an employee called Plaintiff the N word in Nolan's presence, but Nolan asked Plaintiff to shake the other employee's hand to resolve the conflict, without disciplining the other employee. (*See* Dkt. No. 106 at 10, ¶ 56 [Pl.'s Aff.].) Plaintiff further asserts that, "[u]pon information and belief, Department of Personnel employee Terri Macri has made statements to other DPW employees that she does not approve of mixed race babies." (*Id.,* ¶ 60.) Other evidence includes Plaintiff's assertion that Nolan said that "no black man was ever going to make anything on my watch" in 2007. (*Id.,* at 8, ¶ 46.)

***22** To be sure, even assuming the admissibility of Plaintiff's double hearsay statements attributable to Terri Macri, their relevance is dubious considering they were made outside the presence of Plaintiff. *See, e.g., Greaves v. St. Luke's–Roosevelt Hosp. Ctr.,* 03–CV–7424, 2005 U.S. Dist. LEXIS 4082, at *33 (S.D.N.Y. March 17, 2005) (rejecting plaintiff's claim of hostile work environment because, "[w]ith the exception of a single hearsay remark, made outside his presence, Greaves fails to point to any discriminatory insult or abuse"); *cf. Benjamin v. Metro. Transp. Auth.,* 07–CV–3561, 2012 WL 3188764, at *12 (S.D.N.Y. Aug. 2, 2012) ("While some of Benjamin's fellow Plaintiffs also make allegations about a hostile work environment, the record does not indicate that Benjamin was aware of any comments made to other Plaintiffs, let alone was present to hear them and have them impact his own work environment."). Moreover, Plaintiff's assertion regarding another employee calling him the N-word in Nolan's presence is also of questionable relevance because, while Plaintiff fails to state with specificity when the statement was made, he asserts that it was made when Nolan was a crew leader, which would have been prior to the relevant time period at issue in this action. (*See* Dkt. No. 117, at 6 [Dep. of Andrew Nolan, Jan. 8, 2013].)

Nonetheless, even assuming the truth, relevance and admissibility of all of the aforementioned evidence, Plaintiff still cannot identify a question of fact regarding his hostile work environment claims. As indicated in Point II.C. 1.a. of this Decision and Order, occasional offensive racial comments are not sufficiently severe or pervasive in order to establish a hostile work environment claim. Accordingly, Defendants' motion for summary judgment on Plaintiff's hostile work environment claims is granted.

### G. Whether Plaintiff's Due Process Claims Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 68–70 [Defs.' Mem. of Law]; Dkt. No. 124 at 15–16 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

First, the Court notes that the Third Amended Complaint contains an allegation that "Plaintiff maintained a property and liberty interest in his good name and reputation" which was deprived by Defendants. (Dkt. No. 45 ¶¶ 103–104 [Pl.'s Third Am. Compl.].) In his papers in opposition to Defendants' motion for summary judgment on his due process claim, Plaintiff makes no mention of a liberty interest in his reputation, nor does the record contain any evidence of an offensive statement that was made public. Accordingly, to the extent any substantive due process claim was intended by Plaintiff, it is dismissed from this action.

Second, to the extent Plaintiff alleges a procedural due process claim based on any employment action other than termination, those claims are dismissed. Courts in this Circuit hold that an employee does not have a constitutionally protected interest to be free from employment actions other than termination. *See Barnes v, Pilgrim Psychiatric Ctr.,* 860 F.Supp.2d 194, 204 (E.D.N.Y.2012) (citing cases).

***23** Finally, regarding Plaintiff's termination, it is clear that the grievance procedure set forth in the CBA provided Plaintiff the appropriate pre-deprivation hearing as required by the Due Process Clause. *See Adams,* 517 F.3d at 128. Regarding post-deprivation procedures, Plaintiff argues that the CBA "replaces N.Y. Civil Service Law § 75 and any other procedures to challenge the termination of employment." (Dkt. No. 104 at 17 [Pl.'s Mem. of Law].) To be sure, the CBA provides, in relevant part, that the grievance procedure outlined therein "shall apply in lieu of Section 75 and 76 of the Civil Service Law for any employee who

would be covered by those sections." (Dkt. No. 96–2 at 52 [Ex. B to Thompson Decl.].) However, there is nothing in the CBA or otherwise that prevents Plaintiff from seeking a post-deprivation hearing. "[T]he availability of an Article 78 proceeding after the fact provides all the process that is due." *Kruggel v. Town of Arietta,* No. 11–CV–1250, 2013 WL 5304184, at *4 (N.D.N.Y. Sept. 19, 2013) (quoting *Sebast v. Mahan,* 754 F.Supp.2d 423, 431–32 (N.D.N.Y.2010)).

For these reasons, Defendants' motion for summary judgment regarding Plaintiff's due process claims is granted.

**H. Whether Plaintiff's Claims Based on Discriminatory Assignments Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 43–45 [Defs.' Mem. of Law]; Dkt. No. 124 at 14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Plaintiff has failed to oppose Defendants' motion for summary judgment in this regard. As indicated above in Point II.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. At the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond.

In any event, the Court would reach the same conclusion even if it were to subject the Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. The receipt of undesirable work assignments must be accompanied by a materially adverse change in employment, such as demotion or loss of wages, in order to be actionable. *See Henry v. NYC Health & Hosp. Corp.,* No. 13–CV–6909, 2014 WL 957074, at *5 (S.D.N.Y. Mar. 10, 2014). Here, Plaintiff complains that "he and other Black employees have been given less desirable assignments" such as those requiring work outdoors in the hazardous weather. (*See* Dkt. No. 42 at ¶ 28 [Pl.'s Third Am. Compl.].) At his deposition, however, Plaintiff conceded that it was part of his job to go out in the cold and shovel snow. (*See* Dkt. No. 108 at 116 [Pl.'s Dep.].) There is no evidence that such job assignments were accompanied by a loss in job title or pay. Accordingly, the alleged discriminatory job assignments cannot form the basis of a discrimination or retaliation claim since they were not materially adverse. Therefore, Defendants' motion for summary judgment on any claim of discriminatory or retaliatory reassignment of job duties is granted.

**I. Whether Plaintiff's Claims Based on Discriminatory Denial of Promotion Must Be Dismissed**

***24** After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 57–67 [Defs.' Mem. of Law]; Dkt. No. 124 at 6–9 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

In support of his discriminatory failure to promote claim, Plaintiff alleges that he asked Defendants Nolan and Wright for promotions and that, when asked why he did not promote black employees, Nolan responded, "A black man will never make anything on my watch." (*See* Dkt. No. 42 at ¶¶ 26–27 [Pl.'s Third Am. Compl.].)

The following facts are undisputed. The opportunities for a pay grade promotion just above Plaintiff's job title, Laborer I, include Laborer II, Motor Equipment Operator ("MEO") I and MEO II, all of which are within Plaintiff's bargaining unit. Each of these positions require a Commercial Driver's License ("CDL"), which Plaintiff never sought. Plaintiff also never applied for any of these pay grade promotions. The title of "Crew Leader" is a position within the Street Cleaning Bureau, which falls under a separate CBA between the AFSCME 1773 and the City. (*See* Dkt. No. 96–7 [Ex. G to Thompson Decl.].) Under that CBA, all Crew Leader vacancies must be advertised and filled by qualified Local 1773 members before being offered to members of other bargaining units, such as Local 400.

Although the City has no record of Plaintiff ever having applied for a Crew Leader position, Plaintiff asserts that between 2006 and 2010, whenever a bid was posted for a Crew Leader position, he submitted an application, but was never promoted to Crew Leader. However, at his deposition, when asked what positions he put in a bid for between 2006 and 2010, Plaintiff replied that he "put in a bid for a crew leader" and later that he bid for "a couple of" and "more than one bid" for Crew Leader. (Dkt. No. 108 at 96, 99.) [11]

Plaintiff went on to explain that there was one Crew Leader position in Sanitation, and another in Street Cleaning. Plaintiff said that Sanitation position went to Efren Maldonado, who had previously worked in Street Cleaning and Sanitation, and the other position went to Thomas Rubado, who came from the Aviation Department. Finally, when asked what reason he has to believe he did not get those jobs because of his race, Plaintiff testified that he believes he didn't get those positions because "they didn't like me." (*Id.* at 105.)

According to Jeffrey Wright, who was Commissioner through the end of 2009, the only Crew Leader positions that he appointed in the Street Cleaning Bureau during his tenure were filled by existing Local 1773 members, Thomas Rubado and Richard Shepherd. Since both were qualified, the position would not have been opened to other bargaining units. The only non Local 1773 member who filled a Crew Leader position during Wright's tenure was Efran Maldonado, a minority who was an MEO at the time of his promotion. Also, that position opened in the Department of Sanitation in 2006 and had entirely different job responsibilities than that of the Street Cleaning Bureau. (*See* Dkt. No. 97 at ¶¶ 48–49 [Decl. of Jeffrey Wright, June 13, 2013].)

***25** Nolan, Superintendent, asserts that he was not involved in formal hiring decisions, which are made by the Commissioner. (*See* Dkt. No. 98 at ¶ 13 [Decl. of Andrew Nolan, June 13, 2013].) Plaintiff disputes this, citing Nolan's promotion of Ray Garcia to the vacant position of "acting crew leader" in 2007. It was at that time that, Plaintiff asserts, Nolan made the comment that "no black man was ever going to make anything on my watch." (Dkt. No. 106 at ¶¶ 44–46 [Pl.'s Aff.].)

Jeffrey Wright, who was Commissioner through 2009, affirms that, in the day-to-day operation of the Street Cleaning Bureau, it becomes necessary to name an acting Crew Leader if the actual Crew Leader is out sick or on vacation. These positions are temporary and are made by the Superintendent, not the Commissioner. (*See* Dkt. No. 97 at ¶ 51 [Jeffrey Wright Decl.].) Wright further affirmed that "at some point in 2007," Plaintiff came to Wright and told him that he should be considered for promotion to Crew Leader; not for a specific opening, but more generally in the future. Then Commissioner Wright explained to Plaintiff that he needed to make himself more competitive, "including obtaining his CDL and applying for some of the intermediate positions such as Laborer II and MEO." (*Id.,* at ¶ 50.) Wright explained that, "[i]n other words, since a Crew Leader must supervise laborers and heavy equipment and motor vehicle operators and be familiar with the operation of all of the equipment in the Bureau, it helps to have experience actually performing those jobs and operating that equipment." (*Id.*)

At his deposition, Plaintiff explains that he was told by Bobby Reed, a supervisor, that "next week you are going to be the acting crew leader" but then when that week arrived, Ray Garcia was the acting crew leader. (Dkt. No. 108 at 106–107 [Pl.s' Dep.].) Plaintiff agreed "that an acting crew leader is someone who is working out of title for a short period of time while somebody is either on medical leave or vacation." (*Id.* at 107:9–14.) Plaintiff also explained that during this short period of time, the acting crew leader is paid at the Crew Leader rate. Plaintiff testified that he felt that Nolan gave Ray Garcia the acting crew leader position because of racial animosity toward Plaintiff due to Nolan's comment that a black man wasn't going to make anything on his watch. (*Id.* at 108.) Plaintiff clarified that Nolan made this comment after he made Ray Garcia acting crew leader. (*Id.*)

In his opposition to Defendants' motion, Plaintiff cites one factual question that he argues warrants a denial of summary judgment. Specifically, Plaintiff argues that there is a question of fact regarding whether Nolan made the statement that no black man will ever make anything on his watch. Moreover, Plaintiff contends that even where Nolan was not the decision maker, under a Cat's Paw theory of liability, his racial animus may be imputed to the decision maker.

***26** As indicated in Point II.C. 1.b. of this Decision and Order, Plaintiff bears the burden at trial to show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *See Bir v. Pfizer, Inc.,* 510 F. App'x 29, 30 (2d Cir.2013). In order to establish a prima facie case of discrimination based on failure to promote, Plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."

Plaintiff cannot establish a prima facie case of discriminatory failure to promote for several reasons. First, there is evidence that Plaintiff was not qualified to be a Crew Leader, given

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

his lack of experience and failure to obtain a CDL, which Plaintiff does not dispute. Next, as it relates to Plaintiff's claim that Defendants failed to promote him, instead promoting Mr. Rubado and Mr. Maldonado, to vacant Crew Leader positions, there is absolutely no evidence of racial animus underlying the decision to promote Mr. Rubado and Mr. Maldonado. In fact, Plaintiff testified that he was not promoted to either of these positions because "they didn't like me" but then later also testified that Mr. Rubado and Mr. Maldonado were in a position to get those jobs. (Dkt. No. 108 at 105, 106.) Moreover, even if Plaintiff could establish a prima facie case of discrimination on this basis, Defendants have identified legitimate, non-discriminatory reasons, which Plaintiff does not dispute, for promoting Mr. Rubado and Mr. Maldonado rather than Plaintiff: those gentlemen were qualified for the position and were members of Local 1773, which, pursuant to the CBA, required that the City promote them before opening the position up to members of other bargaining units, such as Local 400. Given the lack of evidence regarding racial animus attached to those promotions, Defendants are entitled to summary judgment in that regard.

Regarding Nolan's assignment of Ray Garcia to a temporary, acting crew leader position instead of Plaintiff, the Court notes that it is questionable whether such an assignment may be considered a promotion. *See Petrosino v. Bell Atlantic,* 385 F.3d 210, 229 (2d Cir.2004) (concluding that an assignment to substitute for an absent supervisor generally cannot fairly be labeled a promotion). Nonetheless, Plaintiff does not identify any evidence suggesting that he was qualified for the acting crew leader position, while Mr. Garcia, who was an MEO II, three positions ahead of Plaintiff, was clearly qualified. Because Plaintiff cannot show that the acting crew leader position was given to someone less qualified than him, he cannot establish a prima facie case of discrimination based on failure to promote.

***27** For these reasons, Defendants' motion for summary judgment on Plaintiff's claims based on failure to promote is granted.

**J. Whether Plaintiff's Claims Based on Discriminatory Discipline Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 48–577 [Defs.' Mem. of Law]; Dkt. No. 124 at 9–12 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following point.

Plaintiff has not identified any evidence of discriminatory or retaliatory animus based on his race as it relates to discipline. The sole question of fact Plaintiff identifies, which is whether Nolan stated in 2007 that no black man would get promoted on his watch, is irrelevant to the disciplinary actions taken against Plaintiff. It is undisputed that the only Defendant who was the decision maker regarding the disciplinary actions against Plaintiff was Commissioner Wright.[12] Moreover, other than a bald and unsupported assertion by Plaintiff in his response to Defendants' Local Rule 7.1 statement, there is no evidence that Nolan had anything to do with the Commissioner's decision to discipline Plaintiff. Finally, there is absolutely no evidence of racial animus or bias on behalf of Commissioner Wright against Plaintiff.

Moreover, for the reasons stated in Defendants' memoranda, Plaintiff has failed to adduce any evidence that similarly situated white employees were treated more favorably than Plaintiff in terms of discipline. (*See* Dkt. No. 100–8 at 51–55 [Defs.' Mem. of Law].)

For these reasons, Defendants' motion for summary judgment on Plaintiff's claims regarding discriminatory and/or retaliatory discipline is granted.

**K. Whether Plaintiff's Claims Based on Discriminatory Termination Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 14–25 [Defs.' Mem. of Law]; Dkt. No. 124 at 2–6 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Plaintiff has not identified any evidence of discriminatory or retaliatory animus based on his race as it relates to his termination. The sole question of fact Plaintiff identifies, which is whether Nolan stated in 2007 that no black man would get promoted on his watch, is irrelevant to Plaintiff's termination. The evidence reflects that Defendant O'Connor, who was Commissioner at the time, made the decision to terminate Plaintiff. Even assuming that Defendants Thompson and Simone advised or encouraged O'Connor to terminate Plaintiff, there is no evidence of racial animus or

bias on behalf of O'Connor, Thompson [13] or Simone against Plaintiff.

The only person that Plaintiff has identified as having racial animus is Nolan. Nolan affirms that he did not initiate the discipline leading up to Plaintiff's termination, did not participate in the pre-disciplinary hearing and played no role in the decision to terminate Plaintiff. Nolan further affirms that O'Connor did not ask for his input regarding the termination. (*See* Dkt. No. 98 at ¶ 49 [Nolan Decl.].) O'Connor affirms that he was the sole decision maker in the determination to terminate Plaintiff. (*See* Dkt. No. 99 at ¶ 36 [Decl. of John M. O'Connor, III, June 13, 2013].). In making the decision to terminate Plaintiff, O'Connor states that he relied upon

> ***28** (a) the Police Report and the statements Guynell Wright made to the police that he knew he was violating DPW policy; (b) the fact that Guynell Wright was in the last stage of disciplinary progression; (c) the fact that Guynell Wright had been previously received significant discipline in 2007 for near identical conduct; and (d) a review of Guynell Wright's prior "thick" disciplinary file which reflected numerous prior major and minor violations and demonstrated a pattern of misconduct over time.

(*Id.* at ¶ 37.) In his response to Defendants' Local Rule 7.1 Statement of Material Facts, Plaintiff denies the assertion that Nolan did not initiate the discipline leading up to Plaintiff's termination, did not participate in the pre-disciplinary hearing and played no role in the decision to terminate Plaintiff. (*See* Dkt. No. 105 at ¶ 47 [Pl.'s Rule 7.1 Response Statement].) In support of his purported denial, Plaintiff cites his affirmation that he personally observed O'Connor go to Nolan and Culkin for advice on how to perform his duties as Commissioner. (*See* Dkt. No. 106 at ¶ 42 [Pl.'s Aff.].) Plaintiff has failed to identify any evidence of Nolan's participation in his termination, either directly or by communication or encouragement of a decision maker.

For these reasons, Defendants' motion for summary judgment as it relates to Plaintiff's claims for discriminatory and/or retaliatory termination is granted.

Finally, the Court notes that Plaintiff has identified no evidence of a causal connection between his DHR complaints and the alleged adverse actions. There is no direct evidence of retaliatory motive on behalf of any decision maker. Moreover, there is no temporal proximity between Plaintiff's complaints and the adverse actions. For example, Plaintiff complained to DHR in March 2008, but the next adverse action did not occur until January 2009. Also, Plaintiff was terminated an entire year after his February 2009 DHR complaint. For these reasons, in addition to those asserted by Defendants in their memoranda of law, Plaintiffs' retaliation claims are dismissed.

Because the Court dismisses Plaintiff's claims for the absence of a question of material fact as to the substantive elements of those claims, the Court need not address the remainder of Defendants' arguments for dismissal, such as failure to exhaust and failure to file a notice of claim.

**ACCORDINGLY,** it is

**ORDERED** that the Defendants' motion for summary judgment (Dkt. No. 95) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's claims are dismissed with prejudice. The clerk is directed to enter judgment in favor of the defendants and close this case.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1293527

## Footnotes

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

1 Conclusions of law in a Local Rule 7.1 Statement, even where unopposed, are not deemed admitted. *See Johnson v. Enu,* No. 08–CV–158, 2011 WL 3439179, at *1 (N.D.N.Y. July 13, 2011) (Homer, M .J.), *adopted in its entirety by,* 2011 WL 3439524 (N.D.N.Y. Aug. 5, 2011) (Scullin, J.).

2 Plaintiff asserts that he began working for the City on October 3, 1988 as a "Laborer I" for the Department's Sanitation Bureau. (*See* Dkt. No. 108, at 44–45 [Dep. of Guynell Wright, Jan. 18, 2013].) However, events which occurred prior to June of 2006 are irrelevant to the resolution of the pending motion since the longest statute of limitations applicable to any of the claims in this action is four years. *See James v. Countrywide Fin. Corp.,* 849 F.Supp.2d 296, 317–318 (E.D.N.Y.2012) (finding that four-year statute of limitations set forth in 28 U.S.C. § 1658(a) applies to employment discrimination and retaliation claims brought pursuant to 42 U.S.C. § 1981); *Asanjarani v. City of New York,* No. 09–CV–7493, 2011 WL 4343687, at * 10 (Aug. 18, 2011) (statute of limitations for employment discrimination claims brought pursuant to Section 1983 is three years); *Ruggerio v. Dynamic Elec. Sys. Inc.,* No. 12–CV–100, 2012 WL 3043102, at *6 (E.D.N.Y. Jul. 25, 2012) (citing 42 U.S.C. § 2000e–5(e)(f)) (claims are timely under Title VII if an administrative complaint is filed within 300 days of the alleged discriminatory act, and a judicial action is filed within 90 days of receipt of a rightto-sue letter by the administrative body); *Sloth v. Constellation Brands, Inc.,* 883 F.Supp.2d 359, 373 (W.D.N.Y.2012) (citing N.Y.C.P.L.R. § 214(2) (McKinneys 2008)) (under Section 296, the limitations period runs for three years from the date on which an action asserting NYHRL violations is filed, but this limitations period is tolled for the period between the filing of an administrative charge and the issuance of a right-to-sue letter).

3 Plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") on March 3, 2008, in which he argued that his 20–day suspension by the City for fighting was disparate treatment based on race. On August 18, 2008, DHR dismissed the complaint based on a lack of probable cause. (*See* Dkt. Nos. 96–29 and 96–30 [Exs. CC and DD to Thompson Decl.].)

4 Plaintiff ostensibly filed a complaint with DHR on February 18, 2009, charging the City with race discrimination due to his termination. The DHR later dismissed the complaint citing a lack of evidence of unlawful discrimination. (*See* Dkt. No. 96–31 [Ex. EE to Thompson Decl.].)

5 Plaintiff's complaints were cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").

6 As the Supreme Court has famously explained, "[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348 (1986) (citations omitted).

7 Plaintiff's counsel argues that here, this Court must apply the "universal" rule in the courts of the State of New York that allows a non-moving party to successfully oppose summary judgment with evidence that would be inadmissable at trial because some of Plaintiff's claims arise under New York law. (*See* Dkt. No. 104 at 1–2 [Pl.'s Mem. of Law].) Without commenting on the veracity of Plaintiff's counsel's interpretation of New York law in this regard, the Court notes that it is by now very well-settled law that "[t]he issue of what burden a movant for summary judgment bears when the ultimate burden of proof lies with the non-movant is procedural rather than substantive, under the distinction created by *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817 (1938) and its progeny, and accordingly is subject to federal rather than state law ." *Tingling v. Great Atl. & Pac. Tea Co.,* 02–CV–4196, 2003 WL 22973452, *2 (S.D.N.Y. Dec. 17, 2003), citing *Erie R. Co. v. Tompkins.* 304 U.S. 64, 58 S.Ct. 817 (1938) and *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986) (applying federal law on defendant's burden at summary judgment stage to diversity action).

8 "The primary doctrinal differences between Title VII claims and employment discrimination claims pursuant to Sections 1981 and 1983 regard (1) the statute of limitations, (2) the requirement that Section 1981 or 1983

plaintiffs must show employment discrimination pursuant to an official policy or custom, (3) that individuals may be held liable under Sections 1981 and 1983, but not under Title VII, and (4) a Title VII claim may be established through proof of negligence, whereas Section 1981 and 1983 claims must be supported by evidence of intentional discrimination." *Jackson v. City of New York,* No. 11–CV–3028, 2014 WL 1010785, at *4, n. 10 (E.D.N.Y. Mar. 17, 2014) (citing *Patterson,* 375 F.3d at 225–227).

9 Although, as Defendants point out, this decision is a Report and Recommendation that was later vacated, the case was thereafter reassigned to another District Judge who adopted the Report and recommendation in full. See *See Brown v. JP Morgan Chase Bank,* No. 12–CV544, 2013 U.S. Dist. LEXIS 109700 (E.D.N.Y. Aug. 5, 2013).

10 Regarding these incidents of discipline, the Court notes Plaintiff's affirmation that in 1997, another black employee slapped his bottom in the restroom, which resulted in two separate physical altercations between Plaintiff and this other employee: one in the restroom and another later in the day when Plaintiff was on his way home from work. Plaintiff asserts that both he and the other employee were disciplined as a result. (*See* Dkt. No. 106 at 2, ¶ 8 [Pl.'s Aff.].) Plaintiff further asserts that in February 2007, Stanley Gardynski, a white employee, made humping motions with his groin at Plaintiff's head. Plaintiff admits that afterward, when Gardynski was provoking him again, Plaintiff hit him. Both Plaintiff and Gardynski were disciplined as a result. (*Id.* at 3, ¶ 13.)

11 Plaintiff also put in a bid for a gardener position in the Parks and Recreation Department.

12 In his response to Defendants' Local Rule 7.1 Statement of Material Facts, Plaintiff denies that Nolan was not the decision maker regarding the discipline he received between 2006 and 2009. (*See* Dkt. No. 105 at ¶ 68 [Pl.'s Rule 7.1 Response Statement] .) In support of this purported denial, Plaintiff asserts that Commissioner Wright relied on Defendants Nolan and Culkin to make the final determination regarding discipline. However, Plaintiff cites a portion of his deposition testimony that does not support this assertion. Accordingly, this fact is deemed admitted.

13 At his deposition, Plaintiff testified that he did not believe that O'Connor or Thompson decided to terminate him because he is black. (*See* Dkt. No. 108 at 222 [Pl.'s Dep.].) Plaintiff testified that he thought Thompson retaliated against him for making complaints of discrimination because Thompson "never helped me out" when Plaintiff would go to him with problems. (*Id.* at 222–223.) Finally, at his deposition, Plaintiff testified that the only involvement Simone had was being present at meetings and that "[h]e didn't do anything, really." (*Id.* at 247.)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag
Report and Recommendation Adopted in Part, Rejected in Part by Young v. Lugo, E.D.N.Y., June 9, 2026

2026 WL 1978864
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Jamie E. YOUNG, Plaintiff,
v.
Mark LUGO, et al., Defendants.

18-cv-04216 (JS) (JMW)
|
Signed February 6, 2026

**Attorneys and Law Firms**

Frederick K. Brewington, Albert Darnell Manuel, III, Cobia Malik Powell, Law Offices of Frederick K. Brewington, 556 Peninsula Boulevard, Hempstead, NY 11550, Attorneys for Plaintiff

Valerie Singleton, NYS Office of the Attorney General, 200 Old Country Road, Suite 240, Mineola, New York 11501, Attorney for the State Defendants

Albert Darnell Manuel III, Law Offices of Frederick K. Brewington, Hempsead, NY, Cobia Malik Powell, Frederick K. Brewington, Law Offices of Frederick K. Brewington, Hempstead, NY, for Plaintiff.

Christina H. Bedell, Valerie Singleton, Office of the Attorney General, Mineola, NY, for Defendant Mark Lugo.

Valerie Singleton, Christina H. Bedell, Office of the Attorney General, Mineola, NY, for Defendants Parole Officer Orrison McClean, Parole Officer Alonzo Payton, Parole Officer Joseph Rahal, Parole Officer Ross Botwinick, Parole Officer Catherine Mencarelli.

Amy E. Bedell, Greg M. Mondelli, Jessica D. Klotz, Lewis Johs Avallone Aviles, LLP, Islandia, NY, Carl A. Formicola, Lewis Johs Avallone Aviles, LLP, New York, NY, for Defendant Dr. Carl Goodman.

Arlene S. Zwilling, Suffolk County Attorney, Hauppauge, NY, Kyle O. Wood, Suffolk County Department of Law, Hauppauge, NY, for Defendants Suffolk County Detec Alberto Acevedo, Suffolk County P.O. Matthew Spilatros.

**REPORT AND RECOMMENDATION**

WICKS, Magistrate Judge:

***1** Jamie E. Young ("Plaintiff") commenced this action, pursuant to 42 U.S.C. §§ 1981 and 1983 and New York State law, against New York State parole officer Defendants Mark Lugo, Orrison McLean, Alonzo Payton, Joseph Rahal, Ross Botwinick, Catherine Mencarelli (the "State Defendants"), Suffolk County police officer Defendants Alberto Acevedo, Matthew Spilotros, and John Does 1-4 (the "County Defendants"), and Dr. Carl Goodman ("Goodman") and Nurse Henry Hernandez (the "Medical Defendants"). Plaintiff alleges violations of the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution in addition to various state law causes of action. (*See generally* ECF No. 158.)

Before the Court on referral from the Honorable Joanna Seybert is the State Defendants' motion for summary judgment (ECF No. 234) on all claims asserted against them in the Corrected Second Amended Complaint (ECF No. 158). For the reasons set forth below, the undersigned respectfully recommends that the State Defendants' motion (ECF No. 234) be **GRANTED** in part and **DENIED** in part.

**BACKGROUND**

The following facts are gleaned from the parties' Local Rule 56.1(a) Statements and are uncontested unless otherwise noted. [1]

**A. The State Defendants**

***2** Catherine Mencarelli is an Investigator with the Office of Special Investigations for the Department of Corrections and Community Supervision ("DOCCS"). (ECF No. 236-1 at ¶ 5.) She has held this position for six years and has worked for DOCCS for sixteen years. (*Id.*) Mark Lugo has been an Investigator with the Office of Special Investigations for DOCCS since 2014. (*Id.* at ¶ 6.) Orrison McLean has worked for DOCCS for twenty years and is an Investigator with the Office of Special Investigations for DOCCS. (*Id.* at ¶ 7.) Investigator Payton was an Investigator with the Office for Special Investigations for DOCCS. (*Id.* at ¶ 8.) Ross Botwinick has worked for DOCCS for nine years as a Parole

Officer. (*Id.* at ¶ 9.) Joseph Rahal was a Parole Officer with DOCCS for over nineteen years. (*Id.* at ¶ 10.) At all times in this action, the State Defendants were New York State DOCCS Officers and/or Investigators employed by DOCCS and were acting under color of law and color of their authority as Parole Officers. (*Id.* at ¶ 11.)

**B. Plaintiff's Arrest**

Plaintiff is an individual with a history of cocaine abuse and been to drug rehabilitation in the past. (*See id.* at ¶ 14.) Plaintiff was convicted by trial of Criminal Possession of a Controlled Substance in the Second Degree, Criminal Possession of a Controlled Substance in the Third Degree, and Criminal Possession of a Weapon in the Third Degree and was sentenced on April 1, 1996 to 8 years to life, among other charges. (*Id.* at ¶ 12.) On September 5, 2014, Plaintiff was released to parole. (*Id.* at ¶ 13.) As part of his conditions of release, he consented to search of his person or property while on parole. (*Id.*) He was also required to notify his Parole Officer immediately when he is in contact with or arrested by any law enforcement agency. (*Id.*) Plaintiff also agreed that he would not be in the company of or fraternize with any person with a criminal record. (*Id.*) Plaintiff was not only prohibited from acting in a manner that threatens his safety and well-being or that of others, but also from using or possessing any controlled substance. (*Id.*)

On December 14, 2017 at or around 3:00PM, Plaintiff and a "parole absconder," Shati Roy, pulled into the parking lot of the Radisson Hotel in Holtsville in separate vehicles to engage in what State Defendants allege was a drug transaction. (*See id.* at ¶ 15.) Once the vehicle pulled into the parking lot, parole officers and Suffolk County police officers swarmed the vehicle and ordered Plaintiff out of the vehicle. (*See id.* at ¶ 16.) Plaintiff and Roy were identified as being on parole and placed in handcuffs. (*Id.* at ¶¶ 15-16.) Shati Roy was arrested after being found with crack cocaine on his person and was found hiding crack cocaine in his body after attempting to destroy evidence in his vehicle. (*See id.* at ¶¶ 17-18.)

**C. Search of Plaintiff at the Precinct**

Plaintiff was arrested for violating the terms of his parole and for fraternizing with a known felon and parolee absconder, Shati Roy. (*Id.* at ¶ 19.) After Plaintiff was placed under arrest, he was placed in Investigator Lugo's vehicle with Investigator McLean and transported to Suffolk County's Fifth Precinct to be searched and processed. (*Id.* at ¶ 20.) Though the State Defendants contend that Plaintiff was "acting suspiciously," "fidgeting in his pants quite feverishly" with his hands placed down the back of his pants, and was told to take his hands out of his pants (*see* ECF No. 237-18 at ¶ 21), Plaintiff denies these actions. (*Id.* at ¶ 21.) Plaintiff was then brought into the precinct to be searched for his own safety and well-being and to ensure that he did not bring contraband into the correctional facility. (*Id.* at ¶ 22.) The parties dispute whether Investigator Lugo had concerns that something was wrong with Plaintiff based on Plaintiff's purported actions in the vehicle and that Lugo was concerned for Plaintiff's safety especially given the potential presence of drugs inside of Plaintiff which, if they exploded, could kill Plaintiff. (*See id.*)

***3** Plaintiff was taken to a holding or searching cell along with Investigator Lugo and Suffolk County Detective Acevedo. (*Id.* at ¶ 23.) Plaintiff's handcuffs were also removed and he was then advised he would be stripped and searched. (*See id.* at ¶¶ 23-24.) Plaintiff complied without any issues or concerns. (*Id.*) During the search, Detective Acevedo instructed Plaintiff to bend over and squat at which point Investigator Lugo observed what he believed to be something in Plaintiff's rectum. (*See id.* at ¶¶ 25-26.) The parties sharply dispute whether what Lugo observed was a bag of drugs with three balloon knots protruding from Plaintiff's rectum. (*See id.*) Investigator Lugo asked Plaintiff to remove the object to which Plaintiff cursed at Investigator Lugo and denied he had anything in his anus. (*Id.*) At this point, according to the State Defendants, Plaintiff said "if you want to know what's in my ass, take me to the hospital," a statement Plaintiff denies making. (*See id.* at ¶ 26.)

Plaintiff was then transported to the Brookhaven Memorial Hospital ("Hospital") by Investigator Lugo and Investigator Payton, with Investigator McLean following in a separate vehicle, for an internal search of Plaintiff to be conducted. (*Id.* at ¶¶ 27, 29.) During the transport, Plaintiff was handcuffed, had a waist chain to keep his hands in front of him, and had shackles on his feet. (*Id.* at ¶ 28.) The parties dispute whether while enroute to the hospital Plaintiff was banging his head against the window stating he was "going to give you something to take me to the hospital for." (*Id.*) Once at the Hospital, Plaintiff was allegedly non-compliant and tightened his body in a fetal position on the floor of the police vehicle to prevent being removed. (*See id.* at ¶ 29.) While the State Defendants contend that Plaintiff locked his legs to prevent being removed, even making contact Investigator Lugo's hand in the process causing alleged wrist and thumb injuries, Plaintiff denies kicking of this sort. (*Id.*) With the assistance of Investigator Payton and hospital staff, Plaintiff was removed

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

from the police vehicle and placed in a wheelchair. (*Id.* at ¶ 30.) While being transported to the emergency room's nursing station, Plaintiff was yelling that he did not want to be treated. (*See id.*) The parties dispute whether, in addition to this yelling, Plaintiff was trying to spit on and bite Investigator Lugo. (*See id.*)

Investigators Lugo, and Payton, members of the Suffolk County Police Department, nurses and a doctor were present in Plaintiff's treatment room, Trauma 1, while Investigator Mencarelli, Officers Botwinick and Rahal remained in the hallway of Trauma 1. (*Id.* at ¶ 31.) In fact, Plaintiff did not recall seeing Investigator Mencarelli, Investigator McLean, Investigator Payton, Officer Botwinick, or Officer Rahal at the precinct or Hospital. (*See id.* at ¶¶ 39, 40.) At the Hospital, Plaintiff was treated by Goodman who observed Plaintiff acting extremely agitated and belligerent, making it difficult for Goodman to speak to, or perform a physical evaluation of, Plaintiff. (*Id.* at ¶¶ 32, 33.) The parties largely disagree on the circumstances surrounding Goodman's care of Plaintiff. (*See id.* at ¶¶ 33, 34.)

The State Defendants allege that Goodman was told that Plaintiff may have put a foreign body in his rectum and they observed something protruding from his rectum, Goodman was concerned about Plaintiff's capacity to make an informed decision, Goodman decided to sedate Plaintiff allegedly without seeking input from any of the DOCCS or Suffolk County investigators, detectives, or officers. (*Id.* at ¶ 33.) Conversely, Plaintiff avers Goodman did not consider Plaintiff's statement regarding not having anything in his rectum and made the decision to force treatment as per law enforcement request. (*See id.*) Plaintiff was then sedated and examined by Goodman, specifically given x-rays and a rectal examination. (*See id.* at ¶ 34.) There was no foreign body present in Plaintiff's body. (*See id.* at ¶ 35.) Consequently, Plaintiff sustained, *inter alia*, swollen, red ankles and wrists, and had pain in his rectal area for a couple of days on and off following the examination. (*Id.* at ¶ 42.)

***4** After Plaintiff was sedated, Investigator Lugo left the room to get medical attention for his hand that Plaintiff kicked, and to file charges for Assault 2nd and Obstruction of Governmental Administration against Plaintiff. (*Id.* at ¶ 36.) At 11:15PM, Plaintiff was formally arrested for breaking Investigator Lugo's thumb and charged with Assault 2nd and Obstructing Governmental Administration 2nd. (*Id.* at ¶ 37.) As Plaintiff rebuts, the Assault and Obstruction charges were either dismissed and/or lacked evidence to warrant a guilty plea on both charges. (*See id.*) Plaintiff was then transported back to the precinct and then to Yaphank Correctional Facility. (*Id.* at ¶ 38.) Plaintiff eventually pled guilty to a parole violation revocation charge and to promoting prostitution as part of an offered plea deal. (*See id.* at ¶ 41.)

## THE LEGAL FRAMEWORK

On a summary judgment motion, the movant must demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets its initial burden, the burden shifts and the nonmovant may defeat the motion only by adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).

"The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts." *Sosa v. New York City Dep't of Educ.*, 406 F. Supp. 3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted). The role of the court at the summary judgment phase is not to *resolve* disputed issues of fact but only undertake an analysis to *identify* whether triable issues of fact exist. *See* *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021). That is, the court's function is "issue-finding," not "issue-resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)). *Au fond*, the court's role is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (citing *Anderson*, 477 U.S. at 248 and *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

## DISCUSSION

The State Defendants seek summary judgment on "all claims" asserted against them in the Corrected Second Amended Complaint. (*See* ECF No. 234-1 at p. 2.) In his Corrected Second Amended Complaint, Plaintiff asserts the following nine causes of action[2] against the State Defendants: (i) Fourth Amendment violation for an unreasonable search/violation of privacy pursuant to 42 U.S.C. § 1983; (ii) Fourth Amendment violation for unreasonable seizure/excessive force pursuant to § 1983; (iii) malicious prosecution pursuant to § 1983; (iv) abuse of process pursuant to § 1983; (v) fabrication of evidence pursuant to § 1983, (vi) Eighth Amendment violations for cruel and unusual punishment pursuant to § 1983; (vii) Fourteenth Amendment violations for substantive due process violations pursuant to § 1983; (viii) assault and battery; and (ix) false imprisonment. (*See generally* ECF No. 158.) The Court considers each asserted cause of action in turn.

### A. State Action

***5** To determine whether Plaintiff's § 1983 claims survive summary judgment, the Court must first decide whether the State Defendants were functioning as a state actor. A § 1983 claim "requires the plaintiff to establish two elements: '(1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law.' " *Clay v. County of Suffolk*, 404 F. Supp. 3d 737, 753 (E.D.N.Y. 2019) (quoting *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 87-88 (2d Cir. 2015)). There are three tests used by courts to determine whether the conduct of a private entity may be attributed to the state, satisfying the state action requirement: (1) the compulsion test; (2) the joint action test; and (3) the public function test. *Rene v. Mustafa*, No. 16-CV-4072 (JS) (ST), 2024 WL 1332556, at *21 (E.D.N.Y. Mar. 28, 2024) (discussing the three tests).

The compulsion test considers whether the private entity acts pursuant to the "coercive power" of the state or is "controlled" by the state. *Id*. The joint action test, sometimes referred to as the close nexus test, is satisfied when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are "entwined" with state policies. *McNulty v. New York Racing Association, Inc.*, No. 03-CV-1368 (JS) (WDW), 2006 WL 8441289, at *3 (E.D.N.Y. Mar. 29, 2006). The public function test considers whether the entity "has been delegated a public function by the [s]tate." *Rene*, 2024 WL 1332556, at *21 (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)).

Here, the State Defendants are comprised of six parole officers: Parole Officer Mark Lugo, Parole Officer Orrison McClean, Parole Officer Catherine Mencarelli, Parole Officer Alonzo Payton, Parole Officer Joseph Rahal, and Parole Officer Ross Botwinick. (*See* ECF No. 234.) As such, they are state actors for purposes of § 1983 claims. *See Murray v. New York City Dep't of Corrs.*, No. 13 CV 7090 (KAM) (LB), 2016 WL 11395007, at *7 (E.D.N.Y. Aug. 18, 2016) (noting that state parole officers are state actors), *report and recommendation adopted*, 2016 WL 5928672 (E.D.N.Y. Sept. 30, 2016). The parties do not dispute this either. (*See* ECF No. 236-1 at ¶ 11 (State Defendants "were acting under color of law and under color of their authority as Parole Officers")).

### B. Personal Involvement of Each of the State Defendants

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Sepulveda v. City of New York*, No. 15-cv-5187 (RRM) (CLP), 2020 WL 2836952, at *6 (E.D.N.Y. May 29, 2020) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation and internal quotation marks omitted)). "Personal involvement can be shown by evidence that the defendant 'participated directly in the alleged constitutional violation'; or that the defendant acted in a supervisory capacity by creating a policy or custom under which violations occurred, by negligently supervising subordinates, or by failing to act or remedy wrongs after being aware of them." *Anderson v. City of New York*, 817 F. Supp. 2d 77, 93 (E.D.N.Y. 2011) (quoting *Colon*, 58 F.3d at 873). Like here, where an action involves multiple officer defendants, a "defendant officer may be personally involved either because he directly violated the plaintiff's rights or because he failed to intervene to prevent another officer from violating such rights." *Smith v. Village of Brockport*, No. 19-CV-6404 CJS, 2024 WL 3791240, at *5 (W.D.N.Y. Aug. 13, 2024) (alteration omitted).

***6** For instance, in *Sepulveda* where the court granted summary judgment on plaintiff's § 1983 claim because, *inter alia*, plaintiff "fail[ed] to present evidence to establish defendants' personal involvement" in the allegedly violative search at the hospital. 2020 WL 2836952, at *9. There, though officers drove plaintiff to the hospital after believing drugs

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

were hidden in his rectum, the officers played "no role" in the search that took place at the hospital nor were the officers involved in plaintiff's treatment at the hospital. *See id.* Accordingly, plaintiff failed to "plead facts" establishing the officers "participated directly in the alleged constitutional violation" or "fail[ed] to act or remedy wrongs after being award of them." *Id.* (alterations in original).

Here, unlike in *Sepulveda*, the record demonstrates that PO Lugo and PO Payton were personally involved in the allegedly violative conduct. Indeed, Lugo was personally involved not only at the precinct as the officer performing the cavity search (ECF No. 236-1 at ¶¶ 23-27), but also during the transport to the Hospital as the driver who subsequently attempted to remove Plaintiff from the vehicle. (*See* ECF No. 236-1 at ¶¶ 28-31.) The same holds true for Payton. (*See* ECF No. 236-1 at ¶ 30 (Payton and hospital staff removed Plaintiff from the vehicle into the wheelchair), ¶ 31 (Payton, Lugo, and nurses present before Plaintiff was sedated); *see also* ECF No. 236-5, Young Dep. Tr. at p. 105:14-18 (noting Payton was putting shackles and handcuffs on Plaintiff at the Hospital)).

*Sepulveda* applies with greater force to officers McLean, Mencarelli, Rahal, and Botwinick. For example, it is undisputed that McLean was not with Lugo or Plaintiff while on the way to the Hospital as he followed in a separate vehicle. (ECF No. 236-1 at ¶ 27.) Moreover, it is undisputed that Plaintiff did not recall seeing Investigator McLean at the Hospital. (ECF No. 236-1 at ¶ 40.) Indeed, McLean, in his deposition, affirms that he did not go into the hospital, never went in the vehicle that Plaintiff was in, and was "just for safety following the vehicle that was taking him to the hospital." (ECF No. 236-20, McLean Dep. Tr. at p. 28:3-11.) Nothing in the record demonstrates that McLean was present at the precinct during the initial search or in the vicinity to intervene.

Similarly, while Plaintiff avers that he was certain Mencarelli was present at the Hospital because "[a]ccording to her notes, she described what happened to [Plaintiff]" (ECF No. 236-1 at ¶ 39), it is undisputed that Investigator Mencarelli, along with Officers Botwinick and Rahal were not in the Trauma 1 room with Plaintiff considering they "remained in the hallway of Trauma 1" while Plaintiff was with Goodman. (*See* ECF No. 236-1 at ¶ 31.) Nothing is presented to indicate Rahal or Botwinick played a role either in the search conducted at the precinct or the search conducted at the Hospital or that an opportunity to intervene presented itself. In fact, it is undisputed that Plaintiff did not recall seeing McLean, Botwinick, or Rahal at the Hospital or the precinct. (ECF No. 236-1 at ¶ 40.) Though Plaintiff contends, in his Opposition Memorandum, that Botwinick and Rahal were called to the Hospital to assist, and that records generated by Mencarelli "place [Mencarelli, Botwinick, Rahal, and McLean] at the scene," mere presence at the scene of a constitutional violation is insufficient to constitute personal involvement. *See Snead v. City of New York*, 463 F. Supp. 3d 386, 399-400 (S.D.N.Y. 2020) ("An officer's mere presence at the scene of [the alleged constitutional violation] generally does not constitute sufficient personal involvement for § 1983 liability.") (collecting cases); *see also Jordan v. Wright*, No. 3:24-cv-1166 (VAB), 2024 WL 3742767, at *10 (D. Conn. Aug. 9, 2024) (noting that "merely being present when a constitutional violation occurs is insufficient to establish personal involvement"). Plaintiff's argument on an alleged "failure to intervene" as sufficing for personal involvement is equally conclusory and unsupported by the record. (*See* ECF No. 236 at pp. 22-23.)

***7** Accordingly, the undersigned recommends granting summary judgment on all § 1983 claims Plaintiff asserted against State Defendants McLean, Mencarelli, Rahal, and Botwinick given the lack of evidence demonstrating their personal involvement or their failure to intervene.

### C. Federal Claims

#### i. *Fourth Amendment Violations*

##### *i. Unreasonable Search/Violation of Privacy*

Plaintiff's unreasonable search/violation of privacy centers around the visual body cavity search performed while at the precinct (*see* ECF No. 158 at ¶¶ 41-43) but also the allegedly invasive search at the Hospital (*see* ECF No. 158 at ¶¶ 46, 49). The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A search occurs when the Government acquires information by either 'physically intruding on persons, houses, papers, or effects,' or otherwise invading an area in which the individual has a reasonable expectation of privacy." *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014) (quoting *Florida v. Jardines*, 569 U.S. 1, 5 (2013)). "Fourth Amendment protections extend only to 'unreasonable government intrusions into ... legitimate expectations of privacy.' " *United States v. Thomas*, 729 F.2d

120, 122 (2d Cir. 1984) (quoting *United States v. Chadwick*, 433 U.S. 1, 7 (1977)). "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.' " *Riley* v. *California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City* v. *Stuart*, 547 U.S. 398, 403 (2006)).

Indeed, the reasonableness of a search under the Fourth Amendment is "determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Massey*, 461 F.3d 177, 178 (2d Cir. 2006) (citation omitted). For an individual's expectation of privacy to be legitimate, he must have "exhibited an actual (subjective) expectation of privacy" and the expectation must be "one that society is prepared to recognize as 'reasonable.' " *United States v. Reyes*, 283 F.3d 446, 457 (2d Cir. 2002) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)).

Relevant here, "[w]e have held that among '[t]he rights diminished by *parolee* status [are] Fourth Amendment protections.' " *Reyes*, 283 F.3d at 458 (quoting *Thomas*, 729 F.2d at 123 (emphasis added); *accord United States v. Grimes,* 225 F.3d 254, 258 (2d Cir.2000) ("[P]arole justifies some departure from traditional Fourth Amendment standards."). This is largely because "[o]ne of the principal purposes of a ... parole officer's observation and supervision responsibilities is to ensure that a convicted person under supervision does not again commit a crime." *Reyes*, 283 F.3d at 458 (recognizing a parole officer's duty to "investigate whether a parolee is violating the conditions of his parole").

Further, in order to conduct a visual body cavity search, "one where the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked," police must have "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity." *Sepulveda*, 2020 WL 2836952, at *6 (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2013) and *Sloley v. VanBramer*, 945 F.3d 30, 38 (2d Cir. 2019)). When "an arresting officer has reason to believe, based on specific and articulable facts, taken together with rational inferences from those facts, that an arrestee is secreting contraband inside a body cavity, then the officer is permitted to conduct a visual body cavity search." *Sloley*, 945 F.3d at 158 (internal citations and quotation marks omitted).

***8** In *Sepulveda*, the Court granted summary judgment on plaintiff's Fourth Amendment unreasonable search claims. There, plaintiff was transferred to a precinct following plaintiff's arrest for possession of a gravity knife. 2020 WL 2836952, at *1. Following the arrest, officers had reason to believe that plaintiff inserted a plastic bag of drugs into his rectum, namely because the officer noticed plaintiff place something down near his pants, allegations that plaintiff denies. *See id.* at *1-2. While at the precinct, officers asked plaintiff if he wanted to remove the plastic bag from his rectum which plaintiff refused. *Id.* at *2. The officers proceeded to conduct a visual body cavity search after which time they decided to take plaintiff to the hospital for his safety. *Id.* While at the hospital, plaintiff was given an x-ray which "showed no foreign body" and no drugs were ever recovered from plaintiff. *See id.* at *3. Plaintiff contended that the officers were holding him at the hospital despite telling offices he had nothing to give them. *See id.* Consequently, plaintiff brought a § 1983 claim alleging that the police officers "conducted a visual body cavity search without probable cause, in violation of [his] rights under the Fourth Amendment" and a § 1983 claim "based on his detention at the hospital alleging he was subjected to an unlawful search by the hospital at the direction of the officers." *Id.* at *4.

In granting summary judgment on the Fourth Amendment claim based on the search conducted at the precinct, the court noted that no reasonable jury could conclude that plaintiff "did not insert drugs – or something that appeared to be a plastic bag containing drugs – into his rectum" because plaintiff presented nothing beyond his own testimony to refute the evidence to the contrary. *Id.* at *7-8. As such, the "arresting officers had 'reason to believe, based on specific and articulable facts, taken together with rational inferences from those facts, that [plaintiff was] secreting contraband inside a body cavity' and were thus 'permitted to conduct a visual body cavity search. *Id.* at *8 (quoting *Sloley*, 945 F.3d at 38). Similarly, the court granted summary judgment on the Fourth Amendment claim for the search conducted at the hospital. *See id.* at *8-9. Namely, the court noted that plaintiff failed to present evidence to support the alleged pretextual motive for transport to the hospital (performing a digital body cavity search) while also determining defendants were justified by their safety concerns surrounding hidden drugs in plaintiff's rectum. *Id.* at *8.

The conclusion rendered in *Sepulveda* compels a similar outcome here. Plaintiff was taken to the precinct after fraternizing with Shati Roy, an individual found with drugs

on his person. (*See* ECF No. 237-6, Lugo Dep. Tr. at p. 110:13-25 (noting "Mr. Roy being caught with an amount of crack cocaine that he was hiding on his body"). Moreover, in the ride to the precinct, Plaintiff was "acting suspiciously," "fidgeting," and, like the plaintiff in *Sepulveda*, appeared to put his hands near his pants. (*See id.* at p. 79:13-25, p. 80:8-15 (highlighting that Plaintiff's "fidgeting" behavior was "placing his hands down the back of his pants while in the back of the car"; ECF No. 237-9, McLean Dep. Tr. at p. 22:21-25, p. 23:2-6 (confirming the same fidgeting behavior)). These circumstances, together, formed the basis for bringing Plaintiff in the precinct to search him. (*See* ECF No. 237-7, Lugo Dep. Tr. at p. 241:3-18 ("He was being searched because of what was found on Shati Roy, the evidence Shati Roy tried to destroy in his vehicle. Mr. Young's actions in the vehicle were not normal or somebody being transported with the way he was moving, so it raised some concerns that something may be wrong with Mr. Young, that's why we brought him in to search him.") Accordingly, like in *Sepulveda*, the officers had "reason to believe, based on specific and articulable facts, taken together with rational inferences from those facts, that [Plaintiff was] secreting contraband inside a body cavity," and were thus "permitted to conduct [the] visual body cavity search."

Additionally, during the same visual body cavity search as the one conducted in at *Sepulveda*, PO Lugo observed what appeared to be a balloon protruding from Plaintiff's rectum. (*See* ECF No. 236-1 at ¶ 26.) The record demonstrates that, at that stage, Lugo decided it was in Plaintiff's best interest and for his safety to take him to the Hospital. (*See* ECF No. 237-6, Lugo Dep. Tr. at 110:13-25; *see also* ECF No. 237-7 at p. 192:19-25.) Plaintiff presents no evidence other than conclusory assertions to refute that he was brought to the Hospital for reasons other than to provide for his safety and to ensure no harmful foreign objects burst inside of him. (*See, e.g.,* ECF No. 236-1 at ¶ 22 (counsel for Plaintiff pointing to no support in the record for the contention that "Parole Officer Lugo did not have concerns that something was wrong with Plaintiff and was not concerned for Plaintiff's safety"). Accordingly, the undersigned recommends granting State Defendants' motion for summary judgment on Plaintiff's first cause of action—his Fourth Amendment claim for unreasonable search/violation of privacy.

***ii. Unreasonable Seizure/Excessive Force***

***9** Plaintiff, in his cause of action for unreasonable seizure/ excessive force, contends that he "was subjected to excessive and unnecessary force by Defendants Lugo and Payton when they dragged him out of the patrol vehicle in order to force him to submit to a body cavity search ...." (ECF No. 158 at ¶ 54.) Similarly, while at the Hospital, Plaintiff avers that the State Defendants "participated in the efforts to forcibly restrain Plaintiff ...." (*Id.* at ¶ 55.)

Under the scope of the Fourth Amendment, a "seizure" occurs where, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (internal marks omitted). "Claims that law enforcement officers have used excessive force ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham* v. *Connor*, 490 U.S. 386, 395 (1989). A use of force violates the Fourth Amendment if the police officer's conduct is "objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.' " *Cruz* v. *City of New York*, 232 F. Supp. 3d 438, 451 (S.D.N.Y. 2017) (quoting *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (internal quotation omitted)). Under this test of objective reasonableness, the inquiry weighs the particular facts and circumstances of the disputed incident to balance the plaintiff's Fourth Amendment interests against the concerns of law enforcement. *Harrison v. Inc. Vill. Freeport*, 498 F. Supp. 3d 378, 394 (E.D.N.Y. 2020); *Amnesty Am. v. Town W. Hartford,* 361 F.3d 113, 123 (2d Cir. 2004). For a court to grant summary judgment on Fourth Amendment seizure/excessive force claims, "the evidence must demonstrate that 'no rational jury could have found the force used was so excessive that no reasonable officer would have made the same choice.' " *McKinley v. Crevatas*, No. 20 Civ. 3606 (KPF), 2023 WL 4364182, at *16 (S.D.N.Y. July 6, 2023) (quoting *Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995)).

Here, genuine issues of fact persist as to the reasonableness of the force exercised upon Plaintiff's arrival at the Hospital. Indeed, while Plaintiff denies kicking and flailing his feet, other documentary evidence exists to counter this point like the grand jury indictment against Plaintiff for assaulting PO Lugo after Plaintiff kicked his hand. (*See* ECF No. 238-7.) Further, Plaintiff testifies that was "*placed*" in a wheelchair once removed from the vehicle. (*See* ECF No. 237-5, Young Dep. Tr. at p. 187:10-13 (noting Lugo and Payton "picked

[Plaintiff] up and put [him] in a wheelchair"), p. 188:3-5) (emphasis added). A juror should therefore be entitled to consider whether the force leading up to merely "placing" Plaintiff in the wheelchair was warranted or excessive. Lastly, not only is it disputed that Lugo and Payton even were participants in the restraint of Plaintiff at the Hospital (*see* ECF No. 238-1 at ¶ 42), but there is also a dispute as to whether the level of force necessary to assist Goodman in sedating Plaintiff was reasonable under the circumstances. (*See* ECF No. 237-16, Goodman Dep. Tr. at pp. 147-148). Indeed, one of the reasons submitted for the force exercised by Lugo was that Plaintiff tried to spit and bite Lugo ((*See* ECF No. 237-5 at p. 159:4-9 (stating Lugo had to "control [Plaintiff] from not" spitting and biting him)), yet Plaintiff denies this conduct entirely.

***10** A reasonable juror, therefore, could find that the force used was excessive in light of behavior exhibited by Plaintiff. *See* *Esperanza v. City of New York*, 325 F. Supp. 3d 288, 304 (E.D.N.Y. July 12, 2018) (concluding summary judgment was not appropriate where the use of force used could be considered excessive to a reasonable juror in light of the factual circumstances that plaintiff was not trying to resist or that he was an immediate threat to the safety of officers); *see also* *Graham v. City of New York*, 928 F. Supp. 2d 610, 619 (E.D.N.Y. 2013) (denying summary judgment on an excessive force claim where a reasonable jury could find that forcibly removing plaintiff from his car was excessive under the circumstances). Accordingly, the undersigned recommends denying State Defendants' motion for summary judgement on Plaintiff's second cause of action—his Fourth Amendment claim for unreasonable seizure/excessive force.

ii. *Qualified Immunity*

Should the District Judge agree with the undersigned's recommendations that the Court deny summary judgment on the Fourth Amendment unreasonable seizure/excessive force claim, the Court proceeds to analyze whether the doctrine of qualified immunity precludes State Defendants liability on the unreasonable seizure/excessive force claim under the Fourth Amendment.

Qualified immunity shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Kelsey v. County of Schoharie,* 567 F.3d 54, 60-61 (2d Cir. 2009); *Gonzalez*, 728 F.3d at 154. In assessing whether an officer is entitled to qualified immunity, the Court must consider (1) whether the official violated a statutory or constitutional right, (2) whether the right was clearly established at the time of the alleged misconduct; and (3) "even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful.' " *Gonzalez*, 728 F.3d at 154 (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 133-34 (2d Cir. 2010)); *Matusak v. Daminski*, 2026 WL 233791, at *6 (2d Cir. Jan. 29, 2026) (noting that for qualified immunity to apply, the actions of law enforcement must be reasonable based on the "particular facts of the case"). "Relevant for purposes of this action, 'it is axiomatic that the right that plaintiff asserts—namely plaintiff's right under the Fourth Amendment to be free from excessive force—is clearly established.' " *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 479 (E.D.N.Y. 2016) (quoting *Hodge v. Village of Southampton*, 838 F. Supp. 2d 67, 86 (E.D.N.Y. 2012)).

Indeed, the overwhelming majority of courts echo the idea that "where there are questions of material fact as to the reasonableness of the force used ... summary judgment on the ground of qualified immunity is not appropriate." *John*, 406 F. Supp. 3d at 246; *see* *Frederique*, 168 F. Supp. 3d at 479 (finding that the questions of material fact that existed as to whether the officer's use of force upon plaintiff was "objectively reasonable," summary judgment on qualified immunity grounds was denied); *Matusak*, 2026 WL 233791, at *6, *12 (citing cases where questions of whether the force was excessive substantially overlaps with the questions underlying the determination of qualified immunity); *Smith v. Fields*, No. 95 Civ. 8374, 2002 WL 342620, at *6, n.9 (S.D.N.Y. Mar. 1, 2002) (holding that allegations pertaining to the reasonableness of force used, specifically that plaintiff was "slapped and kicked about the face," were sufficient to defeat a claim of qualified immunity at the summary judgment stage). Here, as demonstrated above, because material questions of fact persist over the reasonableness of force used, the undersigned recommends finding that summary judgment on qualified immunity grounds inappropriate. *Thomas v. Roach*, 164 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

iii. Malicious Prosecution

***11** Plaintiff avers that "Defendants caused Plaintiff to be falsely and maliciously charged" with Assault in the Second Degree and Obstruction of Government Administration by falsely claiming that he assaulted Lugo. (ECF No. 158 at ¶ 63.) Similarly, "Defendants also caused Plaintiff to be charged with parole violations" related to the search of Plaintiff. (*Id.* at ¶ 63.)

"In order to prevail on [a malicious prosecution] claim under both Section 1983 and New York State law, a plaintiff is required to demonstrate: (i) the commencement or continuation of a criminal proceeding against her; (ii) the termination of the proceeding in her favor; (iii) that there was no probable cause for the proceeding; and (iv) that the proceeding was instituted with malice." *Morrison v. City of New York*, No. 14-cv-04508, 2019 WL 175121, at *7 (E.D.N.Y. Jan. 10, 2019) (quoting *Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (citations and internal quotation marks omitted)); *Torres v. Jones*, 47 N.E.3d 747, 760 (N.Y. 2016) ("The elements of the tort of malicious prosecution are: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice" (citations omitted)).

It follows, therefore, that existence of probable cause behind each criminal charge is a complete defense to a malicious prosecution claim. *See Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021) ("Probable cause to prosecute is a complete defense to a claim of malicious prosecution ... [but] 'such probable cause must be shown as to each crime charged in the underlying criminal action.' ") (citation omitted). Probable cause exists when "the arresting officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016) (cleaned up). If probable cause existed at the time of an arrest, it continues to exist at the time of prosecution unless it is undermined "by the discovery of some intervening fact." *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003).

Here, Plaintiff already pled guilty to the parole violation. (*See* ECF No. 236-1 at ¶¶ 37, 41.) In doing so, Plaintiff struck a fatal blow to his malicious prosecution claim. *See LaRocco v. Jackson*, No. 10-cv-01651 (NGG) (LB), 2012 WL 947554, at *3 (E.D.N.Y. Mar. 19, 2022) (noting plaintiff's malicious prosecution claim failed not only because plaintiff failed to show a lack of probable cause for the commencement of proceedings against him, but also because the guilty plea entered by plaintiff "preclude[d] a finding of termination of the proceedings in [his] favor") (internal marks and citation omitted). With respect to the Assault and Obstruction of Government Administration charges, probable cause existed to bring these criminal claims against Plaintiff. Indeed, Lugo testified he was kicked in the hand while trying to remove Plaintiff from the police vehicle before bringing him into the Hospital. (*See* ECF No. 237-6, Lugo Dep. Tr. at p. 148:2-7.) The same holds true for the Obstruction of Government Administration considering Plaintiff was curled up in the fetal position on the floor of the police vehicle to prevent being taken into the Hospital to ensure Plaintiff's safety was not jeopardized by the presence of drugs inside his rectum. (*See* ECF No. 236-1 at ¶ 29.) Plaintiff was also indicted by a grand jury of Assault in the Second Degree and Obstructing Governmental Administration in the Second Degree. (*See* ECF No. 238-5, 238-7 (grand jury indictment)).

***12** Moreover, Plaintiff fails to present any admissible evidence supporting another element of malicious prosecution—that the State Defendants instituted the proceedings with "actual malice." The only support adduced by Plaintiff as to this mental state are conclusory allegations in the Corrected Second Amended Complaint (*see* ECF No. 158 at ¶ 64 (alleging the State Defendants were "motivated solely by their vindictive desire to make Plaintiff suffer for resisting their unlawful and unreasonable conduct toward him" very well knowing there was no probable cause to bring the charges against Plaintiff)), Opposition Memorandum of Law (ECF No. 236 at p. 18 ("Defendants intentionally falsified and misrepresented documents stating that Mr. Young allegedly committed an assault"), and Plaintiff's 56.1 statement (*see* ECF No. 236-1 at ¶ 4 (noting Plaintiff was "maliciously prosecuted, without reason, legal basis or justification" by the defendants)).

Without more, these barebone assertions are insufficient for Plaintiff's malicious prosecution claim to survive summary judgment. *See EZ Pawn Corp. v. City of New York*, 390 F. Supp. 3d 403, 427 (E.D.N.Y. 2019) (granting summary judgment on malicious prosecution claim where plaintiff provided no more than conclusory allegations that plaintiff was arrested for wrongful, improper purposes). Accordingly,

the undersigned recommends granting State Defendants' motion for summary judgment on Plaintiff's malicious prosecution claim.

iv. *Abuse of Process*

Plaintiff's cause of action for abuse of process asserts that the State Defendants, in initiating the proceedings against Plaintiff for Assault and Obstruction of Governmental Administration, "subjected Plaintiff to extensive, unnecessary, and fundamentally baseless criminal process, including felony grand jury proceedings, supported solely by Defendants' malicious desire to humiliate Plaintiff for challenging their abuse of him." (ECF No. 158 at ¶ 70.) Plaintiff makes a similar assertion his Opposition: "the record is clear that Defendants Lugo and Payton improperly used the criminal process to take Mr. Young to the hospital to have an invasive anal search performed, without authorization, for the collateral purpose to embarrass and humiliate Mr. Young as a means of retribution." (*See* ECF No. 236 at p. 20.)

To survive summary judgment on a § 1983 claim for abuse of process, a defendant must show he "(1) employs regularly issued legal process to compel performance or forbearance of some act[,] (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Hernandez v. United States*, 939 F.3d 191, 203 (2d Cir. 2019) (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)); *Rivera v. Jahmi*, 801 F. Supp. 3d 129, 160 (E.D.N.Y. 2025). It is not sufficient to allege that a defendant had an improper motive in initiating the legal process, but rather a plaintiff must allege that the legal process was instituted to gain a collateral objective — that a defendant had "an ulterior *purpose* or *objective*" in pursuing a plaintiff's prosecution. *Savino*, 331 F.3d at 77–78 ("Although [the complaint] does allege that ... defendants acted with an improper *motive*, [the plaintiff] has not presented any evidence that they had an ulterior *purpose* or *objective* in facilitating his prosecution.") (emphasis in original).

Here, Plaintiff fails to plead or allege that the State Defendants had any collateral purpose beyond pursuing Plaintiff's criminal prosecution. *See Savino*, 331 F.3d at 76. Indeed, Plaintiff's contention that the collateral purpose was to "embarrass and humiliate," without more, is insufficient. *See Posner v. City of New York*, No. 11 Civ. 4859 (JMF), 2014 WL 185880, at *7 (S.D.N.Y. Jan. 16, 2014) (granting summary judgment on plaintiff's abuse of process claim where the assertion that "Defendants' goal was 'to embarrass and humiliate plaintiff' " was not supported by any evidence "beyond her speculation, which is insufficient to avoid summary judgment"). Accordingly, the undersigned recommends granting State Defendants' motion for summary judgment on Plaintiff's abuse of process claim.

v. *Fabrication of Evidence*

***13** To survive summary judgment on a claim based on fabrication of evidence, a plaintiff must show that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Gutierrez v. New York*, No. 18-CV-3621 (MKB), 2021 WL 681238, at *17 (E.D.N.Y. Feb. 22, 2021) (quoting *Ganek v. Leibowitz*, 874 F.3d 73, 90 (2d Cir. 2017) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016))).

Plaintiff, in his Corrected Second Amended Complaint, contends that the State Defendants "created false reports in an attempt to retroactively justify the unlawful search of Plaintiff's rectal cavity" and "filed false reports claiming that Plaintiff assaulted Defendant Lugo" all in "an effort to support parole and criminal charges against Plaintiff." (ECF No. 158 at ¶ 74.) Notwithstanding these conclusory allegations, Plaintiff fails to pinpoint any information that was fabricated, how this information would have swayed a verdict or decision, or that any information was given to prosecutors. Indeed, in his Opposition, Plaintiff merely says that "[w]hat was charged by the State Defendants was untrue. That is how the records were falsified." This is insufficient for a fabrication of evidence claim. *See Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863 (KMK), 2021 WL 1164185, at *51 (S.D.N.Y. Mar. 26, 2021) ("But as courts have routinely held, a plaintiff may not survive summary judgment through a conclusory assertion that relevant records were forged or falsified.") (collecting cases). Accordingly, the undersigned recommends granting State Defendants' motion for summary judgment on Plaintiff's fabrication of evidence claim.

vi. *Cruel and Unusual Punishment*

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. Amend. VIII. The Eighth Amendment also prohibits the "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components, one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Govan v. Campbell*, 289 F. Supp. 2d 289, 298 (N.D.N.Y. 2003) (quoting *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8 (1992))); *see Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (noting that the two elements to an Eighth Amendment cause of action involve the allegation that the defendant "acted with a subjectively sufficiently culpable state of mind" and "that the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions").

The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991)). The objective component of a cruel and unusual punishment claim focuses on the harm done, but the amount of harm that must be shown depends on the nature of the claim and turns on contemporary standards of decency. *Govan*, 289 F. Supp. 2d at 299; *DeJesus v. Malloy*, 531 F. Supp. 3d 650, 659 (W.D.N.Y. 2021).

***14** As Plaintiff concedes in the Correct Second Amended Complaint, he was not yet incarcerated at the time of the allegedly unconstitutional behavior, but pleads this Eighth Amendment cause of action "in case the court determines otherwise given his status as a parolee." (ECF No. 158 at ¶ 79.) Indeed, "[a]lthough a parolee, plaintiff had been convicted of nothing when he was subjected to the deeply perverse and arbitrary indignity of being sedated and subjected to an involuntary body cavity search. In fact, Plaintiff had not even been arraigned for his supposed parole violation." (*Id.* at ¶ 80.)

Notwithstanding the fact that the purported "cruel and unusual punishment" Plaintiff cites to does not even involve the conduct of the State Defendants but rather the sedation and body cavity search that occurred in the Hospital, Plaintiff does not fall within an ambit of those protected by the Cruel and Unusual punishment clause. *See Clark v. City of New York*, No. 13-CV-210 (ENV) (ST), 2016 WL 11469535, at *5 n.7 (E.D.N.Y. July 22, 2016) (granting summary judgment on plaintiff's cruel and unusual punishment claim against municipal defendants where plaintiff was not charged with a crime let alone convicted and punished for one); *see also Dunn v. Schultz*, No. 98-cv-693 (LEK/DRH), 2010 WL 3522326, at *1 n.3 (N.D.N.Y. Aug. 11, 2010) ("The Eighth Amendment protections apply to those who have been convicted of a crime, sentenced, and are thus suffering the "punishment" contemplated by the Cruel and Unusual Punishment Clause.") (citing *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2003)); *see Bell v. Wolfish*, 441 U.S. 520, 539 (1979) (discussing "punishment" in the context of pretrial detention). Even so, Plaintiff falls short of identifying, let along establishing, the requisite level of "wantonness" on the part of the State Defendants to progress this cause of action past the summary judgment phase. Accordingly, the undersigned recommends granting Defendant's motion for summary judgment on Plaintiff's claim of cruel and unusual punishment under the Eighth Amendment.

vii. *Substantive Due Process*

"[T]he Due Process Clause of the Fourteenth Amendment embodies a substantive component that protects against certain government actions regardless of the fairness of the procedures used to implement them." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 217 (2d Cir. 2012) (quoting *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460 (2d Cir. 1996) (internal quotation marks omitted)). "[W]here a constitutional wrong is alleged and the protection at issue is governed specifically by a constitutional amendment, 'that Amendment, not the generalized notion of "substantive due process," must be the guide for analyzing these claims.' " *See Barkai v. Mendez*, 629 F. Supp. 3d 166, 202 (S.D.N.Y. 2022) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Notably, "[a] plaintiff cannot succeed on a substantive due process claim where the state action in question is a Fourth Amendment seizure." *Greenaway v. County of Nassau*, 97 F. Supp. 3d 225, 237 (E.D.N.Y. 2015) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 843-44 (1998)).

In fact, a line of case law has emerged in this Circuit under circumstances like those here—where a plaintiff is involuntarily hospitalized by law enforcement and/or medical staff and consequently brings substantive due process claims and Fourth Amendment claims against those violating parties. In those cases, the courts have dismissed the substantive

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

due process claims as duplicative after finding the conduct underlying the substantive due process claims also formed the basis for an unreasonable seizure under the Fourth Amendment. *See, e.g., Greenaway*, 97 F. Supp. 3d at 237 (granting summary judgment on the Nassau Defendants' motion for summary judgment considering "the complained-of conduct" forming the substantive due process claim "occurred in the course of the Nassau police officers' seizure of [plaintiff]"); *Heller v. Bedford Central School District*, 144 F. Supp. 3d 596, 625 (S.D.N.Y. 2015) (dismissing the substantive due process claim premised on plaintiff's allegations of involuntary confinement by defendants at the hospital where it was pleaded alongside an unlawful seizure claim under the Fourth Amendment); *Barkai*, 629 F. Supp. 3d at 203 (concluding that "substantive due process claims cannot be brought 'against law enforcement officers who bring a person into a hospital' in the civil confinement context") (quoting *Matthews v. City of New York*, No. 15-cv-2311, 2016 WL 5793414, at *5 (S.D.N.Y. Sept. 30, 2016)).

***15** Here, the same conduct underlying the substantive due process claim also underlies Plaintiff's Fourth Amendment unreasonable seizure claim. (*Compare* ECF No. 158 at ¶ 89 (Plaintiff alleging that the State Defendants subjected Plaintiff to the invasive rectal exam and sedative drug being injected into him without good cause or a warrant, all without "the process he was due before depriving him of his bodily autonomy"), *with* ECF No. 158 at ¶ 54 ("Plaintiff was subjected to excessive and unnecessary force by Defendants Lugo and Payton when they dragged him out of the patrol vehicle in order to force him to submit to a body cavity search, without any legal justification, causing Plaintiff significant pain and injury."). In fact, in Opposition, Plaintiff squarely characterizes the conduct underlying his substantive due process claim as a "seizure." (*See* ECF No. 236 at p. 13 ("That is exactly what we have here in the teaming up, and enlistment, of Goodman, Suffolk County Police and State Defendants to physically force Mr. Young to be doped to sleep, x-rayed and digitally searched in his rectum. *The seizure* was accompanied by a pure disregard for any rights to process to which Mr. Young was unquestionable entitled.")) (emphasis added).

Accordingly, "in light of the Supreme Court's prior admonition against creating substantive due process rights where other Amendments provide relief" and considering the "complained-of conduct occurred in the course of the [State Defendants] seizure of [Plaintiff]," the undersigned recommends granting State Defendants' motion for summary judgment on Plaintiff's substantive due process claim. *Matthews*, 2016 WL 5793414, at *6; *Greenaway*, 97 F. Supp. 3d at 237.

**D. <u>The State Law Claims</u>**

i. *<u>Supplemental Jurisdiction</u>*

Should the District Judge agree with these recommendations, and conclude that some federal claims survive, the Court must undertake an analysis to determine whether Plaintiff's state law claims should be heard. The Court's jurisdiction in this action is predicated on federal question jurisdiction by reason of the § 1983 claims. (*See* ECF No. 158 at ¶ 5.)[3] As such, Plaintiff's remaining state law causes of action for assault and battery and false imprisonment rest upon the exercise of supplemental jurisdiction under 28 U.S.C. § 1367. *See Romero v. Bestcare, Inc.*, No. CV 15-7397 (JS) (GRB), 2018 WL 1702001, at *11 (E.D.N.Y. Feb. 28, 2018) (finding where a claim does not otherwise carry an independent basis for subject matter jurisdiction, i.e. federal question or diversity, that claim must meet § 1367's criteria for supplemental jurisdiction.), *report and recommendation adopted*, 2018 WL 1701948 (E.D.N.Y. Mar. 31, 2018).

Section 1367(a) confers on the Court "supplemental jurisdiction over all [ ] claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "For purposes of section 1367(a), claims 'form part of the same case or controversy' if they 'derive from a common nucleus of operative fact.' " *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004)).

***16** Here, Plaintiff has met the "common nucleus of operative fact standard set forth in in *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) ("The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from a common nucleus of operative fact.") (internal citation omitted). State and federal claims arise out of a common nucleus of operative fact when, as a practical matter, they are so related that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 332 (2d Cir. 2011)

(quoting *Gibbs*, 383 U.S. at 725). The exercise of jurisdiction is proper over state law claims when "the facts underlying the federal and state claims substantially overlapped," or "the federal claim necessarily brought the facts underlying the state claim before the court." *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir. 2000).

Plaintiff's Corrected Second Amended Complaint is premised upon Lugo and Payton's offensive contact, extraction of Plaintiff from the police vehicle, and unlawful searching of Plaintiff's body—conduct which also forms the basis behind the causes of action for assault and battery and false imprisonment. (*See* ECF No. 158 at ¶¶ 3, 93-94, 122, 124-25.) Both the state law claims in the Corrected Second Amended Complaint and the federal claims involve the same facts, the same misconduct, and the same or similar parties. *Styleline Studios Int'l Ltd. v. Litvack*, No. 24-cv-01192 (OEM) (JMW), 2025 WL 2306738, at *9 (E.D.N.Y. Apr. 22, 2025), *report and recommendation adopted*, 2025 WL 2092288 (E.D.N.Y. July 25, 2025). Moreover, the "conclusion [here] is further buttressed by considerations of fairness, judicial economy, convenience and comity. *See Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 446–48 (2d Cir. 1998). As such, the state law claims in the Corrected Second Amended Complaint arise from the common nucleus of operative facts as the federal claims.

But that is not all. The "trial court must consider whether any of the four grounds set out in subsection 1367(c) are present to an extent that would warrant the exercise of discretion to decline assertion of supplemental jurisdiction." *Jones*, 358 F.3d at 214. Under subsection 1367(c), a court may decline to exercise supplemental jurisdiction over a permissive counterclaim if: "(1) the claim raises novel issues or complex issues of State law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." Here, none of the four exceptions apply, nor do the parties even address why the Court should refuse to hear the state law claims under one of these grounds. Accordingly, should the District Judge agree that some federal claims survive summary judgment, the undersigned recommends exercising supplemental jurisdiction over Plaintiff's state law claims.

Should the District Judge disagree with the undersigned's recommendation and find that no federal claims survive, the Court may decline to exercise supplemental jurisdiction over the state law claims. "The decision to exercise supplemental jurisdiction over state law claims once the claims over which the district court had original jurisdiction have been dismissed 'is within the sound discretion of the district court.' " *Silverman v. Miranda*, 116 F. Supp. 3d 289, 300 (S.D.N.Y. 2015), *aff'd sub nom. Silverman v. Teamster Loc. 210 Affiliated Health & Ins. Fund*, 725 F. App'x 79 (2d Cir. 2018), *as amended* (June 7, 2018) (quoting *Lundy v. Catholic Health Sys. of Long Island*, 711 F.3d 106, 117 (2d Cir. 2013)). "Where a court dismisses all claims over which it has original jurisdiction, it may, in its discretion, decline to exercise supplemental jurisdiction over remaining claims." *Kneitel v. Silvery*, No. 15-CV-6811 (NGG) (SJB), 2018 WL 526486, at *6 (E.D.N.Y. Jan. 22, 2018) (citing 42 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it had original jurisdiction....")). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' " *Snyder v. Neurological Surgery Practice of Long Island, PLLC*, No. 24-cv-06911 (JMW), 2025 WL 1434032, at *8 (E.D.N.Y. May 19, 2025) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)). The "trial court must consider whether any of the four grounds set out in subsection 1367(c) are present to an extent that would warrant the exercise of discretion to decline assertion of supplemental jurisdiction." *See Jones*, 358 F.3d at 209. One of these grounds includes where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

***17** Consistent with the approach adopted by most courts in this Circuit, the undersigned recommends dismissing Plaintiff's remaining state law claims should the District Judge dismiss the federal question claims. *See, e.g., Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 307-08 (2d Cir. 2003) (finding that the district court abused its discretion by exercising jurisdiction over a state-law claim following summary judgment dismissing the plaintiffs' federal claims); *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well"); *Paschalidis v. Airline Rest. Corp.*, No. 20-cv-2804 (LDH) (LB), 2024 WL 4607230, at *4 (E.D.N.Y. Oct. 28, 2024) ("Because the Court has granted Defendants' motion for summary judgment as to Plaintiff's federal claims, it 'decline[s] to exercise

supplemental jurisdiction' over Plaintiff's state law claims [because] 'it "has dismissed all claims over which it has original jurisdiction.' "") (quoting *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 121-22 (2d Cir. 2006)) (alterations in original). This is particularly appropriate in the § 1983 context. *See e.g., Chroscielewski v. Chroscielewski*, No. 16-CV-6640 (DG) (CLP), 2024 WL 5089540, at *3 (E.D.N.Y. Dec. 12, 2024) ("In light of the dismissal of Plaintiff's federal-law claim (the First Cause of Action, brought under Section 1983) ... the Court declines at this stage to exercise supplemental jurisdiction over the remaining claims and those claims are dismissed without prejudice to the parties pursuing any appropriate relief in state court."); *Rivera v. Jahmi*, No. 22-cv-2233 (KAM) (VMS), 801 F. Supp. 3d 129, 164 (E.D.N.Y. 2025) (dismissing state law claims after granting summary judgment on the § 1983 claims—the only federal claims brought); *Myers v. Davenport*, No. 21-cv-0922 (AMN/CFH), 2024 WL 4892741, at *3 (N.D.N.Y. Nov. 26, 2024) (granting summary judgment on all "remaining state law claims" after granting summary judgment on "the sole federal claims" under § 1983).

ii. *Qualified Immunity and State Law Claims*

Similarly, should the District Judge disagree with the undersigned's recommendation on qualified immunity and find that the State Defendants are entitled to qualified immunity for their actions, the undersigned recommends dismissing the state law claims against the State Defendants under the same grounds.

"The doctrine of qualified immunity is generally understood to only protect government officials from federal, not state, causes of action. However, New York common law fills this gap by providing government officials with a similar form of protection against state law claims." *Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 400 (S.D.N.Y. 2009) (citing *Jenkins v. City of New York,* 478 F.3d 76, 86 (2d Cir. 2007)). Indeed, "New York law ... grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *See Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006)). "The only difference between the federal and state doctrines is that the reasonableness of an officer's action is judged with references to state law and the state, not the federal, constitution." *Bancroft*, 672 F. Supp. 2d at 401 (citing *Doyle v. Rondout Valley Central School District*, 3 A.D.2d 669, 670-71 (App. Div. 3rd Dep't 2004)). Notably, under New York law, "governmental officers are immune from tort liability based on 'official action involving the exercise of discretion even if resulting from negligence or malice.' " *Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 470 (S.D.N.Y. 2008) (citing *Tango by Tango v. Tulevech*, 459 N.E.2d 182 (N.Y. 1983)).

For example, in *Rene*, defendants argued "if the Court determines they are state actors entitled to qualified immunity as to Plaintiff's federal and constitutional law claims, then the Court should also afford them qualified immunity as to Plaintiff's state law claims" and "[based] upon such immunity, Plaintiff's medical malpractice and false imprisonment causes of action should be dismissed." 2024 WL 1332556, at *19. The Hon. Joanna Seybert agreed, concluding that if the court were to exercise supplemental jurisdiction over the state law claims, "Defendants are entitled to qualified immunity against Plaintiff's state law claims because the record evidence established the Defendants acted reasonably" in making their determinations, thus supporting the finding of qualified immunity on "Plaintiff's federal and constitutional claims" as well. *Id.* at *23.

***18** Accordingly, like in *Rene*, if the Court concludes that the State Defendants are entitled to qualified immunity on the constitutional claims, the undersigned recommends dismissing the state law claims of assault and battery and false imprisonment. *See Bancroft*, 672 F. Supp. 2d at 408-09 (dismissing state law claims of, *inter alia*, assault, battery, and false imprisonment/false arrest under the doctrine of qualified immunity where the officers acted reasonably and consistent with acceptable practices considering the same reasonableness determination guided the court's decision to grant qualified immunity on the federal and constitutional claims).

Alternatively, should the District Judge agree with the undersigned's recommendation that material facts preclude a finding that the State Defendants are subject to qualified immunity, the undersigned proceeds to analyze each of Plaintiff's state law claims. *See Jones*, 465 F.3d at 64 (affirming decision to deny defendants motion for summary judgment on the constitutional claims considering disputed material facts were presented as to the reasonableness of force used, and denying qualified immunity on the state law claims of false arrest and imprisonment, assault, battery because the "resolution of these claims rests heavily on the same facts [and reasonableness] that form the heart of the federal claims").

iii. *Assault and Battery*

Under New York law, "assault is an intentional placing of another person in fear of imminent harmful or offensive contact" and a "battery is an intentional wrongful physical contact with another person without consent." *Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006) (citing *Charkhy v. Altman*, 678 N.Y.S.2d 40, 41 (App. Div. 1998)); *see Baker v. City of New York*, 551 F. Supp. 3d 258, 269 (S.D.N.Y. 2021) ("Under New York law, to plead an assault claim, Plaintiff must allege "physical conduct placing [her] in imminent apprehension of harmful contact. To plead a battery claim, Plaintiff must allege "bodily contact, made with intent, and offensive in nature.") (internal citation and quotations omitted) (quoting *Fugazy v. Corbetta*, 825 N.Y.S.2d 120, 122 (App. Div. 2d Dep't 2006)). Notably, "[f]ederal excessive force claims and state law assault and battery claims against police officers are nearly identical." *Graham*, 928 F. Supp. 2d at 624 (citing *Humprey v. Landers*, 344 Fed. App'x 686, 688 (2d Cir. 2009)). It follows, therefore, that where an excessive force claim under § 1983 does not survive summary judgment, claims for assault and battery will similarly be dismissed because "except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially similar." *Cornell v. Village of Clayton*, 691 F. Supp. 3d 608, 622 (N.D.N.Y. 2023) (citing *Lee v. City of Troy*, 520 F. Supp. 3d 191, 198 (N.D.N.Y. 2021)).

As explained *supra*, issues of material fact persist over Plaintiff's Fourth Amendment excessive force claims to preclude a grant of summary judgment. Consequently, denial of summary judgment is also appropriate for Plaintiff's assault and battery claims which are premised on the same conduct forming the basis for the excessive force claim. *See John v. City of New York*, 406 F. Supp. 3d 240, 246 (E.D.N.Y. 2017) (concluding that because questions of fact precluded summary judgment on the excessive force claim, questions of fact similarly precluded summary judgment on assault and battery claims); *Graham*, 928 F. Supp. 2d at 625 ("Since there are questions of fact regarding Plaintiff's excessive force claim, there are also questions of fact regarding Plaintiff's state law assault and battery claims ....") Accordingly, the undersigned recommends denying State Defendants' motion for summary judgment on Plaintiff's cause of action for assault and battery.

iv. *False Imprisonment*

***19** "To succeed on a claim of false imprisonment [at the summary judgment stage], a plaintiff must show: (1) that the defendant *intended* to confine the plaintiff, (2) that the plaintiff was aware of the confinement, (3) that the plaintiff did not consent to the confinement, and (4) that the confinement was not otherwise privileged." *King v. Crossland Sav. Bank*, 111 F.3d 251, 256 (2d Cir. 1997) (emphasis in original) (citing *Brouhgton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)). A confinement is "privileged" when it is based on probable cause which, if established, serves as a complete defense to an action for false imprisonment. *See Jackson v. Suffolk County*, 87 F. Supp. 3d 386, 404 (E.D.N.Y. 2015) (finding the same four elements for false arrest, including that probable cause constitutes justification, "hold[ ] true for [ ] false imprisonment claims because, under New York law, the claim is identical to a false arrest claim ....") (quoting *Kilburn v. Village of Saranac Lake*, 413 Fed. App'x 362, 363 (2d Cir. 2011)).

Probable cause exists where the officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citation and internal quotation marks omitted). Indeed, probable cause "does not require a prima facie showing of criminal activity" but rather requires "that the possibility of criminal activity or the *possibility of evidence of a crime will be found*." *Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 266 (S.D.N.Y. 2002) (emphasis added) (citing *United States v. Cruz*, 834 F.2d 47 (2d Cir. 1987) and *Texas v. Brown*, 460 U.S. 730 (1983)). It follows, therefore, that granting summary judgment on false imprisonment claims is only appropriate where there is no dispute as to whether the arrest or confinement was done "with legal justification," meaning with probable cause. *See Arum v. Miller*, 332 F. Supp. 2d 99, 110 (E.D.N.Y. 2004) ("A claim for wrongful imprisonment cannot succeed where the undisputed facts establish probable cause because it vitiates a required element of this causes of action: that the arrest or confinement be without legal justification.").

In Plaintiff's Corrected Second Amended Complaint, he alleges he was falsely imprisoned by the State Defendants' "willful[ ] and malicious[ ] detain[ment]" of him through physical restraint "for the purposes of subjecting Plaintiff

to an involuntary, unnecessary, and invasive rectal cavity search." (ECF No. 158 at ¶ 122.) Plaintiff's Opposition Memorandum seemingly expands this cause of action to "[a]ll aspects of transport, removal from the police car, entry into the hospital, use of drugs and all procedures ...." (ECF No. 236 at p. 19.)

Notwithstanding, the Parole Officers were justified in use of force considering Plaintiff's refusal to enter the Hospital and curling into the fetal position in the car, the alleged biting and kicking of PO Lugo, and Plaintiff's agitated and belligerent state up to and including the time of injection. As noted above, this confinement was legally justified considering the Parole Officers had reason to believe that Plaintiff was secreting drugs from his rectum—a conclusion generated after picking up Plaintiff's passenger, Shati Roy, who had drugs on his person, Plaintiff's fidgety and peculiar behavior in the police vehicle, Plaintiff placing his hands down the back of his pants, and PO Lugo observing what he believed to be a bag of drugs protruding from Plaintiff's rectum. Courts find similar observations and conduct to amount to probable cause to grant summary judgment on a false arrest/false imprisonment claim. *See* *Falls*, 2021 WL 1164185, at *13 (noting probable cause existed to grant summary judgment on plaintiff's false imprisonment claim considering the police officers had knowledge that plaintiff was selling narcotics and police officers witnessed behaviors typical to drug dealing and smuggling, thus "it was objectively reasonable for the [responding] officer[s] to believe that probable cause existed" to detain plaintiff); *see also* *Kneitel v. City of New York*, No. 15-cv-6942 (NGG) (LKE), 2025 WL 2712136, at *8 (E.D.N.Y. Sept. 23, 2025) (granting summary judgment on claims for false imprisonment where under the totality of circumstances, the officers had probable cause for their confinement). Accordingly, the undersigned recommends granting State Defendants' motion for summary judgment on Plaintiff's false imprisonment claim.

## CONCLUSION

***20** For the foregoing reasons, the undersigned recommends **GRANTING** in part and **DENYING** in part State Defendants' motion for summary judgment (ECF No. 234), specifically as follows:

(i) **GRANTING** as to Plaintiff's causes of action for Fourth Amendment unreasonable search/violation of privacy, malicious prosecution, abuse of process, fabrication of evidence, cruel and unusual punishment, substantive due process, and false imprisonment; and

(ii) **DENYING** as to Plaintiff's causes of action for Fourth Amendment unreasonable seizure/excessive force, assault and battery, and on the defense of qualified immunity.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served through ECF on all counsel. Any written objections to this Report and Recommendation must be filed within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. 2011); Fed. R. Civ. P. 6(a), 72(b); *see also* *Nambiar v. The Central Orthopedic Group LLP*, No. 24-1103 (2d Cir. Oct. 28, 2025) (addressing timing and scope of objections to Reports and Recommendations). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days precludes further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see* *Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (summary order) (same).

**All Citations**

Slip Copy, 2026 WL 1978864

**Footnotes**

1 The facts set forth above are taken from the State Defendants' 56.1 Statement (ECF No. 237-18) and corresponding responses from Plaintiff (ECF No. 236-1). Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it. Where relevant, however, the Court may also cite directly to an underlying document. The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal. *See Stewart v. Fashion Inst. of Tech.,* No. 18-CV-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) (" '[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.' ") (quoting *Knight v. N.Y.C. Hous. Auth.*, No. 03-CV-2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires ... that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). "Additionally, to the extent [a party's] 56.1 statement 'improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts,' the Court has disregarded [such] statement[s.]" *McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020).

2 Plaintiff asserts additional causes of action for intentional and/or negligent infliction of emotional distress, negligence, and medical malpractice but solely against Defendants Goodman and Hernandez. (*See* ECF No. 158 at pp. 21, 23, 24.)

3 Diversity jurisdiction does not exist in this case, nor do the parties argue or plead the existence of diversity. (*See* ECF No. 158 at ¶¶ 7-18.)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 1662274
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Jamie E. YOUNG, Plaintiff,
v.
Mark LUGO, et al. Defendants.

18-CV-4216(JS)(JMW)
|
Signed June 9, 2026

**Attorneys and Law Firms**

For Plaintiff Jamie Young: Frederick K. Brewington, Esq., Law Offices of Frederick K. Brewington, 556 Peninsula Boulevard, Hempstead, New York 11550.

For Defendants Mark Lugo and Alonzo Payton: Valerie Singleton, Esq., Assistant Attorney General, State of New York, 200 Old Country Road, Suite 240, Mineola, New York 11501.

ORDER

Joanna Seybert, United States District Judge.

***1** Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, Defendants Mark Lugo ("Lugo") and Alonzo Payton ("Payton", together with Lugo, the "R&R Defendants") object to the portion of Magistrate Judge James M. Wicks's February 6, 2026 Report and Recommendation ("R&R", ECF No. 244) recommending denial of summary judgment on the unreasonable seizure/excessive force and assault and battery claims brought by Plaintiff Jamie Young ("Plaintiff", together with the R&R Defendants, the "Parties"). (See Obj., ECF No. 248; Supp. Obj., ECF No. 251; Reply, ECF No. 253; Motion, ECF No. 234.) Plaintiff's causes of action relate to events that took place while Plaintiff was in law enforcement custody on December 14, 2017. Because this Court concludes no dispute of material fact precludes application of the qualified immunity defense, the R&R Defendants' Objection is SUSTAINED and their Motion is GRANTED, as set forth below.

BACKGROUND

I. Undisputed Facts

The Court draws all undisputed facts from the Rule 56.1 materials submitted by the Parties. (See Pl.'s 56.1 Response, ECF No. 236-1, attached to Opp'n; Defs.' 56.1 Response, ECF No. 235-2, attached to Defs.' Reply.) Unless otherwise noted, all facts are undisputed.

On December 14, 2017, Plaintiff was arrested for allegedly violating his parole by fraternizing with Shati Roy ("Roy"), a known parolee. (Pl.'s 56.1 Response ¶¶ 15, 19.) Both Plaintiff and Roy were additionally suspected of being involved with a prostitution ring. (Id.) New York State Department of Correction and Community Supervision ("DOCCS") Officer Lugo effectuated Plaintiff's arrest. (Id. ¶ 19.) The Parties dispute whether Roy was found in possession of crack cocaine on his person and in his vehicle. (Id. ¶ 17.) Plaintiff's term of parole stemmed from several drug-related convictions and a weapons conviction from 1996. (Id. ¶ 12.) Plaintiff has a history of cocaine abuse and has spent time in drug rehabilitation, which is reflected in his medical records. (Id. ¶ 14.)

After Plaintiff was arrested and taken into custody, Lugo and DOCCS Officer and Defendant Orrison McLean drove Plaintiff to the Suffolk County Police Department's Fifth Precinct ("Fifth Precinct"). (Id. ¶ 20.) The Parties dispute several aspects of Plaintiff's conduct in the vehicle at the Fifth Precinct parking lot. Lugo testified that Plaintiff: was "acting suspiciously"; was "fidgeting in his pants quite feverishly"; and repeatedly placed his hands down the back of his pants. (Id. ¶ 21.) Plaintiff denies engaging in this conduct, but acknowledged in his deposition that he "shift[ed] his position" while at the Fifth Precinct to relieve rectal discomfort. (Id.; Pl.'s Tr., ECF No. 237-5, 183:06-11, attached to Decl., ECF No. 237.)

Believing Plaintiff may have rectally-stored drugs, Lugo and Suffolk County Detective and Defendant Alberto Acevedo ("Acevedo") went with Plaintiff to a holding cell. (Id. ¶¶ 23–24.) Plaintiff was subsequently advised he would have to remove his clothes so police could search his body for drugs. (Id. ¶ 24.) Plaintiff complied. (Id.) As part of his parole, Plaintiff had consented to searches of his person or property. (Id. ¶ 13.)

***2** During the search, Lugo observed something resembling a bubble protruding from Plaintiff's rectum. (Id. ¶ 26; Defs.' 56.1 Response ¶ 7.) Lugo believed the "bubble" was a bag of drugs, testifying it appeared to have three balloon knots. (Pl.'s

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

56.1 Response ¶ 26.) But Plaintiff testified that, after officers laughed and referred to what they observed as a "bubble", he informed them the "bubble" was actually a hemorrhoid. [1] (Defs.' 56.1 Response ¶¶ 10–11.) Defendants dispute that Plaintiff disclosed his hemorrhoid condition; Lugo contends instead Plaintiff stated, "if you want to know what's in my ass, take me to the hospital." (Id. ¶¶ 10–11.) Plaintiff denies making that statement or ever requesting to be taken to a hospital. (Pl.'s 56.1 Response ¶ 26.) After Plaintiff was told to get dressed, he indicated he was willing to provide officers a second look at his rectum and thereafter requested an attorney. (Defs.' 56.1 Response ¶¶ 12, 15.) Acevedo advised Plaintiff that a warrant would be obtained to determine whether anything was present in Plaintiff's rectum, although no such warrant was ever issued. (Id. ¶¶ 9, 13.)

Following the search, and at the direction of his supervisor, Lugo transported Plaintiff to Brookhaven Memorial Hospital Medical Center ("Brookhaven Hospital" or "Hospital"), accompanied by DOCCS Investigator Payton. (Pl.'s 56.1 Response ¶ 27.) In the transport vehicle, Plaintiff was handcuffed, secured with a waist chain, and shackled at the feet. (Id. ¶ 28.) The Parties dispute whether, on his way to the Hospital, Plaintiff repeatedly banged his head against the window. (Id.) Upon arrival at Brookhaven Hospital, Plaintiff exhibited several instances of erratic and non-compliant behavior, including: refusing to exit the vehicle; curling into the fetal position on the floor of the vehicle; and locking his legs to prevent law enforcement from removing him from the vehicle. (Id. ¶ 29.) Plaintiff states he was ultimately removed from the vehicle when the R&R Defendants pulled on his handcuffs and leg shackles, before "plac[ing]" him in a wheelchair (the "Vehicle Extraction"). (Id. ¶¶ 29-30; Defs.' 56.1 Response ¶ 23.) The R&R Defendants contend Plaintiff kicked and flailed his legs during the Vehicle Extraction, striking Lugo and causing injuries to Lugo's wrist and thumb. (Pl.'s 56.1 Response ¶ 29.) Plaintiff denies kicking, flailing, or injuring Lugo. (Id.) The Parties further dispute whether Plaintiff attempted to spit on or bite Lugo as he was brought into the Hospital. (Id. ¶ 30.) Although Plaintiff disputes he injured Lugo or kicked him, it is undisputed Lugo broke his wrist and thumb at some point on December 14. (Id. ¶¶ 36–37.)

Once inside the Hospital, Plaintiff continued yelling that he did not want to be there, at times "at the top of his lungs." (Id. ¶¶ 30–31.) Plaintiff was subsequently examined by Dr. Carl Goodman ("Dr. Goodman" or "Doctor"), an attending emergency physician at Brookhaven Hospital, who described Plaintiff as "extremely agitated and belligerent" with some more calm periods throughout the night. (Pl.'s 56.1 Response ¶¶ 32-33; Defs.' 56.1 Response ¶ 33.) One of several law enforcement officers present with Plaintiff informed Dr. Goodman they believed Plaintiff may have put a foreign body in his rectum, and that they had observed something protruding from Plaintiff's rectal area. (Pl.'s 56.1 Response ¶ 33.) They requested Plaintiff be "checked out" by medical staff. (Defs.' 56.1 Response ¶ 26.) Law enforcement supplied the information underlying Dr. Goodman's belief that Plaintiff may have had a foreign object in his rectum; the Parties dispute whether the Doctor's subsequent actions were the product of independent medical judgment or law enforcement influence. (Pl.'s 56.1 Response ¶ 33.)

***3** After consulting with law enforcement personnel, Dr. Goodman sedated Plaintiff with a ketamine injection. (Pl.'s 56.1 Response ¶ 34.) Dr. Goodman testified he sedated Plaintiff to physically examine him for a suspected foreign body, amid Plaintiff's persistent non-compliance and erratic behavior. (Defs.' 56.1 Response ¶ 42.) The Parties dispute whether law enforcement officers helped restrain Plaintiff during the ketamine injection. (Id.) Plaintiff contends Lugo and Payton held him down during the injection, testifying "[p]olice basically tugg[ed] on the shackles because I was trying to avoid from being sedated, but they overpowered me" and with one officer holding his weight to Plaintiff's body (hereinafter, the "Alleged Ketamine Restraint" or the "Alleged Restraint"). (Pl.'s Tr. 61:19-62:20.) Lugo and Dr. Goodman each testified they do not recall law enforcement restraining Plaintiff prior to injection. (Defs.' 56.1 Response ¶ 42.) While Plaintiff was sedated, his abdomen and pelvis were x-rayed and Dr. Goodman performed a manual rectal examination. [2] (Pl.'s 56.1 Response ¶ 34.) The examination revealed hemorrhoids but no foreign body. (Id. ¶ 35.)

At approximately 11:15, Plaintiff was formally arrested and charged with Assault in the Second Degree, based upon allegations he injured Lugo's thumb, and Obstructing Governmental Administration in the Second Degree. (Pl.'s 56.1 Response ¶ 37.) Plaintiff was transported back to the Fifth Precinct and later to Yaphank Correctional Facility. (Id. ¶ 38.) Plaintiff ultimately pleaded guilty to a parole revocation charge and to promoting prostitution. (Id. ¶ 41.) Plaintiff maintains the assault charge was brought maliciously, citing the fact he did not plead guilty to the offense. (Id. ¶ 4.)

In the days following the examination, Plaintiff experienced swollen and reddened wrists and ankles from the restraints

and pain in his rectal area, which he treated with Tylenol. (Id. ¶ 42; Defs.' 56.1 Response ¶ 23.) Plaintiff contends the swollen and reddened wrists and ankles stem from the R&R Defendants pulling on his chains, and the rectal pain stemmed from Dr. Goodman's examination. (Defs.' 56.1 Response ¶ 23.) He did not seek follow-up medical treatment. (Pl.'s 56.1 Response ¶ 42.) Plaintiff also claims ongoing emotional distress, embarrassment, diminished self-esteem, and mental trauma resulting from the events of that night. (Id.)

II. Relevant Procedural Background

A. Commencement of Action and Substantive Claims Against Law Enforcement Defendants

On January 25, 2018, Plaintiff commenced this action pro se. (See Compl., ECF No. 1.) On December 27, 2021, after retaining counsel, Plaintiff filed the operative Second Amended Complaint against: the R&R Defendants; DOCCS Officers Orrison McLean, Joseph Rehal, Ross Botwinick, and Catherine Mencarelli; Suffolk County Police Officers Alberto Acevedo, Matthew Spilatros, and four John Doe Suffolk Police Officers (collectively with the aforementioned Defendants, the "Law Enforcement Defendants"); Dr. Goodman, and Nurse Henry Hernandez (collectively with the Law Enforcement Defendants and Dr. Goodman, the "Defendants"). ("SAC," ECF No. 151.) The SAC generally alleges Defendants: subjected Plaintiff to an unlawful warrantless body cavity search; used excessive force to compel his submission to the search; fabricated criminal charges against Plaintiff in retaliation; and falsified records to conceal their conduct. (See generally SAC.) Pertinent to this decision, the SAC alleges the Law Enforcement Defendants violated Plaintiff's Fourth and Fourteenth Amendment rights by using unjustified physical force to remove him from a patrol vehicle and transport him into the Hospital, by restraining him before he was sedated, and sedating him to compel submission to a body cavity search (the "Excessive Force Claim"). (Id. ¶¶ 52-59.) Such behavior, per the SAC, also amounts to assault and battery under New York State law (the "Assault and Battery Claim"). (Id. ¶¶ 92-98.) The SAC also asserts claims against the Law Enforcement Defendants for: unreasonable search/invasion of privacy; malicious prosecution; abuse of process; fabrication of evidence; cruel and unusual punishment; and violations of Plaintiff's substantive due process right to bodily autonomy. (See generally id.)

B. Law Enforcement Defendants' Motion and Plaintiff's Opposition

***4** On March 19, 2024, the Law Enforcement Defendants served their Motion for Summary Judgment. (See generally Support Memo, ECF No. 234-1, attached to Motion.) At a high level, the Law Enforcement Defendants maintain none of their actions violated Plaintiff's constitutional rights, while additionally emphasizing Plaintiff's diminished expectation of privacy as a parolee. (See id. at 6–22.) In the alternative, the Law Enforcement Defendants contend they are entitled to qualified immunity because no precedent clearly established a parolee's right to be free from the type of body cavity search at issue. (Id. at 25-26.) The Law Enforcement Defendants further assert qualified immunity is applicable because: (1) they had an arguable reasonable basis to believe Plaintiff was concealing drugs in his rectum; and (2) they acted objectively reasonable under the circumstances. (Id. at 26.)

On September 12, 2024, Plaintiff served his Opposition. (See generally Opp'n, ECF No. 236.) The Opposition maintains, first, the searches at issue were unlawful, and, second, several issues of material fact preclude summary judgment. Id. For example, Plaintiff disputes whether, prior to visiting the Hospital: certain witnesses actually observed the events they described; Plaintiff was fidgeting or reached into his pants in the vehicle; whether the warrantless rectal search complied with County policy; and whether Plaintiff possessed contraband in his rectum. (Opp'n. at 2-8; 10-11.) As to the events at the Hospital, Plaintiff contends the parole officers "served as the driving force to have Dr. Goodman perform the unconsented to and opposed injection of ketamine as a sedative, performed the unconsented and opposed by Plaintiff anal probe and other medical tests upon Plaintiff without a warrant." (Id. at 15.) On qualified immunity, Plaintiff argues the Law Enforcement Defendants are not protected because the constitutional prohibition on warrantless, invasive body cavity searches was clearly established at the time, and the searches here fell short of the required legal threshold. (Id. at 24-25.)

C. Judge Wicks's R&R

On February 6, 2026, Judge Wicks issued the R&R. (See R&R.) The R&R recommended dismissal of all claims except the Excessive Force and Assault and Battery Claims against the R&R Defendants, on grounds disputes of material fact

surrounded the Vehicle Extraction and Alleged Ketamine Restraint, therefore the R&R Defendants were not entitled to qualified immunity.[3] (Id. at 17-21.) With respect to the Vehicle Extraction, Judge Wicks observed the Parties disputed whether Plaintiff kicked and flailed which, in Judge Wicks's view, called into question how much force was justified to extract Plaintiff. (Id. at 18-19.) On the Alleged Ketamine Restraint, Judge Wicks found the dispute over whether, first, the R&R Defendants were involved at all and, second, "whether the level of force necessary to assist Goodman in sedating Plaintiff was reasonable under the circumstances" precluded summary judgment. (Id.) Judge Wicks likewise recommended denying summary judgment as to the Assault and Battery Claim, since it arose from the same facts as the Excessive Force Claim. (Id. at 37-38.)

These factual disputes foreclosed qualified immunity, Judge Wicks also reasoned, because they prevented any determination that Defendants' conduct was reasonable as a matter of law. (Id. at 19-21.) In addressing whether Plaintiff's rights were clearly established, Judge Wicks briefly quoted Frederique v. County of Nassau for the proposition that " 'it is axiomatic that the right that plaintiff asserts—namely plaintiff's right under the Fourth Amendment to be free from excessive force—is clearly established.' " (Id. at 20 (citing 168 F. Supp. 3d 455, 479 (E.D.N.Y. 2016) (quoting Hodge v. Village of Southampton, 838 F. Supp. 2d 67, 86 (E.D.N.Y. 2012)).) Because the federal Excessive Force claim survived, Judge Wicks suggested exercising supplemental jurisdiction over the Assault and Battery Claim, because it related to the same conduct as the Excessive Force Claim. (Id. at 30-31.)

D. Defendants' Objections and Plaintiff's Response

***5** On March 21, 2026, a few hours after the Court-imposed March 20 deadline, the R&R Defendants untimely filed their Objection.[4] (See generally Obj.) On April 7, 2026, at this Court's direction, the R&R Defendants submitted a Supplemental Objection addressing the applicability of the Supreme Court's decision in Zorn v. Linton, as the Supreme Court's issuance of Zorn came after Judge Wicks issued the R&R. (See generally Supp. Obj. (citing Zorn, 146 S. Ct. 926 (2026)).)

In their Objection, the R&R Defendants argue they are entitled to qualified immunity because the force they employed was objectively reasonable under the totality of the circumstances. (Obj. at 2-4.) In support, they emphasize: Plaintiff's parolee status; drug-related criminal history; arrest while associating with a parole absconder; Lugo's observation of a "bubble" in Plaintiff's rectum; and Plaintiff's resistance. (Id. at 2-7.) The Supplemental Objection further contends Zorn reinforces their position, as no prior precedent clearly established the force used here as unlawful. (Supp. Obj. at 2.)

On May 1, 2026, Plaintiff filed his Reply, maintaining Judge Wicks was correct on qualified immunity. (See generally Reply.) Plaintiff continues to maintain the R&R Defendants used unreasonable force in violation of his constitutional rights, and that existing precedent clearly establishes such conduct as illegal. (Id.)

DISCUSSION

I. Applicable Law, Generally

A. Reports and Recommendations

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); see also FED R. CIV. P. 72(b)(3). A party objecting to an R&R "must lodge a specific objection to some specific aspect of the R&R," and "[w]hen a timely filed objection raises and properly briefs arguments previously rejected by the magistrate judge, the district judge must review those arguments de novo." Nambiar v. Cent. Orthopedic Grp., LLP, 158 F.4th 349, 361 (2d Cir. 2025). The Court need not review the findings and conclusions to which no proper objection has been made, and an objection "may not simply rest on the briefs considered by the magistrate judge." Id.; Thomas v. Arn, 474 U.S. 140, 150 (1985).

B. Summary Judgment

The Court shall grant summary judgment under Rule 56(a) when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material for the purposes of resolving a summary judgment motion "when it might affect the outcome of the suit under the governing law." Adamson v. Miller, 808 F. App'x 14, 16 (2d Cir. 2020). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Jeffreys v. City of N.Y., 426 F.3d. 549, 553 (2d Cir. 2005)).

"The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.' " Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The burden of persuasion may be satisfied by either: "(1) [ ] submitting evidence that negates an essential element of the non-moving party's claim; or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." Id. (further citation omitted). Once the moving party has met its burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts" and instead must offer "some hard evidence showing that its version of the events is not wholly fanciful." Stein v. County of Nassau, 417 F. Supp. 3d 191, 197 (E.D.N.Y. 2019) (citations omitted).

***6** "Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (citations and quotation marks omitted). In reviewing the record, the Court "may not make credibility determinations or weigh the evidence" as such determinations are to be made by the jury, not the judge. Id. (citing Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000)). Accordingly, where an issue as to a material fact cannot be resolved without weighing the credibility of a witness, summary judgment is improper. Id.

C. Which Objections This Court Will Consider

On February 12, 2026, this Court instructed the Parties to file any objections to the R&R by March 20, 2026. (See Feb. 12, 2026 Order.) On March 21, 2026, the R&R Defendants filed their Objection, shortly after midnight. (Obj.) On March 23, 2026, without explanation or leave of Court, the R&R Defendants filed a "Corrected Memorandum of Law in Support of State Defendants' Objections to the Report and Recommendation." (Supp. Obj.) Because "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," and because the Objection was filed shortly after the relevant deadline, the Court will consider the arguments made in the Objection notwithstanding the noncompliance with the Court's deadline. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001), abrogated in part on other grounds, Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). However, because the Second Objection was submitted several days past the deadline and without any explanation or leave, in its broad discretion, the Court will not consider any arguments raised therein.

II. Qualified Immunity

A. Applicable Law

Qualified immunity shields state actors "performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Where applicable, qualified immunity offers "ample protection to all but the plainly incompetent or those who knowingly violate the law." Sacaza v. City of N.Y., 169 F.4th 363, 369 (2d Cir. 2026) (quoting Dufort v. City of N.Y., 874 F.3d 338, 354 (2d Cir. 2017)). "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established', whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." Monroe v. Gould, 372 F. Supp. 3d 197, 204 (S.D.N.Y. 2019) (quoting Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013)). "Courts may use their discretion in deciding the order in which to approach a qualified immunity analysis." Sacaza, 169 F.4th at 370 (citing Coollick v. Hughes, 699 F.3d 211, 219-20 (2d Cir. 2012)).

"[C]ourts have observed that the distinction between the defense of qualified immunity and the substantive law of an excessive force claim has become blurred." Frederique, 168 F. Supp. 3d at 479 (citing Landy v. Irizarry, 884 F. Supp. 788, 800 (S.D.N.Y. 1995)). To determine whether force was excessive, courts must assess "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Figueroa v. Mazza, 825 F.3d 89, 105 (2d Cir. 2016) (citing Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 251–52 (2d Cir. 2001)). "The evaluation of a police officer's use of force must be from the perspective of a reasonable police officer at the incident, not from hindsight." Cruz v. City of N.Y., 232 F. Supp. 3d 438, 451 (S.D.N.Y. 2017) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).

***7** "To be entitled to qualified immunity at the summary judgment stage of a case, a defendant must show that, even viewing the evidence in the light most favorable to the plaintiff, the defendant's actions did not violate clearly established law." Falls v. Pitt, No. 16-CV-8863, 2021 WL 1164185, at *28 (S.D.N.Y. Mar. 26, 2021) (citation omitted). A right is clearly established only when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)). To find a right is clearly established, courts ordinarily "need to identify a case where an officer acting under similar circumstances was held to have violated" the Constitution. Escondido v. Emmons, 586 U.S. 38, 43 (2019) (further citation omitted); see also Zorn, 146 S. Ct. at 930 ("[a] right is not clearly established if existing precedent does not place the constitutional question 'beyond debate' ") (citing Rivas-Villegas, 595 U.S. at 5). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.' " Zorn, 146 S. Ct. at 930 (citing District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)). "Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice." Id. (citing Kisela v. Hughes, 584 U.S. 100, 105 (2021)). Those acting under color of state law will receive qualified immunity "unless they could have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed their specific conduct." Id. (citing City and County of San Francisco v. Sheehan, 575 U.S. 600, 616 (2015)).

B. Application

1. The Undisputed Facts

In recommending denial of summary judgment, Judge Wicks identified three primary factual disputes: whether Plaintiff kicked, spat at, or attempted to bite Lugo during and after the Vehicle Extraction; whether the R&R Defendants participated in the Alleged Ketamine Restraint; and the extent to which these disputes bore on the Excessive Force Claim. (Id. at 19–21.) Even taking Plaintiff's version of the facts as true —and reviewing them in light of the relevant precedents— this Court is convinced the R&R Defendants acted reasonably and did not violate any clearly established right. See Bolmer v. Oliveira, 594 F.3d 134, 141 (2d Cir. 2010) (courts may determine entitlement to qualified immunity "on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find") (quoting Salim v. Proulx, 93 F.3d 86, 90 (2d Cir. 1996)).

Prior to the Vehicle Extraction, it is undisputed Plaintiff: had a long history of drug-related issues; was arrested for associating with another parolee; "shifted" in a way that Lugo believed could indicate rectal contraband; and had something protruding from his rectum. (See supra pp. 3-4.) This set of facts provided the R&R Defendants with a reasonable basis to believe Plaintiff had drugs in his rectum, and they responded to the perceived exigency of the same by taking him to the Hospital. [5] (Id. at 5.) Once at the Hospital, there is no dispute Plaintiff: (1) resisted removal by positioning himself on the floor of the vehicle in the fetal position and locking his legs; and (2) had to be forcibly removed from the vehicle, including via law enforcement pulling on his chains. (Id. at 5-6.)

Even assuming the R&R Defendants did participate in the Alleged Ketamine Restraint, Plaintiff merely states he was "overpowered" when one officer pressed his weight on Plaintiff and another "tugg[ed]" his shackles because he "was trying to avoid [ ] being sedated" amid his erratic behavior, which included screaming "at the top of his lungs" earlier in the evening that he would not be examined. (Id. at 7.) After Plaintiff was sedated and was no longer resisting, Dr. Goodman was able to complete the examination. (Id.)

2. The Reasonableness of the R&R Defendants' Actions

***8** In light of the aforementioned backdrop and undisputed facts, it is immaterial whether or not Plaintiff was kicking, spitting, or biting during the Vehicle Extraction. The R&R Defendants appear to have reasonably believed they needed to get Plaintiff inside the Hospital quickly and, in doing so, did not engage in any kind of drastic or disproportionate violence. The R&R Defendants' actions in the Alleged Ketamine Restraint, as Plaintiff describes them, were also reasonable. Given Plaintiff's admitted physical resistance and erratic behavior that included screaming "at the top of [his] lungs," it would have been exceedingly difficult to determine whether any medical or evidentiary exigency existed without first sedating him. (Id. at 7.) Because "[t]he evaluation of a police officer's use of force must be from the perspective of a reasonable police officer at the incident, not from hindsight," the fact that no drugs were ultimately found in Plaintiff's

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

rectum is not a bar to finding the R&R Defendants' conduct reasonable. Cruz, 232 F. Supp. 3d at 451.

The reasonableness of the force deployed against Plaintiff's undisputed resistance is further buttressed by the lack of a major injury. It is undisputed Plaintiff had swollen and reddened wrists and ankles, along with rectal pain, which were temporary conditions that did not prompt follow-up treatment and were treated with over-the-counter pain medication, i.e.: Tylenol. (See Id. at 8.) Although not dispositive, several courts have held similarly mild physical injuries can indicate force was appropriately used. See, e.g., Rasmussen v. City of N.Y., 766 F. Supp. 2d 399, 407 (E.D.N.Y. 2011) (plaintiff's "lack of any injury beyond bumps and bruises suggests" no excessive force); Garcia v. Greco, No. 05-CV-9587, 2010 WL 446446, at *7 (S.D.N.Y. Feb. 9, 2010) ("pain to the left shin, right elbow, and face," along with brief hospitalization for difficulty breathing, suggested no excessive force); Garcia v. Greco, No. 05-CV-9587, 2010 WL 446446, at *8 (S.D.N.Y. Feb. 9, 2010) (collecting cases suggesting where plaintiffs sustained, inter alia, scrapes, bruises, swelling, contusions, back and joint pain, a bloody lip, or split stitches, no excessive force took place).

In concluding material factual disputes precluded summary judgment on the Excessive Force Claim, Judge Wicks relied upon two cases where the factual dispute addressed whether officers deployed significant force against non-resisting plaintiffs. (See R&R at 19 (citing Esperanza v. City of N.Y., 325 F. Supp. 3d 288, 304 (E.D.N.Y. 2018); Graham v. City of N.Y., 928 F. Supp. 2d 610, 619 (E.D.N.Y. 2013)).) For example, in Esperanza, the material dispute concerned whether the plaintiffs posed an immediate threat, or were even actively resisting at all, when officers allegedly threw one plaintiff to the ground and slammed another against a vehicle. Esperanza, 325 F. Supp. 3d at 304. Likewise, in Graham, the court found triable issues where a non-resisting plaintiff stopped for a non-violent traffic infraction allegedly was dragged from his vehicle, shoved against it, and tightly handcuffed. Graham, 928 F. Supp. 2d at 619.

These factual disputes were outcome determinative: if a police officer did in fact slam a non-resisting plaintiff's face into a vehicle, such conduct would very likely be unreasonable. But no such drastic dispute exists in this case. Indeed, the facts of Esperanza and Graham are distinguishable from this case. Here, Plaintiff was engaged in active physical and verbal resistance, unlike the plaintiffs in Esperanza and Graham. And neither Esperanza nor Graham involves perceived medical exigencies or a parolee who had consented to searches of his body as a condition of his release. (Id. at 4.)

Judge Wicks's qualified immunity analysis also cites to cases where factual disputes bore on whether substantial force was used against plaintiffs presenting little or no active resistance. (R&R at 20-21 (citing John v. City of N.Y., 406 F. Supp. 3d 240, 244 (E.D.N.Y. 2017) (denying qualified immunity where plaintiff claimed his hand was twisted, he was punched in the face, and was shoved onto the hood of a car during an arrest arising from a noise complaint); Frederique, 168 F. Supp. 3d at 472-73, 479 (finding factual dispute where plaintiff alleged he was repeatedly punched and kicked despite not resisting arrest and attempting to comply with officer demands); Smith v. Fields, No. 95-CV-8374, 2002 WL 342620, at *6 n.9 (S.D.N.Y. Mar. 1, 2002) (precluding summary judgment where plaintiff asserted he was slapped and kicked in the face after being placed in handcuffs).) These cases involve outcome-determinative disputes that potentially show drastic violence inflicted against a compliant or passive plaintiff, which are vastly different disputes than the one present in this case.

3. Whether the R&R Defendants Violated a Clearly Established Right

***9** In Judge Wicks's brief "clearly established" analysis, he quoted to language from Frederique, explaining "plaintiff's right under the Fourth Amendment to be free from excessive force [ ] is clearly established." (R&R at 20 (citing Frederique, 168 F. Supp. 3d at 479).) This language is at odds with the Supreme Court's warning in Zorn, decided shortly after the R&R was issued, which explains "[p]rinciples stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice" in the "clearly established" analysis. Zorn, 146 S. Ct. at 930 (quoting Kisela, 584 U.S. at 105). To this point, neither the aforementioned authorities, nor those cited in Plaintiff's Reply, clearly establish that the R&R Defendants violated Plaintiff's Fourth Amendment rights.

Most of Plaintiff's cited cases fall into one of three categories, i.e., they: (1) explain the general proposition that searches into the body require a heightened level of probable cause; (2) address rectal searches undertaken by officers with no evidence pointing to the rectum specifically; or (3) concern searches undertaken for improper purposes or under materially different circumstances. Under the first category,

Schmerber v. California is cited for the broad proposition that "intrusions into the human body" must meet Fourth Amendment standards of reasonableness. (Id. at 4 (citing 384 U.S. 757, 767-68 (1966)). This is too amorphous a concept to define any right at issue with a "high degree of specificity." Zorn, 146 S. Ct. at 930 ("principles stated generally" do not suffice to clearly establish a right) (citing Kisela, 584 U.S. at 105).[6] People v. Hall, a New York State court case, applied Schmerber to hold "specific and articulable facts" are required for a rectal search. 10 N.Y.3d 303, 311 (2008). This too is a general principle.[7]

Even if, ultimately, there were no drugs found in Plaintiff's rectum, there were certainly facts pointing to the possibility of drugs being there, including Plaintiff's "shifting" in the car and appearance of his hemorrhoid. (See supra pp. 3-5.) For this reason, cases involving rectal searches where no facts pointed to the rectum are unavailing. For example, in Sloley v. VanBramer, two state troopers conducted a strip and visual body cavity search of a plaintiff following his misdemeanor arrest, which was prompted when a drug-sniffing dog showed interest in his vehicle. 945 F.3d 30, 35-37 (2d Cir. 2019). The Second Circuit denied summary judgment because clearly established law required "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity," and factual disputes existed as to whether such suspicion was present. Id. at 40 (citing Hall, 10 N.Y.3d at 311). Similarly, Monroe v. Gould involved a plaintiff who, after being arrested for misdemeanor drug and weapon charges, was subjected to a body cavity search in a police station where police did "not point to plaintiff's physical appearance, apparent discomfort, or any suspicious actions or other articulable facts which might have suggested he was hiding something inside his body." 372 F. Supp. 3d at 204-05 (emphasis in original). And, in Wilson v. Aquino, police conducted routine searches "that yielded no weapons or contraband" and did not have any facts pointing to rectally-stored drugs before examination. 233 F. App'x 73, 77 (2d Cir. 2007); see also Sarnicola v. County of Westchester, 229 F. Supp. 2d 259, 268 (S.D.N.Y. 2002) (defendant "did not harbor any particular belief that [plaintiff] was secreting drugs" before searching a plaintiff's rectum). Unlike the guesswork in Sloley and Wilson, the lack of "apparent discomfort" in Monroe, and the lack of subjective belief in Sarnicola, the "shifting" motions in the car and the visual protrusion of a hemorrhoid upon visual examination demonstrate the R&R Defendants had a reasonable basis to suspect Plaintiff was concealing contraband in his rectum, thereby warranting a further search. (See supra at pp. 3-5.)

***10** Cases concerning searches undertaken for improper purposes or under materially different circumstances are similarly unpersuasive. Ficklin v. Rusinko addressed a situation involving "an invasive body cavity search for no legitimate purpose, but instead solely to retaliate against and humiliate Plaintiff." No. 18-CV-06310, 2020 WL 5513812, at *6 (W.D.N.Y. Sept. 14, 2020). Here, by contrast, other than Plaintiff's unsubstantiated assertions to the contrary, the record demonstrates the R&R Defendants had at least a subjective reason to believe Plaintiff had rectally-stored contraband. (See Id.) Similarly, in Santiago v. City of Yonkers, a court declined to grant summary judgment on a search-based claim due to a factual dispute about whether an officer "inserted his fingers into plaintiff's rectum—in the context of either a sexual assault or a manual cavity," circumstances not present in this case. No. 13-CV-1077, 2015 WL 6914799, at *7 (S.D.N.Y. Oct. 30, 2015). Plaintiff's reliance on Harris v. Miller, is likewise misplaced, as it turned on a "violent and forceful" strip search of a female inmate by male officers and focused its reasoning heavily on the cross-gender nature of the search, which is not at issue here. 818 F.3d 49, 60 (2d Cir. 2016).

Accordingly, because the factual disputes identified by Judge Wicks are not material, the Court finds R&R Defendants' conduct was objectively reasonable in light of the facts that are material and undisputed, and because no authority clearly established the R&R Defendants' conduct, under the specific factual scenario of this case, as unlawful, the Court SUSTAINS the R&R Defendants' objection as to qualified immunity.

III. Remaining State Law Claims

Although federal courts have supplemental jurisdiction over state law claims, "a district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.' " Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)). District courts have wide latitude in deciding whether to exercise supplemental jurisdiction. See Id. at 122. Because there are no remaining claims for which this Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's Assault and Battery claim and accordingly DECLINES TO ADOPT Judge Wicks's R&R to the extent it recommends exercising jurisdiction over the same.

III. Unobjected Portions of the R&R

As Judge Wicks noted in the R&R, "failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision." Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008). The Court accordingly ADOPTS the portions of Judge Wicks's R&R to which there were no specific objections.

## Conclusion

For the stated reasons, IT IS HEREBY ORDERED that the R&R Defendants' Objection is SUSTAINED. Accordingly:

I. The Court DECLINES TO ADOPT Judge Wicks's Report and Recommendation to the extent it recommends denying summary judgment as to the Excessive Force and Assault and Battery claims;

II. Relatedly, the Court DECLINES TO ADOPT Judge Wicks's R&R to the extent it recommends exercising supplemental jurisdiction over the Assault and Battery Claim, and;

III. The Court ADOPTS Judge Wicks's Report and Recommendation to the extent it recommends granting summary judgment on Plaintiff's causes of action for Fourth Amendment unreasonable search/violation of privacy, malicious prosecution, abuse of process, fabrication of evidence, cruel and unusual punishment, substantive due process, and false imprisonment; and

Having rejected in part and adopted in part the R&R, the Court FURTHER ORDERS:

I. Because the R&R Defendants are entitled to qualified immunity, the Court GRANTS their Motion for Summary Judgment (ECF No. 234) as to the remaining federal claims; and

II. Because there are no remaining federal claims, the Court declines to take jurisdiction over the remaining state law claims.

Judgment shall be entered for Defendants Mark Lugo and Alonzo Payton; the Clerk of Court is accordingly directed to CLOSE this case.

***11 SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 1662274

## Footnotes

1 Although Plaintiff asserts Defendants did not subjectively believe Plaintiff had a bag of drugs in his rectum (see Pl.'s 56.1 Response ¶ 26), he cites to no record support for the proposition. Plaintiff's bald assertion is insufficient to create a disputed fact. See Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005) ("a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful' ") (quoting D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998)).

2 Although Plaintiff contends law enforcement requested he be sedated, the record contains no evidence that any officer specifically requested sedation. (Defs.' 56.1 Response ¶ 31.)

3 Judge Wicks recommended summary judgment be granted on all claims against McLean, Mencarelli, Rahal, and Botwinick, on grounds these defendants were not alleged to be personally involved in the alleged violations and torts. (Id. at 11-13.) The R&R did not address the involvement of Acevedo, Spilatros, or John Does 1-4. (Id.)

4 On March 23, 2026, the R&R Defendants filed an untimely, "corrected" Objection. (See Second Obj., ECF No. 249.) For the reasons discussed infra, this Court will not consider the arguments raised in the "corrected" objection.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

5 In recommending a grant of summary judgment on Plaintiff's unreasonable search/violation of privacy claim—which Plaintiff did not challenge—Judge Wicks persuasively explained “the officers had ‘reason to believe, based on specific and articulable facts, taken together with rational inferences from those facts, that [Plaintiff was] secreting contraband inside a body cavity,’ and were thus ‘permitted to conduct [the] visual body cavity search.’ ” (R&R at 16-17 (quoting Sepulveda v. City of N.Y., No. 15-CV-5187, 2020 WL 2836952, at *6 (E.D.N.Y. May 29, 2020)).)

6 In any event, Schmerber is not a qualified immunity case and did not address body cavity searches.

7 But, in any event, here, there were specific and articulable facts which reasonably supported the search. Moreover, Plaintiff did not object to the portions of the R&R recommending summary judgment be granted as to the unreasonable search claim. (See R&R at 13-17.)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.